# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| Richard and Melba Aguilar, Albert Carrell, Sharon Cobb, Clayton Givens, Linda Givens, Stanley Kuhlo, Gina Mastrantonia, Phil Rosemann and Loren and Mary Winterhof, | ) ) ) ) ) ) |
| Plaintiff's, | ) ) |
| vs. | ) Case No. ) |
| PNC Bank, N.A., a nationally chartered bank, | ) ) ) ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW plaintiff's and for their complaint against defendant PNC Bank alleges the following:

### JURISDICTION AND VENUE

1.     There are multiple bases for this Court's jurisdiction as the allegations in this complaint allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 giving this Court jurisdiction pursuant to 18 U.S.C. § 1964(c) over those claims. This Court also has "federal question" jurisdiction pursuant to 28 U.S.C. § 1331 of the allegations in this Complaint for actions arising under the "laws" of the United States.

2.     The state claims allege are "so related to claims in the action" that "they form part of the same case or controversy" giving this Court supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367(a).

i

3.     Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in St. Louis County, Missouri, which is located within the geographical area of this court. See 28 U.S.C. § 105(a)(1) (Eastern District of Missouri comprises St. Louis County).

### PLAINTIFF AND DEFENDANT

4.     The Plaintiffs who lost money deposited into PNC Bank as part of Sigillito's Ponzi scheme include: (a) Richard and Melba Aguilar who reside in St. Louis, Missouri and lost $66,000; (b) Albert Carrell, who resides in Cedar Springs, Michigan and lost $74,450; (c) Sharon Cobb who resides in Seminole, Florida and lost $125,000; (d) Clayton Givens who resides in St. Louis, Missouri and lost $20,000; (e) Linda Givens who resides in St. Louis, Missouri and lost $362,000; (f) Stanley Kuhlo who resides in St. Charles, Missouri and lost $45,000; (g) Gina Mastrantonia who resides in Cleveland, Ohio and $200,000; (h) Phil Rosemann who resides in Michigan and lost $2,100,000; and (i) Loren and Mary Winterhof, who reside in Jackson, Missouri and lost $84,335 (collectively the "Plaintiff").

5.     Defendant PNC Bank, N.A. ("PNC"), is a nationally chartered bank with its principal place of business in Pittsburgh, Pennsylvania. National City Bank acquired Pioneer Bank in or around December 2005 and National City Bank merged into PNC in November 2009. As the surviving entity, PNC assumed all liabilities of National City Bank and its predecessors including Pioneer Bank.

## THE BRITISH LENDING PROGRAM (PONZI SCHEME)

6.     From 1999 to 2010, St. Louis attorney Martin Sigillito ("Sigillito") organized and operated a fraudulent loan program which marketed one year loans for an English developer, Derek Smith and his English company, Distinctive Properties, for purported investments in real estate development in England. The loan program, known as the British Loan Program ("BLP"), operated as a ***classic Ponzi scheme*** in which loan payments from existing loans were paid with money from new loans.

7.     Sigillito deposited and directed lenders to transfer money for loans in the BLP into his IOLTA account. An IOLTA account is a fiduciary account where an attorney as fiduciary holds money for the benefit of others. PNC Bank at all material times was aware of the fiduciary character of the IOLTA funds. Sigillito was Rosemann's fiduciary and Rosemann's money deposited into the IOLTA account was supposed to be held by Sigillito in the account for their benefit. The IOLTA account created the false appearance that fiduciary funds transferred in and out of the account were being used for legitimate purposes.

8.     Instead of sending Rosemann's funds to England, Sigillito, with the substantial assistance of Pioneer Bank, laundered the fiduciary funds by manipulating his IOLTA account. Sigillito made it appear as if Rosemann's funds were invested in the BLP and accruing interest, when actually, Sigillito was fraudulently siphoning the funds out of his IOLTA account for distribution to himself and others.

9.     Sigillito's Ponzi and embezzlement scheme required access to the banking system and an IOLTA account was vital to his ability to defraud Rosemann. One marketing

brochure for the BLP stated that the process to initiate a loan starts when "money is either deposited via check or wire into Martin Sigillito's trust account, that is set up for this sort of purpose" and the "money is then dispensed to Derek Smith for permitted purposes."

10.     During the Ponzi and embezzlement scheme, Sigillito maintained an IOLTA account at Pioneer Bank from 2000 until May 2006, account number 4006192.

11.     Based upon good information and belief and subject to further discovery, when National City merged with Pioneer Bank in May 2006 the bank's auditors conducted a simple examination of Sigillito's IOLTA acct and came to the inescapable conclusion that the bank was a party to a fraud and that Sigillito was engaged in the illegal use of his IOLTA account.

12.     During the ten years that Sigillito ran his Ponzi scheme, he deposited over $50 million in his IOLTA accounts.

13.     When National City took over the accounts at Pioneer Bank in June 2006, the deposits (wires and checks) in Sigillito's IOLTA totaled $720,163 and his withdrawals (wires and checks) totaled $753,956. Such acct activity was completely at odds with a one man law firm with no discernible law practice.

14.     Even though Sigillito had maintained a relationship with Pioneer for over five years with multiple accounts, both business and personal, he was swiftly asked to leave the bank.

15.     Sigillito opened an IOLTA account at St. Louis Bank and continue to use the IOLTA and took steps so as not to trigger any inquiries from the bank.

iv

16.     PNC Bank played an active and essential role in the Ponzi and embezzlement scheme and facilitated its continued existence by its material participation in multiple account manipulations.

