# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

Richard and Melba Aguilar; Clark Amos; Preston Amos; Thomas Barnes; Henry and Julia Barthel; Northwest Properties (1973) Ltd.; Tom and Donna Bertani; Noel Bosse, individually and in a representative capacity; Kristy Bova; David Caldwell; Albert Carrell; Bonita Cobb; Sharon Cobb; Casey and Delores Cook; Jerry Cronkite; Mark Cunningham; Daryll Currier; Roy Currier; Sam Currier; Thomas Currier; Charles Davis; Charlotte Garrett; William Gaylor; Clayton Givens; Robert Givens; Linda Givens; Suzanne Glisson; Carol Green; Randall and Aubrey Harp; Billy Harrison; Odis Hash; Donna Hogshooter; John and Audrey Holland; Donald Horner; Doris Howard; Barbara and Gifford Jordan; David and Mary Kellogg; Stanley Kuhlo; Wanda Lavender; Gina Mastrantonio; Stanko Matayo; Daren and Sheila Mays; William McCalla; Carol McCarthy and Barbara O'Hanlon in representative capacities; William McLemore; Mark, Cindy and Marie Merlotti; Lorena Messenger; Ben Miller; Bob Moore; Jim Neill; Mary O'Sullivan individually and in a representative capacity; Rudolf Ouwens; Ronald Pastor; William and Carol Phillips; Buddy Quessenberry; Elaine Reed; Darren and Debbie Rogers; Betty Rollon; Leonard Roman; Phillip Rosemann; David Schultz; John Shahan; Arlene Sincoski; Homer, Dorothy and Gary Smith; Judith Smith; Kent Sturhahn; Arlene Stevens; Winston Vines; Barbara Vollmar; Lewis Vollmar; Brian Waffle; William Wantling; Brad Werner in a representative capacity; Loren and Mary Winterhof; Eric and Jill Wittenmyer; and Dorothy Zeigler,

        Plaintiffs,

vs.

PNC BANK, N.A.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:14-cv-00985

Judge: Hon. Linda R. Reade
(Chief Judge N. Dist. Iowa)

Jury Trial Demanded

**First Amended Complaint**

# TABLE OF CONTENTS

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFFS AND DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE BRITISH LENDING PROGRAM (PONZI SCHEME). . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IOLTA ACCOUNT FUNDAMENTALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MISSOURI'S UNIFORM FIDUCIARIES LAW FUNDAMENTALS. . . . . . . . . . . . . . . . . . . . . 10

ALLEGIANT BANK HELD SIGILLITO'S IOLTA ACCOUNT. . . . . . . . . . . . . . . . . . . . . . . 11

ALLEGIANT BANK WAS CUSTODIAN FOR IRA ACCOUNTS INVESTED IN THE BLP. . . . . . 12

ALLEGIANT BANK'S CEO (SHAUN HAYES) AND ALLEGIANT TRUST'S PRESIDENT
    (RICHARD MARKOW) HAD A COMPREHENSIVE UNDERSTANDING OF THE BLP. . . 13

ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT THE
    LOAN AGREEMENT DID NOT PROVIDE FOR UP-FRONT FEES. . . . . . . . . . . . . . . . . 15

ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO
    MISAPPROPRIATED IOLTA FUNDS BY PAYING INTEREST ON
    EXISTING LOANS WITH FUNDS FROM NEW LOANS. . . . . . . . . . . . . . . . . . . . . . . . 16

MARKOW HAD EXTENSIVE CONTACT WITH SIGILLITO AND BROWN. . . . . . . . . . . . . . . 18

ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO
    MISAPPROPRIATED IOLTA FIDUCIARY FUNDS FROM CARL LAVENDER. . . . . . . . . 19

ALLEGIANT BANK VETTED THE BLP FOR ITS TRUST CLIENTS AND
    HAD A COMPREHENSIVE UNDERSTANDING OF THE BLP. . . . . . . . . . . . . . . . . . . . 20

ALLEGIANT BANK FAILED TO REPORT AN
    $84,742 OVERDRAFT IN SIGILLITO'S IOLTA ACCOUNT. . . . . . . . . . . . . . . . . . . . 24

ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED
    IOLTA FIDUCIARY FUNDS TO PAY MARGARET PRICE'S BLP INTEREST. . . . . . . . 25

ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO
    MISAPPROPRIATED IOLTA FIDUCIARY FUNDS FROM THE BOSSE TRUST. . . . . . . 28

ALLEGIANT BANK VETTED THE BLP FOR THE CWIAKALA LOAN
    AND TRANSFERRED LOAN FUNDS INTO SIGILLITO'S IOLTA ACCOUNT. . . . . . . . 30

ALLEGIANT BANK VETTED THE BLP FOR A FIFTH TIME IN APPROVING A
    $100,000 LOAN TO DOUG GIVENS WITH THE BLP AS COLLATERAL.. . . . . . . . . . 32

ALLEGIANT BANK ACQUIRED ACTUAL KNOWLEDGE THAT
    SIGILLITO MISAPPROPRIATED FIDUCIARY FUNDS. . . . . . . . . . . . . . . . . . . . . . . . 33

MARKOW REVIEWED SIGILLITO'S IOLTA ACCOUNT AND
    CONCLUDED THAT SIGILLITO MISAPPROPRIATED FIDUCIARY FUNDS. . . . . . . . . . 35

ALLEGIANT BANK FAILED TO INFORM LAW ENFORCEMENT, REGULATORY
    AGENCIES, SUCCESSOR CUSTODIANS, OR THE VICTIMS OF SIGILLITO'S FRAUD.. . 38

ALLEGIANT BANK CONSPIRED WITH SIGILLITO TO MOVE HIS IOLTA AND THE IRAS TO
    ANOTHER BANK WITHOUT DISCLOSING SIGILLITO'S MISAPPROPRIATION. . . . . . . 43

ALLEGIANT BANK, WITH ACTUAL KNOWLEDGE OF SIGILLITO'S FRAUD,
    SILENTLY TERMINATED ITS RELATIONSHIP WITH SIGILLITO WITHOUT
    INFORMING LAW ENFORCEMENT, REGULATORY AGENCIES, SUCCESSOR
    BANKS, SUCCESSOR CUSTODIANS OR THE VICTIMS OF SIGILLITO'S FRAUD.. . . . . . 46

AFTER ALLEGIANT BANK OUSTED SIGILLITO, ALLEGIANT
    ACCEPTED BLP FUNDS FOR INTEREST AND LOAN REPAYMENT. . . . . . . . . . . . . . 49

ALLEGIANT BANK APPROPRIATED FIDUCIARY FUNDS IN BAD FAITH. . . . . . . . . . . . . . 54

AFTER ALLEGIANT BANK OUSTED SIGILLITO, ALLEGIANT CONTINUED TO ACT
    AS CO-TRUSTEE OF THE BOSSE TRUST WITHOUT DISCLOSING ITS FINDINGS TO
    NOEL BOSSE, THE BENEFICIARY AND CO-TRUSTEE OF THE BOSSE TRUST. . . . . . . 56

PIONEER BANK HELD SIGILLITO'S IOLTA ACCOUNT
    AFTER SIGILLITO WAS OUSTED FROM ALLEGIANT BANK. . . . . . . . . . . . . . . . . . . 58

PIONEER BANK AND NATIONAL CITY BANK ACQUIRED ACTUAL
    KNOWLEDGE IN 2006 THAT SIGILLITO WAS DIVERTING FIDUCIARY FUNDS. . . . . . 62

NATIONAL CITY BANK AND PIONEER BANK CONSPIRED WITH
  SIGILLITO TO TRANSFER HIS IOLTA ACCOUNT WITHOUT
  DISCLOSING SIGILLITO'S MISAPPROPRIATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

COUNT I - VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW
  (ACTUAL KNOWLEDGE). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

COUNT II - VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW
  (MO. REV. STAT. § 469.270). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

COUNT III - VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW (BAD FAITH). . . . 77

COUNT IV - AIDING AND ABETTING FRAUD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

COUNT V - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY. . . . . . . . . . . . . . . . 83

COUNT VI - BREACH OF FIDUCIARY DUTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

COUNT VII - CONSPIRACY TO BREACH FIDUCIARY DUTIES.. . . . . . . . . . . . . . . . . . . . 87

COUNT VIII - NEGLIGENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

COUNT IX - CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED
  AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . 90

CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d).. . . . . . . . . . . . . . . . . . . . . . . 90

ASSOCIATION-IN-FACT RICO ENTERPRISE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

NEXUS BETWEEN RICO ENTERPRISE AND INTERSTATE COMMERCE. . . . . . . . . . . . . . . 97

RICO CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

ALLEGIANT BANK ASSOCIATED WITH THE RICO ENTERPRISE
  AND AGREED TO PARTICIPATE IN THE AFFAIRS OF THE ENTERPRISE. . . . . . . . . . 99

PIONEER BANK AND NATIONAL CITY ASSOCIATED WITH THE RICO ENTERPRISE
  AND AGREED TO PARTICIPATE IN THE AFFAIRS OF THE ENTERPRISE. . . . . . . . . . 102

PLAINTIFFS' RICO INJURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

DEMAND FOR JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

# FIRST AMENDED COMPLAINT

Plaintiffs, for their First Amended Complaint against defendant PNC Bank, N.A., allege as follows:

## JURISDICTION AND VENUE

1.      There are multiple bases for this Court's jurisdiction as this Court has complete diversity of jurisdiction under 28 U.S.C. § 1332(a)(1) between the parties. Defendant is incorporated under the laws of Delaware with its principal place of business in Pittsburgh, Pennsylvania and the amount in controversy exceeds $75,000.

2.      The allegations in this amended complaint also allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 giving this Court jurisdiction pursuant to 18 U.S.C. § 1964(c) over that claim (Count IX) and "federal question" jurisdiction pursuant to 28 U.S.C. § 1331 for actions arising under the "laws" of the United States over that claim (Count IX).

3.      Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in St. Louis County, Missouri, which is located within the geographical area of this court. See 28 U.S.C. § 105(a)(1) (Eastern District of Missouri comprises St. Louis County).

## PLAINTIFFS AND DEFENDANT

4.      The Plaintiffs include:(1) Richard and Melba Aguilar who reside in St. Louis, Missouri; (2) Clark Amos who resides in St. Louis, Missouri; (3) Preston Amos who resides in St. Louis, Missouri; (4) Thomas Barnes who resides in Grove, Oklahoma; (5) Henry and

Julia Barthel who reside in Fenton, Missouri; (6) Northwest Properties (1973) Ltd., c/o Mark Bernstein who resides in St. Louis, Missouri; (7) Tom and Donna Bertani who reside in St. Louis, Missouri; (8) Noel Bosse who resides in Port Orchard, Washington, individually and as trustee of the Bosse Trust; (9) Kristy Bova who resides in Springdale, Arkansas; (10) David Caldwell who resides in Benton, Arkansas; (11) Albert Carrell who resides in Cedar Springs, Michigan; (12) Bonita Cobb who resides in St. Petersburg, Florida; (13) Sharon Cobb who resides in Seminole, Florida; (14) Casey and Delores Cook who reside in Oklahoma City, Oklahoma; (15) Jerry Cronkite who resides in Oak Burr, Michigan; (16) Mark Cunningham who resides in Farmington, Arkansas; (17) Daryll Currier who resides in Howe, Indiana; (18) Roy Currier who resides in Middlebury, Indiana; (19) Thomas Currier who resides in Howe, Indiana; (20) Sam Currier who resides in Burr Oak, Michigan; (21) Charles Davis who resides in Athens, Texas; (22) Charlotte Garrett who resides in Jefferson City, Missouri; (23) William Gaylor who resides in Hamilton, Ohio; (24) Clayton Givens who resides in St. Louis, Missouri; (25) Suzanne Glisson who resides in Tampa, Florida; (26) Linda Givens who resides in High Ridge, Missouri; (27) Robert Givens who resides in Overland Park, Kansas; (28) Carol Green who resides in Benton, Arkansas; (29) Randall and Aubrey Harp who reside in Springdale, Arkansas; (30) Billy Harrison who resides in Lowell, Arkansas; (31) Odis Hash who resides in Bentonville, Arkansas; (32) Donna Hogshooter who resides in Springdale, Arkansas; (33) John and Audrey Holland who reside in

Clearwater, Florida; (34) Donald Horner who resides in Gilbert, Arizona; (35) Doris Howard who resides in Springdale, Arkansas; (36) Barbara and Gifford Jordan who reside in Springdale, Arkansas; (37) David and Mary Kellogg who reside in Springdale, Arkansas; (38) Stanley Kuhlo who resides in St. Charles, Missouri; (39) Wanda Lavender who resides in Bryant, Arkansas; (40) Gina Mastrantonio who resides in Cleveland, Ohio; (41) Stanko Matayo who resides in Bella Vista, Arkansas; (42) Daren and Sheila Mays who reside in Tampa, Florida; (43) Carol McCarthy, who resides in Kirkwood Missouri, as successor co-trustee of the Angelene Block Revocable Trust and as co-trustee of the Carol A. McCarthy Living Trust; and Barbara O'Hanlon who resides in Kirkwood, Missouri, as successor co-trustee of the Angeline Block Revocable Trust and as co-trustee of the Barbara J. O'Hanlon Living Trust; (44) William McCalla who resides in Ann Arbor, Michigan; (45) William McLemore who resides in Gainesville, Florida; (46) Mark, Cindy and Marie Merlotti who reside in St. Louis, Missouri; (47) Lorena Messenger who resides in Springfield, Missouri; (48) Ben Miller who resides in St. Louis, Missouri; (49) Bob Moore who resides in Decatur, Arkansas; (50) Jim Neill who resides in Mountain View, California; (51) Mary O'Sullivan, who resides in St. Louis, Missouri, individually and as trustee of the Thomas E. O'Sullivan Revocable Living Trust and as trustee of the Neil J. O'Sullivan Trust and as executor of Neil J. O'Sullivan Estate and Thomas E. O'Sullivan Estate; (52) Rudolf Ouwens who resides in Phoenix, Arizona; (53) Ronald Pastor who resides in Howard City,

Michigan; (54) William and Carol Phillips who reside in Arkadelphia, Arkansas; (55) Buddy Quessenberry who resides in Seymore, Missouri; (56) Elaine Reed who resides in Cassopolis, Michigan; (57) Darren and Debbie Rogers who reside in Springdale, Arkansas; (58) Betty Rollon who resides in Benton, Arkansas; (59) Leonard Roman who resides in Hiram, Ohio; (60) Phillip Rosemann who resides in Concord, Michigan; (61) David Schultz who resides in Battle Creek, Michigan; (62) John Shahan who resides in Gainesville, Florida; (63) Arlene Sincoski who resides in Gainesville, Florida; (64) Homer, Dorothy and Gary Smith who reside in Springdale, Arkansas; (65) Judith Smith who resides in Bella Vista, Arkansas; (66) Kent Sturhahn who resides in Quincy, Illinois; (67) Arlene Stevens who resides in Springdale, Arkansas; (68) Winston Vines who resides in Austin, Arkansas; (69) Barbara Vollmar who resides in St. Louis, Missouri; (70) Lewis Vollmar who resides in St. Louis, Missouri; (71) Brian Waffle who resides in Lowell, Arkansas; (72) William Wantling who resides in Jacksonville Beach, Florida; (73) Brad Werner who resides in St. Louis, Missouri, as trustee of the J. H. Werner Revocable Living Trust; (74) Loren and Mary Winterhof who reside in Jackson, Missouri; (75) Eric and Jill Wittenmyer who reside in Chicago, Illinois; and (76) Dorothy Zeigler who resides in Springdale, Arkansas (collectively the "Plaintiffs").

5.      Defendant PNC Bank, N.A. ("PNC Bank") is a nationally chartered bank with its principal place of business in Pittsburgh, Pennsylvania. PNC Bank is the ultimate successor in interest to National City Bank, Pioneer Bank and Allegiant Bank.

## THE BRITISH LENDING PROGRAM (PONZI SCHEME)

6.      From 2000 to 2010, St. Louis attorney Martin T. Sigillito ("Sigillito") and Kansas attorney J. Scott Brown ("Brown") operated a fraudulent loan scheme which marketed one year loans for purported investments in real estate development in England. The loan program, known as the British Lending Program ("BLP"), operated as a ***classic Ponzi scheme*** in which payments on existing loans were paid with money from new loans.

7.      Instead of sending Plaintiffs' funds to the borrower in England, Sigillito laundered the funds through his attorney trust account by paying himself and his co-conspirators up-front fees of 32% or higher. After deducting up-front fees of 32%, Sigillito paid interest on existing loans using loan proceeds from the new investors.

8.      Individual Retirement Accounts ("IRA accounts") were the primary funding source for BLP loans. Sigillito targeted IRA account holders because they typically were long-term investors who renewed their loans annually. By law, a person with an IRA must have a qualified IRA custodian, usually a bank, make investments on their behalf. Every BLP lender with an IRA established at least one custodial IRA account at either Allegiant Bank (2000-2001), Millennium Trust (2002-2008) or Enterprise Bank (2008-2010).

9.      IRA accounts were critical to Sigillito's fraud because, among other reasons, IRA custodians would send out monthly IRA statements showing the value of their loan. The IRA statements created the false appearance that loan funds were transmitted to England and that interest was received from England.

10.     Allegiant Bank, the initial IRA custodian, uncovered Sigillito's fraud in early October 2001 and conspired with Sigillito to transfer the IRAs to successor custodian Millennium Trust Company without disclosing the bank's findings of Sigillito's fraud.

11.     Seven years later, Millennium Trust Co. ("Millennium Trust"), the second IRA custodian, discovered Sigillito's fraud in April 2008 and, like Allegiant Bank, conspired with Sigillito to transfer the IRAs to a successor custodian, Enterprise Bank, without disclosing the fraud. Enterprise Bank was the IRA custodian when the BLP collapsed in May 2010.

12.     Also vital to Sigillito's fraud was his Interest On Lawyers Trust Account ("IOLTA account"), a fiduciary bank account where an attorney holds money as fiduciary for the benefit of the depositors. Sigillito maintained an IOLTA account at Allegiant Bank (2000-2001), Pioneer Bank (2002-2006), National City Bank (2006) and St. Louis Bank (2006-2010). These IOLTA accounts created the false appearance that funds deposited into the accounts were used for legitimate purposes.

13.     Sigillito directed lenders to transfer money for BLP loans into his IOLTA account. One marketing brochure for the BLP stated that the process to initiate a loan starts when "money is either deposited via check or wire into Martin Sigillito's trust account" and the "money is then dispensed" to the English developer for "permitted purposes."

14.     Allegiant Bank's dual position as an IRA custodian and IOLTA deposit bank enabled it to see every side of each transaction and gave it more than sufficient information to unmask the fraud. In October 2001, Allegiant Bank uncovered that Sigillito was paying himself and others up-front fees and paying interest on existing loans from fiduciary funds allocated for new loans. Allegiant Bank elected not to inform law enforcement, regulatory

agencies, successor custodians, or the victims of Sigillito's fraud. Instead, Allegiant Bank conspired with Sigillito to quietly transfer his IOLTA account to Pioneer Bank without disclosing its discovery of fraud.

