# DECLARATION OF CO-COUNSEL
# IN SUPPORT OF MOTION TO COMPEL THIRD PARTY DISCOVERY

I, Jonathan F. Andres, declare under penalty of perjury as follows:

1.     This declaration is made in support of Plaintiffs' Motion to Compel Third Party Discovery. I am co-counsel for the plaintiffs in *Aguilar v. PNC Bank*, 4-cv-985-LRR. I commenced my involvement in parallel cases in December 2010. During the past fifty three months, I have reviewed over one million pages of documents concerning Martin Sigillito and the British Lending Program. I have personal knowledge of the following facts.

2.     PNC Bank, in response to Plaintiffs' Amended Complaint states in paragraph 130 of its Answer: "PNC admits that Allegiant Bank advised its counsel upon becoming suspicious of the activity in Sigillito's accounts." (docket no. 33 at ¶ 130). In paragraph 131 of its Answer "PNC admits that Allegiant Bank advised its counsel upon becoming suspicious of the activity in Sigillito's accounts and that counsel investigated the matter." (Id. at ¶ 131). In paragraph 375 of its Answer "PNC admits that Allegiant Bank became suspicious of activity in Sigillito's accounts [in early October 2001]." (Id. at ¶ 375).

3.     Plaintiffs through various means have sought discovery about the bank's suspicions and counsel's investigation into suspicious activity in Sigillito's accounts in 2001. Plaintiffs have served written discovery on PNC Bank, Plaintiffs have taken the depositions of Richard Markow, Herb Morisse, Robin Fitzgibbons, Art Weiss, and Brian Davies, all former officers of Allegiant Bank, and Plaintiffs have directed subpoenas to the third party lawyers representing Allegiant Bank, Sigillito and MGM in 2001.

## THOMPSON COBURN PRIVILEGE LOG

4.     Thompson Coburn represented Allegiant Bank in 2001. PNC Bank claims to hold the work product and attorney client privileges that Thompson Coburn, at PNC's direction, is claiming shields from discovery the documents and information sought by subpoena, including the documents identified in the privilege log that Thompson Coburn produced in response to Plaintiffs' subpoenas ("Privilege Log") (see Exhibit D to Memo. in Support). Thompson Coburn represents Jan Alonzo in connection with Plaintiffs' subpoena and has advised she has no responsive documents of any kind in her possession.

5.     Thompson Coburn in response to Plaintiffs' subpoenas produced redacted billing records ("Billing Records") for "legal services rendered in connection with" Custodial Account Question for Allegiant Bank ("CAQ"). The information disclosed in the Billing Records is responsive to Plaintiffs' subpoenas. According to the Billing Records, Jan Alonzo's first activity on the CAQ was attending a meeting on October 2, 2001 with Richard Markow, Art Weiss, and Matthew Finn from Allegiant and a person identified in the Billing Records as "counsel for the lenders." This person, based on Mr. Weiss' testimony, is Martin Sigillito ("Sigillito Meeting").

6.     Exhibit 1 compiles relevant events from the time records and billing records obtained from Thompson Coburn, Spencer Fane, and Husch and shows the interaction among the lawyers representing Allegiant, Sigillito and Brown, and MGM in 2001 and 2002.

7.     The Privilege Log shows Jan Alonzo authored four pages of notes of a meeting or conversation on October 9, 2001 with lawyers from Husch who represented MGM ("Husch Meeting"). The Husch Meeting is not listed in the Billing Records, but the Privilege Log lists four pages of Jan Alonzo's attorney notes dated October 9, 2001 and identified as Priv. #55-58. These notes are responsive to paragraph 1 of Exhibit A to record subpoenas directed to Thompson Coburn which seeks attorney notes of meetings or conversations with lawyers from Husch.

8.     The Privilege Log also shows Jan Alonzo received 22 pages from Richard Markow on October 9, 2001. The Privilege Log lists documents identified as Priv. # 68-89 as a fax from Mr. Markow to Ms. Alonzo ("Markow Fax").

9.     The Privilege Log lists undated attorney notes, but there is no activity in the Privilege Log and Billing Records by Jan Alonzo on the CAQ indicated between the Sigillito Meeting on October 2, 2001 and the Husch Meeting on October 9, 2001 except receiving the Markow Fax on October 9, 2001.

10.    Time records produced by Husch ("Time Detail"), show Richard Wolkowitz attended a meeting on October 5, 2001 with John Mark and John Morse and Allegiant Bank and Matthew Finn's Declaration shows Richard Markow, Art Weiss, and he attended that meeting ("MGM Meeting"). The record does not show that Jan Alonzo attended the MGM Meeting and the Privilege Log does not list any undated attorney notes responsive to paragraph 1 of Exhibit A to the record subpoenas directed to Thompson Coburn.

11.     Based on the Sigillito Meeting, the MGM Meeting and the Markow Fax, together with Jan Alonzo's limited activity on the CAQ prior to October 9, 2001, as well as my opinion that the Markow Fax is likely Allegiant's investigative file or material related to the investigation, I believe that Allegiant investigated and further suspect that the statement, "counsel investigated" may be an attempt of some kind to keep the facts of Allegiant's investigation shielded by the attorney client privilege and away from Plaintiffs.

## DEPOSITIONS OF ALLEGIANT BANK OFFICERS DID NOT PROVIDE ANY ANSWERS TO THE BANK'S INVESTIGATION INTO SUSPICIOUS ACTIVITY IN SIGILLITO'S ACCOUNTS

12.     Plaintiffs have tried discovering through depositions the details of the suspicious activities in Sigillito's accounts. Plaintiffs deposed Richard Markow on April 7, 2015. Mr. Markow recalls Sigillito but he does not recall having any misgivings or suspicions about Sigillito. (Exhibit 2). Before leaving Allegiant Bank in October or November 2001, Mr. Markow's last contact with Jan Alonzo while at the bank was in 1997. (*Id.*) He does not recall having any dealings with Jan Alonzo regarding bank business after 1997. (*Id.*) And Mr. Markow does not recall having any interaction with anyone from MGM. (*Id.*)

13.     Plaintiffs deposed Herb Morisse on April 20, 2015. Mr. Morisse does not recall any suspicious activity in Sigillito's accounts. (Exhibit 3). He does not recall why Allegiant Bank resigned as IRA custodian. (*Id.*) He does not recall if he asked why Allegiant was resigning as IRA custodian. (*Id.*) He does not recall if he discussed Betty Womack at Allegiant Bank. (*Id.*) And Mr. Morisse does not recall if Allegiant was concerned about fees being taken in the BLP. (*Id.*)

14.     Plaintiffs deposed Robin Fitzgibbons on April 30, 2015. Robin Fitzgibbons does not recall if anyone told her of suspicious activity in Sigillito's accounts. (Exhibit 4). She does not recall why Allegiant resigned as IRA custodian. (*Id.*) She testified that she does not recall when she worked at Allegiant. (*Id.*)

15.     Plaintiffs deposed Art Weiss on April 23, 2015. Art Weiss does not recall Allegiant becoming suspicious of activity in Sigillito's accounts. (Exhibit 5). He does not recall why Allegiant resigned as custodian. (*Id.*) He claims he does not recall writing the October 26 letter to Sigillito, but he recalls one meeting with Sigillito "sometime prior to

writing [the October 26] letter." (*Id*.) And Mr. Weiss recalls Sigillito made a sales pitch at the meeting he had with Sigillito but he does not recall any specifics. (*Id*.)

16. Plaintiffs deposed Brian Davies on April 27, 2015. Mr. Davies was a commercial banker at Allegiant who helped arrange loans for Sigillito's clients to invest in the BLP. (Exhibit 6). He was not aware of any suspicious activity in Sigillito's accounts. (*Id*.)

17. After the subpoenas at issue were served, the undersigned and Kenton Knickmeyer of Thompson Coburn spoke by telephone. Mr. Knickmeyer asked me if Plaintiffs' counsel believed Thompson Coburn had done an investigation. I confirmed we did. Mr. Knickmeyer, fastidious to a fault, responded that from his review of the file on his desk, he had found "precious little" to suggest that the firm had done any investigation. He seemed unaware of the relevant admissions in PNC's Answer.

18. I told Mr. Knickmeyer that my and co-counsel's belief in this regard was based on the authority of PNC's admissions in its Answer, specifically paragraphs 130 and 131. Mr. Knickmeyer offered no response.

19. Thompson Coburn represented four of the five former Allegiant Bank officers at their depositions in this case. Herb Morisse, Robin Fitzgibbons, Art Weiss and Brian Davies all appeared for deposition accompanied by the same lawyer from Thompson Coburn. Prepped and defended by the same lawyer, these witnesses displayed in my view a uniform and virtually universal inability to recall important facts and events. Richard Markow, who had his own lawyer and who is a lawyer himself, turned in a similar performance.

### WRITTEN DISCOVERY TO PNC DID NOT YIELD ANY INFORMATION ABOUT THE BANK'S INVESTIGATION INTO SUSPICIOUS ACTIVITY IN SIGILLITO'S ACCOUNTS

20. Based on paragraphs 130 and 131 of PNC's Answer, Plaintiffs prefaced their Interrogatories Nos. 1-4 to PNC as follows: "Your Answer to Paragraph 130 of Plaintiffs' Amended Complaint states that Allegiant Bank became suspicious of activity in Sigillito's accounts. With respect to such activity in Sigillito's accounts and Allegiant Bank's suspicions: [followed by Interrogatories Nos. 1-4]," and, similarly, Interrogatories Nos. 5-6 as follows: "Your Answer to paragraph 131 of Plaintiffs' Amended Complaint states that

Allegiant Bank, upon becoming suspicious of activity in Sigillito's accounts, advised its counsel and that counsel investigated the matter. With respect to such activity in Sigillito's accounts, Allegiant Bank's suspicions and advisements, and counsel's investigation: [followed by Interrogatories Nos. 5-6]."