17.     Sigillito was indicted on April 28, 2011 by the federal grand jury in St. Louis and charged with money laundering, mail fraud, and wire fraud. The indictment alleged in part that Sigillito as an attorney "maintained an attorney trust bank account" and that "loan funds were usually sent by wire communication to" his "attorney trust account."

18.     At Sigillito's month-long trial, thirty-eight witnesses testified and over 1,000 exhibits were admitted into evidence, including 1,750 pages of records from Sigillito's IOLTA and business records at PNC Bank. Sigillito's secretary testified that the "IOLTA trust account at PNC Bank" was the account "in which the lender's money would come into." Similarly, an FBI agent testified that "the money that was received from lenders by Sigillito went into his IOLTA account." An IRS agent also testified that "funds were commingled in the trust account" and that money "deposited in Sigillito's trust account" were used for personal expenses.

19.     The jury found Sigillito guilty of money laundering, mail fraud, and wire fraud and he was sentenced to forty years in federal prison and ordered to forfeit $51.5 million. The court noted in its sentencing memorandum that the "majority of the victims of this scheme are of an age and station in life where they will never be able to earn their way back to where they were before they got mixed up with the BLP. It is a certainty that proceeds from the forfeiture of the assets of Sigillito and his co-conspirators will not begin to make the victims

economically whole. It has become necessary for many victims to scale down their lifestyles, which had never been extravagant before they invested in the BLP."

## IOLTA ACCOUNT FUNDAMENTALS

20.     Every state has established an IOLTA account program. These programs require lawyers to open and maintain an IOLTA account to hold fiduciary funds belonging to third parties. Missouri Supreme Court rules define the proper use of IOLTA accounts for attorneys and banks.

21.     Missouri Supreme Court Rule 4-1.15 provides that a "lawyer should hold property of others with the care required of a professional fiduciary." A lawyer must keep client funds in a trust account separate from the lawyer's personal or business funds.

22.     A lawyer is prohibited from co-mingling client or third party funds with personal or business funds. Rule 4-1.15 also mandates that "withdrawals shall be made only by check payable to a named payee" and not by "electronic transfer." A lawyer's obligation to comply with Rule 4-1.15 is "independent of those arising from activity other than rendering legal services" and "a lawyer who serves only as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction."

23.     Only financial institutions approved by the Missouri Supreme Court Foundation may offer IOLTA accounts in Missouri. Approved financial institutions, like PNC Bank, have written agreements with the Foundation governing their treatment of IOLTA accounts. Information the Foundation provides to approved financial institutions

spells out the fiduciary nature and proper uses of IOLTA accounts. A financial institution's understanding of Rule 4-4.15 is one of the qualifications for servicing IOLTA accounts.

24.     The Missouri Supreme Court Foundation is a charitable corporation that administers the IOLTA program in Missouri. The Foundation uses the same tax identification number 43-1355525 with interest paid in every IOLTA account in Missouri. IOLTA accounts also pool their deposits which makes it difficult to track the ownership of funds after transfer from an IOLTA account. Because of this, a lawyer's misuse of IOLTA funds appears legitimate making IOLTA accounts particularly susceptible to laundering money.

25.     In addition to complying with the regulations established by the Missouri Supreme Court Foundation, approved financial institutions are also required under federal regulations to develop policies, procedures and processes that enable the bank to identify unusual account relationships and circumstances, questionable sources of funds, and other potential areas of risk. Certain circumstances, especially IOLTA accounts that hold and process significant dollar amounts, warrant enhanced due diligence.

### MISSOURI'S UNIFORM FIDUCIARIES LAW FUNDAMENTALS

26.     The Uniform Fiduciaries Act, promulgated by the Commissioners on Uniform State Laws and adopted by more than 25 states, modifies a bank's common law liabilities in dealings with fiduciaries. Missouri codified the Uniform Fiduciaries Act in Mo. Rev. Stat. §§ 469.240 through 469.350 and it is cited as the Uniform Fiduciaries Law ("UFL").

27.     The UFL imposes strict liability in one specific transaction: A bank is strictly liable when a *fiduciary uses fiduciary funds to repay a personal debt to the bank*.

28.     Under Mo. Rev. Stat. § 469.270 titled "Check drawn by fiduciary payable to third person," a bank is not bound to inquire whether the fiduciary is breaching his fiduciary obligation unless the bank takes the check with actual knowledge of such breach or takes the check in bad faith.

29.     Bad faith giving rise to liability under the UFL does not require proof of dishonesty or evil motive. The test of bad faith under the statute is whether it is commercially unjustifiable for the bank to receive a deposit or pay a check under circumstances that are suggestive of the fiduciary's breach and are sufficiently obvious such that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction.

30.     A bank's failure to make inquiry constitutes bad faith under the UFL if such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, that is to say, where there is an intentional closing of the eyes or stopping of the ears. A bank acts in bad faith under the UFL when it remains passive in the face of obvious circumstances suggestive of the fiduciary's breach.