15. In 2004, National City purchased Allegiant Bank and many employees remained employed with the new bank. Two years later, in 2006, National City purchased Pioneer Bank and Sigillito and his IOLTA account were again scrutinized by former Allegiant Bank employees. During a routine review, Sigillito's IOLTA account was flagged for suspicious activity and investigation. National City again uncovered that Sigillito was paying himself and others up-front fees and paying interest on existing loans from fiduciary funds allocated for new loans.

16. National City, like its predecessor Allegiant Bank, chose not to inform law enforcement, regulatory agencies, or the victims of the fraud; instead, National City, like its predecessor Allegiant Bank, conspired with Sigillito to silently allow him to close his accounts at the bank and transfer his IOLTA account to St. Louis Bank which held Sigillito's IOLTA when the BLP collapsed in May 2010.

17. In 2009, PNC Bank purchased National City Bank and Plaintiffs bring claims against PNC Bank for its participation in the fraud through its predecessors in interest, Allegiant Bank, Pioneer Bank and National City Bank.

18. Sigillito was indicted on April 28, 2011 by a federal grand jury in St. Louis and charged with money laundering, mail fraud, and wire fraud. The indictment alleged in part that Sigillito charged up-front fees of "32% or higher" and that "loan funds" were laundered through his "attorney trust account."

7

19.     At Sigillito's month-long trial, thirty-eight witnesses testified and over 1,000 exhibits were admitted into evidence, including thousands of pages of bank records from Sigillito's accounts at St. Louis Bank, National City Bank, Pioneer Bank and Allegiant Bank.

20.     An FBI agent testified at Sigillito's criminal trial that "the money that was received from lenders by Sigillito went into his IOLTA account." An IRS agent similarly testified that "funds were commingled in the trust account" and that money "deposited in Sigillito's trust account" was used for personal expenses.

21.     The jury found Sigillito guilty of money laundering, mail fraud, and wire fraud, and he was sentenced to forty years in federal prison and ordered to forfeit $51.5 million. Sigillito's co-conspirator Scott Brown plead guilty and was sentenced to three years in federal prison. The court noted in Sigillito's sentencing memorandum that

> "The majority of the victims of this scheme are of an age and station in life where they will never be able to earn their way back to where they were before they got mixed up with the BLP. It is a certainty that proceeds from the forfeiture of the assets of Sigillito and his co-conspirators will not begin to make the victims economically whole. It has become necessary for many victims to scale down their lifestyles, which had never been extravagant before they invested in the BLP."

### IOLTA ACCOUNT FUNDAMENTALS

22.     Every State has established an IOLTA account program which requires lawyers to maintain IOLTA accounts to hold fiduciary funds belonging to third parties. Missouri Supreme Court Rules define the proper use of IOLTA accounts for attorneys and banks.

23.     Missouri Supreme Court Rule 4-1.15 provides that a "lawyer should hold property of others with the care required of a professional fiduciary." A lawyer must keep client funds in a trust account separate from the lawyer's personal or business funds.

24.     A lawyer is prohibited from commingling client or third party funds with personal or business funds. Rule 4-1.15 also mandates that "withdrawals shall be made only by check payable to a named payee" and not by "electronic transfer."

25.     A lawyer's obligation to comply with Rule 4-1.15 is independent of a lawyer's obligation "arising from activity other than rendering legal services" and "a lawyer who serves only as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction."

26.     Only financial institutions approved by the Missouri Supreme Court Foundation ("Missouri Foundation") may offer IOLTA accounts in Missouri. Approved financial institutions have written agreements with the Missouri Foundation governing their treatment of IOLTA accounts. Information the Missouri Foundation provides to approved financial institutions spells out the fiduciary nature and proper uses of IOLTA accounts.

27.     A financial institution's compliance with Rule 4-4.15 is one of the qualifications for servicing IOLTA accounts. An approved financial institution is obligated under its agreement with the Missouri Foundation to report any overdraft for "insufficient funds, irrespective of whether or not the instrument or debit is honored." Mo. Sup. Court Rule 4-1.15, Overdraft Reporting (b)(1). A check "that is dishonored for insufficient funds is often evidence that a lawyer has improperly commingled client funds, in violation of his or her fiduciary duties." *Lerner v. Fleet Bank*, 459 F.3d 273, 279 (2d Cir. 2006).

28.     IOLTA accounts pool their deposits which makes it difficult to track the ownership of funds after funds are withdrawn. Because of this, a lawyer's misuse of IOLTA funds can appear legitimate, making IOLTA accounts particularly susceptible to laundering

money. Financial institutions are required under federal regulations to develop policies, procedures and processes that enable the bank to identify questionable sources of funds, and other potential areas of money laundering.

<p align="center">**MISSOURI'S UNIFORM FIDUCIARIES LAW FUNDAMENTALS**</p>

29.     The Uniform Fiduciaries Act, promulgated by the Commissioners on Uniform State Laws and adopted by more than 25 states, modifies a bank's common law liabilities in dealings with fiduciaries. Missouri codified the Uniform Fiduciaries Act in Mo. Rev. Stat. §§ 469.240 through 469.350 and it is cited as the Uniform Fiduciaries Law ("UFL").

30.     Under Mo. Rev. Stat. § 469.270 titled "Check drawn by fiduciary payable to third person," a bank "is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with ***actual knowledge of such breach*** or with knowledge of such facts that this action in taking the instrument ***amounts to bad faith***."

31.     "The test of bad faith is whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of ***the fiduciary's breach become sufficiently obvious*** it is 'bad faith' to remain passive." *Watson Coatings v. Am. Express*, 436 F.3d 1036, 1041 (8th Cir. 2006). A bank's actions are commercially unreasonable if the bank violates its "normal procedures" or uses "procedures that unreasonably vary from general banking usage." *Id.*

32.    "The elements of a cause of action under [the Uniform Fiduciaries Law] are: (1) the defendant dealt with one who was a fiduciary; (2) the fiduciary breached his fiduciary duty; and (3) the defendant had either actual knowledge of the breach or knew sufficient facts to amount to bad faith." *Nangle v. Lauer*, 98 F.3d 378, 386 (8th Cir. 1996).

33.    When an attorney (fiduciary) has an IOLTA (trust account) at a bank, the bank has knowledge that all IOLTA deposits are fiduciary funds. Allegiant Bank dealt with Sigillito, an attorney and known fiduciary with an IOLTA account at the bank. Sigillito breached his fiduciary duty when he took undisclosed fees from fiduciary funds and when he paid interest on existing loans by diverting money from new loans. Allegiant Bank had actual knowledge of Sigillito's misappropriation of fiduciary funds as the IOLTA checks plainly show the diversion of fees and diversion of interest.

**ALLEGIANT BANK HELD SIGILLITO'S IOLTA ACCOUNT**

34.    Sigillito could not have successfully implemented his Ponzi scheme without an attorney IOLTA trust account. The IOLTA account gave a false sense of security to investors and the appearance of legitimacy.

35.    During 2000 and 2001, Sigillito used Allegiant Bank for all of his banking needs. Sigillito opened multiple business and personal accounts at Allegiant Bank, including an attorney IOLTA trust account (no. 404007010), an attorney business account (no. 404007544) and a personal account (no. 408016586). Sigillito also had a home mortgage loan (no. 361858) and a $300,000 equity line of credit (no. 364509) at Allegiant Bank.

36.    Sigillito directed lenders to transfer money for BLP loans into his attorney IOLTA trust account at Allegiant Bank. BLP investment funds are the only funds that flowed through Sigillito's accounts at Allegiant Bank. Sigillito never deposited a single penny of

revenue from his purported law practice into his IOLTA account. No legitimately earned funds ever came into any of Sigillito's accounts at Allegiant Bank.

37.     Sigillito, operating a one-man law office and without any discernable law practice, **deposited $6.28 million into his IOLTA account** at Allegiant Bank, during 2000 and 2001. Unlike a typical attorney trust account where payments are made to various clients, over **90% percent** of all funds withdrawn from Sigillito's IOLTA account went to Sigillito, Brown and their companies.

38.     Allegiant Bank's unique role as the bank holding Sigillito's IOLTA account and as the IRA custodian for BLP lenders provided Allegiant with direct knowledge that funds for investment in England were the only funds deposited into Sigillito's IOLTA account. Nonetheless, Allegiant paid checks and executed intra-bank transfers for the payment of fees and interest on BLP loans from Sigillito's IOLTA account.

39.     Allegiant Bank, consistent with a classic Ponzi scheme, applied new investor loan funds to pay interest on existing investors loans from the IOLTA account. Allegiant also assisted Sigillito to launder money by paying "fees" to Sigillito and Brown from the IOLTA account. The check memos noted that the various payments were for fees or interest.

### ALLEGIANT BANK WAS CUSTODIAN FOR IRA ACCOUNTS INVESTED IN THE BLP

40.     IRAs were the primary funding source for BLP loans and Sigillito could not have successfully implemented his Ponzi scheme without a cooperative IRA custodian.

41.     One marketing brochure for the BLP encouraged investors with IRAs to use Allegiant Bank as IRA custodian. The brochure stated that arrangements had "been made to maximize under-performing IRA accounts" by substituting an existing IRA custodian with "Allegiant Trust in St. Louis, Missouri" a "major regional bank and trust company."

42.     Prior to 2002, every lender to the BLP with an IRA established at least one custodial IRA account at Allegiant Bank. Some of the lenders, like plaintiff Linda Givens, established over a dozen IRA accounts at Allegiant with over $1 million invested in the BLP. Some of the plaintiffs, like Linda Givens also had their bank accounts at Allegiant Bank.

43.     Allegiant Bank as the IRA custodian had possession of original loan agreements for BLP loans signed by the lender (plaintiffs) and borrower. The loan agreements did not provide for up-front fees to anyone. In fact, the loan agreements made no provision for transferring loan funds directly to Brown or Sigillito.

44.     Allegiant's IRA custodian records and the IOLTA banking records show the timing and amount of BLP investments (IOLTA deposits) and the timing and amount of interest and principal repaid (IOLTA withdrawals). These records confirm that loan funds deposited into Sigillito's IOLTA for investment in England were diverted to pay interest on BLP loans and up-front fees to Sigillito and his co-conspirators. Allegiant's dual position as the IRA custodian and IOLTA deposit bank enabled it to see every side of each transaction and gave it more than sufficient information to unmask the fraud.

### ALLEGIANT BANK'S CEO (SHAUN HAYES) AND ALLEGIANT TRUST'S PRESIDENT (RICHARD MARKOW) HAD A COMPREHENSIVE UNDERSTANDING OF THE BLP

45.     Allegiant Bank was a privately owned bank that provided traditional banking services to the local community. As a community bank, bankers at Allegiant Bank developed close relationships with their customers.

46.     Sigillito was a preferred customer at Allegiant Bank and developed a close business relationship with Allegiant's president and CEO Shaun Hayes ("Hayes"). Hayes and Sigillito were both members of the St. Louis Racquet Club, a prominent social club where

business is often conducted in the dining and meeting rooms. Sigillito was a member of the board at the Racquet Club and recruited many club members to lend money to the BLP.

47. In October 2000, Hayes approved a $307,000 mortgage on Sigillito's home in Webster Groves, Missouri (Account No. 361858). In June 2001, Hayes approved a $300,000 line of credit on Sigillito's home (Account No. 364509).

48. Sigillito's home loan and line of credit required Hayes to review Sigillito's personal financial statement and tax returns. From his review, Hayes acquired a complete understanding of the BLP, as this was the principal source of income for Sigillito.

49. Sigillito also developed a close business relationship with the president of Allegiant Bank's trust division, Richard Markow ("Markow"), a seasoned banker, certified public accountant and licensed attorney.

50. One marketing brochure stated that the "point of contact for the IRAs is the president of Allegiant Trust Company Mr. Richard Markow at Allegiant Bank." Markow opened and managed IRA custodial accounts for lenders to the BLP. Many plaintiffs had direct contact with Markow in setting up and maintaining their IRAs at Allegiant.

51. Markow was in weekly contact with Sigillito and also coordinated many wire and intra-bank transfers for Sigillito between various accounts at the bank. Markow, like Hayes, also had a comprehensive understanding of the BLP and Sigillito's banking habits.

52. Markow closely monitored Sigillito's account activity and observed deposits of money into Sigillito's IOLTA account and the subsequent diversion through transfers and deposits between Sigillito's various accounts.

53. Markow's constant contact with Sigillito and the bank's dual position as IRA custodian and IOLTA deposit bank gave Markow, a seasoned banker, CPA and attorney, sufficient information to unmask Sigillito's misappropriation of IOLTA fiduciary funds.

## ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT THE
## LOAN AGREEMENT DID NOT PROVIDE FOR UP-FRONT FEES

54.     After Markow opened an IRA account at Allegiant Bank for Lewis Vollmar,

Sigillito on August 9, 2000, sent Markow a letter instructing him to transfer $26,400 from

Vollmar's IRA to Scott Brown's company. The letter stated: "It is my opinion that the

investments in which this money will be placed are suitable for IRA funds, and in no way

prohibited by the pertinent laws/regulations."

Mr. Richard E. Markow, President
Allegiant Trust Company
15061 Manchester Road
Ballwin, MO 63011

    In re: Account of Lewis C. Vollmar, Jr., M.D.

Dear Mr. Markow:

    Pursuant to the authority granted to me by my client in his letter to you of June 29, 2000, I hereby direct that a transfer in the amount of $26,400.00 be made by wire to:

    In Account With:

    J. Scott Brown Associates

| | |
|---|---|
| Account No.: | 001 3145 |
| Bank Name: | Bank of Blue Valley |
| | 11935 Riley |
| | Overland Park, KS 66225 |
| ABA Number/ | |
| Bank Routing No.: | 10 100 50 27 |
| Reference: | (name of transferor as to be used on loan contract) |

    I would ask you to arrange for this transfer as quickly as possible and to inform me when such transfer has been made.

    It is my opinion that the investments in which this money will be placed are suitable for IRA funds, and in no way prohibited by the pertinent laws/regulations.

    Thank you for your help in this matter.

                    Very truly yours,

                    Martin T. Sigillito

55.     A few weeks later, Markow received from Sigillito a Loan Agreement with

Mark Gilbert Morse ("MGM"), an English law-firm, as the borrower and Allegiant Bank, as

custodian for Vollmar's IRA, as the lender.

15

<div style="border: 1px solid black; padding: 10px;">

## LOAN AGREEMENT

This Agreement is made the _18th_ day of _August_ 2000

**BETWEEN:**

**ALLEGIANT BANK, CUSTODIAN OF THE LEWIS C VOLLMAR JUNIOR MD SELF-DIRECTED IRA** by Richard E Markow Esq, President, Allegiant Trust Company, c/o Martin T Sigillito Esq, Helfrey Simon & Jones, PC, 200 South Central Avenue, Suite 1500, St Louis, Missouri 63105, USA (hereinafter referred to as "Dr Vollmar IRA") (1) and **JOHN LAURENCE MARK, JOHN BEDE MORSE and JOHN GEORGE GIBSON** together known as Mark Gilbert Morse of 53 Grey Street, Newcastle upon Tyne, NE1 6EE (hereinafter referred to as "MGM") (2)

1.  Dr Vollmar IRA agrees to lend to MGM the sum of Eight thousand US dollars ($8,000).

2.  MGM agrees to repay the said sum of Eight thousand US dollars ($8,000) on the third anniversary hereof together with interest at the rate of 25 per centum per annum such interest to be payable annually in arrears the first payment to be made on the first anniversary hereof and annually thereafter until repayment of the said sum of Eight thousand US dollars ($8,000).

</div>

56. The Loan Agreement did not provide for up-front fees to anyone. Nor did the Loan Agreement make any mention of, or provisions for, loan funds being transferred to Brown or Sigillito. In fact, the loan agreement stated that "MGM agrees to repay" the principal with 25% interest, not that Brown or Sigillito agree to pay principal and interest.

### ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED IOLTA FUNDS BY PAYING INTEREST ON EXISTING LOANS WITH FUNDS FROM NEW LOANS

57. Nina Blaylock opened an IRA account with Markow at Allegiant and loaned $35,694.86 to MGM. Her loan provided for monthly interest payments of $490.80.

58. On December 7, 2000, Sigillito sent Markow a letter "on behalf of the firm of Mark Gilbert Morse" from Newcastle, England, and enclosed a "check payable to Allegiant Trust Company" for $490.80 representing the first month's interest repayment on the loan for

Nina Blaylock who held an IRA at Allegiant Bank. Sigillito's letter to Markow concluded: "It is expected that in months to come ***this payment will be made directly from Newcastle***."

CLIFFORD L. GOETZ
MARTIN T. SIGILLITO
OF COUNSEL

December 7, 2000

Mr. Richard E. Markow, JD, CPA
President
Allegiant Trust Company
15061 Manchester Road
Ballwin, MO 63011

Re:    **Custodianship of the Self-Directed IRA of Mrs. Nina Blaylock,**
        **of 18200 Blaylock Road, Benton, Arkansas 72015-8108;**
        **Loan to Mark Gilbert Morse, Solicitors**

Dear Mr. Markow:

I am pleased to write to you on behalf of the firm of Mark Gilbert Morse, Solicitors in Newcastle-Upon-Tyne, England.

On their behalf, I enclose my check payable to Allegiant Trust Company in the sum of Four Hundred Ninety Dollars eighty cents ($490.80) representing the first month's interest repayment on the loan agreement arranged for your customer by Mr. Hal Millsap of Retirement Benefit Solutions in Siloam Springs, Arkansas.

It is expected that in months to come this payment will be made directly from Newcastle.

Thank you for you attention to this matter.

Very truly yours,

Martin T. Sigillito

59.    Sigillito's representation to Markow that interest payments would "be made directly" from MGM, the English borrower, never materialized. Instead, every interest payment, and loan repayment, was made from Sigillito or Brown.

60.    One month after stating that interest payments would come from the borrower in England, Sigillito once again paid the $490.80 interest due on Nina Blaylock's loan to the BLP, with Check #2057 from his Attorney Business Account at Allegiant Bank.



```
Ck# 2057 Paid 01/26/2001 for $490.80
```

61.    Allegiant's bank records confirm that Sigillito's Attorney Business Account at Allegiant held only fees from Sigillito's IOLTA or which Brown sent to Sigillito after first getting IOLTA funds directly from Sigillito. Allegiant Bank's records confirm that Sigillito diverted fiduciary funds from his IOLTA account by paying interest on existing loans with fiduciary funds from new loans.

### Markow Had Extensive Contact With Sigillito and Brown

62.    On December 20, 2000, Markow contacted Sigillito because Margaret Price's IRA account lacked funds for her required minimum distribution under IRS regulations. After  Markow spoke to Brown, Markow faxed Brown wire instructions for Brown to wire $10,860 to Allegiant Bank for the minium distribution to Margaret Price's IRA.