21.    Plaintiffs also propounded Requests for Production to PNC with identical prefaces to the Requests.

22.    The discovery responses Plaintiffs received from PNC do not put Plaintiffs any closer to discovering the facts of the bank's suspicions or the investigation to which PNC admits in its Answer. The undersigned, on behalf of Plaintiffs, offers in Paragraphs 15-26 examples of the difficulties Plaintiffs encountered in trying to discover from PNC facts of the suspicions and investigation.

23.    Plaintiffs in their Interrogatories nos. 1-4 asked PNC to identify each employee, officer and director of Allegiant Bank who (1) became suspicious of activity in Sigillito's accounts; (2) became suspicious of how Sigillito financed the repayment of any loan held in the IRA account of any Lender (a defined term that includes Betty Womack); (3) became suspicious of how Sigillito was using funds in or from any Lender's IRA account intended for offshore investment; (4) became suspicious of how Sigillito was using funds from any Lender (a defined term that includes Doug Givens and Rudolf Ouwens) intended for offshore investment.

24.    PNC, after including its boilerplate objections, answered in each instance: "Following a diligent search for and of documents in its possession, numerous witness interviews, depositions, and the ongoing discovery process in this case, PNC states: none."

25.    Plaintiffs also asked PNC, for example, in Interrogatory No. 5 to "[i]dentify, by name, address and law firm or employer, each attorney or lawyer whom Allegiant Bank advised upon becoming suspicious of activity in Sigillito's accounts."

26.    PNC, after objecting, answered: "Following a diligent search for and of documents in its possession, numerous witness interviews, depositions, and the ongoing discovery process in this case, PNC states: none."

27.    Plaintiffs, on the heals of Interrogatory no. 5, asked PNC in Interrogatory no. 6, for each lawyer it identified, to further identify "each employee, officer and director of

Allegiant Bank who communicated, or had communications, with that lawyer in connection with counsel's investigation of the matter."

28.     PNC, after objecting, answered: "In any event, given the response to Interrogatory no. 5 above: N/A."

29.     PNC's Answers to Interrogatories Nos. 1-4 do not state, indicate or suggest that the premise to the Interrogatory, a quote from paragraph 130 of its Answer, is an incorrect, mistaken, untruthful or intentionally misleading statement or that the premise makes the Interrogatory insusceptible to comprehension or a meaningful answer.

30.     PNC's Answers to Interrogatories Nos. 5-6 do not state, indicate or suggest that the premise to the Interrogatory, a quote from paragraph 131 of its Answer, is an incorrect, mistaken, untruthful or intentionally misleading statement or that the premise makes the Interrogatory insusceptible to comprehension or a meaningful answer.

31.     Plaintiffs in their Requests for Production nos. 5, 6, 18, 19, and 21 asked PNC, for example, to produce all Documents that (5) describe, discuss or refer, relate or pertain to activity in Sigillito's accounts which caused or contributed to causing Allegiant Bank to become suspicious; (6) describe, discuss or refer, relate or pertain to activity in Sigillito's accounts related to any Lenders (a defined term that included Betty Womack) which caused or contributed to causing Allegiant Bank to become suspicious; (18) Allegiant Bank provided to its counsel that refer, relate or pertain to the activity in Sigillito's account or Allegiant Bank's suspicions; (19) Allegiant Bank provided to its counsel that refer, relate or pertain to activity in Sigillito's account related to any Lenders; (21) Allegiant Bank received that describe, discuss or refer to counsel's findings or conclusions after its investigation of the matter.

32.     PNC, after objecting, answered: "Following a diligent search for and of documents in its possession, numerous witness interviews, depositions, and the ongoing discovery process in this case, PNC states: none."

33.     PNC's Responses to Requests for Production Nos. 5-16 do not state, indicate or suggest that the premise to the Request, a quote from paragraph 130 of its Answer, is an incorrect, mistaken, untruthful or intentionally misleading statement or that the premise makes the Request insusceptible to comprehension or a meaningful response.

34.     PNC's Responses to Requests for Production Nos. 17-28 do not state, indicate or suggest that the premise to the Request, a quote from paragraph 131 of its Answer, is an incorrect, mistaken, untruthful or intentionally misleading statement or that the premise makes the Request insusceptible to comprehension or a meaningful response.

### ALLEGIANT PROMPTLY RESIGNED UPON DISCOVERING SUSPICIOUS ACTIVITY

35.     Records of Sigillito's emails show that Sigillito was surprised by a change of attitude at Allegiant following the October 2, 2001 meeting. (Exhibit 7).

36.     Records show that by October 11, 2001, Scott Brown had learned from Hal Millsap that someone in the upper reaches of Allegiant management had formally ordered an embargo on contact with any person who in any way is involved in the whole series of IRA custodial transactions and that Robin Fitzgibbons advised Mr. Millsap that she had been ordered 'not to talk to any of you.'" A voice mail from Sigillito's lawyer, Tom Jerry to Jan Alonzo confirmed Allegiant's embargo. (Exhibit 8).

37.     Records point to Allegiant's knowledge and awareness of the fraud seeping out in 2001. For example, two weeks after Sigillito met with Allegiant and Jan Alonzo, Scott Brown stated in an email to his lawyers and Sigillito about having just finished a most worrying conversation with Kevin Cooper who, in turn, had earlier had a conversation with John Morse of MGM. (Exhibit 9).

38.     Records show that an initial draft of Allegiant's notice letter to clients that Art Weiss enclosed with his October 26, 2001 letter to Sigillito included a sentence that read: "It is important that you act promptly to complete a transfer of your IRA to another financial organization of your choice." (Exhibit 10).

39.     Records show that Sigillito and his lawyers edited the bank's notice letter to clients. They changed it to read: "It is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of your self-directed IRA to Millenium [sic] Trust Company, LLC. Please note that it is important that you act promptly to complete a transfer of your IRA to another financial organization of your choice." (Exhibit 10). Sigillito and his lawyers added the sentence: "Please complete, sign and return to my attention the second page of this letter to confirm your choice of successor Custodian with respect to your self-

directed IRA" and supplied a form styled "Notice as to Choice of Successor Custodian" for enclosure with the letter. (*Id.*) Allegiant records show that on November 1, 2001, Tom Jerry forwarded these edits to Jan Alonzo with the message, "Attached is a blackline and clean copy of the IRA notice reflecting our suggested changes." (*Id.*)

40.    Records show that Jan Alonzo approved and Allegiant Bank adopted the changes that Sigillito and his lawyers made to the notice letter. (Exhibit 11).

41.    Allegiant records show that the notice letter that Allegiant Bank sent to the IRA investors so completely adopted and approved Sigillito's changes that the bank's letter even includes Sigillito's misspellings of Millennium.

42.    Allegiant records establishes that Thompson Coburn omitted the first three pages of Tom Jerry's November 1, 2001 fax to Jan Alonzo from its initial document production in response to Plaintiffs' subpoenas. (Exhibit 12). Thompson Coburn acknowledges that the last four pages of Tom Jerry's November 1, 2001 fax to Jan Alonzo are responsive to Plaintiffs' subpoenas and the second and third pages of the fax should have been produced to Plaintiffs in the first instance. (*Id.*)

43.    Allegiant records show that on November 13, 2001, the day Allegiant mailed the notice letters, Tom Jerry told Sigillito that Jan Alonzo was concerned about clients calling the bank asking questions: "I spoke with Jan Alonzo late yesterday afternoon. . . Jan needs to know when the loan documentation for the various accounts will be forthcoming. She is concerned that the notice letters will result in phone calls from clients wanting to know the status of their accounts." (Exhibit 13).

44.    Allegiant records show that Tom Jerry kept Jan Alonzo updated on efforts to get the IRA accounts in shape for transfer. On December 7, 2001, for example, he called her with a status report and left a voice mail message. (Exhibit 14). He passed along Sigillito's assurances that Sigillito and his gang were diligently working to locate the missing loan documents and by all indications would "have copies of the documents available Monday and the originals will be sent around that time." (*Id.*)

45. Discovery establishes that: Allegiant suspended activity in Sigillito's IOLTA in October 2001, (Exhibit 15 at RFA no. 13); Allegiant waited until December to require him to close his IOLTA, (*Id.* at RFA no. 15); and the bank's resignation as IRA custodian was not effective until mid-December 2001. (Exhibit 11).

46. Allegiant records and testimony show that Art Weiss at Allegiant signed a letter to Sigillito dated October 26, 2001 stating that the bank no longer wanted to serve as IRA custodian and inviting him to contact Jan Alonzo at Thompson Coburn with any questions. (Exhibit 16).

47. I have personal knowledge of all facts stated in this declaration and could competently testify to such knowledge if necessary.