**SIGILLITO OPENS AN IOLTA AND MULTIPLE ACCOUNTS AT PIONEER BANK**

31.     From 2002 until May 2006, Sigillito used Pioneer Bank for all of his banking needs. During that time he held an IOLTA account and multiple business and personal accounts at the bank. Sigillito maintained the following bank different bank accounts at Pioneer Bank:

| Account Holder | Type | Number |
|---|---|---|
| Martin T. Sigillito | Checking | xxx-3635 |
| Martin T. Sigillito | Checking | xxx-0071 |
| Martin T. Sigillito | Checking | xxx-8833 |
| Martin T. Sigillito | Checking | xxx-8841 |
| Martin T. Sigillito | Checking | xxx-1112 |
| Martin T. Sigillito | Other | xxx-xxx-1824 |
| Martin T. & Mindy Sigillito | Checking | xxx-5865 |
| Martin t. & Mindy Sigillito | Checking | xxx-1664 |
| Martin T. Sigillito Assoc. | Checking | xxx-5442 |
| Martin T. Sigillito Assoc. IOLTA | Checking | 400-6192 |

32.     Sigillito, a solo practitioner with no obvious or significant law practice, made frequent deposits and withdrawals with no apparent business source. Sigillito also made large deposits and maintained large balances with little or no apparent justification.

33.     Sigillito made substantial cash deposits into the Pioneer IOLTA account and the money was almost always quickly withdrawn and transferred either to another Sigillito account or to British American Group and his fellow fraudster, Scott Brown.

34.     Inconsistent with a typical IOLTA account, there were virtually no payments or disbursements of trust funds back to Sigillito's law practice clients.

35.     Each of Sigillito's business accounts at PNC Bank were alter-ego accounts that he treated as his personal account. Sigillito never deposited a single penny of revenue from his purported law practice into any business account, including the IOLTA account.

36.     Investment funds from BLP investors and loan proceeds from the lines of credit from PNC Bank are the only funds that flowed through Sigillito's business accounts at the bank. No legitimately earned funds ever came into Sigillito's accounts at PNC Bank.

37.     Sigillito's multiple bank accounts were intended to obscure the flow of fiduciary funds deposited into the IOLTA account. Multiple accounts enabled Sigillito to misappropriate money and obscure movement of fiduciary funds for personal use. Sigillito transferred funds in repeated patterns of transfers to steal fiduciary funds.

38.     PNC Bank knew that third party fiduciary funds were the only funds deposited into Sigillito's IOLTA account. They also knew that Sigillito never deposited into his IOLTA account any revenue or funds earned from his law practice or other work activities.

39.     PNC Bank closely monitored Sigillito's account activity. Sigillito executed hundreds of wire transfers, and intra-bank transfers. PNC Bank observed deposits of money into Sigillito's IOLTA account and its subsequent diversion through transfers and deposits between the various accounts.

40.     The Pioneer Bank IOLTA account history illustrates a series of transactions that raised money laundering red flags, one right after the other:

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| Phil Rosemann | Dec. 26, 2003 | $300,000 | |
| M. Sigillito Assoc. | Dec. 31, 2003 | | $100,000 |
| British-Am. Group | Dec. 31, 2003 | | $200,000 |

x

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| John Shahan | Jul. 26, 2004 | $100,000 | |
| M. Sigillito Assoc. | Aug. 25, 2004 | | $100,000 |

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| Phil Rosemann | Oct. 20, 2004 | $75,000 | |
| M. Sigillito Assoc. | Oct. 25, 2004 | | $46,499.99 |

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| L. & M. Winterhof | Dec. 8, 2004 | $66,189.13 | |
| M. Sigillito Assoc. | Dec. 17, 2004 | | $50,000 |

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| Phil Rosemann | Apr. 7, 2005 | $500,000 | |
| M. Sigillito Assoc. | Apr. 8, 2005 | | $75,000 |
| British-Am. Group | Apr. 8, 2005 | | $425,000 |

| Name | Date | Money In | Money Out |
|------|------|----------|-----------|
| Phil Rosemann | Oct. 11, 2005 | $300,000 | |
| Gina Mastrantonio | Oct. 13, 2005 | $75,000 | |
| Phil Rosemann | Oct. 24, 2005 | $50,000 | |
| M. Sigillito Assoc. | Oct. 18, 2005 | | $14,000 |
| M. Sigillito Assoc. | Oct. 26, 2005 | | $9,550 |
| M. Sigillito Assoc. | Oct. 26, 2005 | | $50,000 |
| British-Am. Group | Oct. 27, 2005 | | $100,000 |

| Name | Date | Money In | Money Out |
|---|---|---|---|
| Albert Carrell | Nov. 21, 2005 | $74,450 | |
| British-Am. Group | Nov. 28, 2005 | | $74,450 |

| Name | Date | Money In | Money Out |
|---|---|---|---|
| Gina Mastrantonio | Dec. 27, 2005 | $75,000 | |
| M. Sigillito Assoc. | Dec. 31, 2005 | | $40,000 |
| M. Sigillito Assoc. | Dec. 31, 2005 | | $47,500 |

| Name | Date | Money In | Money Out |
|---|---|---|---|
| Phil Rosemann | April 26, 2006 | $350,000 | |
| British-Am. Group | April 27, 2007 | | $250,000 |
| M. Sigillito Assoc. | May 10, 2006 | | $25,000 |

| Name | Date | Money In | Money Out |
|---|---|---|---|
| Phil Rosemann | June 1, 2006 | $200,000 | |
| M. Sigillito Assoc. | June 12, 2006 | | $60,000 |
| M. Sigillito Assoc. | June 12, 2006 | | $11,206 |

| Name | Date | Money In | Money Out |
|---|---|---|---|
| Stanley Kuhlo | June 23, 2006 | $45,000 | |
| M. Sigillito Assoc. | June 26, 2006 | | $17,355.20 |

### BANK SECRECY ACT/ANTI-MONEY LAUNDERING

41.     FDIC regulations required that PNC Bank establish an "anti-money laundering programs including, at a minimum (A) the development of internal policies, procedures, and

controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs." 31 U.S.C. § 5318(h)(1).