## Allegiant Trust Company

### FAX COVER SHEET

DATE: _12-21-00_

TO: _Scott Brown_                FAX NUMBER: _913-469-8597_

FROM: _Rich Markow_              FAX NUMBER: _(636) 391-1635_

MESSAGE:

> S-  Please wire us $10,860 per the attached wire instructions.  This represents Margaret Price's 2000 contribution from her self-directed IRA.  Thanks.  R

63.     On January 29, 2001, someone from Allegiant contacted IRA client Cynthia Smith and in a disbelieving tone asked "**what is this British real estate stuff**?" This concerned Ms. Smith and she immediately contacted Scott Brown for reassurances.

64.     Brown eventually met with Markow so that errors of this sort could be avoided. Brown asked Markow and Markow agreed to prepare a monthly sheet setting out the IRA accounts and the monthly interest payments due under the IRAs held by Allegiant.

### ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED IOLTA FIDUCIARY FUNDS FROM CARL LAVENDER

65.     Another example of the diversion of fiduciary funds to Sigillito and Brown instead of the borrowers in England, occurred after Carl Lavender opened an IRA and custody account at Allegiant Bank.

66.     On January 16, 2001 Lavender loaned $140,000 to the BLP by issuing a check to Sigillito's IOLTA account.  The check memo stated: "Real Estate Loan."



67.     Two days after Lavender's check was deposited into Sigillito's IOLTA account, Check #506 was paid to J. Scott Brown and Associates. The check memo stated "Lavender."

19



Ck# 506 Paid 01/18/2001 for $140,000.00

68.     After depositing Lavender's check, Brown forwarded a check for $11,200 to Sigillito ($140,000 loan x 8%). The check memo stated "Lavender - consulting fee." On Jan. 18, 2001 Sigillito deposited Check #1366 into his Attorney Business Account at Allegiant.



69.     Allegiant Bank records confirm that Sigillito misappropriated fiduciary funds by paying himself and his co-conspirators undisclosed up-front fees.

### ALLEGIANT BANK VETTED THE BLP FOR ITS TRUST CLIENTS AND HAD A COMPREHENSIVE UNDERSTANDING OF THE BLP

70.     Allegiant Bank handled self-directed IRAs and advisory IRAs where Allegiant assisted in the decision regarding which securities to purchase. Doug and Linda Givens had a dozen self-directed IRAs at Allegiant holding assets worth over $1 million in BLP loans. They introduced their cousin Noel Bosse to Allegiant Trust's president Richard Markow,

whom they knew personally. Linda Givens was Markow's son's fifth grade school teacher.

Noel Bosse, as co-trustee and beneficiary of the Bosse Trust opened an IRA account at

Allegiant and appointed Allegiant Bank as co-trustee of the Bosse Trust (Account No. 28-00-1033-258).

71.    On February 9, 2001, Sigillito sent a letter to Markow which enclosed a

memorandum from Scott Brown in reference to the "Bosse Trust."



MARTIN T. SIGILLITO
OF COUNSEL

February 9, 2001

**VIA FACSIMILE 636-391-1635 ONLY**

Mr. Richard E. Markow
President
Allegiant Trust Company
15061 Manchester Road
Ballwin, MO   63011

**Re:  Bosse Trust**

Dear Rich:

　　　Enclosed is the memorandum from Mr. Brown which I promised you.  I believe that it provides all the information which you will need to bring this matter before the appropriate committee next week.

　　　If you require any additional information, please feel free to contact me at your convenience.  Many thanks for your help in this matter.

Very truly yours,

Martin T. Sigillito

72.     Sigillito's letter to Markow attached a seven page memorandum from Scott Brown seeking to convince Markow to approve investment in the BLP by the Bosse Trust. The memorandum noted that it concerned "Bosse Trust Matters" and promulgated that "a Trustee using his sound judgment" like Markow should allocate "a part of the Trust's funds" from the Bosse Trust "for use in the British Real Estate Backed Lending Program."

**MEMORANDUM**
**(via e-mail, Only)**

8th February 2001

To:     Richard Markow, Esq.
        President, Allegiant Trust Company
cc:     Martin T. Sigillito, Esq.
        Helfrey Simon & Jones, PC
re:     Bosse Trust Matters
From:   J. Scott Brown

This note addresses issues which as I understand it Mr. Sigillito asked be passed along to you for your consideration.

The crux here relates to the efficacy and propriety of a Trustee's using his sound judgment to consider allocating a part of the Trust's funds for use in the British Real Estate Backed Lending Program. In my view, there are three (3) considerations which need to be addressed in that context:

1.  overall security of the investment
2.  insulation from any currencies risk
3.  benefits or otherwise of diversifying somewhat from current investment planning tools and applications

73.     Brown's memo to Markow did not inform Markow of the fact that any of the promoters (Sigillito, Brown, or Cooper) received up-front fees. Instead, Brown's memo to Markow falsely stated that Kevin Cooper, one of the promoters of the BLP, "***charges no up-front fees***."

> To the best of his knowledge, Mr. Cooper's firm is the only finance boutique in the world **whose remuneration is entirely success-based. His firm charges no up-front fees.** He does not insist on any form of exclusivity. Mr. Cooper is confident that the packages that he can put together will always outpace the competition and **this has been proven year in, year out.**

74.     Under Allegiant Bank's written procedures, Allegiant's Trust Committee must approve the purchase of assets for advisory IRAs, like the Bosse Trust.

75.     Shortly after Markow reviewed Brown's memo, Markow presented the BLP to Allegiant's Trust Committee as an investment for the Bosse Trust.

76.     Markow, as the point of contact for BLP loans, upon information and belief, made a presentation to the committee in support of the loan to the BLP. Markow informed Allegiant's Trust Committee that the bank's trust department held many profitable self-directed IRAs holding BLP loans and that those customers were satisfied with the BLP. Markow also informed the committee of Brown's memo and of the bank's close association with Sigillito, including his extensive business with the bank.

77.     Markow, upon information and belief, explained to the committee that a material aspect of a cash investment in the BLP required the transfer of funds directly to Sigillito's IOLTA account and that transfer of funds for IRAs went directly to Brown. The Trust Committee approved the BLP as an investment for the Bosse Trust.

78.     When a check on a lawyer's IOLTA trust account causes a substantial overdraft of the account, the overdraft is often evidence that the lawyer has improperly commingled client funds in violation of his fiduciary duties.

79.     On February 12, 2001, Sigillito's ***IOLTA account was overdrawn by $84,742.88***. Allegiant chose to honor IOLTA Check #510 for $100,000 to J. Scott Brown & Associates, and after the check cleared, Sigillito's ***IOLTA account had a negative balance of $84,742.88***. This overdraft confirmed that Sigillito was commingling and misappropriating client trust funds, a fact made obvious to Allegiant Bank.



80.     The overdraft confirmed that Sigillito was commingling and misappropriating client trust funds and obligated Allegiant under its agreement with the Missouri Foundation to report Sigillito's IOLTA overdraft for "insufficient funds, irrespective of whether or not the instrument or debit is honored." Mo. Sup. Court Rule 4-1.15, Overdraft Reporting (b)(1).

81.     Allegiant Bank did not report the overdraft to the Missouri Foundation as required by its written agreement with the Foundation. Allegiant was motivated by its own financial interest to conceal any report of the overdraft for Sigillito, a valued customer, who

24

held multiple accounts at the bank, convinced others to open accounts there, convinced many to open IRAs at the bank, and had multiple loans with the bank.

82.     After Allegiant Bank advanced $84,742.88 to cover the overdraft, three more checks totaling $130,385 were submitted for payment and rather than advancing the additional sum, Allegiant returned the three checks because the IOLTA account was already overdrawn.



83.     Allegiant Bank was also obligated to report the three checks that were not honored. Allegiant also failed to report the three returned checks to the Missouri Foundation.

84.     Allegiant Bank's failure to report the overdraft and three returned checks to the Missouri Foundation, denied IOLTA account regulators any opportunity to investigate and stop Sigillito from misappropriating client fiduciary funds from his IOLTA trust account.

### ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED IOLTA FIDUCIARY FUNDS TO PAY MARGARET PRICE'S BLP INTEREST

85.     A typical Ponzi scheme uses new investor money to pay principal and interest to existing investors. Sigillito deposited all investor funds into his IOLTA account. Consequently, when Sigillito paid existing investors interest from his IOLTA account, Allegiant Bank was aware that Sigillito was laundering money in a classic Ponzi scheme.

86.     After Margaret Price opened an IRA account with Markow at Allegiant, she loaned $114,536 to the BLP. Her loan provided for monthly interest payments of $1,670.33.

87.     On February 27, 2001, IOLTA Check #519 for $1,670.33 was ***paid to Allegiant*** Bank for payment of the monthly interest on Margaret Price's loan to the BLP.



Ck# 519 Paid 02/27/2001 for $1,670.33

88.     On April 18, 2001, Allegiant Bank, at the request of Sigillito, initiated a ***bank-to-bank transfer*** for $1,670.33 from Sigillito's IOLTA account ***directly to Allegiant*** Bank for payment of interest on Margaret Price's loan to the BLP.

```
          MISSOURI LAWYER TRUST ACCOUNT FUND
          TRUST ACCOUNT OF MARTIN T SIGILLITO
          120 S CENTRAL AVE STE 1500
          CLAYTON MO 63105


          ON JUNE 5 THE RATE & APY OF THE ACCESS MMDA WILL TIER
          BASED UPON DAILY BALANCE - CALL 314-692-8800 FOR INFO.

          40400 701 0        NOW ACCOUNT

          Previous Balance    3-31-01        7,081.81
          +Deposits/Credits        5      142,503.65
          -Checks/Debits           8       89,880.89
          -Service Charge                       .00
          +Interest Paid                      11.79
          Current Balance                 59,716.36
    * - - - - - - - - - - -DESCRIPTIVE TRANSACTIONS- - - - - - - - - - *
    Date      Tracer   Description                         Amount
    4-02        1      CUSTOMER DEPOSIT                   35000.00
    4-17        8      WIRE J SCOTT BROWN ASSOC-PRICE      1670.33
                       /MGM
    4-20        1      CUSTOMER DEPOSIT                   50000.00
    4-26       61      NOEL BOSSE-FC MARGETRETT BOSSE     50000.00
    4-27       14      WIRE MARK GILBER MORSE              5833.32
    4-30      999      INTEREST PAYMENT                     11.79
    * - - - - - - - - - - -EFT ACTIVITY- - - - - - - - - - - - - - *
    Date      Tracer   Description                         Amount
    4-05      10405    MO LAWYER TRUST  IOLTA               10.56-
    4-18        61     TRANSFER TO TRUST CLEARING         1670.33-
                       ACCT # 0404002138 PER MS
```

89. The above bank-to-bank transfer occurred after Markow and Allegiant's Trust Committee vetted the BLP and knew that ***Sigillito's IOLTA account was the depository for investor funds***.

90. On June 5, 2001, IOLTA Check #549 for $1,670.33 was similarly ***paid to Allegiant*** Bank for payment of interest on Margaret Price's loan to the BLP.



Ck#549 Paid 06/05/2001 for $1,670.33

91. Allegiant Bank's unique role as the bank holding Sigillito's IOLTA account and as the IRA custodian for BLP lenders provided Allegiant Bank with direct knowledge that Sigillito was using his IOLTA account to misappropriate client funds. Allegiant Bank knew that Sigillito diverted money from new lenders to pay existing lenders interest, in a classic Ponzi scheme.

92. All of the above interest payments were made to Allegiant Bank and in turn Allegiant cashed the check, or credited the bank-to-bank transfer, to interest payments to the respective IRA account holder.

93. Allegiant Bank had direct knowledge that Sigillito, instead of the English borrower, paid the interest on BLP loans directly from funds in his IOLTA account.

94. Allegiant Bank participated in money laundering by knowingly allowing Sigillito to use new investor funds to pay interest on existing loans.

27

**ALLEGIANT BANK HAD ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED IOLTA FIDUCIARY FUNDS FROM THE BOSSE TRUST**

95.    On May 29, 2001, Sigillito deposited $1,506,574 into his IOLTA account from the Bosse Trust for purchase of a $1.5 million loan in the BLP. Sigillito's IOLTA account statement for May 2001 showed that the Bosse Trust's $1.5 million was deposited into Sigillito's IOLTA account on May 29, 2001.



96.    On May 29, 2001, two days after the Bosse Trust's $1.5 million investment was deposited into Sigillito's IOLTA account, Sigillito issued IOLTA Check #546 for $165,000 to himself and deposited the check into his Attorney Business Account at Allegiant. The check memo stated: "***Bosse Fee***."



Ck# 546 Paid 05/31/2001 for $165,000.00

97.    On June 4, 2001, IOLTA Check #545 for $1,355,000 (loan minus Sigillito's fee) was paid to Scott Brown's company. The check memo stated: "***Bosse Trust Proceeds***."



Ck#545 Paid 06/04/2001 for $1,335,000.00

98.    Allegiant as the IRA custodian had possession of original loan agreements and knew that the loan agreements did not provide for up-front fees to anyone. Allegiant also knew the loan agreements made no mention of, or provision for, loan funds to be transferred to Brown or Sigillito.

99.    Allegiant Bank deposited fiduciary funds into Sigillito's IOLTA account for purchase of new BLP loans. Allegiant cashed checks from Sigillito for fees from the fiduciary funds allocated for new loans. Allegiant also knew at that time that Sigillito breached his fiduciary duty. Allegiant had actual knowledge that Sigillito breached his fiduciary duty as the IOLTA checks plainly showed the diversion of fiduciary funds.

**ALLEGIANT BANK VETTED THE BLP FOR THE CWIAKALA LOAN
AND TRANSFERRED LOAN FUNDS INTO SIGILLITO'S IOLTA ACCOUNT**

100.    In early June 2001, Sigillito convinced Stanley Cwiakala, an 84 year old retiree from Arizona, to invest in the BLP by taking out a loan at Allegiant Bank using the BLP as the collateral for the loan. Sigillito told Cwiakala that he would make all interest payments to Allegiant and also pay interest to Cwiakala on the BLP loan.

101.    Sigillito handled the loan paperwork and upon information and belief, met with Shaun Hayes who approved Loan No. 364099 for Cwiakala in the amount of $107,828.20.

102.    On June 14, 2001, Allegiant Bank advanced loan funds of $107,828.20 *directly into Sigillito's IOLTA account* for Loan No. 364099 to fund a BLP loan of that amount.

103.    Immediately after the proceeds for Loan Number 364099 were deposited into Sigillito's IOLTA account, Sigillito issued IOLTA Check #552 to Brown for $99,202.21. The check memo stated: "Cwiakala - MTS 8%." This represented the loan amount minus an 8% fee to Martin T. Sigillito.



Ck#552 Paid 06/18/2001 for $99,202.20

104.    Sigillito also issued IOLTA Check #551 for $8,626 to himself for the 8% fee on the $107,828.20 loan proceeds that Allegiant deposited into Sigillito's IOLTA account.



Ck#551 Paid 06/14/2001 for $8,626.00

105.    Allegiant Bank deposited the loan funds into Sigillito's IOLTA account, and knew that these funds were fiduciary funds slated for the BLP. Allegiant cashed the check from Sigillito for fees from IOLTA fiduciary funds and knew at that time that Sigillito breached his fiduciary duty. Allegiant had actual knowledge of the breach as the IOLTA checks plainly show the diversion of fiduciary funds.

106. Markow was a personal friend of Doug and Linda Givens, and knew that the Givens' had their bank accounts at Allegiant Bank, had a dozen IRAs at Allegiant Bank, and loaned over $1 million to the BLP.

107. Sometime around late September 2001, Sigillito convinced Doug Givens to borrow $100,000 from Allegiant Bank using the BLP loan as the collateral in return for a one year loan at 25% interest.

108. Doug Givens' company, Albion Consulting, was approved by Allegiant Bank for a $100,000 loan using the BLP loan as collateral. The loan funds for the loan were forwarded directly to Sigillito who deposited the funds into his IOLTA account.

109. By early September 2001, Allegiant Bank and its senior bankers including Hayes and Markow had vetted the BLP five separate times:

(a). The first time in October 2000, when Allegiant approved the BLP as the source of income for Sigillito for his $307,000 mortgage on his home.

(b). The second time in February 2001 when Allegiant approved a $1.5 million investment in the BLP as co-trustee of the Bosse Trust.

(c). The third time in June 2001 when Allegiant approved the BLP for collateral on the $107,828 loan to Cwiakala.

(d). The fourth time in June 2001 when Allegiant approved the BLP as the source of income for Sigillito in approving a $300,000 equity line of credit.

(e). The fifth time in late September 2001 when Allegiant approved the BLP as collateral on Robert Givens' $100,000 loan.

## ALLEGIANT BANK ACQUIRED ACTUAL KNOWLEDGE THAT SIGILLITO MISAPPROPRIATED FIDUCIARY FUNDS

110. Sigillito and Brown wore multiple hats to maintain their fraud. First, they were the promoters of the BLP and in that role they (a) controlled where to house the IOLTA accounts, (b) which bank to act as IRA custodian for the BLP, and (c) whom to recruit as the English borrower. Second, they were also advisors to the investors and in that role controlled the flow of information to the investors from the IRA custodian and the borrower. Third, they controlled the flow of funds from the lenders and provided no transparency on the flow of investor funds.

111. Sigillito and Brown's excessive control and complete lack of transparency were red flags sufficient to alert Markow of the need to investigate.

112. By early October 2001 Markow was aware of the following:

(a). IRA Loan Agreements in his possession made no provisions for up-front fees, nor did the Loan Agreements provide for funds transfer to Brown or Sigillito.

(b). The IRAs transferred funds to Brown without transparency.

(c). The IOLTA account exhibits multiple red flags that fiduciary funds were misappropriated. (i). Sigillito taking unauthorized fees to himself. (ii). Funds from the IOLTA account were used to pay interest on BLP debt. (iii). Circular transactions between Brown and Sigillito with no obvious business purpose.

113. By early October 2001, the long pattern of suspicious activity finally prompted Richard Markow to contact MGM, the English borrower, by telephone to inquire about the legality of the BLP and to ask questions about receipt of loan proceeds in the BLP.

114.     Markow learned from John Morse, one of the principals at MGM, that MGM received loan funds only after 32% up-front fees were taken by Sigillito. Morse explained that Sigillito, Brown, Cooper, and third-party brokers each received 8% of the loan. After deducting 32%, Sigillito or Brown would send the balance of the loan (68%) to MGM. Morse also informed Markow that back-end fees are charged when a loan was rolled over.

115.     Morse also informed Markow that MGM was very dissatisfied with the fee structure and hired a St. Louis law-firm, Husch & Eppenberger, now Husch Blackwell ("Husch") to review the refinancing of the BLP loans. Morse forwarded a memo to Markow dated February 13, 2001 showing him the 32% up-front fee structure on a BLP loan.