Dated: May 26, 2015

Jonathan F. Andres

# TABLE OF EXHIBITS

Exhibit G-1 Compendium of Time

Exhibit G-2 Markow Deposition Excerpt

Exhibit G-3 Morisse Deposition Excerpt

Exhibit G-4 Fitzgibbons Deposition Excerpt

Exhibit G-5 Weiss Deposition Excerpt

Exhibit G-6 Davies Deposition Excerpt

Exhibit G-7 Sigillito Email to Allegiant

Exhibit G-8 Sigillito Lawyer Voicemail to Allegiant Lawyer

Exhibit G-9 Brown email to Sigillito

Exhibit G-10 Sigillito fax to Allegiant

Exhibit G-11 Allegiant Resignation Letter

Exhibit G-12 Thompson Letter to Plaintiffs

Exhibit G-13 Brown email

Exhibit G-14 Sigillito Lawyer Voicemail to Allegiant Lawyer

Exhibit G-15 Plaintiffs Request for Admissions to PNC

Exhibit G-16 Allegiant Letter to Sigillito to Secure Successor

# EXHIBIT G-1

**Thompson Coburn, Spencer Fane, and Husch**
**Events and Interaction – 2001**

| Priv. # | Date | Description | Responsive to Subpoenas at Issue | Privilege |
|---------|------|-------------|----------------------------------|-----------|
| TC53 | Oct. 2 | **Alonzo Time Record**: Conference with **A. Weiss**, M. Finn, **R. Markow** and counsel for lenders | | |
| HB9 | Oct. 5 | Wolkowitz meeting with John Mark and John Morse and with Allegiant | | |
| **55 - 58** | Oct. 9 | 4 pages Alonzo notes | Records subpoena: Notes of meetings or conversations with **Husch** | w/p |
| **68 - 89** | Oct. 9 | 22 page fax from **Markow** to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **INVESTIGATION FILE SENT TO JAN ALONZO** | | | | |
| SF 04 | Oct. 10 | Dankenbring telephone conference with Jan Alonzo | | |
| TC54 | Oct. 11 | **Alonzo Time Record**: Telephone call from Jerry to discuss Sigillito | | |
| SF 04 | Oct. 11 | Jerry telephone conference with Jan Alonzo regarding Allegiant Bank custodial accounts | | |
| **53 - 54** | Oct .11 | 2 pages Alonzo notes | Records subpoena: Notes of meetings or conversations with **Spencer Fane** | w/p |
| SF 04 | Oct. 12 | Dankenbring telephone conference with Alonzo and Wolkowitz | | |
| HB10 | Oct. 12 | Wolkowitz discuss matter with Brown and Sigillito's attorneys | | |

| | | | | |
|---|---|---|---|---|
| SF 05 | Oct. 12 | Jerry telephone conference with Alonzo re transition of accounts | | |
| SF 05 | Oct. 15 | Dankenbring telephone conference with Husch attorneys | | |
| SF 05 | Oct. 15 | Jerry conference with Wolkowitz and Praiss regarding MGM concerns and plan for transitioning loan | | |
| HB10 | Oct. 15 | Wolkowitz and Praiss several conference calls with and meeting at offices of Brown and Sigillito's attorneys | | |
| SF 05 | Oct. 15 | Jerry follow-up telephone conference with Husch attorneys | | |
| SF 05 | Oct. 16 | Jerry review correspondence from Husch | | |
| HB11 | Oct. 18 | Wolkowitz meeting and conferences calls with Brown and Sigillito's attorney | | |
| HB10 | Oct. 17 | Wolkowitz multiple conferences with Brown and Sigillito's attorney | | |
| SF 06 | Oct. 18 | Jerry telephone conference with Wolkowitz and Praiss regarding take out proposal and interim measures | | |
| SF 06 | Oct. 18 | Jerry telephone conference with Praiss regarding discussion with MGM | | |
| SF 06 | Oct. 19 | Jerry prepare fax correspondence to Praiss and Wolkowitz | | |

# Thompson Coburn, Spencer Fane, and Husch
## Events and Interaction – 2001

| | | | | |
|---|---|---|---|---|
| SF 06 | Oct. 22 | Dankenbring telephone conference with Husch | | |
| SF 06 | Oct. 23 | Jerry telephone conference with Wolkowitz and Dankenbring regarding upcoming meeting and global take out | | |
| **42** | Oct. 24 | voice mail from **Markow** to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| SF 07 | Oct. 25 | Dankenbring telephone conference with Wolkowitz | | |
| SF 07 | Oct. 26 | Jerry telephone conference with Wolkowitz | | |
| SF 07 | Oct. 30 | Dankenbring telephone conference with Husch attorneys | | |
| SF 07 | Oct. 30 | Jerry telephone conference with Alonzo regarding transfer of accounts | | |
| TC54 | Oct. 30 | **Alonzo Time Record**: Telephone call from Jerry and Dankenbring | | |
| **45 - 46** | Nov. 1 | 2 pages Alonzo fax to **Morisse, Weiss** | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| TC57 | Nov. 1 | **Alonzo Time Record**: Telephone call from Jerry | | |
| SF 12 | Nov. 1 | Jerry forward documents to Alonzo for review | | |
| **51** | Nov. 1 | 1 page Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| TC57 | Nov. 2 | **Alonzo Time Record**: Telephone call from Jerry | | |
| SF 12 | Nov. 2 | Dankenbring telephone conference with Alonzo regarding Allegiant | | |

## Thompson Coburn, Spencer Fane, and Husch
### Events and Interaction – 2001

| | | | | |
|---|---|---|---|---|
| SF 12 | Nov. 2 | Jerry telephone conference with Alonzo regarding Hal Millsap issues and notice letter | | |
| **92** | Nov. 5 | 2 page emails between Alonzo & **Steve Cupples** (TC attorney and tax expert) | 30b-6 subpoena – ¶¶ 1 – 16 (?) | w/p |
| SF 12 | Nov. 5 | Jerry review revised letter notice forwarded by Alonzo | | |
| **43** | Nov. 6 | 1 page Alonzo notes | Records subpoena: Notes of meetings or conversations with **Spencer Fane** | w/p |
| TC57 | Nov. 6 | **Alonzo Time Record**: Telephone call from Jerry re comments | | |
| **47 - 48** | Nov. 6 | 2 pages Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| SF 12 | Nov. 6 | Jerry telephone conference with Alonzo regarding "same" | | |
| **30** | Nov. 7 | 1 page email from Alonzo to **Morisse** | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| TC57 | Nov. 7 | **Alonzo Time Record**: Telephone call from Jerry | | |
| SF 13 | Nov. 7 | Jerry telephone conference with Alonzo regarding notice, unfunded accounts and list of accounts | | |
| SF 13 | Nov. 7 | Jerry telephone conference with Alonzo regarding additional unfunded accounts and advance list of notice receipients | | |
| **23** | Nov. 8 | 1 page Alonzo notes | Records subpoena: Notes of meetings or conversations with **Spencer Fane** | w/p |

**Thompson Coburn, Spencer Fane, and Husch**
**Events and Interaction – 2001**

| | | | | |
|---|---|---|---|---|
| **15 - 22** | Nov. 11 | 8 page fax from Allegiant to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **24 - 29** | Nov. 12 | 6 page fax from **Morisse** to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| TC57 | Nov. 12 | **Alonzo Time Record**: Telephone call to Jerry | | |
| SF 13 | Nov. 12 | Jerry telephone conference with Alonzo regarding notice letters and problematic accounts | | |
| **8** | Nov 13 | 1 page fax from Allegiant to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **9** | Nov 13 | 1 page Alonzo memo to Allegiant | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **14** | Nov. 13 | 1 page Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| SF 13 | Nov. 13 | Jerry telephone conference with Alonzo regarding mailing, approach to inquiries and information on accounts | | |
| SF 14 | Nov. 14 | Jerry telephone conference with Alonzo's office regarding notices and pending issues | | |
| TC57 | Nov. 15 | **Alonzo Time Record**: Telephone call from Jerry | | |
| | Nov. 16 | **Alonzo Time Record**: Telephone call to Jerry re wire transfer | | |
| SF 14 | Nov. 16 | Jerry telephone conference with Alonzo regarding "same" | | |
| TC58 | Nov. 26 | **Alonzo Time Record**: Telephone call to Jerry re assets | | |

**Thompson Coburn, Spencer Fane, and Husch**
**Events and Interaction  – 2001**

| | | | | |
|---|---|---|---|---|
| SF 14 | Nov. 26 | Jerry telephone conference with Alonzo regarding loan documentation | | |
| TC61 | Nov. 30 | **Alonzo Time Record**: Telephone call to Jerry | | |
| SF 15 | Nov. 30 | Jerry telephone conference with Alonzo | | |
| SF 19 | Dec. 5 | Jerry telephone conference with Alonzo regarding "same" | | |
| TC61 | Dec. 6 | **Alonzo Time Record**: Report from Jerry | | |
| TC61 | Dec 7 | **Alonzo Time Record**: Report from Jerry | | |
| SF 19 | Dec. 7 | Jerry telephone conference with Alonzo regarding "same" | | |
| **5 - 7** | Dec. 11 | 2 pages fax from **Fitzgibbons** to Alonzo | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| TC67 | Dec. 11 | **Alonzo Time Record**: Telephone call to Jerry | | |
| SF 19 | Dec. 11 | Jerry telephone conference with Alonzo regarding loan documentation and account transfers | | |
| SF 19 | Dec. 11 | Jerry telephone conference with Alonzo | | |
| TC61 | Dec. 12 | **Alonzo Time Record**: Return telephone call from Jerry | | |
| TC61 | Dec. 13 | **Alonzo Time Record**: Telephone call to Jerry | | |
| SF 19 | Dec. 13 | Jerry review email and voice message from Alonzo | | |