42.     Pioneer Bank did not have a compliance officer as required by § 5318(h)(1)(B), an ongoing employee training program as required by § 5318(h)(1)(C) or use any anti-money laundering software that analyzed client transactions and detected money laundering as required by § 5318(h)(1)(A).

43.     Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance is regulated by the BSA/AML Examination Manual and provides that "money laundering risk may arise from trust" accounts because they "can conceal the sources and uses of funds." BSA/AML Manual at pg. 288. The manual advocates enhanced due diligence for "***interest on lawyers' trust accounts***" because of the "potential money laundering abuse" by "lawyers" who "act as financial liaisons for their clients" and use "***interest on lawyers' trust accounts***." BSA/AML Manual at pg. 316.

44.     The BSA/AML Examination Manual section on Trust and Asset Management Services identifies "custody accounts" in the "risk factors" and states that "***money laundering risk may arise from trust*** and asset management activities. When misused, trust and asset management accounts can *** conceal the sources and uses of funds*** . . . in order to move illicit funds or avoid scrutiny." BSA/AML Manual at pg. 288.

45.     The Bank Secrecy Act, and the Patriot Act, and federal regulations required PNC Bank to file reports with appropriate regulators when it discovers suspicious activity by any of its customers. Such activity includes, *inter alia*, transactions where the bank has

a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging.

46.     As alleged in detail above, there were numerous suspicious transactions in Sigillito's IOLTA account which should have triggered investigations and reports to regulators. The IOLTA account did not serve a legitimate business purpose, as money in that account was not used to purchase any loans in the BLP. The only plausible explanation was that Sigillito was stealing from customers. Based on the investigation to date, Rosemann has no reason to believe that PNC Bank made reports to federal or state regulators concerning suspicious activity in Sigillito's IOLTA account. Despite the lack of account activity with any legitimate business purpose, the IOLTA account was never closed, which would have been consistent with reports to regulators for such egregious conduct.

47.     The Bank Secrecy Act, the Patriot Act and federal regulations also required PNC Bank to maintain rigorous anti-money laundering policies and procedures. If the bank had followed its purported procedures, the regulators would have had information that would have led to the uncovering of the Ponzi and embezzlement scheme as the only plausible explanation for Sigillito's suspicious activities.

48.     Indeed, federal legislation and regulations have long required banks to have an AML program. One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity. These requirements were first established by the Bank Secrecy Act ("BSA") and federal banking

regulations. 31 U.S.C.§ 5311; 12 C.F.R. § 208.63. All of the federal banking agencies have substantially identical requirements. Under the supervision of the FDIC, PNC Bank had these obligations. The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

49.     One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts. The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal, and what actions to take once suspicious activity is identified.

50.     The first step in identifying suspicious activity is for a bank to determine what its clients' normal business activities would look like. Federal Financial Institutions Examination Council BSA/AML Examination Manual of June 2005. This step can be accomplished in many ways, including by meeting with the client and learning about the client's business, conducting on-site due diligence visits to review the client's business operations, and reviewing the client's financial statements.

51.     Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four pillars: (i) designating an individual or individuals responsible for managing BSA compliance; (ii) a system of policies, procedures, and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel; and (iv) independent testing of compliance. 12 C.F.R. § 208.63.

52.     Financial institutions must also fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "Know Your Customer", is critical to determining what activity was suspicious. 12 C.F.R. § 208.62. Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The Know Your Customer duty also pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was at all times relevant standard industry practice.

53.     While PNC Bank may have created AML and Know Your Customer programs that facially met the requirements of the Patriot Act and related regulations, PNC Bank did not effectively execute those programs and never submitted to the appropriate banking regulators as mandated by statute and regulation any reports of Sigillito's suspicious activities.

54.     PNC Bank also encountered regular account activity that would have been suspicious regardless of the type of business the bank thought Sigillito was running. The Office of the Comptroller of the Currency's 2000 BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures. These red flags included: (i) unexplained repetitive or unusual patterns of activity; (ii) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (iii) spikes in customer activity with little or no

explanation; and (iv) wire activity with offshore banking centers or financial secrecy havens. Sigillito's IOLTA account exhibited virtually all of these types of transactions, and exhibited them repeatedly.

55.     The activity in Sigillito's IOLTA account was not only inconsistent with his visible law practice, but it would have been suspicious in *any* context.

56.     Sigillito's IOLTA account repeatedly exhibited textbook "red flags" and high risk activity including:

(a).     *Repetitive Transactions*: Sigillito frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.

(b).     *Large Dollar Transactions*: Sigillito's IOLTA account reflected a pattern of large dollar transactions. Between 2006 and 2010, Sigillito transferred nearly $42 million out of the IOLTA account to just a few recipients. These transactions represented over 59% of the wires and checks that flowed out of the IOLTA account. It also was typical for Sigillito, through the IOLTA account, to pay personal debt and transfer money for no apparent legitimate business purpose.

(c).     *Spikes in Activity*: Sigillito's IOLTA account showed occasional spikes in overall activity, which should have prompted further investigation by PNC Bank. Shortly after Sigillito opened the IOLTA account, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the

xvii

IOLTA account. A lawyer with no discernable law practice funneled over $41 million dollars through his IOLTA account.