13 February 2001

**Strictly Private and Confidential**
Mr D J Smith
Princess Hotel
101 Portland Street
Manchester
M1 6DF

Dear Derek

**Re:     Ms Margaret A. Fancher**

I now enclose the original Agreement and two fee Authorities in connection with this matter.

I confirm having telegraphed to your account the sum of £44,400.37 as follows:-

| | |
|---|---|
| Original Loan | $100,000.00 |
| **Less:**     Fee Deduction | $32,000.00 |
| | |
| Monies received by Mark Gilbert Morse | $68,000.00 |
| | |
| Converted at :-     1.4555 = | £46,719.34 |
| **Less:**     Fees of K Cooper | £1,500.00 |
| Fees and Disbursements as per account herewith | £818.97 |
| | |
| Monies Telegraphed | £44,400.37 |

Yours sincerely
**JOHN B. MORSE**

34

## MARKOW REVIEWED SIGILLITO'S IOLTA ACCOUNT AND CONCLUDED THAT SIGILLITO MISAPPROPRIATED FIDUCIARY FUNDS

116.    Markow, a seasoned banker, CPA and attorney, believed that the up-front fees (32%), high interest rate (25%) and back-end rollover fees (15%) made the BLP an unsustainable investment vehicle. Markow and Allegiant Bank knew that the remaining loan funds, 68% after fees, would need to generate a 183% return (125% divided by 68%) in order to produce the promised interest of 25% and return of the principal.

117.    This prompted Markow to review Sigillito's IOLTA and other accounts at the bank where he readily observed multiple IOLTA fiduciary fund diversions for "fees" and deposits for fees by Brown into Sigillito's Attorney Business Account.

118.    Many IOLTA checks confirmed that ***Sigillito received up-front fees directly from his IOLTA account***.  One example of the diversion of fiduciary funds to Sigillito for fees occurred after Markow opened an IRA account for Winifred Leonard at Allegiant Bank.

119.    On February 7, 2001, Leonard loaned $40,000 to the BLP by issuing a check payable to Allegiant Bank. The check memo stated: "investment."

120.    On February 12, 2001, Sigillito issued IOLTA Check #514 for $3,200 to himself ($40,000 loan x 8%). The check memo stated "Leonard Fee."



121.    Another example of the diversion of fiduciary funds to Sigillito for fees occurred on May 16, 2001 when Robert Givens loaned $30,000 to the BLP for his IRA at Allegiant Bank. The check memo stated: "investment."

122.    On May 18, 2001, Sigillito issued IOLTA Check #542 for $2,400 to himself, an amount equal to 8% of the $30,000 Givens loan. The check memo stated "R. Givens fee."



Ck# 542  Paid  05/18/2001  for  $2,400.00

123.    The check memos of many IOLTA checks during the first half of 2001 show that Sigillito received up-front fees: IOLTA Check #514 for $3,200 (Leonard Fee)(2-12-01); IOLTA Check #530 for $2,800 (Yarberry Fee) (4-02-01); IOLTA Check #531for $4,000 (Milsap Fee)(4-23-01); IOLTA Ck #542 for $2,400 Givens Fee)(5-18-01); IOLTA Ck #546 for $165,000 (Bosse Fee) (5-31-01); IOLTA Ck #551 for $8,626 (Cwiakala Fee) (6-14-01).

124.    Not only did Sigillito take many up-front fees directly from fiduciary funds in his IOLTA account, Sigillito also received up-front fees from Brown. For example, Sigillito received an up-front fee from the $70,000 deposit for Linda Givens' IRA. The check from Brown was deposited into Sigillito's Attorney Business Account at Allegiant Bank. The check memo stated: "***Givens, L - IRA - 70K agents fee***."



125.    As examples of the many fees that Sigillito received from Brown and deposited into his account at Allegiant, during the first two months of 2001 Sigillito received $126,931 in up-front fees from Brown in seventeen separate checks:

| Check | Amount | Calculation | Note on Check Memo Section | Date |
|-------|--------|-------------|----------------------------|------|
| 1348 | $5,600 | ($70,00 x 8%) | "Wilkening - fees to agent" | 1–02-01 |
| 1349 | $5,600 | ($70,00 x 8%) | "Wilkening - Consulting" | 1–02-01 |
| 1351 | $24,000 | ($300,00 x 8%) | "Agents Fees - Givens/Smith" | 1–02-01 |
| 1352 | $24,000 | ($300,00 x 8%) | "Consulting - Givens/Smith" | 1–02-01 |
| 1353 | $5,333 | ($66,00 x 8%) | "Riverdale - Consulting" | 1–02-01 |
| 1354 | $1,984 | ($24,800 x 8%) | "Cynthia Smith - Consulting" | 1–02-01 |
| 1356 | $1,680 | ($21,000 x 8%) | "Sugg - Consulting fee" | 1–04-01 |
| 1363 | $5,600 | ($70,000 x 8%) | **L. Givens IRA** - $70K consulting" | 1-12-01 |
| 1364 | $5,600 | ($70,000 x 8%) | **L. Givens IRA** - $70K agents fee" | 1-12-01 |
| 1366 | $11,200 | ($140,000 x 8%) | "Lavender - Consulting Fee" | 1–23-01 |
| 1365 | $8,533 | ($80,000 x 8%) | "Vollmar-MGM-Consulting" | 1–24-01 |
| 1385 | $8,250 | ($103,125 x 8%) | "**Smith Rollover** - Consulting" | 2–07-01 |
| 1381 | $5,333 | ($66,000 x 8%) | "Riverdale - Consulting" | 2–07-01 |
| 1383 | $2,185 | ($27,432 x 8%) | "**D. & L. Givens IRA** - consulting" | 2-07-01 |
| 1384 | $2,185 | ($27,432 x 8%) | "**D. & L. Givens IRA** - Intro" | 2-07-01 |
| 1382 | $1,848 | ($23,109 x 8%) | "B.K. Moore - consulting" | 2-07-01 |
| 1388 | $8,000 | ($100,000 x 8%) | "Fancher - consulting" | 2-09-01 |

126.    IOLTA checks also confirm that Brown received up-front fees. IOLTA Check # 513 for $3,200 to J. Scott Brown & Associates (2-15-01) stated in the memorandum section that the check was for "Leonard fee." The check equals 8% of the $40,000 loan to the BLP by Winifred Leonard on February 13, 2001.



127.   Kevin Cooper received many up-front fees out of fiduciary funds from Sigillito's IOLTA account. During the first seven months in 2001 Cooper received IOLTA Check #508 for $3,500 (2-02-01); IOLTA Check #511 for $1,576 (2-06-01); IOLTA Check #533 for $5,000 (4-27-01); and IOLTA Check #555 for $4,465 (7-03-01).

128.   Allegiant Bank's IOLTA bank records confirm that Sigillito diverted fiduciary funds by paying himself and his co-conspirators undisclosed up-front fees.

129.   Allegiant Bank, as the IOLTA account bank and IRA custodian, had direct knowledge that Sigillito was using his IOLTA account to misappropriate client funds by paying himself, Brown, and Cooper up-front fees.

### ALLEGIANT BANK FAILED TO INFORM LAW ENFORCEMENT, REGULATORY AGENCIES, SUCCESSOR CUSTODIANS, OR THE VICTIMS OF SIGILLITO'S FRAUD

130.   Markow informed Hayes of his investigation and Hayes instructed him not to process any more IRA loans for Sigillito and to turn the matter over to the bank's attorneys.

131.   Markow updated Allegiant's legal counsel, Jan Alonzo, of his review of Sigillito's accounts and his conversation with John Morse. Alonzo contacted Husch, MGM's St. Louis law-firm, and the lawyers for Allegiant Bank and MGM held a couple of meetings which Markow attended. At one meeting, an Allegiant trust officer stated that "Marty needed a damned good criminal lawyer" because "what was going on was verging on fraud."

132.   On October 9, 2001, Sigillito aware that his scheme may be in jeopardy, emailed Allegiant and copied Hayes and Markow that he was "absolutely **mystified by the sudden change of attitude**" and that given his "extensive dealings with the Bank" he would have never expected "anything that even remotely resembled a Star Chamber proceeding."

**Sigillito, Martin**

| | |
|---|---|
| To: | aweiss@allegiantbank.com |
| Cc: | shayes@allegiantbank.com; rmarkow@allegiantbank.com; rfitzgibbons@allegiantbank.com; jsba@jscottbrown.com; jsbaseocs@hotmail.com |
| Importance: | High |

Scott Brown, who is today traveling back to the States from abroad, has asked me to relay to you his desire to meet with you and your colleagues either on Friday of this week or Monday next.

We are absolutely mystified by the sudden change of attitude. As both Mr. Brown and I have said to you, we stand ready to answer any questions or provide any material you may need.

Given my extensive dealings with the Bank and the Trust Company, both personally and on behalf of a number of clients, I would never have expected to encounter anything that even remotely resembled a Star Chamber proceeding. I am still hopeful that will change.

I am not available for the balance of today, because of previously-scheduled client meetings. Both Mr. Brown and I are at your disposal by telephone as from the start of business tomorrow.

133.   On October 10, 2001, Allegiant Bank informed Hal Milsap, on of the third-party recruiters working with Sigillito that they could not talk to him about loan repayment.

134.   Later that day on October 10, 2001, Sigillito and Brown hired James Dankenbring with the St. Louis law-firm of Spencer Fane Britt & Brown to represent them with Allegiant Bank.

135.   On October 11, 2001, Brown informed Sigillito in an email that "someone in the upper reaches of Allegiant management has formally ordered an embargo on contact with any person who in any way is involved in this whole series of IRA custodial transactions." The email stated that Allegiant Bank employees were "ordered not to talk" to us.

136.     On October 11, 2011, MGM's counsel wrote Sigillito that "after speaking with Allegiant Bank's counsel," they would like to speak with Sigillito so they could "understand the structure of these transactions and the various alternatives to paying off the loans."

137.     The distance that everyone maintained from Sigillito's fraud is evident by the October 12, 2011 letter from Helfrey Simon & Jones, the law-firm where Sigillito had his office and was "of counsel" and informed him that his "of counsel relationship with this firm is terminated." Sigillito was ousted from his office at Helfrey and that's when he opened his solo law practice.

138.     On October 15, 2001, Brown informed Sigillito in an email that Markow ordered Allegiant employees not to process "outstanding IRAs."

```
From:      "J. Scott Brown" <jsba@jscottbrown.com>
To:        "James R. Dankenbring, Esq." <jrd@dgohlaw.com>; "Thomas W. Jerry, Esq." <tj@dgohlaw.com>
Cc:        "Kevin Cooper (US)" <kcooper1961@aol.com>; "Martin T. Sigillito, Esq."
Sent:      Monday, October 15, 2001 11:50 AM
Subject:   Allegiant Bank
Gentlemen,

Hal Millsap just rang me to advise that Allegiant's Ms. Robin Fitzgibbons just rang him to say that Rich Markow,
Esq. had told her that Allegiant were NOT to be processing the now outstanding IRAs which they have had on
their desks well prior to this latest flare-up and which he (Millsap) had been led to believe were progressing
through the system.

Markow has told Fitzgibbons that these documents will be returned to Millsap.
```

139.     The next day, on October 16, 2001, Brown informed Sigillito by email that it was Allegiant that contacted MGM to express its concerns about the legality of the BLP:

> It is now confirmed by John Morse that **it was Allegiant Bank that initially contacted MGM**. The reason for the contact was to **express Allegiant's concerns about the propriety/legality of the deals being done**, the methodology of the monies being transferred, the purposes for the monies, etc.

*Allegiant and MGM have had a couple of meetings* at which **Markow** and Weiss
*were in attendance*, and at which on one occasion a member of the Husch firm was
in attendance. At those sessions explanations were given by MGM. The results were
that . . . Allegiant reacted very adversely to the property development deals.
Apparently *their main concerns* arose from the rates of interest charged and the
*arrangements fees*. Someone from Allegiant recited to MGM that "Marty needed a
damned good criminal lawyer" and that "*what was going on was verging on fraud*."

140.    One of the many memos from Brown regarding the division of fees confirmed
that Aguilar's $80,228.13, loan is fraught with **up-front fees of 32%** divided in four equal
parts between Sigillito, Brown, Cooper and third-party brokers, each getting 8%.



```
From:       "J. Scott Brown" <jsba@jscottbrown.com>
To:         "Martin T. Sigillito, Esq." <sigillitom@hsjlawstl.com>; "Kevin Cooper (US)"
Cc:         "jsbassocs" <jsbassocs@hotmail.com>
Sent:       Friday, June 15, 2001 6:44 PM
Subject:    Fw: Aguilar IRA -
Gents,

In haste.

Applying the 32% fees structure to this one the math is as follows:

$80,228.13 x 68% = $54,555.13 = sum to be shipped/lent

$80,228.13
-$54,555.13
 25,673.00 = 32% fees divided by 4 = $6,418.25 each to MTS, MTS's introducer in St. Louis, KC and self.
```

141.    On October 17, 2001, Brown emailed his attorney, James Dankenbring: "Husch
reported to MGM that it is their opinion that Marty and I have gravely breached not only
Missouri state law but also ***federal civil and criminal statutes***.. . . .We are painted to be, in
effect, criminals . . . This raises the question in my mind of ***what Husch has been fed by
Allegiant***, as opposed to what they have developed on their own, based, of course, upon ***what
Allegiant fed them to begin with***."

142.    On October 18, 2001, Brown sent a memo to Sigillito stating: "Allegiant and Husch are pushing hard on the issue of civil and criminal violations allegations, ***possible reporting to regulators***. . . . a number of Missouri laws have been broken and furthermore that ***federal laws have also been broken*** and that it is a likelihood that ***we will all be investigated for fraud***. . . . They apparently have also stated that Allegiant may not have any choice but to ***involve regulatory authorities*** . . . ."

143.    Upon information and belief, Allegiant's counsel, Jan Alonzo, after an extensive investigation, informed Hayes and Markow that Sigillito was diverting fiduciary funds in his IOLTA account in a classic Ponzi scheme where IOLTA payments to existing investors were being paid by IOLTA deposits from new investors.

144.    Upon information and belief, Alonzo informed Hayes and Markow that Allegiant Bank could legally be held responsible for the millions it held in custody as the IRA custodian and for the money that passed through Sigillito's IOLTA account. Alonzo also informed Hayes and Markow that Allegiant was the co-trustee of the Bosse Trust and would be liable for approving the purchase of the $1.5 million loan to the BLP by the Bosse Trust.

145.    Upon information and belief, after considering various options, Shaun Hayes, as president and CEO of Allegiant Bank, made the final decision to give Sigillito one week to find a successor custodian, or Allegiant would withdraw as IRA custodian. Hayes flatly rejected Markow's choice for the bank to contact regulators and inform the account holders of their findings and concerns. Hayes was concerned with the bank's liability and instructed Markow not to alert governmental authorities or the bank's IRA customers about the fraud.

**ALLEGIANT BANK CONSPIRED WITH SIGILLITO TO MOVE HIS IOLTA AND THE IRAS TO ANOTHER BANK WITHOUT DISCLOSING SIGILLITO'S MISAPPROPRIATION**

146.    On October 26, 2001, Arthur Weiss, an Allegiant Bank senior executive, sent a letter to Sigillito informing him that Allegiant has "made the decision that *we no longer want to serve as custodian*" and if a "successor custodian" is not appointed within a week Allegiant would "notify the IRA depositors of our election to resign as custodian."



2122 Kratky Road
St. Louis, Missouri 63114
(314) 692-8200 • Fax: (314) 692-8500

Martin T. Sigillito
120 South Central Avenue
Suite 1500
St. Louis, MO 63105

Dear Marty:

We appreciate the time you and your associates have taken to provide further information regarding the various international investments we hold for your clients in a number of self-directed IRA custodial accounts. We have made the decision that we no longer want to serve as custodian. Approximately three weeks have passed since our meeting earlier this month. We have been contacted by a successor corporate custodian for the accounts and we are hopeful that you will be successful in securing their services. However, if we are not notified by November 2 that a successor custodian has been appointed, we intend to notify the IRA Depositors of our election to resign as custodian. The form of the letter we intend to send is enclosed for your information.

Please contact our counsel, Jan Alonzo, of Thompson Coburn LLP, if you have any questions or if you have made arrangements for a successor custodian.

ALLEGIANT BANK

By: _____
      Arthur E. Weiss
      Executive Vice President/Wealth Management

cc: James Dankenbring

147.    Allegiant's letter to Sigillito regarding the timing of the bank's resignation as custodian was intended to force Sigillito to expedite his search for a successor custodian.

148.    There was no legitimate reason for Allegiant Bank to negotiate the timing of their resignation with Sigillito. The IRA custodial agreements were between the IRA account holders and Allegiant Bank. Sigillito was not a party to the custody agreements.

149.    Most importantly, Allegiant Bank and its senior management concluded that Sigillito was engaged in fraud, and Allegiant actively participated in the fraud by allowing Sigillito to find a substitute custodian without disclosing the fraud.

150.    The fact that Allegiant Bank sent the letter to Sigillito, instead of the IRA account holders (the bank's clients) threatening to resign is telling of Allegiant Bank's aim to exit the BLP without disclosing their findings of Sigillito's fraud to its customers.

151.    Two days after Allegiant Bank mailed the October 28, 2001 letter to Sigillito, Millennium Trust agreed to take over as IRA successor custodian. However, Millennium, like the victims of Sigillito's fraud, was unaware of Allegiant's findings of Sigillito's fraud.

152.    Allegiant's silence allowed Sigillito's Ponzi scheme to move undetected to Millennium Trust where Sigillito embezzled another $46.45 million.

153.    After Millennium Trust announced its agreement to take over as successor custodian, Allegiant Bank agreed to delay the release of its letter of resignation for two weeks so that Hal Milsap, one of the third-party brokers, could contact each account holder in person and convince them that the transfer to Millennium was initiated because Allegiant Bank was not servicing the BLP loans.

44

154.    Allegiant Bank also agreed to allow Sigillito to review and edit the bank's resignation letter. Allegiant incorporated many of Sigillito's requested revisions, including the paragraph that Millennium was the new custodian. Omitted from Allegiant's resignation letter is any mention that Allegiant is resigning because it uncovered that Sigillito was misappropriating fiduciary funds.

155.    On November 12, 2001, Sigillito's attorney spoke with Allegiant Bank's counsel who informed him that the resignation letter could result in phone calls regarding the status of the client's IRA accounts, and that Sigillito had to bring every account current.