**Thompson Coburn, Spencer Fane, and Husch**
**Events and Interaction – 2001**

| | | | | |
|---|---|---|---|---|
| SF 19 | Dec. 13 | Jerry telephone conference with Alonzo regarding documents | | |
| TC61 | Dec. 14 | **Alonzo Time Record**: Telephone call from and to Jerry | | |
| SF 19 | Dec. 14 | Jerry review voice message from Alonzo regarding loan documentation and transfer authorizations | | |
| SF 19 | Dec. 14 | Jerry telephone conference with Alonzo regarding "same" | | |
| SF 19 | Dec. 14 | Jerry telephone conference with Alonzo regarding transfer documents | | |
| SF 20 | Dec. 14 | Jerry telephone conference with Alonzo regarding remaining issues | | |
| SF 20 | Dec. 14 | Jerry telephone conference with Alonzo regarding resolution of transfer issues between Allegiant and Millennium | | |
| TC61 | Dec. 17 | **Alonzo Time Record**: Telephone call from Jerry; return telephone call to Jerry | | |
| SF 20 | Dec. 17 | review voice mail from Alonzo regarding missing transfer forms | | |
| SF 20 | Dec. 17 | Jerry telephone conference with Alonzo regarding "same" | | |
| TC61 | Dec. 19 | **Alonzo Time Record**: Return telephone call from Jerry | | |

| | | | | |
|---|---|---|---|---|
| TC61 | Dec. 20 | **Alonzo Time Record**: Telephone call to Jerry | | |
| SF 20 | Dec. 20 | Jerry telephone conference with Alonzo regarding Sharon Carr and missing documentation | | |
| **IRA FILES SENT TO MILLENNIUM    TRUST COMPANY LLC** | | | | |
| SF 22 | Feb. 12, 2002 | Jerry telephone conference with Alonzo's office regarding assignment documents | | |
| TC65 | Feb. 13, 2002 | **Alonzo Time Record**: Telephone call from Jerry; telephone call to Jerry re documents requested from Millennium Trust | | |
| SF 22 | Feb. 13, 2002 | Jerry telephone conference with Alonzo's office regarding assignment of loan documents | | |
| SF 22 | Feb. 13, 2001 | Jerry telephone conference with Alonzo | | |
| TC68 | Mar. 1, 2002 | **Alonzo Time Record**: Telephone call from Jerry | | |
| SF 25 | Mar. 1, 2002 | Jerry telephone conference with Alonzo | | |
| SF 25 | Mar. 7, 2002 | Jerry telephone conference with Alonzo; review assignment faxed by Alonzo | | |
| SF 25 | Mar. 20 | Jerry telephone conference with Alonzo's office regarding Margaret Price | | |
| SF 25 | Mar. 20 | Jerry telephone conference with Alonzo regarding "same" | | |

| | | | | |
|---|---|---|---|---|
| SF 25 | Mar. 21 | Jerry telephone conference with Alonzo status of Margaret Price payment | | |
| TC71 | Sep. 25 2002 | **Alonzo Time Record**: Telephone call from Dankenbring | | |
| SF 29 | Sep. 25, 2001 | Dankenbring telephone conference with Alonzo and related fax | | |
| | Sep. 27, 2001 | **Alonzo Time Record**: Telephone call to Dankenbring | | |
| SF 29 | Sep. 30, 2001 | Dankenbring telephone conference with Alonzo | | |
| **1** | undated | 1 page Alonzo notes | Records subpoena: Notes of meetings or conversations with **Spencer Fane** | w/p |
| **52** | undated | 1 page Alonzo notes to file | Records subpoena: Notes of meetings or conversations with **Spencer Fane** | a/c & w/p |
| **2** | undated | 1 page Alonzo notes to file | 30b-6 subpoena - "unknown" | a/c & w/p |
| **3 - 4** | undated | 2 page Alonzo notes to file | 30b-6 subpoena - "unknown"<br>Records subpoena - "unknown" | a/c & w/p |
| **10** | undated | 1 page Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **11 - 12** | undated | 2 pages Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **13** | undated | 1 page Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c & w/p |
| **35 - 37** | undated | 3 pages Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **38 - 41** | undated | 4 pages Alonzo notes | 30b-6 subpoena – ¶¶ 1 – 16 (?) | |

| | | | | |
|---|---|---|---|---|
| **44** | undated | 1 page Alonzo notes to file | 30b-6 subpoena - "unknown"<br>Records subpoena - "unknown" | a/c & w/p |
| **49 -50** | undated | 2 pages Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c |
| **59** | undated | 1 page Alonzo notes | 30b-6 subpoena – ¶¶ 1 – 16 (?) | w/p |
| **61** | undated | 1 page Alonzo notes | 30b-6 subpoena – ¶¶ 1 – 16 (?) | w/p |
| **62 - 66** | undated | 5 pages Alonzo notes to file | 30b-6 subpoena – ¶¶ 1 – 16 (?) | a/c & w/p |
| **67** | undated | 1 page Alonzo notes | 30b-6 subpoena – ¶¶ 1 – 16 (?) | w/p |
| **90 - 91** | undated | 2 pages Alonzo notes to file | 30b-6 subpoena - "unknown" | a/c & w/p |
| **94 - 95** | undated | 2 page Alonzo notes to file | 30b-6 subpoena - "unknown"<br>Records subpoena - "unknown" | a/c & w/p |

# EXHIBIT G-2

**• Richard Markow had contact with Jan Alonzo while at Allegiant Bank**

1 **Q.** Did you ever have occasion to contact Jan
2 Alonzo in connection with bank business while you were
3 at Allegiant?
4 **A.** Yes.

Markow Depo., p. 141, lines 1-4.

**• Richard Markow does not recall contact with Jan Alonzo after 1997**

5 **Q.** What is the last time that you recall
6 speaking with Jan Alonzo at Thompson Coburn for any
7 reason while you were at Allegiant?
8 **A.** The last time I recall talking to her or
9 dealing with her was when I first joined the bank to
10 get her help in activating the trust powers so
11 Allegiant Trust Company could be approved by the State
12 of Missouri and then henceforth operate.
13 **Q.** Do you recall any instances where you
14 contacted Jan Alonzo at Thompson Coburn while you were
15 at Allegiant after 1997?
16 **A.** '7, yeah. I do not recall any instance when
17 I talked to her about any specific account or anything
18 in general. I just remember our dealings focused on
19 the activation of the dormant trust powers.

Markow Depo., p. 151, lines 6 – 19.

**• Richard Markow does not recall when he met Martin Sigillito**

10 **Q.** Approximately when did you meet Martin
11 Sigillito?
12 **A.** Again, sir, I don't recall.
13 **Q.** Were you at Allegiant Bank?
14 **A.** Yes.
15 **Q.** Would have been sometime after 1997?
16 **A.** Yes.
17 **Q.** Were you introduced to Mr. Sigillito by
18 someone else?
19 **A.** I don't remember, sir.

Markow Depo., p. 56, lines 10-19

**• Richard Markow does not recall receiving any information describing the BLP**

12 **Q.** Okay. Do you recall receiving any
13 information describing the investments in real estate
14 in England from either Mr. Sigillito or anybody else
15 while you were at the bank?
16 **A.** Sir, I don't recall receiving anything.
17 Yeah, I don't recall.

Markow Depo., p. 97, lines 12-17

**• Richard Markow does not recall interaction with anyone from Mark Gilbert Morse**

25 **Q.** Okay. Do you have any recollection of
1 interacting with Mark Gilbert Morse while you were at
2 Allegiant?
3 **A.** I do not recall any specific interaction with
4 the firm or any individuals at the firm.

Markow Depo., p. 98, line 25 to p. 86, line 4

**• Richard Markow does not recall any misgivings or suspicions about Martin Sigillito**

14 **Q.** As I've asked you questions and you've
15 responded here today. It's my sense that you don't
16 recall a lot of interaction with Martin Sigillito.
17 Would that be fair to say?
18 **A.** That is correct, sir.
19 **Q.** In light of that and before you left
20 Allegiant, did you ever have a sense of concern or
21 suspicion or any type of negative feeling towards
22 Martin Sigillito for any reason?
23 **A.** I have no recollection of any misgivings or
24 suspicions about him. Just didn't have enough
25 interaction to generate any suspicions.

Markow Depo., p. 156, lines 14-25

# EXHIBIT G-3

### • Herb Morisse does not recall why Allegiant Bank resigned as IRA custodian

22 **Q.** Did Allegiant Bank, to your knowledge, ever
23 resign as custodian of any self-directed IRA account
24 that was invested in this English real estate?
25 **A.** My understanding is that the bank did resign.

Morisse Depo. p. 102, lines 22-25.

11 Q. Why did the bank resign?
12 **A.** I don't know.
13 Q. You have no idea?
14 **A.** No.
15 Q. Did you consider it unusual when you found
16 out that the bank was resigning from self-directed IRA
17 accounts?
18 **A.** I just don't remember.
19 **Q.** You don't remember whether you considered it
20 unusual?
21 **A.** No. I don't remember what the reason was. I
22 can't recall if I felt it was unusual or not.

Morisse Depo. p. 103, lines 11-22

### • Herb Morisse does not recall if he asked why Allegiant Bank was resigning as IRA custodian

7 **Q.** Okay. So in your banking career, as a trust
8 officer, you've never found any reason to resign from
9 any self-directed IRA account as custodian on behalf
10 of a financial institution; is that right?
11 **A.** I personally never have, no.
12 **Q.** Did you ask anybody at Allegiant why the bank
13 was resigning from self-directed IRA accounts?
14 **A.** I --
15 MR. RUSSELL: I'm sorry. Could you read
16 that back?
17 (Reporter read back pending question.)
18 MR. RUSSELL: Objection to form, lack of
19 foundation.
20 **A.** I don't remember.

Morisse Depo. p. 104, lines 12-20

### • Herb Morisse does not recall suspicious activity in Sigillito's accounts

4 **Q.** Okay. And can you, in your mind, distinguish
5 between a Suspicious Activity Report and something
6 that you might consider to be suspicious

activity in a
7 bank account? Can you distinguish those two concepts
8 in your mind?
9 **A.** Here's my difficulty in responding to your
10 question is in my current employment environment I'm
11 very cognizant of SARs, and in terms of, you know,
12 what, you know, what may be noticed or detected. I'm
13 trying very hard to recall back to -- I'm assuming the
14 time period here is 2001 to 2003, and I'm not, I'm not
15 recalling suspicious activity.

Morisse Depo. p. 63, lines 4-16

### • Herb Morisse does not recall if he discussed Betty Womack at Allegiant Bank

24 **Q.** Did you ever have discussions at Allegiant
25 Bank about Betty Womack?
1 **A.** I don't remember.
2 **Q.** You don't remember one way or the other?
3 **A.** One way or the other.
4 **Q.** Are you saying that it's possible that you
5 had discussions about Betty Womack at Allegiant, but
6 you just can't recall as you sit here today?
7 **A.** That is correct.