(d).  *Wire Activity with Domestic Entities for Putative Offshore Investments*: Through the IOLTA account, Sigillito frequently engaged in transactions with British American Group in Kansas. For example, the IOLTA account's wire transfers to Sigillito and his co-conspirator Scott Brown and his company British American Group accounted over half of the total dollars passing through the IOLTA account.

(e).  *Check Activity*: In addition, many transactions in the IOLTA involved hand-written checks totaling millions of dollars and representing interest payments presumably from the borrower in England. This is not only unusual on its face, but it is particularly unusual given that the interest payments were lumped together instead being issued separated by individual investor. At the very least, this activity *should* have prompted a check-fraud investigation, which would have revealed what lurked behind the suspicious behavior.

57.    Knowing that Sigillito's IOLTA account was not consistent with the purported business purpose of the account, and faced with evidence and actual knowledge that illegal activity was occurring, PNC Bank had a duty to take action, not to participate as it did in money laundering, theft and embezzlement, and instead to prevent further laundering, theft and embezzlement of fiduciary assets. PNC Bank, at a minimum should have questioned

Sigillito and, when it failed to receive a credible explanation for the bizarre activity, closed the IOLTA account as well as Sigillito's other accounts.

58.     By failing to initiate an effective BSA/AML compliance program or transaction monitoring software, PNC Bank assisted Sigillito in laundering the money. PNC Bank was not only the last line of defense to prevent a fraudulent transfer, it was the only line of defense to prevent Sigillito from defrauding unsuspecting victims. If PNC Bank had instituted an effective money laundering detection system (as required by Federal law) and provided proper training, Sigillito's fraud could not have occurred.

### DISCOVERY OF PNC BANK'S INVOLVEMENT IN SIGILLITO'S FRAUD

59.     Plaintiffs did not discover the facts constituting PNC Bank's violations until after May 24, 2010 when a search warrant was executed on Sigillito's office which triggered the investigation of Sigillito. Rosemann learned of the actions and inactions of PNC Bank upon securing documents from the United States Attorneys' Office after they were made public at Sigillito's criminal trial in April 2012.

60.     Plaintiffs could not reasonably have discovered the facts constituting PNC Bank's violations until PNC Bank documents were made public during Sigillito's criminal trial in April 2012.

### COUNT I

### VIOLATION OF MISSOURI'S UNIFORM FIDUCIARY LAW

COME NOW Plaintiffs and for Count I of their Complaint against defendant PNC Bank for violation of Missouri's Uniform Fiduciary Law state as follows:

61.     All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

62.     PNC Bank at all relevant times had knowledge that Sigillito's IOLTA account was a fiduciary account.

63.     PNC Bank at all relevant times had knowledge that Sigillito was a fiduciary and had fiduciary obligations with respect to his IOLTA account at the bank and the third party funds deposited into that account.

64.     All of the money Sigillito transferred to PNC Bank originating from his IOLTA account as alleged in this Petition was for payment of Sigillito's personal benefit and to pay debt he owed to the bank.

65.     PNC Bank at all relevant times had knowledge that Sigillito's transfers to the bank of money originating from his IOLTA account were for Sigillito's personal benefit.

66.     PNC Bank at all relevant times had knowledge that checks drawn on Sigillito IOLTA account and payable to the bank for debt he owed on the Lines of Credit with the bank were for Sigillito's personal benefit.

67.     PNC Bank at all relevant times had knowledge that monies transferred out of Sigillito's IOLTA account were:

(a).     Funds from a fiduciary account;

(b).     Fiduciary funds;

(c).     Funds that did not belong to Sigillito; and

(d).     Funds that belonged to investors in the BLP or other third parties.

xx

68.    PNC Bank at all relevant times was familiar with the nature and function of IOLTA accounts and had knowledge of the applicable rules governing IOLTA accounts.

69.    On each occasion that PNC had notice of facts which, if unexplained, would show that Sigillito was transferring and using money from his IOLTA account that did not belong to him to pay personal debts, the bank at all relevant times was bound under the Uniform Fiduciaries Law ("UFL"), § 469.270, RSMo., to inquire whether Sigillito was committing a breach of his obligation as fiduciary.

70.    On each occasion that PNC Bank had notice of such facts, and at all relevant times, the bank failed to inquire whether Sigillito was committing a breach of his obligation as fiduciary in using money from his IOLTA account to pay personal debt.

71.    Sigillito owed a fiduciary duty to the Rosemann. PNC Bank knew that Sigillito was in possession of Rosemann's funds and that Sigillito owed a fiduciary duty to its customers.

72.    PNC Bank had actual knowledge of Sigillito's breach of fiduciary duty and knew Sigillito was misappropriating its customers' funds. PNC Bank had express factual information that the funds were being used for private purposes in violation of Sigillito's fiduciary relationship with Rosemann.

73.    PNC Bank acted in bad faith because it knew of obvious circumstances indicating that Sigillito was breaching his fiduciary duty to Rosemann but deliberately refrained from investigating Sigillito's activities so as to avoid knowledge that Sigillito was breaching his fiduciary duty. In doing so, PNC Bank acted in a commercially unjustifiable

manner because, among other things, it disregarded and refused to learn facts readily available to it that indicated Sigillito was breaching his fiduciary duty and misappropriating customer funds. It was bad faith for PNC Bank to remain passive.