156.    On November 13, 2001 Allegiant's counsel, Jan Alonzo, sent a letter to Sigillito's counsel: "We have previously talked about the situations in which ***investment assets have not been received*** for self-directed IRA Accounts" and enclosed the following "list of the accounts" where original loan agreements were not received by Allegiant.

| 1. | Lewis C. Vollmer IRA, wired funds to J. Scott Brown on 4/23/01 in the amount of $19,200.00 |
| --- | --- |
| 2. | Carl Lavender Self-Directed IRA, A/C #69005166330, wired funds to J. Scott Brown on 4/27/01 in the amount of $51,272.10 |
| 3. | Iris Pearson Self-Directed IRA, A/C #69006965334, wired funds to J. Scott Brown on 5/14/01 in the amount of $29,466.00 |
| 4. | Patricia N. Ambrose Self-Directed IRA, A/C #69000364351, opened 6/5/01, wired funds to J. Scott Brown on 6/22/01 in the amount of $129,020.71 |
| 5. | Richard Aguilar Self-Directed IRA, A/C #69000196357, opened 6/15/01, wired funds to J. Scott Brown on 6/5/01 in the amount of $80,228.13 |
| 6. | David and Diane Caldwell Custody, A/C #60001240351, opened 8/1/01, wired funds to J. Scott Brown on 8/22/01 in the amount of $9,945.47 |

157.    Each listing confirmed that Allegiant Bank did not wire the loan funds to the English borrower, instead, Allegiant "wired funds to J. Scott Brown." Not only did Allegiant not receive confirmation that the English borrower received the IRA funds, Allegiant did not even receive the original Loan Agreement after sending Brown the money. For example, the funds for Vollmar's loan were wired to Brown on April 23, 2001, yet Allegiant was without a Loan Agreement for Vollmar six months after wiring the money to Brown.

158.    On November 13, 2001, James Dankenbring emailed Sigillito: "I spoke with Jan Alonzo [Allegiant Bank's counsel] late yesterday afternoon. . . . Jan needs to know when the loan documentation for the various accounts will be forthcoming. She is ***concerned that the notice letters will result in phone calls*** from clients wanting to know the status of their accounts. If there is no loan documentation in an account, the bank will have to report that fact in response to direct questioning from a client. . . . it would be more convenient to have all documentation in place at the time of the account transfers."

### ALLEGIANT BANK, WITH ACTUAL KNOWLEDGE OF SIGILLITO'S FRAUD, SILENTLY TERMINATED ITS RELATIONSHIP WITH SIGILLITO WITHOUT INFORMING LAW ENFORCEMENT, REGULATORY AGENCIES, SUCCESSOR BANKS, SUCCESSOR CUSTODIANS OR THE VICTIMS OF SIGILLITO'S FRAUD

159.    On November 13, 2001 Allegiant Bank sent a letter to the IRA account holders advising them that "Allegiant Bank has ***elected to resign as Custodian*** of your IRA effective December 14, 2001. . . . . arrangements have been made to transfer custodianship of your self-directed IRA to Millennium Trust Company."



November 13, 2001

Mr. Richard Aguilar
1016 Leigh Ann Court
Jackson, MO 63755-2596

**RE: IMPORTANT NOTICE about your Individual Retirement Account ("IRA")**

Dear Mr. Aguilar:

Allegiant Bank is currently serving as Custodian of your self-directed IRA. The purpose of this letter is to give you notice that Allegiant Bank has elected to resign as Custodian of your IRA effective December 14, 2001.

It is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of your self-directed IRA to Millenium Trust Company, LLC. Please note that it is important that you act promptly to complete the transfer of your IRA to another financial organization of your choice. If the transfer of your IRA is not completed by December 14, 2001, it may result in the distribution of assets as permitted by your IRA Agreement, which could have adverse tax consequences to you.

160.    Allegiant Bank's November 13, 2001 letter to the IRA account holders did not disclose the bank's knowledge of up-front fees. The letter also did not include Allegiant's knowledge that St. Louis law-firm, Husch, while representing the English borrower MGM, concluded that the BLP was a complete fraud.

161.    By November 13, 2001, Allegiant Bank's senior management, including its president and CEO, Shaun Hayes, had actual knowledge that Sigillito was diverting fiduciary funds by making payments to existing investors from IOLTA deposits from new investors.

162.    Allegiant Bank's CEO and its senior management deliberately chose not to disclose their knowledge of Sigillito's fraud to law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud, so that Sigillito could move his IOLTA account to another bank (Pioneer Bank) and his IRAs to another custodian (Millennium Trust).

163.    Allegiant Bank conspired with Sigillito to move his IOLTA account and the IRAs to other financial institutions and custodians without disclosing that Sigillito was misappropriating fiduciary funds.

164.    Allegiant Bank actively participated in Sigillito's fraud by suppressing its knowledge of the fraud. Allegiant's silence allowed Sigillito to find another bank to hold his IOLTA account, and another custodian for the IRA accounts.

165.    Allegiant's decision to suppress its knowledge of Sigillito's fraud materially assisted Sigillito and allowed his Ponzi and embezzlement scheme to move to other banks where Sigillito embezzled $46.45 million from his victims over the next eight years.

166.    The foreseeable result of Allegiant Bank's silence and its failure to report Sigillito was that Sigillito would continue the same fraudulent conduct with the successor IOLTA bank and IRA custodian.

167.    The foreseeable result of Allegiant's silence in not reporting its knowledge of Sigillito's fraud was that the IRA customers would continue to invest in the BLP.

168.    Allegiant Bank failed to act in a commercially reasonable manner by staying silent upon uncovering that Sigillito was misappropriating fiduciary funds and such silence was commercially unjustifiable.

169.    Allegiant Bank violated Missouri's Uniform Fiduciaries Law by not informing law enforcement, regulatory agencies, successor custodians, or the many victims of Sigillito's fraud that Sigillito was diverting fiduciary funds through his IOLTA account in a classic Ponzi scheme where payments to existing investors were being paid by IOLTA deposits from new investors.

170.    Defendant PNC Bank, as the ultimate successor in interest to Allegiant Bank, is accountable for Allegiant Bank's violation of Missouri's Uniform Fiduciaries Law.

## AFTER ALLEGIANT BANK OUSTED SIGILLITO, ALLEGIANT ACCEPTED BLP FUNDS FOR INTEREST AND LOAN REPAYMENT

171.    Stanley Cwiakala, an elderly retiree and bank customer, at the direction of Sigillito, took out a loan at Allegiant using the BLP as collateral. On June 14, 2001, Allegiant Bank *advanced loan funds directly into Sigillito's IOLTA account* for Loan No. 364099.



172.    After Allegiant Bank ousted Sigillito from the bank, Allegiant accepted over twenty-seven payments from Scott Brown for interest payments on Loan Number 364099.

173.    Check #1223 is a typical check payable to "Allegiant Bank" from Brown for interest on Loan No. 364099. The check memo states: "Interest on Note Number 364099."



174.    Each of the following twenty-seven checks paid to Allegiant Bank by Scott

Brown stated in the check memo that interest payment was for Loan Number 364099.

| Check #1030 | 10-10-01 | $1781.66 | | Check #1218 | 6-09-03 | $578.44 |
|---|---|---|---|---|---|---|
| Check #1043 | 11-03-01 | $693.69 | | Check #1228 | 7-23-03 | $485.78 |
| Check #1081 | 2-20-02 | $1272.12 | | Check #1229 | 8-04-03 | $219.35 |
| Check #1090 | 4-03-02 | $664.49 | | Check #1233 | 8-13-03 | $354.33 |
| Check #1101 | 5-13-02 | $664.32 | | Check #1236 | 9-18-03 | $354.34 |
| Check #1126 | 8-08-02 | $1297.13 | | Check #1245 | 10-20-03 | $342.89 |
| Check #1126 | 10-22-02 | $1272.12 | | Check #1249 | 11-19-03 | $354.32 |
| Check #1129 | 11-12-02 | $646.48 | | Check #1252 | 12-12-03 | $342.89 |
| Check #1133 | 12-06-02 | $584.78 | | Check #1256 | 1-16-04 | $354.32 |
| Check #1137 | 1-14-03 | $578.44 | | Check #1262 | 2-12-04 | $354.32 |
| Check #1141 | 2-04-03 | $578.44 | | Check #1268 | 3-22-04 | $331.46 |
| Check #1206 | 3-10-03 | $522.45 | | Check #1269 | 4-27-04 | $354.32 |
| Check #1208 | 4-09-03 | $578.44 | | Check #1276 | 5-25-04 | $342.89 |
| Check #1213 | 5-07-03 | $559.78 | | | | |

175.    On July 14 2004, three years from the date of the initial Cwiakala loan,

Allegiant Bank received a balloon payment of $174,097.75 on the Cwiakala loan.

176.    At the time that Allegiant Bank accepted the interest and loan payments on

Loan No. 364099, Allegiant Bank was fully aware that Scott Brown's account was where

BLP investment funds were deposited. No legitimately earned funds ever came into any of Brown's accounts, his sole source of deposits accounts were misappropriated BLP funds.

177.    When Brown made the interest and loan payments on Loan No. 364099, Allegiant Bank knew from its investigation of Sigillito that the payments to Brown were diverted fiduciary funds intended for the borrower in England, not interest payments on existing loans.

178.    Under the UFL, if a bank "benefitted from the proceeds of the fiduciary's misappropriation or received any of the fruits thereof, the banks could have been held liable to the principal even absent actual knowledge of a breach of fiduciary obligation." *Trenton Trust v. Western Surety,* 599 S.W.2d 481, 493 (Mo. 1980). A bank "may incur liability" by "appropriating" fiduciary funds for payment of a "debt to the bank." *Id*.

179.    By accepting interest payments on Loan Number 364099, ***Allegiant Bank directly benefitted from the diversion of fiduciary funds*** and Allegiant Bank is liable for appropriating fiduciary funds for payment of interest on Loan Number 364099.

180.    Doug Givens, at Sigillito's insistence, also took out a loan at Allegiant Bank using the BLP as collateral. On September 28, 2001, Allegiant Bank advanced $100,000 from the loan to Givens' directly to Scott Brown. On September 30, 2002, nine months after Allegiant Bank ousted Sigillito, Allegiant accepted fiduciary funds from Scott Brown for repayment of the $100,000 principal on Allegiant's loan to Doug Givens.



10/04/02    1631    100000.00

181.    On September 30, 2002, Brown emailed Sigillito and Cooper and noted in his email the repayment of $100,000 to Allegiant Bank for Doug Givens' loan:

From: "J. Scott Brown" <jsba@jscottbrown.com>
To: <KCooper1961@aol.com>
Cc: "Martin T. Sigillito, Esq." <m.sigillito@worldnet.att.net>
Subject: Re: House keeping
Date: Mon, 30 Sep 2002 14:38:09 -0500

Kevin,

Thanks for the note, below.

Please note that Marty's son is not believed to be seriously ill.

GIVENS

Marty will be back at his office tomorrow as per usual. He will see Doug Givens tomorrow and will give him the check for $100K in repayment of the loan D. Givens made in that sum wherein he lent as 'Albion Consulting

As far as proving the repayment, Marty can prepare a Receipt for the benefit of Princess/Smith and obtain Doug Givens' signature on that when he hands him the check tomorrow. Marty can copy each of us with the signed version

182.    By accepting $100,000 of fiduciary funds from Brown for repayment of the principal on Doug Givens' loan, *Allegiant Bank directly benefitted from the misappropriation* of fiduciary funds.

183.     By the time the payment on the Givens' loan was received, Allegiant Bank was fully aware that Scott Brown's account was where BLP investment funds were deposited. No legitimately earned funds ever came into any of Brown's accounts. His sole source of revenue was misappropriated funds from the BLP.

184.     When Brown made the payment on the Givens' loan, Allegiant Bank knew from its investigation of Sigillito that all payments to Brown from Sigillito were diverted fiduciary funds intended for the borrower in England, not interest payments on existing loans.

185.     Allegiant Bank accepted the above fiduciary funds from Brown without an inquiry into the source of Brown's funds. Allegiant had direct contact with James Dankenbring, Brown's attorney from its investigation nine months earlier, and could easily have asked Jan Alonzo to contact Dankenbring to inquire into the source of the funds.

186.     It was commercially unjustifiable and bad faith for Allegiant Bank, with actual knowledge of Brown's involvement in the misappropriation of fiduciary funds during Allegiant Bank's tenure as the IOLTA bank, to not inquire into the source of the funds.

187.     Under the UFL, Allegiant Bank received proceeds of misappropriated fiduciary funds on multiple instances and is liable because it had actual knowledge that the fiduciary was breaching his fiduciary obligation, or acted with knowledge of such facts that its action in taking the fiduciary funds was commercially unjustifiable and amounted to bad faith by not investigating the source of the fiduciary funds paid to Allegiant Bank.

188.     One month after Allegiant Bank ousted Sigillito for diverting fiduciary funds, Allegiant Bank on January 14, 2002 transferred $13,884.79 to Millennium Trust Company for Sigillito's IRA.



189.     Allegiant Bank, as IRA custodian, was aware on January 14, 2002, that payments by Sigillito to fund his IRA were entirely from misappropriated fiduciary funds.

190.     Allegiant Bank, as IRA custodian, was aware on January 14, 2002, that payments by Sigillito to fund his IRA were entirely from misappropriated fiduciary funds. On July 20, 2001, Sigillito paid Allegiant Bank $25,500 to fund his personal IRA, from his Attorney Business Account which contained diverted fiduciary funds.



Ck#2197 Paid 07/23/2001 for $25,500.00

191. In another instance, on April 19, 2001, Sigillito diverted $11,203 to Allegiant Bank from his Attorney Business Account to fund his personal IRA.



Ck# 2110 Paid 04/19/2001 for $11,203.00

192. Allegiant Bank was also aware at the end of 2001, that Sigillito paid $11,779.58 to Allegiant Bank in interest payments on his home mortgage loan (Loan No. 361858) entirely from diverted fiduciary funds.

| FEDERAL EIN 43-0437475 | ALLEGIANT BANK 2122 KRATKY ROAD SAINT LOUIS, MO (314) 692-8800 | | 63114 | | 01-29-2002 PAGE 1 |
|---|---|---|---|---|---|

OMB NO. 1545-0901
FORM 1098
2001 MORTGAGE/LOAN INTEREST STATEMENT

MARTIN T SIGILLITO
MARGARET A FINAN
350 SIDNEY PLACE
ST LOUIS MO 63119

TAX ID NUMBER
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

| NOTE NUMBER | NOTE DATE | MATURITY DATE | CURRENT INT RATE | YEAR END BALANCE | INT PAID INT REFUNDED MTG POINTS |
|---|---|---|---|---|---|
| * 361858 | 10-27-00 | 10-27-01 | 7.0000 | CLOSED | 11,779.58 |

193. Under the UFL, Allegiant Bank received fiduciary funds and is liable because it had actual knowledge that Sigillito, as a fiduciary, was breaching his fiduciary obligation, or in the alternative Allegiant Bank acted with knowledge of such facts that its actions amounted to bad faith.

194.    Markow was personal friends with Linda Givens, and knew that Noel Bosse was her cousin. Markow was also aware of Sigillito's relationship with Givens and Bosse, and knew that Givens and Bosse loaned over $2.5 million to the BLP.

195.    After Allegiant Bank was appointed co-trustee of the Bosse Trust, Markow as the person in charge of that account, reviewed Scott Brown's memo explaining the benefits of the BLP for the Bosse Trust. Markow approved the purchase of $1.5 million in BLP loans for the Bosse Trust.

196.    When Allegiant Bank confronted Sigillito and ousted him from the bank, Allegiant remained co-trustee of the Bosse Trust, fully aware that Allegiant approved a $1.5 million loan to the BLP for the Bosse Trust. Allegiant had a fiduciary duty to the Bosse Trust to disclose its knowledge that Sigillito was misappropriating fiduciary funds.

197.    Allegiant Bank was instead concerned over the bank's liability in approving the BLP loans for the Bosse Trust and knowingly decided not to disclose its knowledge that Sigillito was misappropriating fiduciary funds to Noel Bosse, the beneficiary of the Bosse Trust. Allegiant's CEO and its senior management knowingly decided to not disclose their knowledge that Sigillito was misappropriating fiduciary funds to the Bosse Trust because of their concern over possible liability to the bank.

198.    On April 29, 2003, when Noel Bosse terminated Allegiant Bank as co-trustee of the Bosse Trust, Allegiant Bank was aware that Sigillito was still involved with Noel Bosse, because the termination letter copied Sigillito.

Mr. William D. Schneck
Allegiant Trust Company
100 South Brentwood
Suite 100
St. Louis, Mo. 63105

April 29,2003

Re:     Edwin H. Bosse Trust FBO Margaret Bosse
        Account # 28 00 1033 25 8

Dear Mr. Schneck:

In accordance with the terms of the above referenced Trust, please accept this letter as your notification that I am removing Allegiant Trust Company as Corporate Co-Trustee of this Trust.

I am appointing Fifth Third Bank as the Successor Corporate Co-Trustee.

You will receive the appropriate documentation from Fifth Third Bank regarding their acceptance, and the transfer instructions.

Thank you for your services over the past several years.

Sincerely,

*Noel K. Bosse*

Noel Bosse
Co-Trustee and Beneficiary

CC: Martin Sigillito

199.    Immediately after Allegiant Bank was terminated as co-trustee, the Bosse Trust invested $468,188.97 in the BLP, bringing the total loans to the BLP from the Bosse Trust to around $1.97 million.

200.    Allegiant Bank put the bank's interests above the interests of Noel Bosse and the Bosse Trust, and Allegiant Bank's decisions injured Noel Bosse and the Bosse Trust.

201.    Allegiant Bank breached its fiduciary duties to Noel Bosse and the Bosse Trust by not informing them of their knowledge that Sigillito was misappropriating fiduciary funds.

202.    PNC Bank, as the successor in interest to Allegiant Bank, is accountable for Allegiant's breach of its fiduciary duty to Noel Bosse and the Bosse Trust.

203.    After Sigillito was ousted from Allegiant Bank, he used Pioneer Bank for all of his banking needs from January 2002 through August 2006.

204.    Sigillito opened multiple business and personal accounts at Pioneer Bank, including an attorney IOLTA trust account (no. 400-6192), an attorney business account (no. 603-0071), multiple business accounts (no. 400-6412 and 180-3739), multiple personal accounts (no. 603-3635, 188-5865 and 188-5865) and a non-profit account (no. 400-5442).

205.    Each of Sigillito's business accounts at Pioneer were alter-ego accounts that he treated as his personal account. Sigillito never deposited a single penny of revenue from his purported law practice into the IOLTA account or any business account. No legitimately earned funds ever came into Sigillito's accounts at Pioneer Bank. Investment funds from BLP investors are the only funds that flowed through Sigillito's accounts at Pioneer Bank.

206.    Sigillito's multiple bank accounts were intended to obscure the flow of fiduciary funds deposited into the IOLTA account. Multiple accounts enabled Sigillito to misappropriate money and obscure movement of fiduciary funds for personal use.