Morisse Depo. p. 136, line 24 to p. 137, line 7

### • Herb Morisse does not recall if Allegiant was concerned about fees being taken in the BLP

19 **Q.** Okay. To your knowledge, did anybody at
20 Allegiant, while you were there, ever express concern
21 about the fact that fees were being taken in
22 connection with the loans made as part of this English
23 real estate program?
24 **A.** I don't remember discussion about that.
25 **Q.** You don't remember it with clarity to say it
1 never happened, or you don't remember one way or the
2 other?
3 **A.** I don't remember one way or the other.
4 **Q.** Okay. It might have happened, it might not;
5 you just can't say as you sit here today?
6 **A.** Correct.

Morisse Depo. p. 165, line 19 to p. 166, line 6

# EXHIBIT G-4

### • Robin Fitzgibbons testified she does not recall when she worked at Allegiant

21 **Q.** Before you tell us a little more about First
22 Bankers Trust Services and what you're doing
23 currently, did you, do you recall working at Allegiant
24 Bank in 2001/2002 time period?
25 **A.** I remember working at Allegiant. I don't
1 know the years that I worked there.
2 **Q.** You don't recall when you started at
3 Allegiant?
4 **A.** No, I do not.
5 **Q.** Do you recall when you left Allegiant?
6 **A.** I don't know what year I left.
7 **Q.** So the years you started and the years you
8 worked and the years you left, you have no memory of
9 that?
10 **A.** No. Correct. I don't know the exact years.
11 **Q.** Well, do you know approximately when?
12 **A.** No.

Fitzgibbons Depo. p. 104, lines 12-20

### • Robin Fitzgibbons does not recall if anyone told her of suspicious Sigillito account activity

18 **Q.** Would you please read the first sentence of
19 paragraph 130 in Exhibit 155 for the record, please?
20 **A.** "PNC admits that Allegiant Bank advised its
21 counsel upon becoming suspicious of the activity of
22 Sigillito's accounts. PNC denies the remaining
23 allegations in this paragraph."

Fitzgibbons Depo. p. 214, lines 18-23

8 **Q.** While you were at Allegiant, did anyone ever
9 express to you in words or substance the view that the
10 activity in Sigillito's accounts was suspicious for
11 any reason?
12 MR. GIORGIO: Object to the form of the
13 question, lack of foundation. You can answer.
14 **A.** I don't recall either way.
15 **Q.** Not recalling either way, do you have a view
16 as to which is more probable?
17 **A.** I do not.

Fitzgibbons Depo. p. 217, lines 8-17

### • Robin Fitzgibbons does not recall why Allegiant resigned as IRA custodian

2 **Q.** You know, when you take into account these
3 court filings, as Mr. Giorgio has said, these legal
4 documents where PNC admits to becoming suspicious of
5 the activity in Sigillito's accounts, when we take
6 into account that of the 3,000 accounts that you were
7 responsible for you can only recall two accounts
8 sending letters to clients advising that the bank had
9 resigned on the account, and also considering the 16
10 letters that we just went through where it has all
11 your signatures and they all say the same thing and
12 they all tell the people on the same date that
13 Allegiant's resigning, in light of all that, is there
anything about that that refreshes your recollection
15 as to why Allegiant resigned as custodian?
16 MR. GIORGIO: I'm going to object to the
17 form of the question for a number of reasons. First
18 of all, mischaracterizes any impact of what is stated
19 in the pleadings. Again, this witness is not a
20 lawyer. She's not here to comment on anything that's
21 in a legal pleading. Subject to that, if the witness
22 understands the question, by all means go ahead and
23 answer.

Fitzgibbons Depo. p. 221, lines 2-23
[Question re-read, objection re-asserted]

21 **A.** No, I don't recall.
22 **Q.** You don't recall why Allegiant resigned in
23 2001 from 16 IRA accounts on the same day; is that
24 right?
25 **A.** I do not recall.

Fitzgibbons Depo. p. 222, lines 21-25

### • Robin Fitzgibbons does not recall the year she graduated from college

3 **Q.** Do you recall when you graduated from
4 U.M.S.L. [University of Missouri St. Louis]?
5 **A.** Not the exact year, no.

Fitzgibbons Depo. p. 20, lines 3-5

# EXHIBIT G-5

**• Art Weiss claims he does not recall writing the October 26, 2001 letter to Martin Sigilito**

18 **Q** Exhibit 77 is a letter dated October 26,
19 2001?
20 **A** Yes, it is.
21 **Q** Did you sign that letter?
22 **A** That is my signature. That -- so I guess I
23 would conclude that I did.
24 **Q** Do you recall drafting this letter?
25 **A** I do not.
1 **Q** Do you recall signing this letter?
2 **A** I do not.
3 **Q** You were the executive vice president for
4 Wealth Management at Allegiant Bank at this time?
5 **A** That is correct.
6 **Q** Okay. You've addressed the letter to
7 Martin Sigillito?
8 **A** That is who this letter is addressed to.
9 **Q** Do you have any recollection of anything
10 about this letter?
11 **A** No.

Weiss Depo. p. 83, line 18 to p. 84, line 11

**• Art Weiss recalls one meeting with Martin Sigillito before writing the October 26 letter**

12 **Q** Before you signed this letter did you attend
13 any meetings in which these international
14 investments were discussed?
15 **A** I met -- I recall meeting with Martin
16 Sigillito one time to hear more about these
17 investments.
18 **Q** Approximately when did you meet with
19 Martin Sigillito?
20 **A** Sometime -- sometime prior to writing this
21 letter.

Weiss Depo. p. 106, lines 12 – 21

**• Art Weiss does not recall Allegiant becoming suspicious of Sigillito's account activity**

4 **Q** Isn't it true that before writing to all of
5 these accountholders about its decision to resign,
6 Allegiant Bank had become suspicious about the
7 activity of Sigillito's accounts?
8 MR. RUSSELL: Objection. Asked and
9 answered.
10 THE WITNESS: I don't recall that, no.

Weiss Depo. p. 228, lines 4 – 10

**• Art Weiss recalls Martin Sigillito making a sales pitch at the October 2001 meeting**

21 **Q** What do you recall learning about
22 international investments at your meeting with
23 Martin Sigillito?
24 **A** I just -- I remember Marty taking us through
25 his, I'll call it sales pitch, but the specifics of
1 it, I don't recall.
2 **Q** Do you recall anything about it?
3 **A** Quite honestly, no. It's a long time ago
4 and it was a fairly -- it may have been an hour
5 meeting or something like that. I don't have any
6 real recollection of the specifics.
7 **Q** Why did you refer Martin Sigillito to your
8 lawyers in this letter?
9 **A** I don't know. I don't remember writing the
10 letter either, so I -- I really don't know.
11 **Q** Do you recall ever referring any clients of
12 the bank, who had accounts, to the bank's lawyers
13 for any reason?
14 MR. RUSSELL: Objection. Asked and
15 THE WITNESS: I can't recall one way or the
16 other doing that.

Weiss Depo. p. 105, line 21 to p. 106, line 16

**• Art Weiss does not recall why Allegiant Bank resigned as IRA custodian**

11 **Q** But you resigned as custodian -- the
12 decision was made to resign as custodian because of
13 suspicions related to Sigillito's account; isn't
14 that correct?
15 MR. RUSSELL: Objection to form. Lack of
16 foundation.
17 THE WITNESS: I don't even recall the
18 specifics as why we resigned.

Weiss Depo. p. 211, lines 11 – 18

# EXHIBIT G-6

**•Brian Davies has no knowledge of any suspicious activity in Martin Sigillito's accounts**

15 **Q.** Are you aware of any activity in Martin
16 Sigillito's accounts at Allegiant Bank that you would
17 characterize as suspicious?
18 MR. GIORGIO: Object to the form of that
19 question.
20 **A.** Other than what I read in the Complaint, no,
21 I was not aware of anything.

Davies Depo. p. 94, lines 15-21

6 **Q.** Are you aware of anybody at Allegiant Bank
7 who did review Martin Sigillito's accounts and who
8 formed the opinion or view that the activity in those
9 accounts was suspicious?
10 **A.** No.

Davies Depo. p. 95, lines 6-10

**• Shaun Hayes introduced Brian Davies to Martin Sigillito**

25 **Q.** How did you come to meet Martin Sigillito?
1 **A.** Shaun Hayes had given me his information and
2 said that Marty had clients that he wanted to find a
3 bank that he could refer them to.
4 **Q.** So Mr. Hayes told you that Martin Sigillito
5 had clients that needed to find a bank?
6 **A.** Yes.

Davies Depo. p. 27, line 25 to p. 28, , line 6

**• Martin Sigillito had clients in need of a bank**

9 **Q.** Did you meet with Martin Sigillito after
10 Mr. Hayes told you about him?
11 **A.** I did.
12 **Q.** What do you recall about meeting
13 Mr. Sigillito for the first time?
14 **A.** He said that he and a couple of other guys,
15 Scott Brown, had this British loan fund that they were
16 either setting up or running, I don't recall which,
17 and that they were looking for a bank to be able to
18 refer individuals to to borrow on personal assets or
19 whatever and invest in their fund.

Davies Depo. p. 29, lines 9–19

**• Brian Davies reported back to Shaun Hayes after meeting with Martin Sigillto**

10 **Q.** After you met with Mr. Sigillito and
11 Mr. Brown, what happened next?
12 **A.** I reported back to Shaun Hayes.
13 **Q.** What did you tell Mr. Hayes?
14 **A.** That -- Basically what had happened in the
15 meeting, that Marty has this loan fund, British loan
16 fund, and he wants to -- You know, he's looking for a
17 bank to be able to refer people to and that's...
18 **Q.** Did the bank, to your knowledge, do any
19 further investigation or look into this British loan
20 fund to get more information about it?
21 **A.** Not that I'm aware of. Shaun's response when
22 I told him that was that we don't want anything to do
23 with, you know, we're not getting involved in
24 underwriting a British loan fund. We're underwriting
25 these people and their collateral.