74.     PNC Bank served as the drawee bank, the payee bank and transferee bank of the payments made by Sigillito to pay his line of credit to PNC Bank. When Sigillito transferred funds from his personal account, to pay his personal debt, PNC Bank was put on notice and bound to inquire further. It was commercially unjustifiable for PNC Bank to not inquire into the use of IOLTA funds for payment of Sigillito's personal debt, after the first transfer of fiduciary funds directly to PNC Bank for payment of Sigillito's personal debt. PNC Bank's decision to remain passive and under these circumstances amounts to a deliberate desire to evade knowledge because of a fear that inquiry would disclose that Sigillito was engaged in a fraud or embezzlement scheme. By failing to inquire, PNC Bank acted in bad faith.

75.     The actual and foreseeable result of PNC Bank's conduct was the loss of the funds belonging to Rosemann, who suffered and will continue to suffer damages as a result.

76.     As a direct and proximate cause of PNC Bank's conduct as described in the foregoing and throughout this Complaint, Plaintiff has been damaged $3,076,784.

77.     PNC Bank's conduct was malicious and corrupt, as well as either intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Rosemann prays for judgment against PNC Bank as follows:

(a).     For an award of actual damages against PNC Bank of $3,076,784;

xxii

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT II

### AIDING AND ABETTING FRAUD

COME NOW Plaintiffs and for Count II of their Complaint against defendant PNC Bank for Aiding and Abetting Fraud state as follows:

78.    All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

79.    As set forth herein, by misappropriating the funds that Rosemann deposited at PNC Bank, Sigillito committed fraud.

80.    PNC Bank substantially and materially assisted Sigillito in the commission of his fraudulent conduct in the following respects:

(a).    Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning deposits and payments into Sigillito's IOLTA account;

(b).    Failing to implement and adhere to compliance and monitoring protocols concerning Sigillito's use of Rosemann's funds;

(c).    Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

(d).    Failing to prevent Sigillito from using funds designated for BLP for personal payments to PNC Bank and others;

(e).    Failing to notify Rosemann, or any governmental entity or regulator about Sigillito's misappropriation of funds designated for customer segregated accounts; and

(f).    Causing and allowing Rosemann's funds to be misappropriated by Sigillito.

81.    By virtue of its substantial and material assistance to Sigillito, PNC Bank was aware of its role in Sigillito's fraudulent activity and it acted knowingly in assisting Sigillito.

82.    PNC Bank's actions aided and abetted Sigillito in causing injury and damages to Rosemann.

83.    As a direct and proximate cause of PNC Bank's conduct as described in the foregoing and throughout this Complaint, Rosemann has been damaged $3,076,784.

84.    PNC Bank's conduct was malicious and corrupt, as well as either intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Rosemann prays for judgment against PNC Bank as follows:

(a).    For an award of actual damages against PNC Bank of $3,076,784;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

xxiv

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

COME NOW Plaintiffs and for Count III of their Complaint against defendant PNC Bank for Aiding and Abetting Breach of Fiduciary Duty state as follows:

85.    All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

86.    PNC Bank's officers and agents, acting within the scope of their employment, at all relevant times had knowledge that:

(a).    Sigillito, in addition to maintaining other accounts at the bank, maintained an IOLTA account at PNC Bank into which he deposited funds belonging to Plaintiffs for the purchase of loan investments in the BLP;

(b).    Sigillito owed fiduciary duties of honesty, loyalty, care and candor to investors, including Plaintiffs, whose funds were deposited into Sigillito's IOLTA account for the purchase of loan investments in the BLP;

(c).    Sigillito was financially exploiting investors and embezzling Plaintiffs' funds deposited into his IOLTA account for personal gain and to fund his Ponzi scheme;

(d).    Sigillito's IOLTA account was a fiduciary account;

xxv

(e).     Sigillito had fiduciary duties and obligations to Plaintiffs whose money was deposited into Sigillito's IOLTA account;

(f).     Money from Plaintiffs deposited into Sigillito's IOLTA account was fiduciary funds;

(g).     Sigillito was financially exploiting new investors and embezzling their funds deposited into his IOLTA account for personal gain and to fund his Ponzi scheme; and

(h).     Sigillito's financial exploitation of Plaintiffs and embezzlement of their funds deposited into his IOLTA account was a breach of Sigillito's fiduciary obligations to Plaintiffs whose funds were deposited into Sigillito's IOLTA account.

87.     PNC Bank's officer and agents, acting within the scope of their employment, actively participated in and provided substantial assistance to Sigillito in his financial exploitation of Plaintiffs and breaches of his fiduciary duties to Plaintiffs whose monies were deposited into Sigillito's IOLTA account.

88.     PNC Bank assisted and aided Sigillito in breaching his fiduciary duties to Plaintiffs by: (a) failing repeatedly to properly investigate the alerts generated by transfers of funds between the IRA Plaintiffs' accounts and Sigillito's IOLTA account; (b) facilitating Sigillito's transfers of Plaintiffs' funds from Sigillito's IOLTA account to various account transfers intended to obscure the flow and use of those funds for Sigillito's personal benefit;

(c) opening and transferring money from lines of credit to cover up Sigillito's overdrafts in

his IOLTA account and conceal clear evidence of embezzlement and misappropriation; and

(d) falsifying bank records to conceal the bank's use of money from lines of credit to cover

up Sigillito's overdrafts in his IOLTA account and conceal clear evidence of embezzlement

and misappropriation.

89.     PNC Bank's actions aided and abetted Sigillito in causing injury and damages

to Plaintiffs.

90.     As a direct and proximate result of PNC Bank's actions, plaintiff Rosemann

has been damaged $3,076,784.