207.    Sigillito, a solo practitioner with no significant law practice, made substantial deposits into his Pioneer Bank IOLTA account. The deposits were immediately transferred either to his Business Account at Pioneer, or to his co-conspirator, Scott Brown's company. Inconsistent with a typical IOLTA account, there were virtually no payments or disbursements of trust funds back to Sigillito's purported law clients.

208.    Between 2003 to 2006, Sigillito moved funds totaling more than $5 million out of the Pioneer IOLTA and into other accounts that he owned or controlled.

209.     Sigillito's IOLTA account activity at Pioneer Bank was completely at odds with a one man law firm with no discernible law practice. In a mere thirty month period, Sigillito received $1,737,751 from his IOLTA account at Pioneer Bank.

210.     In 2006, Brown and Sigillito's companies received 99% of the $2,063,439 withdrawn from Sigillito's IOLTA account. In 2005 and 2004, Sigillito, Brown and their companies received 91% of all deposits from Sigillito's IOLTA account.

211.     In 2006 and 2005, one half of all checks drawn on Sigillito's IOLTA account were written to Sigillito or his companies. In 2005, Sigillito and his company received 40% of all withdrawals ($662,037) out of the IOLTA account. In 2004, Sigillito and his company received 41% of all withdrawals ($671,514) out of the IOLTA account.

212.     Pioneer Bank records also confirm that the bank executed over 150 bank-to-bank transfers by phone which further obscured the flow of funds. One example of the many bank-to-bank transfers occurred on December 2, 2003 when Pioneer Bank executed a $15,000 bank-to-bank transfer from Sigillito's personal account to his IOLTA account.

213.     Sigillito's Pioneer Bank IOLTA records also confirm that money wired into the IOLTA account was immediately wired out to Brown. In a two month period, $840,000 was sent by nine wires from Sigillito's IOLTA account to Brown. The bank records show that Sigillito moved money from his IOLTA account to his business account and then to other accounts at Pioneer Bank.

214.     Money was wire transferred to Sigillito's IOLTA account and immediately transferred either to his Business Account at Pioneer Bank, or to his co-conspirator, Scott Brown's company, British American Group.

215.     Over thirty wire transfers totaling $2,295,101 were deposited into Sigillito's IOLTA account during the three years prior to the IOLTA account's closure.

216.     Pioneer Bank executed five separate wire transfers during June 2006, totaling $664,000 from Sigillito's IOLTA, all to British American Group.

```
                    MO LAWYERS TRUST ACCOUNT
                    MARTIN T SIGILLITO



============================================================
                COMMERCIAL SUPERNOW ACCOUNT 4006192
============================================================
        - - - - - - - - OTHER DEBITS - - - - - - - -
DESCRIPTION                              DATE        AMOUNT
WIRE TRANSFER FEE                        06/12        15.00
WIRE TRANSFER DEBIT                      06/12    24,000.00
WIRE FEE                                 06/23        15.00
WIRE TRANSFER                            06/23   240,000.00
        - - - - - - - - OTHER DEBITS - - - - - - - -
DESCRIPTION                              DATE        AMOUNT
WIRE TRANSFER                            06/01   200,000.00
MO LAWYER TRUST ACH DEBITS 166-4006192   06/05        43.98
WIRE TRANSFER DEBIT                      06/08    50,000.00
WIRE TRANSFER DEBIT                      06/09   150,000.00
```

217.     During May and June 2006, thirteen wire transfers occurred in Sigillito's IOLTA account. During this time, Pioneer Bank executed nine wire transfers out of Sigillito's IOLTA totaling $840,000 to British American Group, and four wire transfers into the IOLTA account totaling $674,120.

218.     Inconsistent with a typical IOLTA account, there were no payments or disbursements of trust funds back to Sigillito's purported law clients. In 2006, only one check was written to a client, an $11,000 check paid to Linda Givens.

219.     A typical example of the movement of money in Sigillito's IOLTA account occurred on April 26, 2006 after Phil Rosemann's $350,000 check cleared the account.

220.     The next day on April 27, 2006, Sigillito wrote a check for $250,000 to British American Group. The check cleared the account on May 3, 2006.

221. That same day, on April 27, 2006, Sigillito wrote a check for $25,000 to his company and deposited that check into his Business Account at Pioneer Bank.



222. On May 10, 2006, Sigillito wrote a second check for $25,000 to his company and deposited that check into his Business Account at Pioneer Bank.



223. One week later, on May 22, 2006, Pioneer Trust wired $50,000 from the IOLTA account to British American Group.

224. In total, $350,000 came into Sigillito's IOLTA account from Phil Rosemann for investment in the BLP, and $350,000 went out; $250,000 to Brown and $100,000 to Sigillito; not a penny was sent to England for investment in the BLP.

225. Another example of the transfers in and out of Sigillito's IOLTA account occurred on June 1, 2006, when Phil Rosemann wired $200,000 to Sigillito's IOLTA account. Immediately after the wire was received, Pioneer Bank wire transferred $200,000 to Brown's company, British American Group.

226. The activity in Sigillito's IOLTA account at Pioneer Bank was not only inconsistent with his purported law practice, but it would have been suspicious in any context. The IOLTA account repeatedly exhibited textbook "red flags" and high risk activity.

### PIONEER BANK AND NATIONAL CITY BANK ACQUIRED ACTUAL KNOWLEDGE IN 2006 THAT SIGILLITO WAS DIVERTING FIDUCIARY FUNDS

227. In July 2004, Allegiant Bank was purchased by National City Bank and over half of Allegiant Bank's employees stayed on with National City Bank, including Shaun Hayes, who became President and CEO of National City's Missouri banking.

228. In May 2006, National City acquired Pioneer Bank and Sigillito's IOLTA and business accounts were once again under the supervision of former Allegiant Bank employees, including Shaun Hayes, President and CEO of National City's Missouri banking.

229. Sometime before the official transfer from Pioneer Bank to National City Bank, during a routine review, Sigillito's IOLTA account was flagged for suspicious activity and investigation. National City again uncovered that Sigillito was paying himself and others up-front fees and paying interest on existing loans from fiduciary funds allocated for new loans.

230.    In October 2001 Allegiant Bank gained "actual knowledge of a breach of a fiduciary obligation" and the bank cannot "divest itself of its continuing knowledge of the faithlessness of the fiduciary. . . . while the Bank may have acted innocently in cashing the first check, it lost this innocence when the second check was received." Allegiant Bank innocence was lost in October 2001 and the bank became liable "for all the later checks in the series." *Maryland Casualty Co. v. Bank of Charlotte*, 340 F.2d 550, 553 (4th Cir. 1965).

231.    In 2006, Hayes, and other former Allegiant bankers now at National City possessed actual knowledge that Sigillito diverted fiduciary funds from his IOLTA account at Allegiant Bank in October 2001 by paying himself undisclosed fees and by making payments to existing investors from IOLTA deposits from new investors.

232.    A brief review of Sigillito's Pioneer Bank IOLTA records once again confirmed that Sigillito was paying himself up-front fees directly from his IOLTA account. For example, IOLTA Check #1155 for $25,000 was paid to Sigillito's company for "fees."



233.    Sigillito's Pioneer Bank IOLTA records also confirmed that interest was once again paid directly from Sigillito's IOLTA account. The August 1, 2006 payment of IOLTA Check #1168 confirmed in the check memo that the payment is for "July Interest."

234. As another example, IOLTA Check #1134 to Valerie Murray confirmed in the memorandum section that the $10,400 payment is for "Principal $10k + Interest $400."



235. Pioneer Bank records confirmed that BLP loan funds deposited into Sigillito's IOLTA for investment in England were diverted to pay interest on BLP loans and up-front fees to Sigillito and his co-conspirators.

### NATIONAL CITY BANK AND PIONEER BANK CONSPIRED WITH SIGILLITO TO TRANSFER HIS IOLTA ACCOUNT WITHOUT DISCLOSING SIGILLITO'S MISAPPROPRIATION

236. National City's CEO of Missouri banking, Shaun Hayes, once again decided not to disclose the bank's knowledge of Sigillito's fraud to law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud, so that Sigillito could once again silently move his IOLTA account to another bank.

237.   Sigillito was informed by seniors bankers at National City that he had to close his accounts at National City Bank before official transfer and Sigillito closed his IOLTA and business accounts immediately after his Pioneer account officially switched to National City.



238.   National City played an essential role in the Ponzi and embezzlement scheme and facilitated its continued existence by keeping silent.

239.   Sigillito defrauded his victims out of $6.28 million during January 2000 through December 2001 when his IOLTA account was held at Allegiant Bank.

240.   The Plaintiffs who lost money as part of Sigillito's Ponzi scheme when his IOLTA account was held at Allegiant Bank from January 2000 through December 2001 include: Noel Bosse invested and lost $1,500,000; Linda Givens invested and lost

$1,039,896; Lewis Vollmar invested and lost $767,973; Wanda Lavender invested and lost $245,090; William Phillips invested and lost $192,074; David Caldwell invested and lost $192,249; Richard Aguilar invested and lost $115,228; Winston Vines invested and lost $100,000; Robert Givens invested and lost $100,000; Leonard Roman invested and lost $81,063; Rudolf Ouwens invested and lost $80,000; Donald Horner invested and lost $36,106; Bob Moore invested and lost $23,109; and Clayton Givens invested and lost $10,000.

241.    Sigillito defrauded his victims out of another $5.2 million from January 2002 through August 2006 when his IOLTA account was at Pioneer Bank.

242.    The Plaintiffs who lost money as part of Sigillito's Ponzi scheme when his IOLTA account was held at Pioneer Bank from January 2002 through August 2006 include: Phil Rosemann invested and lost $2,100,000; Linda Givens invested and lost $362,000; Barbara Vollmar invested and lost $359,330; Noel Bosse invested and lost $324,205; Gina Mastrantonio invested and lost $200,000; Lewis Vollmar invested and lost $171,104; Sharon Cobb lost $125,000; Loren and Mary Winterhof invested and lost $84,335; Albert Carrell lost $74,450; Richard and Melba Aguilar invested and lost $66,000; Stanley Kuhlo invested and lost $45,000; and Clayton Givens invested and lost $20,000.

243.    The foreseeable result of National City Bank's silence and knowing failure to report its knowledge of Sigillito's fraud was that the bank's IRA customers who had already invested in the BLP would continue to invest in the BLP.  Six months after National City secretly ousted Sigillito, Phil Rosemann on January 5, 2007, ***wired $15,596,593 to Sigillito's IOLTA account*** to the successor IOLTA Bank, St. Louis Bank, for investment in the BLP.

244.    Phil Rosemann would not have invested any money, let alone $15,596,593 with Sigillito, if Allegiant Bank, Pioneer Bank or National City Bank had disclosed their findings of Sigillito's fraud to him or the other victims of his fraud or to law enforcement, regulatory agencies, or the successor IOLTA bank.

245.    The additional investments into the BLP after National City secretly forced Sigillito to close his IOLTA account without disclosing Sigillito's misappropriation to the successor IOLTA bank, amount to $41.27 million over the next four years.

246.    Sigillito defrauded his victims out of $6.28 million when Sigillito's IOLTA was held at Allegiant Bank (January 2000 through December 2001). Sigillito defrauded his victims out of another $5.20 million when Sigillito's IOLTA was held at Pioneer Bank (January 2002 through August 2006). Sigillito defrauded his victims out of $41.27 million when Sigillito's IOLTA was held at St. Louis Bank (August 2006 through May 2010).

247.    The foreseeable result of National City's silence in not reporting Sigillito was that he would continue the same fraudulent conduct with the successor bank, as he did when Allegiant Bank ousted him four years earlier.

248.    National City's non-disclosure knowingly assisted Sigillito in the breach of his fiduciary duties and allowed him to open an IOLTA at St. Louis Bank, where Sigillito embezzled $41.27 million from his IOLTA account at St. Louis Bank.

249.    National City Bank actively participated in Sigillito's fraud by suppressing its knowledge that Sigillito was misappropriating fiduciary funds. National City Bank also conspired with Sigillito by not disclosing that Sigillito was misappropriating fiduciary funds.

250.     National City Bank failed to act in a commercially reasonable manner by staying silent upon uncovering Sigillito's fraud. National City Bank violated Missouri's Uniform Fiduciaries Law by not informing law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud.

251.     National City Bank failed to act in a commercially reasonable manner and was commercially unjustified by staying silent upon uncovering Sigillito's fraud in violation of Missouri's Uniform Fiduciaries Law.

252.     The actual and foreseeable result of Allegiant Bank, Pioneer Bank and National City Bank's conduct was the loss of the funds belonging to Plaintiffs.

253.     At all relevant times, Allegiant Bank, Pioneer Bank and National City Bank continued to participate in the conspiracy through their silence that Sigillito was misappropriating fiduciary funds. At no time did Allegiant Bank, Pioneer Bank or National City Bank take the steps necessary to withdraw from the conspiracy or otherwise abandon it. On the contrary, Allegiant Bank, Pioneer Bank and National City Bank remained silent as to their participation, even after Sigillito and Brown were publicly charged criminally for their involvement in the BLP.

254.     At all relevant times, Allegiant Bank, Pioneer Bank and National City Bank did not withdraw from the conspiracy; they did not disavow the unlawful goals of the conspiracy; they did not affirmatively act to defeat the purpose of the conspiracy; and they did not take definite, and positive steps to disassociate themselves from the conspiracy; and at no time did they contact law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud regarding their knowledge that Sigillito was misappropriating fiduciary funds.

255.     As a direct and proximate cause of Allegiant Bank, Pioneer Bank and National City Bank's conduct, Plaintiffs have invested in the BLP and been ***damaged in the collective amount of $33,973,049***, as follows: (1) Richard and Melba Aguilar invested and lost $101,442; (2) Clark Amos invested and lost $250,000; (3) Preston Amos invested and lost $50,000; (4) Thomas Barnes lost $56,000; (5) Henry and Julia Barthel invested and lost $50,000; (6) Northwest Properties (1973) Ltd. invested and lost $1,000,000; (7) Tom and Donna Bertani invested and lost $68,355; (8) Noel Bosse individually and in a representative capacity invested and lost $2,000,000; (9) Kristy Bova invested and lost $5,000; (10) David Caldwell invested and lost $340,069; (11) Albert Carrell invested and lost $66,450; (12) Bonita Cobb invested and lost $1,900,600; (13) Sharon Cobb invested and lost $440,000; (14) Casey and Delores Cook invested and lost $50,000; (15) Jerry Cronkite invested and lost $58,871; (16) Mark Cunningham invested and lost $192,070; (17) Daryll Currier invested and lost $98,750; (18) Roy Currier invested and lost $98,750; (19) Sam Currier invested and lost $306,175; (20) Thomas Currier invested and lost $198,750; (21) Charles Davis invested and lost $509,561; (22) Charlotte Garrett invested and lost $435,000; (23) William Gaylor invested and lost $110,375; (24) Clayton Givens invested and lost $100,000; (25) Robert Givens invested and lost $50,000; (26) Linda Givens invested and lost $651,181; (27) Suzanne Glisson invested and lost $250,000; (28) Carol Green invested and lost $113,716; (29) Randall and Aubrey Harp invested and lost $10,000; (30) Billy Harrison invested and lost $45,000; (31) Odis Hash invested and lost $38,446; (32) Donna Hogshooter invested and lost $37,596; (33) John and Audrey Holland invested and lost $491,051; (34) Donald Horner invested and lost $27,975; (35) Doris Howard invested and lost $35,563; (36) Barbara and Gifford Jordan invested and lost $54,000; (37) David and Mary Kellogg invested and lost $5,000; (38) Stanley Kuhlo invested and lost $413,451; (39) Wanda Lavender invested and

lost $29,308; (40) Gina Mastrantonio invested and lost $139,453; (41) Stanko Matayo invested and lost $130,786; (42) Daren and Sheila Mays invested and lost $150,286; (43) William McCalla invested and lost $56,250; (44) Carol McCarthy and Barbara O'Hanlon, in representative capacities, invested and lost $750,000; (45) William McLemore invested and lost $73,000; (46) Mark, Cindy and Marie Merlotti invested and lost $1,108,000; (47) Lorena Messenger invested and lost $70,023; (48) Ben Miller invested and lost $286,500; (49) Bob Moore invested and lost $83,684; (50) Jim Neill invested and lost $200,000; (51) Mary O'Sullivan, individually and in a representative capacity, invested and lost $1,074,737; (52) Rudolf Ouwens invested and lost $348,603; (53) Ronald Pastor invested and lost $4,714; (54) William and Carol Phillips invested and lost $284,167; (55) Buddy Quessenberry invested and lost $134,441; (56) Elaine Reed invested and lost $16,265; (57) Darren and Debbie Rogers invested and lost $10,000; (58) Betty Rollon invested and lost $35,742; (59) Leonard Roman invested and lost $76,648; (60) Phillip Rosemann invested and lost $14,289,477; (61) David Schultz invested and lost $23,487; (62) John Shahan invested and lost $142,802; (63) Arlene Sincoski invested and lost $651,302; (64) Homer, Dorothy, and Gary Smith invested and lost $376,822; (65) Judith Smith invested and lost $50,000; (66) Kent Sturhahn invested and lost $85,000; (67) Arlene Stevens invested and lost $53,000; (68) Winston Vines invested and lost $42,192; (69) Barbara Vollmar invested and lost $359,330; (70) Lewis Vollmar invested and lost $718,924; (71) Brian Waffle invested and lost $17,750; (72) William Wantling invested and lost $150,000; (73) Brad Werner, in a representative capacity, invested and lost $1,000,000; (74) Loren and Mary Winterhof invested and lost $76,159; (75) Eric and Jill Wittenmyer invested and lost $100,000; and (76) Dorothy Zeigler invested and lost $65,000.

256. National City Bank's conduct was malicious and corrupt, as well as either intentional or reckless, to a degree sufficient to support an award of punitive damages.

257. Plaintiffs did not discover the facts constituting the above bank violations until they secured documents from the United States Attorney's Office that were made public at Sigillito's criminal trial in April 2012. Plaintiffs could not reasonably have discovered the facts constituting the above bank violations until bank documents were made public during Sigillito's criminal trial in April 2012.

## COUNT I
### VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW
### (ACTUAL KNOWLEDGE)

Plaintiffs, for their claim against Defendant PNC Bank for violation of Missouri's Uniform Fiduciaries Law, state as follows:

258. All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

259. PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, had actual knowledge of Sigillito's breach of fiduciary duty and knew Sigillito was misappropriating fiduciary funds.

260. PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, had express factual information that the fiduciary funds were being diverted by Sigillito in violation of his fiduciary obligations by paying undisclosed up-front fees and interest on existing loans with fiduciary funds allocated for new loans.

261. PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, acted in a commercially unreasonable manner by staying silent upon uncovering Sigillito's fraud.

262. PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, violated Missouri's Uniform Fiduciaries Law by not informing law enforcement, regulatory agencies, successor custodians, or the many victims of Sigillito's fraud, including Plaintiffs, that Sigillito was diverting fiduciary funds through his IOLTA account in a classic Ponzi scheme where IOLTA payments to existing investors were being paid by IOLTA deposits from new investors.