Davies Depo. p. 32, lines 10-25

# EXHIBIT G-7

## Sigillito, Martin

**To:**      aweiss@allegiantbank.com
**Cc:**      shayes@allegiantbank.com; rmarkow@allegiantbank.com; rfitzgibbons@allegiantbank.com;
             jsba@jscottbrown.com; jsbassocs@hotmail.com

**Importance:**      High

Scott Brown, who is today traveling back to the States from abroad, has asked me to relay to you his desire to meet with you and your colleagues either on Friday of this week or Monday next.

We are absolutely mystified by the sudden change of attitude.  As both Mr. Brown and I have said to you, we stand ready to answer any questions or provide any material you may need.

Given my extensive dealings with the Bank and the Trust Company, both personally and on behalf of a number of clients, I would never have expected to encounter anything that even remotely resembled a Star Chamber proceeding.  I am still hopeful that will change.

I am not available for the balance of today, because of previously-scheduled client meetings.  Both Mr. Brown and I are at your disposal by telephone as from the start of business tomorrow.

1

PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®

# EXHIBIT G-8

# THOMPSON COBURN

*Thompson Coburn LLP*

*Memorandum*

**To:**   File

**From:**   Jan Robey Alonzo

**Date:**   November 5, 2001

**Re:**   **Allegiant Trust/Custodial Account Question:  Transcript of Voice Mail from Tom Jerry and Jim Dankenbring**

Hey, Jan, this is Tom Jerry and Jim Dankenbring. We received the form that you sent to us by fax. We have gotten that over to Marty and Scott Brown for a quick review and awaiting any comments they have. I don't see anything in particular that stands out that problematic. I would expect to hear from them late today or early tomorrow and I will get you those comments when we get them. I have also talked to Marty about the Howe Milsap situation. They're still concerned that no one from Allegiant's really communicating with them. If they do have the paperwork on that account that Allegiant is not going to be opening what they would like is for that to be returned to them immediately so that it can be opened if a new custodian. As far as the issues on the assets for the one account, again no one at Allegiant is communicating with them, instructing them consistent with what you had told me on Friday, so if you can give us a call to talk about these issues, we'd appreciate. We're at 863-7733. Thanks, Jan.



PLAINTIFF'S EXHIBIT

ALL-STATE LEGAL®

1712476

Aguilar v. PNC Bank
TC LLP #000007

# EXHIBIT G-9

## J. Scott Brown

**From:** "J. Scott Brown" <jsba@jscottbrown.com>
**To:** "James R. Dankenbring, Esq." <jrd@dgohlaw.com>; "Thomas W. Jerry, Esq." <tj@dgohlaw.com>
**Cc:** "Martin T. Sigillito, Esq." <sigillitom@hotmail.com>; "Kevin Cooper (US)"
**Sent:** Tuesday, October 16, 2001 9:35 AM
**Subject:** Allegiant Bank, Mark Gilbert Morse (MGM), et al.

Gentlemen,

I have just finished a most worrying conversation with Kevin Cooper who, in turn, had earlier had a conversation with John Morse, of MGM. Kevin and John are to get together in about another 3 hours time to confer about all issues arising, but the following worrying highlights arise now and require your assessment and possible action, pending Cooper's next report.

It is now confirmed by Morse that it was Allegiant Bank that initially contacted MGM. The reason for the contact was to express Allegiant's concerns about the propriety/legality of the deals being done, the methodology of the monies being transferred, the purposes for the monies, etc.

Allegiant and MGM have had a couple of meetings at which either/&/or Markow and Weiss were in attendance, and at which on one occasion a member of the Husch firm was in attendance. At those sessions explanations were given by MGM. The result were that Allegiant were said to be satisfied with the miners' widows' claims role and MGM's borrowings, but that Allegiant reacted very adversely to the property development deals. Apparently their main concerns arose from the rates of interest charged and the arrangements fees. Some Allegiant member is said to have made the implication or recited to MGM that "Marty needed a damned good criminal lawyer", and that "what was going on was verging on fraud", or words to that effect.

As to the matter of Marty, Kevin and I having a meeting with MGM next week, Husch has told MGM that this was not on unless and until members of the Husch firm were to be present at such a meeting.

This stance seems quite at variance to what you learned form the Husch team yesterday, and one wonders what the true picture is here.

As a result , John Mark is adamant that no meeting can occur.

For his part, Morse is said to be embarrassed at having caused such problems for 'friends' or those he had hoped were his friends, but that matters were still even more complicated.

Based upon what Allegiant told MGM, MGM took advice from The Law Society, the governing body for solicitors in England and Wales. The opinion of The Law Society's solicitors - based solely upon what Allegiant has recited to MGM, or so it appears - is that they fear that MGM may have themselves already committed violations of law in the USA, and that for that reason, MGM should have nil to do with Marty, Kevin and me.

As I say, this was all reported in a short conversation today with Cooper and one which kept breaking up due to a poor cell connection.

As recited, Kevin meets with Morse in about 3 hours time and will report back thereafter. Meanwhile, you see that clearly Ms. Alonzo needs working with and she in turn needs to quickly and substantially re-orient her client.

For my part and also speaking for Kevin, neither of us are keen on doing anything adversarial as to Allegiant, merely getting the proper information loop closed based upon your skillfully leading them through the securities, et al. issues arising and closing this chapter.

Most importantly, however, it is plain as a pikestaff that Allegiant has to be persuaded not to in any way sink our ship with any subsequent banking house, such as Bank of Blue Valley here in Overland Park. Their undertaking on that is a critical issue.

10/16/2001



PLAINTIFF'S
EXHIBIT

Without it, the business is over, and at great liability and cost not only to all three of us but also to MGM as well.

10/16/2001
10/16/2001

# EXHIBIT G-10

# SPENCER FANE

## BRITT (&) BROWNE LLP

ATTORNEYS & COUNSELORS AT LAW

120 S. CENTRAL AVENUE, 5TH FLOOR
ST. LOUIS (CLAYTON) MISSOURI 63105

(314) 863-7733
FAX (314) 862-4656

| RECIPIENT | COMPANY/FIRM NAME | FAX NUMBER |
|---|---|---|
| Jan Alonzo | TC | 552-7002 |
| | | |
| | | |

From: Tom Jerry

Re: Allgaint / Sigillito

Date: 11/1/01

Total Pages (including this cover sheet): 5

Message: Attached is a blackline and clear copy of the IRA notice reflecting our suggested changes.

If you have any problems receiving this fax, please contact me at (314) 863-7733, Ext.

The information contained in this facsimile message is privileged and confidential and is intended only for the Individual or entity named above. If the Reader of this message is not the intended Recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

SF-00044

November 5, 2001

[IRA Holder's Name]
[IRA Holder's Last Address in Bank Records]

Re:    IMPORTANT NOTICE about your Individual Retirement Account ("IRA")

Dear _____:

Allegiant Bank is currently serving as Custodian of your self-directed IRA. The purpose of this letter is to give you notice that Allegiant Bank has elected to resign as Custodian of your IRA effective December 6, 2001.

Your IRA Agreement states that:

> Either party may terminate this Agreement at any time by giving written notice to the other. We can resign as Custodian at any time effective 30 days after we mail written notice of our resignation to you. Upon receipt of that notice, you must make arrangements to transfer your IRA to another financial organization. If you do not complete a transfer of your IRA within 30 days from the date we mail the notice to you, we have the right to transfer your IRA assets to a successor IRA custodian or trustee that we choose in our sole discretion or we may pay your IRA to you in a single sum. We shall not be liable for any actions or failures to act on the part of any successor custodian or trustee nor for any tax consequences you may incur that result from the transfer or distribution of your assets pursuant to this section.

> If this Agreement is terminated, we may hold back from your IRA a reasonable amount of money that we believe is necessary to cover anyone or more of the following:

> - any fees, expenses or taxes chargeable against your IRA;
> - any penalties associated with the early withdrawal of any savings instrument or other investment in your IRA.

It [is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of your self-directed IRA to Millenium Trust Company, LLC. Please note that it] is important that you act promptly to complete a transfer of your IRA to another financial organization of your choice. If {you do not complete} the transfer of your IRA [is not completed] by December 6, 2001, {we may distribute the }[it may result in the distribution of] assets as permitted by your IRA Agreement, which could have adverse tax consequences to you. [Please complete, sign and return to my attention the second page of this letter to confirm your choice of successor Custodian with respect to your self-directed IRA.]

ALLEGIANT BANK

By: _____
        [name, title]

cc:    Martin T. Sigillito

## [NOTICE AS TO CHOICE OF SUCCESSOR CUSTODIAN

SF-00045

**Please check one of the choices below.**

☐    I hereby designate Millenium Trust Company, LLC to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.

☐    I hereby designate _____ to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.


Dated: _____

                              _____
                              [IRA Holder's Name]]

November 5, 2001

[IRA Holder's Name]
[IRA Holder's Last Address in Bank Records]

Re:   IMPORTANT NOTICE about your Individual Retirement Account ("IRA")

Dear _____:

Allegiant Bank is currently serving as Custodian of your self-directed IRA. The purpose of this letter is to give you notice that Allegiant Bank has elected to resign as Custodian of your IRA effective December 6, 2001.

Your IRA Agreement states that:

> Either party may terminate this Agreement at any time by giving written notice to the other. We can resign as Custodian at any time effective 30 days after we mail written notice of our resignation to you. Upon receipt of that notice, you must make arrangements to transfer your IRA to another financial organization. If you do not complete a transfer of your IRA within 30 days from the date we mail the notice to you, we have the right to transfer your IRA assets to a successor IRA custodian or trustee that we choose in our sole discretion or we may pay your IRA to you in a single sum. We shall not be liable for any actions or failures to act on the part of any successor custodian or trustee nor for any tax consequences you may incur that result from the transfer or distribution of your assets pursuant to this section.