91.     Additionally, PNC Bank's conduct was malicious and corrupt, as well as either

intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, plaintiff Rosemann prays for judgment against defendant PNC Bank

as follows:

(a).     For an award of actual damages against PNC Bank of $3,076,784;

(b).     For an award of prejudgment interest at the applicable statutory rate;

(c).     For an award of punitive damages in a amount that equals up to six times the

amount of actual damages;

(d).     For costs of this suit, including reasonable attorneys' fees; and

(e).     For such other and further relief as this Court may deem just and proper.

## COUNT IV

### Conspiracy to Breach Fiduciary Duty

COME NOW Plaintiffs and for Count IV of their Complaint against defendant PNC Bank for Conspiracy to Breach Fiduciary Duty state as follows:

92.    All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

93.    PNC Bank had a superior position compared to Rosemann and possessed knowledge of material facts that were not disclosed to Rosemann.

94.    PNC Bank was placed in a position where it made decisions that injured Rosemann's interests. PNC Bank put its own interests above the interests of its customer, Rosemann.

95.    PNC Bank breached its fiduciary duty and its conduct was the direct and proximate cause of Rosemann's $3,076,784 damages.

WHEREFORE, plaintiff Rosemann pray for judgment against defendant PNC Bank as follows:

(a).    For an award of actual damages against PNC Bank of $3,076,784;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to five times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT V

### NEGLIGENCE

COME NOW Plaintiffs and for Count V of their Complaint against defendant PNC Bank for Negligence state as follows::

96.     All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

97.     Based on its contractual relationship with Sigillito, PNC Bank owed Rosemann the duty to use such skill, prudence, and diligence as other banks commonly exercise, including the duty to prevent conflicts of interest and inside dealings and for the safekeeping of Plaintiff's funds in Sigillito's IOLTA account.

98.     PNC Bank breached its duty of care and was therein negligent.

99.     As a direct and proximate cause of PNC Bank's negligence, Plaintiff has been damaged $3,076,784 and PNC Bank's conduct was the direct and proximate cause of Rosemann's $3,076,784 damages.

WHEREFORE, plaintiff Rosemann prays for judgment against defendant PNC Bank as follows:

(a).     For an award of actual damages against PNC Bank of $3,076,784;

(b).     For an award of prejudgment interest at the applicable statutory rate;

(c).     For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).     For costs of this suit, including reasonable attorneys' fees; and

(e).     For such other and further relief as this Court may deem just and proper.

xxix

## COUNT VI

### VIOLATION OF RICO 18 U.S.C. § 1962(c)

COME NOW Plaintiffs and for Count VI of their Complaint against defendant PNC Bank for violation of RICO 18 U.S.C. § 1962(c) state as follows:

100.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

101.    RICO, 18 U.S.C. §§ 1961-68, permits claimants in a civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

102.    18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise" to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

103.    RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1)(B) to include wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. § 1956.

104.    The wire fraud statute, 18 U.S.C. § 1343 prohibits anyone from "devising any scheme" to "defraud" to obtain "money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" for the "purpose of executing such scheme." The money laundering statute, 18 U.S.C. § 1956 prohibits conducting a financial transaction with the proceeds of specified unlawful activity

xxx

"knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

105.   RICO defines "enterprise" as "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

106.   At all relevant times, PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., associated in fact with each other and with others as to constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). At all times relevant to this Complaint, the association in fact of PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., ("RICO Enterprise") was engaged in, and its activities affected, interstate and foreign commerce.

107.   The "association in fact" RICO Enterprise had an ascertainable structure and organization, and it existed apart from its predicate acts. Defendant associated with the RICO Enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the RICO Enterprise's activities.

108.   PNC Bank, associated with Sigillito, and Martin T. Sigillito & Associates Ltd., other for the common purpose of defrauding Plaintiff and other investors in the BLP and converting their funds and property for Defendant's  personal gain.

109.   In furtherance of the RICO Enterprise, PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., committed numerous overt acts, as set forth in this Complaint, including violation of wire fraud and money laundering statutes.

110.    The principal purpose of the racketeering conspiracy was to generate money for Defendant, the Ponzi scheme and BLP, and others through the operation of the RICO Enterprise and various criminal activities, including wire fraud and money laundering.

111.    PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., and others agreed to engage in a pattern of racketeering activity using various locations including ,but not limited to, PNC Bank's offices located in St. Louis, to further the objectives of the RICO Enterprise.

112.    PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c). Furthermore, the Defendant were "employed by or associated with" the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

113.    PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., directed and managed the RICO Enterprise's activities, as more fully alleged throughout this Complaint, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

114.    PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., conducted and participated in the RICO Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

115.    In the course of conducting and participating in the Ponzi scheme and BLP RICO Enterprise, Defendant executed numerous predicate acts of racketeering activity,

which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. Section 1961(1)(B), as more specifically alleged below. As described throughout this Complaint, Defendant engaged in a pattern of related and continuous predicate acts over a substantial period of time. The unitary scheme began sometime in or around 2006 and continued until approximately May 2010.

116.   The predicate acts demonstrated a variety of unlawful activities, each conducted in furtherance of the RICO Enterprise and the common purpose to defraud Plaintiff and other victims and obtain millions of dollars. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts are related and are not isolated events.