263. As a direct and proximate cause of PNC Bank's conduct, as the successor in interest, Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

264. PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against PNC Bank as follows:

(a). For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d). For costs of this suit, including reasonable attorneys' fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT II
### VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW
### (MO. REV. STAT. § 469.270)

Plaintiffs, for their claim against Defendant PNC Bank for violation of Missouri's Uniform Fiduciaries Law, state as follows:

265.    All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

266.    The UFL imposes strict liability in one specific transaction: A bank is strictly liable when a fiduciary uses fiduciary funds to repay a personal debt to the bank.

267.    Under Mo. Rev. Stat. § 469.270 if "such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security *for a personal debt of the fiduciary* to the actual knowledge of the creditor, or is drawn and delivered in any transaction *known by the payee to be for the personal benefit of the fiduciary*, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument."

268.    The Commissioners' Notes to the Uniform Fiduciaries Act, from which Missouri's UFL is taken and on which it is patterned, make clear that "where the bank has once received payment of a personal debt of the fiduciary to it by a check drawn on the fiduciary's personal account, in which fiduciary funds have been deposited, *the bank is bound to inquire* into the purpose of *all subsequent checks drawn upon the account*." Uniform Fiduciaries Act, sec. 9, Commissioner's Notes.

269.    Under the UFL, if a bank "benefitted from the proceeds of the fiduciary's misappropriation or received any of the fruits thereof, the banks could have been held liable

to the principal even absent actual knowledge of a breach of fiduciary obligation." *Trenton Trust v. Western Surety,* 599 S.W.2d 481, 493 (Mo. 1980). A bank "may incur liability" by "appropriating" fiduciary funds for payment of a "debt to the bank." *Id*.

270.    When a "check is payable to the depository bank and delivered in payment of or as security for a debt of the fiduciary, the bank is put upon inquiry. Thus, where the fiduciary makes a deposit in his personal account and subsequently pays a personal debt to the bank by a check on that account, the bank must ascertain what is done with the funds withdrawn." *Schneider Fuel v. West Allis State Bank*, 236 N.W.2d 266, 270 (Wisc. 1975) (citing Uniform Fiduciaries Act, sec. 9, Commissioner's Notes). See *Trenton Trust v. Western Surety,* 599 S.W.2d at 493 citing *Schneider Fuel* with approval.

271.    Under the UFL, cases from other states "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." Mo. Rev. Stat. § 469.340.

272.    The UFL provides for uniformity of interpretation since not all fact patterns may technically be provided for in specific sections of the statute. The UFL could not contemplate every fiduciary breach- given the imaginations of Fraudsters, which is why the drafters of the UFL, in their considerable wisdom, allowed for the UFL to contemplate how other Courts interpreted the various Sections. In *Minnesota Valley Country Club, Inc. v. Gill*, 356 N.W.2d 356 (Minn. App. 1984), the court held that the facts did not fit squarely within any Section of the UFL. Regardless the court held that "the actual format of the transactions which occurred . . . is not as important as their substance, which was conduct that the provisions . . . were intended to prevent." *Id*. at 362. When a fiduciary makes a deposit in his

personal account and subsequently pays a personal debt to the bank by a check drawn on that account, the UFL requires the bank to inquire and determine if the payment is made out of trust funds. The bank must ascertain the amount of the (a) trust funds deposited; (b) personal funds deposited; (c) trust funds withdrawn; and (d) personal funds withdrawn.

273.    Under the UFL, a bank that receives any of the proceeds of the fiduciary's misappropriation is liable, regardless of whether it has actual knowledge of a breach of fiduciary obligation.

274.    On June 14, 2001, Stanley Cwiakala took out Loan No. 364099 for $107,828.20 at Allegiant Bank using the BLP as collateral. Allegiant Bank deposited the $107,828.20 loan funds directly into Sigillito's IOLTA account. (See paragraph 102 supra).

275.    The Cwiakala loan, while in Cwiakala's name, was in reality a loan to Sigillito to address cash flow shortages in the BLP. Sigillito personally arranged for the loan at Allegiant through banker Brian Davies. Allegiant Bank knew the funds were for Sigillito's benefit because the bank deposited the funds for Loan No. 364099 directly into Sigillito's IOLTA account, completely bypassing Cwiakala.

276.    The loan funds for every BLP loan with an IRA at Allegiant were wire transferred by Allegiant directly to Brown. Allegiant was aware that investor funds that flowed into Sigillito's IOLTA account were also diverted to Brown. Allegiant knew that Brown held diverted fiduciary funds. Also, Markow had direct communication with Brown and understood his role in the BLP. Allegiant knew that Loan No. 364099 was in substance a loan to Sigillito and not Cwiakala.

277.    Cwiakala believed he was investing in the BLP but was merely a straw man in the transaction intended to benefit Sigillito. Allegiant knew that the loan proceeds for Loan No. 364099 deposited into Sigillito's IOLTA account were fiduciary funds and that these funds, which were intended for investment in the BLP, went directly to Sigillito instead.

278.    After Allegiant Bank ousted Sigillito from the bank, Allegiant Bank accepted twenty-seven payments from Scott Brown for interest payments on Loan Number 364099. (See paragraph 174 *supra*). Each of the twenty-seven checks paid to Allegiant Bank by Scott Brown stated in the check memo that interest payment was for Loan Number 364099.

279.    On July 14 2004, three years from the date of the initial Cwiakala loan, Allegiant Bank received a balloon payment of $174,097.75 on the Cwiakala loan.

280.    Allegiant Bank was fully aware that Sigillito transferred BLP investment funds from his IOLTA account to Brown's accounts. Allegiant also knew that Brown was making interest payments on Loan No. 364099, and that the loan: (a) was taken out by Cwiakala and not Brown; (b) proceeds were deposited directly with Sigillito; and (c) proceeds were deposited into Sigillito's IOLTA account, from which fiduciary funds were transferred to Brown.

281.    Allegiant Bank directly benefitted from Sigillito's misappropriation by accepting the above payments for Loan No. 364099 from diverted fiduciary funds.

282.    As a direct and proximate cause of PNC Bank's conduct, as the successor in interest, Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

283. PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against PNC Bank as follows:

(a).    For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT III

### VIOLATION OF MISSOURI'S UNIFORM FIDUCIARIES LAW (BAD FAITH)

Plaintiffs, for their claim against Defendant PNC Bank for violation of Missouri's Uniform Fiduciaries Law, state as follows:

284. All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

285. When Markow telephoned MGM in early October 2001, he learned from John Morse that Sigillito was taking 32% up-front fees in a four-way split and taking interest payments from new borrowers to pay interest to existing borrowers.

286.     However, MGM was one of two borrowers which Sigillito used to make BLP loans. The other borrower, Princess Hotel Management, made 53 loans during the two years that Allegiant Bank's IOLTA was used to handle BLP loans.

287.     Markow was familiar with Princess Hotel Management (Derek Smith's company) from the many IRA accounts that made loans to Princess Hotel, like the BLP loans from Richard Aguilar, Noel Bosse, David Caldwell, Linda Givens, Wanda Lavender, Rudolf Ouwens, Carol Phillips, William Phillips, Winston Vines, and Lewis Vollmar, all of which were opened by Markow.

288.     Notwithstanding, the fact that Princess Hotel Management's address is listed on every loan agreement, or the fact that MGM was the solicitor (attorney) on each Princess Hotel loan, Markow did not contact Derek Smith to inquire about the BLP.

289.     Had Markow contracted Smith he would have learned that Smith had millions in loans but received less than 10% of the amount of the loan. Smith would also have confirmed that he did not pay any interest on any of the existing loans.

290.     Under Mo. Rev. Stat. § 469.270 a bank must inquire when a bank takes the instrument "with knowledge of such facts that this action in taking the instrument ***amounts to bad faith***." The "test of bad faith is whether it is commercially unjustifiable" for Allegiant Bank to "refuse to learn facts readily available." *Watson Coatings v. American Express*, 436 F.3d 1036, 1041 (8th Cir 2006).

291.     Derek Smith was readily available and Allegiant Bank had to inquire as to the facts underlying his loans to the BLP. It was bad faith for Allegiant not to contact Smith and to instead bury its head in the sand as to his involvement with the BLP.

292.    Because the circumstances suggestive of Sigillito's breach of his fiduciary duties were "sufficiently obvious," it was 'bad faith'" for Allegiant to "remain passive" and not contact Derek Smith. *Watson Coatings*, 436 F.3d at 1041.

293.    Additionally, Allegiant Bank's written procedures require an investigation when wrongdoing is suspected. By not contacting Derek Smith, Allegiant violated its "normal procedures" when bank officers suspect wrongdoing. *Watson Coatings*, 436 F.3d at 1041. In effect, Allegiant's actions as stated above were commercially unjustifiable and unreasonable.

294.    Also, general banking protocol requires that when evidence of wrongdoing is discovered the bank must investigate by contacting all of the parties. This required the bank to contact Derek Smith. By not contacting Smith, Allegiant Bank used "procedures that unreasonably vary from general banking usage." *Watson Coatings*, 436 F.3d at 1041.

295.    PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, acted in a commercially unreasonable manner by not contacting Derek Smith in violation of Missouri's Uniform Fiduciaries Law.

296.    Also, Doug Givens took out a $100,000 loan at Allegiant Bank using the BLP as collateral. On September 28, 2001, Allegiant Bank advanced $100,000 from Givens' loan directly to Brown. On September 30, 2002, nine months after Allegiant Bank ousted Sigillito, Allegiant Bank directly benefitted from Sigillito's misappropriation by accepting $100,000 of fiduciary funds from Brown for repayment of Doug Givens' loan.

79

297. Allegiant Bank was also aware at the end of 2001, that Sigillito paid $11,779.58 to Allegiant Bank in interest payments on his home mortgage loan (Loan No. 361858) entirely from diverted fiduciary funds.

298. It was commercially unjustifiable and bad faith for Allegiant Bank, with actual knowledge of Brown's involvement in the misappropriation of fiduciary funds during Allegiant Bank's tenure as the IOLTA bank, to not inquire into the source of the funds.

299. Under the UFL, Allegiant Bank received proceeds of misappropriated fiduciary funds and is liable because it had actual knowledge that the fiduciary breached his fiduciary obligation. Alternatively, Allegiant Bank's actions were commercially unjustifiable and amounted to bad faith by not investigating the source of the fiduciary funds.

300. As a direct and proximate cause of PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

301. PNC Bank's conduct, as the successor in interest, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against PNC Bank as follows:

(a). For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d). For costs of this suit, including reasonable attorneys' fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT IV
### AIDING AND ABETTING FRAUD

Plaintiffs, for their claim against Defendant PNC Bank for aiding and abetting fraud, state as follows:

302.   All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

303.   As set forth herein, by misappropriating Plaintiffs' funds deposited into Sigillito's IOLTA account, Sigillito committed fraud.

304.   PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, substantially and materially assisted Sigillito in the commission of his fraudulent conduct in the following respects:

(a).   Failing to notify law enforcement, regulatory agencies, successor custodians, the many victims of Sigillito's fraud, or the Plaintiffs, about Sigillito's misappropriation of fiduciary funds;

(b).   Agreeing to remain silent in order to allow Sigillito to open IOLTA accounts and IRA accounts at other banks and custodians;

(c).   Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning deposits into and payments out of Sigillito's IOLTA account;

(d).   Failing to notify the Missouri Foundation about the substantial overdrafts in Sigillito's IOLTA account;

(e).    Failing to implement and adhere to compliance and monitoring protocols concerning Sigillito's use of fiduciary funds;

(f).    Failing to prevent Sigillito from using funds designated for the BLP for payment of fees or interest to existing lenders;

(g).    Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance red flags;

(h).    Causing and allowing Plaintiffs' funds to be misappropriated by Sigillito;

(i).    Failing to implement and maintain an adequate Bank Secrecy Act/Anti-Money Laundering program and protocols; and

(j).    Failing to adequately investigate red flags generated by the BSA/AML program and protocols.

305.    By virtue of its substantial and material assistance to Sigillito, PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was aware of its role in Sigillito's fraudulent activity and it acted knowingly in assisting Sigillito.

306.    PNC Bank's actions, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, aided and abetted Sigillito in causing injury and damages to Plaintiffs.

307.    As a direct and proximate cause of PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, as described above

Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

308.    PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against defendant PNC Bank as follows:

(a).    For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT V
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Plaintiffs, for their claim against Defendant PNC Bank for aiding and abetting breach of fiduciary duty, state as follows:

309.    All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

310.    Allegiant Bank, Pioneer Bank, and National City Bank's officers acting within the scope of their employment, at all relevant times had knowledge that:

(a).     Sigillito, in addition to maintaining other accounts at the bank, maintained an IOLTA account into which he deposited funds belonging to Plaintiffs for the purchase of loan investments in the BLP;

(b).     Sigillito owed fiduciary duties of honesty, loyalty, care and candor to investors, including Plaintiffs, whose funds were deposited into Sigillito's IOLTA account for the purchase of loan investments in the BLP;

(c).     Sigillito had fiduciary duties and fiduciary relationships with Plaintiffs whose money was deposited into Sigillito's IOLTA account;

(d).     Monies deposited into Sigillito's IOLTA account were fiduciary funds; and

(e).     Sigillito was embezzling the fiduciary funds deposited into his IOLTA account for personal gain and to fund his Ponzi scheme.

311.     Allegiant Bank, Pioneer Bank, and National City Bank's officers, acting within the scope of their employment, actively participated in, and provided substantial assistance to, Sigillito in his financial exploitation of Plaintiffs and breached his fiduciary duties to Plaintiffs whose monies were deposited into Sigillito's IOLTA account.

312.     Allegiant Bank, Pioneer Bank, and National City Bank assisted and aided Sigillito in breaching his fiduciary duties to Plaintiffs by: (a) failing repeatedly to properly investigate the alerts generated by transfers of funds between the IRA Plaintiffs' accounts and Sigillito's IOLTA account; (b) facilitating Sigillito's transfers of Plaintiffs' funds from

Sigillito's IOLTA account to various accounts intended to obscure the flow and use of those funds for Sigillito's personal benefit; and (c) opening and transferring money from lines of credit to cover up Sigillito's overdrafts in his IOLTA account and conceal clear evidence of embezzlement and misappropriation.

313. Allegiant Bank, Pioneer Bank, and National City Bank's actions aided and abetted Sigillito in causing injury and damages to Plaintiffs.

314. As a direct and proximate result of Allegiant Bank, Pioneer Bank, and National City Bank's actions, Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

315. PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant PNC Bank as follows:

(a). For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d). For costs of this suit, including reasonable attorneys' fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT VI
### BREACH OF FIDUCIARY DUTY

Plaintiffs, for their claim against Defendant PNC Bank for conspiracy to breach fiduciary duty, state as follows:

316.    All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

317.    Allegiant Bank, Pioneer Bank, and National City Bank had a superior position compared to Plaintiffs and possessed knowledge of material facts that were not disclosed to Plaintiffs.

318.    Allegiant Bank, Pioneer Bank, and National City Bank made decisions that injured Plaintiffs' interests. Allegiant Bank, Pioneer Bank, and National City Bank put their own interests above the interests of their customers.

319.    PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, breached its fiduciary duty and its conduct was the direct and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

320.    PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant PNC Bank as follows:

(a).    For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT VII
### CONSPIRACY TO BREACH FIDUCIARY DUTIES

Plaintiffs, for their claim against Defendant PNC Bank for conspiracy to breach fiduciary duties, state as follows:

321.    All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

322.    Allegiant Bank as IRA custodian owed a special duty of trust to Plaintiffs with IRAs at Allegiant, including Noel Bosse, Linda Givens, Lewis Vollmar, Wanda Lavender, William Phillips, David Caldwell, Richard Aguilar, Winston Vines, Robert Givens, Leonard Roman, Rudolf Ouwens, Donald Horner, Bob Moore, and Clayton Givens. This duty arose out of their special financial relationship of trust and confidence with Plaintiffs which imposed common law, contractual and statutory duties upon each of the parties.

323.    Allegiant Bank and Sigillito conspired with each other to perform the acts or omissions detailed above, with full knowledge of the special common law duties of trust and

confidence owed to Plaintiffs and with the intent to aid in the breach of those obligations, all for their own personal gain and benefit.

324.    As a direct and proximate cause of Allegiant Bank's conduct, Plaintiffs have invested in the BLP and been damaged in the collective amount of $4,854,193, as follows: (1) Noel Bosse individually and in a representative capacity invested and lost $2,000,000; (2) Lewis Vollmar invested and lost $718,924; (3) Linda Givens invested and lost $651,181; (4) David Caldwell invested and lost $340,069; (5) Rudolf Ouwens invested and lost $348,603; (6) William and Carol Phillips invested and lost $284,167; (7) Richard and Melba Aguilar invested and lost $101,442; (8) Clayton Givens invested and lost $100,000; (9) Bob Moore invested and lost $83,684; (10) Leonard Roman invested and lost $76,648; (11) Robert Givens invested and lost $50,000; (12) Winston Vines invested and lost $42,192; (13) Donald Horner invested and lost $27,975; and (14) Wanda Lavender invested and lost $29,308.

325.    PNC Bank, as the successor in interest to Allegiant Bank, conspired to breach its fiduciary duty and its conduct was the direct and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action, which amount exceeds $4,854,193.

326.    PNC Bank's conduct, as the successor in interest to Allegiant Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant PNC Bank as follows:

(a).  For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $4,854,193;

(b).  For an award of prejudgment interest at the applicable statutory rate;

(c).  For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).  For costs of this suit, including reasonable attorneys' fees; and

(e).  For such other and further relief as this Court may deem just and proper.

## COUNT VIII
### NEGLIGENCE

Plaintiffs, for their claim against defendant PNC Bank for negligence, state as follows:

327.  All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

328.  PNC Bank, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, owed Plaintiffs the duty to use such skill, prudence, and diligence as other banks commonly exercise, including the safekeeping of Plaintiffs' funds in Sigillito's IOLTA account.

329.  Allegiant Bank, Pioneer Bank, and National City Bank breached their duty of care and were therefore negligent.

330.  As a direct and proximate cause of Allegiant Bank, Pioneer Bank, and National City Bank's negligence, Plaintiffs have been damaged and Allegiant Bank, Pioneer Bank,

and National City Bank's conduct was the direct and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

WHEREFORE, Plaintiffs pray for judgment against defendant PNC Bank as follows:

(a). For an award of actual damages against PNC Bank in an amount to be determined upon trial of this action, which amount exceeds $33,973,049;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For costs of this suit, including reasonable attorneys' fees; and

(d). For such other and further relief as this Court may deem just and proper.

## COUNT IX
### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

Plaintiffs, for their claim against defendant PNC Bank for Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), state as follows:

331.   All other paragraphs of this First Amended Complaint are incorporated by reference as though fully set forth herein.

### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)

332.   18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate" 18 U.S.C. § 1962(c). Hence, § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

333.    A conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) is established if the defendant associated with an enterprise which affected interstate commerce and the defendant objectively manifested an agreement to participate in the affairs of the enterprise.

334.    A conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) is established if: (1) an enterprise existed; (2) the enterprise affected interstate or foreign commerce; (3) the defendant associated with the enterprise; and (4) the defendant objectively manifested an agreement to participate in the affairs of the enterprise.

335.    A tacit understanding between the conspirators shown wholly through the circumstantial evidence of each defendant's actions is sufficient. Proof of an express agreement is not required.

336.    A conspiracy to violate RICO may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense.

337.    Plaintiffs need not prove that each alleged conspirator agreed that he or she would be the one to commit the two predicate acts required under that statute.

338.    A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.

339.    A violation of 18 U.S.C. § 1962(d) intentionally omits two elements necessary to prove a violation of § 1962(c): The requirement that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise, and the requirement that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts.

340.    18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. RICO defines "enterprise" to include any "group of individuals associated in fact." 18 U.S.C. 1961(4). "The essence of an 'association in fact' is that it is not a legitimate business or other entity operating in the public eye." *U.S. v. Lemm*, 680 F.2d 1193, 1200 n. 7 (8th Cir. 1982).

341.    The "RICO enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Atlas Pile Driving Co. v. DiCon Fin. Co*., 886 F.2d 986, 995 (8th Cir. 1989).

342.    The RICO enterprise consists of the association-in-fact of Martin Sigillito and his company, Martin T. Sigillito & Associates Ltd., a Missouri corporation; Scott Brown and his companies, J. Scott Brown Associates and British American Group, Inc., Kansas corporations; Hal Milsap and his company Retirement Benefit Solutions, an Arkansas fictitious business name; Bob Mack and his company, M&M Financial Investors, LLC, an Ohio limited liability company; and David Fazio, and his company Fountain Capital Management LLC, an Arizona limited liability company (the "RICO Enterprise"). The RICO Enterprise had as its common purpose the operation and management of the BLP.

343.    Sigillito did business in connection with the BLP as an attorney and maintained attorney trust accounts at Allegiant Bank (Jan. 2000 - Dec. 2001), Pioneer Bank (Jan. 2002 - May 2006), National City Bank (May 2006 - Aug. 2006) and St. Louis Bank (Aug. 2006 - Dec. 2010). The attorney trust account was used to divert fiduciary funds to Sigillito, Brown

and the third-party brokers who recruited the victims. Sigillito also did business in connection with the BLP as Martin T. Sigillito and Associates, Ltd., a Missouri corporation, with Sigillito as the president and sole shareholder. Sigillito maintained corporate bank accounts at the above-banks in the name of Martin T. Sigillito and Associates and used his corporate bank account to divert fiduciary funds.

344.    Scott Brown did business in connection with the BLP as an individual, also an attorney, and as a Kansas company, J. Scott Brown and Associates, and also did business as British American Group, Inc., a Kansas corporation, with Brown as the sole shareholder and president. Brown maintained bank accounts used to divert fiduciary funds in the name of J. Scott Brown Associates and British American Group.

345.    Third-party brokers who recruited the victims include Hal Milsap who did business in connection with the BLP as Retirement Benefit Solutions, an Arkansas fictitious business name. Third-party broker Robert Mack did business in connection with the BLP as M&M Financial Investors, LLC, an Ohio limited liability company, in which he was the managing member. Third-party broker David Fazio did business in connection with the BLP as Fountain Capital Management LLC, an Arizona limited liability company, in which he was the managing member.

### RICO ENTERPRISE HAD THE OPERATION OF THE BLP AS ITS COMMON PURPOSE

346.    The RICO Enterprise had as its common purpose the operation of the BLP as a Ponzi scheme and fee-generating machine for Sigillito, Brown and the third-party brokers who recruited the victims. The RICO Enterprise also had a secondary purpose to conceal the diversion of loan funds from the lenders (victims), law enforcement and regulatory agencies.

347. The RICO Enterprise marketed the BLP to lenders based upon a number of fraudulent material representations, leaving the victims with the belief that their loan funds were being used by an English borrower for real estate investment in England. However, loan funds pooled in Sigillito's attorney trust account were rarely sent to England for use in real estate projects as promised. Instead, loan funds were diverted to pay fees to Sigillito, Brown and third-party brokers who recruited the victims. When lenders requested interest payments on their loans, fiduciary funds from Sigillito's attorney trust account were diverted to Scott Brown's bank account in a classic Ponzi scheme where IOLTA payments to existing investors were being paid by IOLTA deposits from new investors.

## RICO ENTERPRISE HAD WELL-DEFINED STRUCTURE

348. The RICO Enterprise operated with an intricate and well-defined structure for decision-making. Sigillito had the most significant degree of control over the affairs of the RICO Enterprise. Sigillito selected the IRA custodian and IOLTA deposit bank. Sigillito, as the primary beneficiary of fees from the BLP, controlled the flow of the funds, including the misappropriation of fees to himself and others.

349. Scott Brown executed Sigillito's directives regarding fees and presided over the inner circle of third-party brokers (Hal Milsap, David Fazio, and Bob Mack). The third-party brokers had direct contact with lenders, made in-person loan presentations at the direction of Brown and at the interest rate set by Sigillito. The third-party brokers also had direct contact with Allegiant Bank during the two years that Allegiant was the IRA custodian.

## RICO Enterprise had Continuity of Personnel

350.    The RICO Enterprise operated with continuity-of-personnel. Sigillito and Brown, as the managers and operators of the BLP, remained constant throughout the endeavor, from inception until the BLP was shut down in May 2010.

351.    The inner circle of third-party brokers (Hal Milsap, David Fazio and Bob Mack), which took directions from Sigillito and Brown, made loan presentations, and secured loan approvals from the victims to invest in the BLP, remained constant throughout the endeavor, from inception until the BLP was shut down in May 2010.

352.    The brokers who associated with the RICO Enterprise underwent some alteration without loss of the enterprise's identity as an enterprise. When Bob Mack died in 2007, his loans were transferred to Hal Milsap who took over the roll-over of those loans without alteration to the BLP.

353.    Allegiant Bank, Pioneer Bank, and National City Bank had an on-going relationship with Sigillito during the period that they held his attorney trust account and his business accounts. Allegiant Bank as the IRA custodian, also had on-going ties with Brown, and the third party brokers who initiated the loans.

354.    The relationships between Sigillito, Brown, the third party brokers and their companies and Allegiant Bank, Pioneer Bank, and National City Bank demonstrate a sophisticated organizational pattern.

## RICO Enterprise has Ascertainable Structure Which Functioned Separate And Apart from the Pattern of Racketeering Activity Related to the BLP

355.    The RICO Enterprise had an ascertainable structure which functioned separate and apart from the pattern of racketeering activity related to the BLP. Putting the predicate

acts of mail fraud and money laundering aside, the RICO enterprise had an on-going structure and its members were not engaged in sporadic criminal activity.

356.    Sigillito and his company engaged in lawful banking at Allegiant Bank, Pioneer Bank, and National City Bank. The banks associated with Sigillito through lawful commercial banking independent of the commission of the predicate acts related to the BLP.

357.    As a lawyer, Sigillito was required to maintain and did maintain an IOLTA account at Allegiant Bank, Pioneer Bank, and National City Bank independent of any predicate acts. Sigillito also opened and maintained personal, business and non-profit accounts at all three banks independent of any predicate acts related to the BLP. Allegiant Bank also approved loans for Sigillito's personal use independent of any predicate acts.

358.    Putting the predicate acts of mail fraud and money laundering aside, Sigillito, Brown and their companies had an ongoing structure that engaged in legitimate international business consulting independent of any predicate acts of racketeering.

359.    Sigillito and Brown, through their corporations worked as international business consultants who associated for legitimate loans outside of the loans for the BLP. Sigillito and his company, secured the lender Phil Rosemann, while Brown and his company secured the borrower, Metis, a Turkish corporation, for a $5 million loan. The Metis loan stated on the loan documents that Martin T. Sigillito and Associates, arranged the loan. Multiple memos and emails confirmed that Brown arranged the loan with Metis.

360.    Putting the predicate acts of mail fraud and money laundering aside, Milsap, Fazio and Mack and their companies had an ongoing structure as insurance agents and as investments brokers, independent of any predicate acts of racketeering.

361.     Sigillito, Brown, Milsap, Fazio and Mack and their companies leased office space, purchased office equipment, maintained business bank accounts, and operated in their respective businesses (international business consulting, insurance and investment brokerage) distinct from the commission of any predicate acts regarding the BLP.

362.     If the predicate acts ceased, Sigillito, Brown, the third party brokers and their companies remained intact. Martin T. Sigillito and Associates remained a viable entity after the BLP ended until it was administratively dissolved on August 29, 2012. British American Group remained a viable entity until its forfeiture on July 15, 2011. Retirement Benefit Solutions, Fountain Capital Management LLC and M&M Financial Investors, LLC, remained legal entities in good standing as of the date of the filing this Amended Complaint.

## NEXUS BETWEEN RICO ENTERPRISE AND INTERSTATE COMMERCE

363.     18 U.S.C. § 1962(c) requires that a RICO enterprise activities "affect, interstate or foreign commerce."

364.     The association-in-fact RICO Enterprise's conspiracy of silence with regulatory authorities, bank regulators and the victims of the fraud, permitted BLP loans to flourish for eight years after Allegiant Bank first uncovered, and suppressed, the fraud.

365.     The BLP loans to out-of-state lenders affected interstate commerce. The BLP loans to lenders in England affected foreign commerce and impacted the flow of electronic wire transfers to and from England and the United States. The loans also impacted the FDIC insurance as the banks receive insurance from the FDIC for the losses.

## RICO CONSPIRACY

366.     Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank communicated with, requested information from, and acted on instructions from Sigillito and Brown and each other and each conspirator played some role in the conception, creation, or execution of the scheme and assumed some part in directing the RICO Enterprise's affairs.

367.     Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank agreed to conduct or participate in the affairs of the RICO Enterprise and agreed to commit acts of mail fraud and money laundering, as their regular way of conducting the affairs of the RICO Enterprise.

368.     Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank, objectively manifested an agreement to commit substantive RICO violations and to commit two or more predicate acts of mail fraud and money laundering through their participation in the conduct of the affairs of the RICO Enterprise.

369.     Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. Their conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(d).

370.     Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank agreed and combined with Sigillito, and with persons known and unknown, to do a criminal or unlawful act, or a lawful act by criminal or unlawful means.

371.    Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise.

372.    Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank engaged in a pattern of racketeering activity that can be reasonably inferred from their close professional relationship; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.

373.    At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

### ALLEGIANT BANK ASSOCIATED WITH THE RICO ENTERPRISE AND AGREED TO PARTICIPATE IN THE AFFAIRS OF THE ENTERPRISE

374.    Sigillito did all his banking at Allegiant Bank from January 2000 through December 2001. Sigillito had a home loan and line of credit at Allegiant Bank and held a dozen bank accounts at Allegiant including his IOLTA account. Sigillito also sent all IRA business to Allegiant Bank and in turn Allegiant opened dozens of IRAs with investments in loans to the BLP.

375.    Richard Markow, in early October 2001 uncovered that Sigillito, Brown and others used Sigillito's IOLTA account to take up-front fees totaling 32% from each BLP loan and used new investor loan funds to pay interest on loans to existing investors.

376. After initially halting all BLP loans, Allegiant Bank conspired with Sigillito to suppress its knowledge of the fraud from the bank's customers, regulators and successor banks, so that Sigillito could transfer his business to a new IRA custodian and IOLTA bank.

377. Allegiant Bank believed that Sigillito was taking too long to find a successor and on October 26, 2001 sent him a letter informing him he had a week to find a "successor custodian" or Allegiant would "notify the IRA depositors" of its decision "to resign as custodian."

378. After Millennium informed Allegiant Bank that it would take over as IRA custodian, Allegiant conspired with Sigillito to draft a termination letter to its IRA customers who invested in the BLP. From November 5 through November 13, 2001, Allegiant Bank's attorney mailed many versions of Allegiant's termination letter to Sigillito's attorney for approval and comments.

379. The November 13, 2001 letter Allegiant Bank mailed to the IRA account holders strategically omitted that Allegiant conducted an investigation of Sigillito and that Allegiant had uncovered that Sigillito paid himself and others up-front fees from fiduciary funds deposited into his IOLTA account. Allegiant Bank also omitted in the letter that it had discovered that interest on existing loans was paid from fiduciary funds allocated for new loans. The letter of resignation was reasonably calculated and intended to deceive a person of ordinary prudence.

380. On January 14, 2002, one month after Allegiant Bank ousted Sigillito for diverting fiduciary funds, Allegiant transferred $13,884.79 to Millennium Trust for Sigillito's

IRA. Allegiant Bank, as IRA custodian, was aware that all of Sigillito's payments to fund his IRA were misappropriated fiduciary funds from his IOLTA account.

381.    Allegiant Bank, after ousting Sigillito, conspired to launder money by accepting funds from Brown with knowledge that the payments were misappropriated fiduciary funds from Sigillito's IOLTA account.

382.    Nine months after Allegiant Bank ousted Sigillito, Allegiant accepted fiduciary funds from Scott Brown for repayment of the $100,000 principal on Allegiant's loan to Doug Givens. Allegiant Bank knew that the payments from Brown were diverted fiduciary funds.

383.    After transfer of the IRAs to Millennium Trust and the IOLTA account to Pioneer Bank, Allegiant Bank accepted twenty-seven checks paid to Allegiant Bank by Scott Brown on his company account for payment of interest on Cwiakala Loan Number 364099. Allegiant Bank, from its investigation of Sigillito, had knowledge that the payments from Brown were diverted fiduciary funds and that such funds were intended for the borrower in England and not as interest payments on existing loans.

384.    Allegiant Bank objectively manifested an agreement to participate and associate with the RICO Enterprise in a conspiracy of silence by agreeing to keep Sigillito's misappropriation of client fiduciary funds hidden from law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud.

385.    The foreseeable result of Allegiant's material omissions in its resignation letter was that IRA customers would continue to invest in the BLP and that Sigillito would continue the same fraudulent conduct with a successor IRA custodian and IOLTA bank.

386.    Allegiant Bank played an essential role in the Ponzi and embezzlement scheme and facilitated its continued existence by conspiring with Sigillito to keep silent.

## PIONEER BANK AND NATIONAL CITY ASSOCIATED WITH THE RICO ENTERPRISE AND AGREED TO PARTICIPATE IN THE AFFAIRS OF THE ENTERPRISE

387.    In May 2004, National City Bank purchased Allegiant Bank and over half of Allegiant's employees remained with National City. In May 2006, National City acquired Pioneer Bank and Sigillito's IOLTA and business accounts were once again under the control and examination of former Allegiant Bank employees. Sometime before the official transfer from Pioneer Bank to National City Bank, Sigillito's IOLTA account was investigated.

388.    National City investigated Sigillito's IOLTA records and former Allegiant's employees once again confirmed that Sigillito was paying himself up-front fees and paying interest on existing loans from fiduciary funds allocated for new loans.

389.    National City, like its predecessors in interest, decided not to disclose Sigillito's fraud to law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud, which allowed Sigillito once again to silently move his IOLTA account to another bank.

390.    Sigillito was informed that he had to close his accounts at National City Bank. Sigillito closed his IOLTA and business accounts two days after the accounts switched to National City. Sigillito's National City Bank IOLTA account was open for two days before it was closed.

391. National City objectively manifested an agreement to participate and associated with the RICO Enterprise in a conspiracy of silence by agreeing to keep Sigillito's misappropriation of client fiduciary funds hidden from law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud.

392. The foreseeable result of National City's silence was that IRA customers would continue to invest in the BLP and that Sigillito would continue the same fraudulent conduct with a successor IRA custodian and IOLTA bank.

393. National City, like its predecessor in interest Allegiant Bank, played an essential role in the Ponzi and embezzlement scheme and facilitated its continued existence by keeping silent.

## PLAINTIFFS' RICO INJURY

394. Sigillito defrauded his victims out of $6.28 million during the time his IOLTA account was held at Allegiant Bank. Sigillito defrauded his victims out of $5.2 million during the next four years while the IOLTA account was at Pioneer Bank.

395. The additional investments into the BLP after National City secretly forced Sigillito to close his IOLTA account without disclosing Sigillito's misappropriation to the successor IOLTA bank, amounted to $41.27 million over the next four years.

396. As a result of one or more acts predicate to the conspiracy, and the conduct and participation of Sigillito, Brown, Allegiant Bank, Pioneer Bank, and National City Bank in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained direct and substantial injury, including loss of their investment funds.

397.    PNC Bank's conduct, through its predecessors in interest Allegiant Bank, Pioneer Bank, and National City Bank, together with Sigillito's and Brown's acts or omissions detailed above, were the actual cause of Plaintiffs' damages, which would not have occurred without Allegiant Bank, Pioneer Bank, and National City Bank's conduct.

398.    PNC Bank, through its predecessors in interest, knowingly left in place and undisclosed in 2006 a fraud scheme that it knew would require additional future investors for the scheme to continue and that Brown and Sigillito had every intention of continuing to operate.

399.    In addition, the acts or omissions detailed above were the direct, natural, and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action, which amount exceeds $33,973,049.

400.    RICO permits plaintiffs in a civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Plaintiffs seek that any damages are duly trebled in accordance with § 1964(c).

401.    PNC Bank's conduct, as the successor in interest to Allegiant Bank, Pioneer Bank, and National City Bank, was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against defendant PNC Bank as follows:

(a).    For damages against PNC Bank in an amount to be determined upon trial of this action, which amount exceeds $33,973,049, and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(b).     For an award of punitive damages in a amount that equals up to six times the

amount of actual damages;

(c).     For costs of this suit, including reasonable attorneys' fees in accordance with

18 U.S.C. § 1964(c); and

(d).     For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.


GREEN JACOBSON, P.C.                              LAW OFFICES OF SEBASTIAN RUCCI


/s/ *Jonathan F. Andres*                          /s/ *Sebastian Rucci*
Jonathan F. Andres (Mo. Bar 39531)                Sebastian Rucci (E.D. Mo. 178114CA)
Green Jacobson, P.C.                               Law Offices of Sebastian Rucci
7733 Forsyth Boulevard, Suite 700                 401 E. Ocean Blvd., Suite 1240
St. Louis, MO 63105                               Long Beach, CA 90802
Tel: (314) 862-6800                               Tel: (330) 720-0398
Email: andres@stlouislaw.com                      Email: SebRucci@gmail.com
Attorney for Plaintiffs                           Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2014 a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties via the Court's electronic filing system and

parties may access this filing through the Court's Case management/Electronic Case Files

(CM/ECF) found on the internet at https://ecf.moed.uscourts.gov.

/s/ Sebastian Rucci
Sebastian Rucci (E.D. Mo. 178114CA)