> If this Agreement is terminated, we may hold back from your IRA a reasonable amount of money that we believe is necessary to cover anyone or more of the following:

> - any fees, expenses or taxes chargeable against your IRA;
> - any penalties associated with the early withdrawal of any savings instrument or other investment in your IRA.

It is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of your self-directed IRA to Millenium Trust Company, LLC. Please note that it is important that you act promptly to complete a transfer of your IRA to another financial organization of your choice. If the transfer of your IRA is not completed by December 6, 2001, it may result in the distribution of assets as permitted by your IRA Agreement, which could have adverse tax consequences to you. Please complete, sign and return to my attention the second page of this letter to confirm your choice of successor Custodian with respect to your self-directed IRA.

ALLEGIANT BANK

By: _____
[name, title]

cc:   Martin T. Sigillito

SF-00047

## NOTICE AS TO CHOICE OF SUCCESSOR CUSTODIAN

Please check one of the choices below.

☐    I hereby designate Millenium Trust Company, LLC to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.

☐    I hereby designate _____ to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.

Dated:_____      _____

                                             **[IRA Holder's Name]**

SF-00048

# EXHIBIT G-11



**Allegiant Trust Company**
A Division of Allegiant Bank          Member FDIC

15061 Manchester Road
Ballwin, MO 63011
(636) 391-9393 • Fax: (636) 391-1635
TTY: (636) 391-1792

November 13, 2001

Mr. Richard Aguilar
1016 Leigh Ann Court
Jackson, MO  63755-2596

**RE:  IMPORTANT NOTICE about your Individual Retirement Account ("IRA")**

Dear Mr. Aguilar:

Allegiant Bank is currently serving as Custodian of your self-directed IRA.  The purpose of this letter is to give you notice that Allegiant Bank has elected to resign as Custodian of your IRA effective December 14, 2001.

It is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of your self-directed IRA to Millenium Trust Company, LLC.  Please note that it is important that you act promptly to complete the transfer of your IRA to another financial organization of your choice.  If the transfer of your IRA is not completed by December 14, 2001, it may result in the distribution of assets as permitted by your IRA Agreement, which could have adverse tax consequences to you.

> Your IRA Agreement states that:
>
> Either party may terminate this Agreement at any time by giving written notice to the other.  We can resign as Custodian at any time effective 30 days after we mail written notice of our resignation to you.  Upon receipt of that notice, you must make arrangements to transfer your IRA to another financial organization.  If you do not complete a transfer of your IRA within 30 days from the date we mail the notice to you, we have the right to transfer your IRA assets to a successor IRA custodian or trustee that we choose in our sole discretion or we may pay your IRA to you in a single sum.  We shall not be liable for any actions or failures to act on the part of any successor custodian or trustee nor for any tax consequences you may incur that result from the transfer or distribution of your assets pursuant to this section.
>
> Please take the following steps to complete the transfer of your IRA:
>
> 1.   Complete, sign and return to my attention both the second page of this letter <u>and</u> the IRA Transfer Request form which is enclosed to confirm your choice of successor Custodian; and
>
> 2.   Make payment for the enclosed final fee statement for your self-directed IRA by mailing a check to the address shown on the invoice.

Thank you for the opportunity to serve as your self-directed IRA custodian

ALLEGIANT BANK

By:   Robin Fitzgibbons
      Robin Fitzgibbons
      Trust Officer

## NOTICE AS TO CHOICE OF SUCCESSOR CUSTODIAN

Please check one of the choices below.

- ☐ I hereby designate Millenium Trust Company, LLC to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.

- ☐ I hereby designate_____to serve as successor Custodian with respect to my self-directed IRA account and I hereby instruct Allegiant Bank to provide it with all information and materials requested by it to accomplish the transfer of my account.

_____   _____

Date               Richard Aguilar

# EXHIBIT G-12



Kenton E. Knickmeyer
P 314.552.6064
F 314.552.7064
kknickmeyer@thompsoncoburn.com

May 8, 2015

**VIA Electronic Mail**

Jonathan F. Andres
7733 Forsyth
Suite 700
St. Louis, MO 63105
andres@andreslawpc.com

Sebastian Rucci
16400 Pacific Coast Hwy
Suite 212
Huntington Beach, AC 92649
sebrucci@gmail.com

Re:     *Aguilar v. PNC Bank, N.A.*:  Subpoenas to Thompson Coburn, LLP

Gentlemen:

I write in response to Mr. Andres' letter to me dated November 7, 2014 and specifically his inquiry concerning certain communications with Mr. Jerry and draft letters to IRA account holders dated November 5, 2001.

Thompson Coburn LLP's files include four pages that likely represent a portion of the November 1, 2001 communication from Mr. Jerry to Ms. Alonzo referenced in your letter.  The first two pages are clearly a draft of a letter to IRA account holders dated November 5, 2001 that has been marked to show changes from another version of the document.  These pages bear markings indicating they were pages 002 and 003 of a November 1, 2001 fax from Spencer Fane Britt Brown.  It was our intention to produce these two pages.  They were omitted from our production due to an error on my part.  I enclose copies of these pages (marked TC LLP 00072 – 73), and apologize for the error.  The third and fourth pages are listed on our privilege log as TC Priv. Log #47 – 48.  They apparently started as a clean copy of the November 5 draft letter and were transmitted as pages 004 and 005 of the November 1 fax referenced above.  These pages now have extensive handwritten notes that were part of a communication between Ms. Alonzo and our client, which is the basis upon which these pages are included on the privilege log.

Insofar as communications from Jan Alonzo to Tom Jerry dated November 7, 2001 are concerned, you are correct that we did not locate or find any such communications.  The only dated material we located or found referencing a communication between Ms. Alonzo and Mr. Jerry on November 7, 2001 is the time entry shown on TC LLP # 000057 referencing a "Telephone call from T. Jerry" on 11/07/01.

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com
Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

Very truly yours,

Thompson Coburn LLP


By
    Kenton E. Knickmeyer

KEK/


Enclosures

cc: Jeffrey Russell

# EXHIBIT G-13

**From:** "J. Scott Brown" <jsba@jscottbrown.com>
**To:** "Thomas W. Jerry, Esq." <tj@dgohlaw.com>
**Date:** 11/13/01 9:30AM
**Subject:** Allegiant

Tom,

Thanks for the note, copied to me by Marty. As you see, he is to be out of action until well after lunchtime.

In the first instance, Kevin Cooper will need to immediately need to liaise with Mark Gilbert Morse on the matter of the missing Agreements.

It is singularly unhelpful for Allegiant to persist in an artifical send date for their letter, given this latest matter. Can reason not prevail, and they be encouraged to wait until next week, as earlier requested? In any case, this is nothing more than sheer Allegiant's maliciousness. So much for any sense of burying the hatchet.

As to Mrs. Carol Yarberry, we are fully aware of the position there, and which Mr. Hal Millsap now has under control. She and her husband are in the throes of a difficult divorce (is there any other kind?), so this is not at all unexpected.

Await your word.

Best regards,

Scott Brown


----- Original Message -----
From: "Martin Sigillito" <sigillitom@hotmail.com>
To: <jsbassocs@hotmail.com>; <kcooper1961@aol.com>
Cc: <tj@dgohlaw.com>
Sent: Tuesday, November 13, 2001 9:17 AM
Subject: Fwd: Allegiant


| Gentlemen: Help! I will be out of the office today in order to take care of some personal matters. I will be at home from about 2:00pm.
|
|
| >From: "Tom Jerry" <TJ@dgohlaw.com>
| >To: <sigillitom@hotmail.com>
| >Subject: Allegiant
| >Date: Tue, 13 Nov 2001 09:12:22 -0600
| >
| >Marty:
| >
| > I spoke with Jan Alonzo late yesterday afternoon. She identified two other accounts that lack loan documentation--Carl Lavender ($51,272.10) and Iris Pearson ($29,466). Jan needs to know when the loan documentation for the various accounts will be forthcoming. She is concerned that the notice letters will result in phone calls from clients wanting to know the

**Richard Aguilar, et. al. 019722**

PLAINTIFF'S EXHIBIT

ALL-STATE LEGAL®

status of their accounts. If there is no loan documentation in an account, the bank will have to report that fact in response to direct questioning from a client. This could create more confusion and further complicate the transfer process. Naturally, it would be more convenient to have all documentation in place at the time of the account transfers. At this point, documentation has not yet arrived with respect to approximately $325,000 in loans. Please contact me immediately to let me know the status of the documents.

| >
| >      The notice letters are going out today and a full copy of them is being hand delivered to our office. Please let me known how I can get the copies to you.

| >
| >      Jan has faxed me a final copy of the notice letter as well as a full list of the clients who will receive the notice. The transmission is rather poor quality. I can attempt to fax you a copy of this information or give you a copy by some other means.

| >
| >      Jan also informed me that Carol Yarberry has revoked your investment authority with respect to her account. Apparently there are two notes in her account and one of them was to mature in October.

| >
| >      Please contact me right away to discuss these various issues.

| >
| >                              Tom J.   863-7733
| >
|
|


**CC:**          "Kevin Cooper (US)" <kcooper1961@aol.com>, "Martin T. Sigillito, Esq." <sigillitom@hotmail.com>

# EXHIBIT G-14

**December 6, 2001 Message from Tom Jerry:**

"Hi Jan. This is Tom Jerry. Didn't want you to think I'm ignoring you because I'm not. I have been emailing Marty and Scott everyday or making phone contact, just reminding them of the immediate need to get these things documented and to get it over to Allegiant. I didn't have anything to tell you yesterday. I did receive a responsive email from Marty indicating that he thought tomorrow, let me look at what this says. He thinks.. he says they may be there by then. So, apparently he thinks the documentation is either ready or almost ready. As soon as I receive something definitive from them I will call you, by all means. And, of course, I get the information to Herb as soon as I have it in my hands. But, again, I just wanted to assure you I'm not letting the issue die and I understand that it's important. So, I'm staying after them. At least doing what I can do. Give me a call if you have any questions, 863-7733. Thanks."