117.   The predicate acts all had the purpose of diverting and misappropriating monies that Plaintiff and other victims had given to Sigillito which were deposited into Sigillito's IOLTA account at PNC Bank purportedly for investment in the BLP.  The predicate acts were committed or caused to be committed by Defendant, and were interrelated in that they involved using Plaintiff's funds. Further, on information and belief, Defendant's misappropriation repeatedly involved diversion of funds for: (a) Defendant's personal benefit and (b) making various fund transfers between accounts at PNC Bank to conceal the theft and embezzlement Plaintiff's funds pursuant to the scheme. More specifically, PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd., enhanced the credibility of the BLP by maintaining in IOLTA account at, and by utilizing the offices of, PNC Bank to convince Plaintiff and others of the legitimacy and safety of the investments.

118.    By virtue of PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd.'s violation of 18 U.S.C. Section 1962(c), Plaintiff has sustained substantial injury.

119.    PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd.'s RICO violations were the actual cause of Plaintiff's damages, which would not have occurred without PNC Bank, Sigillito, and Martin T. Sigillito & Associates Ltd.'s conduct. In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiff including, but not limited to, the loss of Plaintiff's funds. PNC Bank, Hingle, Olhms, Sigillito, and Martin T. Sigillito & Associates Ltd., profited from their RICO acts and used some proceeds to further their RICO Enterprise.

120.    PNC Bank, knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c) by participating in the transfer of Plaintiff's funds from the IOLTA to Sigillito's other, personal accounts for Sigillito and PNC Bank's benefit, directing the creation of loans and lines of credit to cover overdrafts in Sigillito's IOLTA where much of the fraud occurred, preparing false bank records intended to conceal the illegal use and transfer of funds needed to continue the fraud, and knowingly accepting payments of fiduciary funds for Sigillito's debts and credit line for the benefit and profit of PNC Bank, and directing the decisions not to report evidence of Sigillito's embezzlement from and abuse of the IOLTA account to the Missouri Supreme Court. directing transfers of funds to, at, and from Sigillito's various accounts at Enterprise, orchestrating transfers and directing diversions of investor funds, including Plaintiff's funds, from the IOLTA intended to mislead and conceal, and accepting fiduciary

funds from Sigillito's IOLTA account as payment of Sigillito's personal debt owed the bank, all in furtherance of the RICO Enterprise and as more fully alleged throughout this Complaint.

121.   PNC Bank knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

122.   PNC Bank knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

123.   PNC Bank knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

WHEREFORE, Rosemann prays for judgment against PNC Bank as follows:

(a).   For damages against of $3,076,784, and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(b).   For costs of this suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(c).   For such other and further relief as this Court may deem just and proper.


## COUNT VII

### VIOLATION OF RICO 18 U.S.C. § 1962(d)

COME NOW Plaintiffs and for Count VII of their Complaint against defendant PNC Bank for violation of RICO 18 U.S.C. § 1962(c) state as follows::

124.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

125.    In violation of 18 U.S.C. Section 1962(d), Sigillito, Martin T. Sigillito & Associates Ltd., PNC Bank, and others known and unknown conspired with each other to violate 18 U.S.C. Section 1962(a)-(c).

126.    The objects of the conspiracy included, without limitation, the misappropriation of funds from Rosemann and others by means of a scheme to defraud. By these misappropriations, Sigillito, Martin T. Sigillito & Associates Ltd., PNC Bank, gained personal benefits; obtained funds directly from the conversion of Plaintiff's funds for their own use; and fraudulently profited through their fraudulent scheme.

127.    PNC Bank, combined with Sigillito and Martin T. Sigillito & Associates Ltd., and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. PNC Bank, objectively manifested an agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise. PNC Bank, knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

128.    PNC Bank, agreed and combined with Sigillito and Martin T. Sigillito & Associates Ltd., and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. PNC Bank, objectively manifested agreement

xxxvi

to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise. PNC Bank knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

129.   PNC Bank, Sigillito and Martin T. Sigillito & Associates Ltd., to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.

130.   At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

131.   As described above, the conspiratorial agreement was an agreement to participate in an enterprise which engaged in racketeering activity within the meaning of 18 U.S.C. Sections 1961(1) and 1962(a)-(c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

132.   As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sections 1961(5) and 1962(a)-(c). PNC Bank knew that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

133.    As a result of one or more acts predicate to the conspiracy, and the conduct and participation of PNC Bank, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, Plaintiff have sustained substantial injury, including loss of their investment funds.

134.    PNC Bank's, Sigillito's, and Martin T. Sigillito & Associates Ltd.'s acts and violations were the actual cause of Rosemann's damages, which would not have occurred without the PNC Bank's conduct. In addition, the acts and violations were the direct, natural, and proximate cause of Rosemann's $3,076,784 in damages.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a).    For damages against of $3,076,784, and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(b).    For costs of this suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(c).    For such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff Rosemann hereby demand a trial by jury of all issues so triable.

xxxviii

GREEN JACOBSON, P.C.                     LAW OFFICES OF SEBASTIAN RUCCI


/s/ Jonathan F. Andres                   /s/ Sebastian Rucci
Jonathan F. Andres #39531                Sebastian Rucci (E.D. Mo. 178114CA)
Martin M. Green #16465                   401 E. Ocean Blvd., Suite 1240
Joe D. Jacobson #33715                   Long Beach, CA 90802
7733 Forsyth Boulevard, Suite 700        Tel: (330) 720-0398
St. Louis, MO 63105                      Fax: (330) 954-0033
Tel: (314) 862-6800                      Email: SebRucci@gmail.com
Fax: (314) 862-1606
Email: andres@stlouislaw.com             Attorney for Plaintiff Rosemann
Email: green@stlouislaw.com
Email: jacobson@stlouislaw.com


Attorneys for Plaintiff Rosemann