**December 7, 2001 Message from Tom Jerry:**

Jan, this is Tom Jerry following up with you on the missing documentation. I just got off the phone with Marty Siduleto. First of all he assured me that they diligently have been working on getting all this put together and here. And all indications are they will have copies of the documents available on Monday and the originals will be sent around that time. What I have recommended to him is they, you know kind of pursuant to your original suggestion, that they go ahead and DHL those directly to Herb Morrisey which Marty assured me that they would do that, take that approach. So, hopefully, Monday we will have copies to verify that all the documentation is there and then the actual originals will be shortly there after to Herb's attention. Give me a call if you have any questions. I really don't have much to tell you other than what I just communicated and I will touch bases with you on Monday. Thanks. Have a good weekend."

/tmf

Aguilar v. PNC Bank
TC LLP #000041

# EXHIBIT G-15

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

RICHARD AGUILAR, *et al.*,     )
                             )
       Plaintiffs,       )   Case No. 4:14-cv-985-LRR
vs.                     )
                             )
PNC BANK, N.A.,        )   Judge: Honorable Linda R. Reade
                             )   (Chief Judge N. Dist. Iowa)
       Defendant.       )
                             )

### DEFENDANT PNC BANK'S FIRST REQUEST FOR
### ADMISSIONS DIRECTED TO PLAINTIFF RICHARD AGUILAR

COME NOW, Plaintiff Richard Aguilar, and through his undersigned counsel, responds to PNC Bank's First Request for Admissions as follows:

1. Admit that You had no customer relationship with Allegiant Bank between 2000 and 2010.

RESPONSE: DENIED.

2. Admit that You had no customer relationship with Pioneer Bank between 2000 and 2010.

RESPONSE: ADMIT.

3. Admit that You had no customer relationship with National City Bank between 2000 and 2010.

RESPONSE: ADMIT.

4. Admit that You did not invest in the British Lending Program between January 1, 2000 and December 31, 2001.

RESPONSE: DENIED.

5. Admit that none of Your investments in the British Lending Program were ever deposited into Martin Sigillito's IOLTA while it was maintained at Allegiant Bank.
RESPONSE: DENIED.

6. Admit that You did not invest in the British Lending Program between January 1, 2002 and August 31, 2006.
RESPONSE: DENIED.

7. Admit that none of Your investments in the British Lending Program were ever deposited into Martin Sigillito's IOLTA while it was maintained at Pioneer Bank
RESPONSE: DENIED.

8. Admit that Martin Sigillito maintained an IOLTA at National City Bank for two days in 2006.
RESPONSE: ADMIT.

9. Admit that during the timeframe in which Martin Sigillito maintained an IOLTA at National City Bank in 2006, no funds from that account were transferred to Martin Sigillito.
RESPONSE: ADMIT.

10. Admit that during the timeframe in which Martin Sigillito maintained an IOLTA at National City Bank in 2006, no new funds were deposited into that account.
RESPONSE: ADMIT.

11. Admit that during the timeframe in which Martin Sigillito maintained an IOLTA at National City Bank in 2006, funds were only transferred out of that account into a new IOLTA at a different bank.
RESPONSE: ADMIT.

12. Admit that Allegiant Bank inquired into Martin Sigillito's IOLTA activities in October 2001.
RESPONSE: ADMIT.

13. Admit that Allegiant Bank suspended activity in Martin Sigillito's IOLTA in October 2001.

RESPONSE: ADMIT.

14. Admit that Allegiant Bank ceased doing business with Martin Sigillito before January 1, 2002.

RESPONSE: DENIED.

15. Admit that Allegiant Bank required Martin Sigillito to close his IOLTA at the bank in December 2001.

RESPONSE: ADMIT.

16. Admit that Allegiant Bank informed Martin Sigillito in October 2001 that it would no longer serve as IRA custodian for any of Sigillito's investors.

RESPONSE: ADMIT.

17. Admit that Allegiant Bank withdrew as IRA custodian for all of Martin Sigillito's investors in December 2001.

RESPONSE: ADMIT.

18. Admit that You did not seek the advice of anyone from Allegiant Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

19. Admit that You did not obtain the advice of anyone from Allegiant Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

20. Admit that You did not rely on the advice of anyone from Allegiant Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

21. Admit that no one from Allegiant Bank advised that You invest in the British Lending Program.

RESPONSE: ADMIT.

22. Admit that no one from Allegiant Bank recommended that You invest in the British Lending Program.

RESPONSE: ADMIT.

23. Admit that You did not seek the advice of anyone from Pioneer Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

24. Admit that You did not obtain the advice of anyone from Pioneer Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

25. Admit that You did not rely on the advice of anyone from Pioneer Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

26. Admit that no one from Pioneer Bank advised that You invest in the British Lending Program.

RESPONSE: ADMIT.

27. Admit that no one from Pioneer Bank recommended that You invest in the British Lending Program.

RESPONSE: ADMIT.

28. Admit that You did not seek the advice of anyone from National City Bank in deciding to invest in the British Lending Program.

RESPONSE: ADMIT.

29. Admit that You did not obtain the advice of anyone from National City Bank in deciding to invest in the British Lending Program.
RESPONSE: ADMIT.

30. Admit that You did not rely on the advice of anyone from National City Bank in deciding to invest in the British Lending Program.
RESPONSE: ADMIT.

31. Admit that no one from National City Bank advised that You invest in the British Lending Program.
RESPONSE: ADMIT.

32. Admit that no one from National City Bank recommended that You invest in the British Lending Program.
RESPONSE: ADMIT.

33. Admit that the IRA You maintained at Allegiant Bank were self-directed.
RESPONSE: ADMIT.

34. Admit that You were solely responsible for deciding how to invest the money in the IRA You maintained at Allegiant Bank.
RESPONSE: ADMIT.

35. Admit that You made all investment decisions with respect to the IRA You maintained at Allegiant Bank.
RESPONSE: ADMIT.

36. Admit that it was solely Your decision to open an IRA with Allegiant Bank.
RESPONSE: ADMIT.

37. Admit that no one from Allegiant Bank advised You to open an IRA at Allegiant Bank.
RESPONSE: ADMIT.

38. Admit that no one from Allegiant Bank suggested that You should open an IRA at Allegiant Bank.

RESPONSE: ADMIT.

39. Admit that no one from Allegiant Bank recommended that You should open an IRA at Allegiant Bank.

RESPONSE: ADMIT.

40. Admit that, in deciding to open an IRA at Allegiant Bank, You did not rely on any advice from anyone at Allegiant Bank.

RESPONSE: ADMIT.

41. Admit that Allegiant Bank was not the payee for any check drawn on Martin Sigillito's IOLTA at any bank following the closure of his IOLTA at Allegiant Bank.

RESPONSE: DENIED.

42. Admit that Pioneer Bank was not the payee for any check drawn on Martin Sigillito's IOLTA at any bank following the closure of his IOLTA at Pioneer Bank.

RESPONSE: ADMIT.

43. Admit that National City Bank was not the payee for any check drawn on Martin Sigillito's IOLTA at any bank following the closure of his IOLTA at National City Bank.

RESPONSE: ADMIT.

44. Admit that PNC was not the payee for any check drawn on Martin Sigillito's IOLTA at any bank between January 1, 2000, and December 31, 2010.

RESPONSE: ADMIT.

JONATHAN F. ANDRES P.C.                    LAW OFFICES OF SEBASTIAN RUCCI


/s/ *Jonathan Andre*                         /s/ *Sebastian Rucci*
Jonathan F. Andres (E.D. Mo. 39531MO)        Sebastian Rucci (E.D. Mo. 178114CA)
7733 Forsyth Boulevard, Suite 700            16400 Pacific Coast Hwy, Suite 212
St. Louis, MO 63105                          Huntington Beach, CA 92649
Tel: (314) 862-6800                          Tel: (330) 720-0398
Fax: (314) 862-1606                          Fax: (330) 954-0033
Email: andres@andreslawpc.com                Email: SebRucci@gmail.com
Attorney for Plaintiffs                      Attorney for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2015 a copy of the foregoing was emailed to

Jeffrey Russell (jsrussell@BryanCave.com) and Herbert Giorgio

(Herb.Giorgio@bryancave.com), counsel of record for PNC Bank.


/s/ Sebastian Rucci
Sebastian Rucci (E.D. Mo. 178114CA)

# EXHIBIT G-16



2122 Kratky Road
St. Louis, Missouri 63114
(314) 692-8200 • Fax: (314) 692-8500

October 26, 2001

Martin T. Sigillito
120 South Central Avenue
Suite 1500
St. Louis, MO 63105

Dear Marty:

We appreciate the time you and your associates have taken to provide further information regarding the various international investments we hold for your clients in a number of self-directed IRA custodial accounts. We have made the decision that we no longer want to serve as custodian. Approximately three weeks have passed since our meeting earlier this month. We have been contacted by a successor corporate custodian for the accounts and we are hopeful that you will be successful in securing their services. However, if we are not notified by November 2 that a successor custodian has been appointed, we intend to notify the IRA Depositors of our election to resign as custodian. The form of the letter we intend to send is enclosed for your information.

Please contact our counsel, Jan Alonzo, of Thompson Coburn LLP, if you have any questions or if you have made arrangements for a successor custodian.

ALLEGIANT BANK

By: _____
    Arthur E. Weiss
    Executive Vice President/Wealth Management

cc: James Dankenbring



PLAINTIFF'S
EXHIBIT

ALL-STATE LEGAL®

PLEDGED TO A BETTER WAY OF BANKING