UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD AGUILAR, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-985-LRR |
| | ) | |
| PNC BANK, N.A., | ) | Judge: Honorable Linda R. Reade |
| | ) | (Chief Judge N. Dist. Iowa) |
| Defendant. | ) | |

**THOMPSON COBURN LLP AND JAN ALONZO'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL THIRD PARTY DISCOVERY**

THOMPSON COBURN LLP
John R. Musgrave, 20359MO
Kenton E. Knickmeyer, 29158MO
One US Bank Plaza
St. Louis, Missouri 63101
jmusgrave@thompsoncoburn.com
kknickmeyer@thompsoncoburn.com
314-552-6000
FAX 314-552-7000

*Attorneys for Thompson Coburn and
Jan Robey Alonzo*

## TABLE OF CONTENTS

Page No.

I.  INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ..................................................................................3

    A.  The British Lending Program ....................................................................3

    B.  The BLP Participants' Use of Allegiant's Banking Services ............................4

    C.  Thompson Coburn and Ms. Alonzo's Disclosed Involvement In Allegiant's Resignation As Custodian of Plaintiffs' Self-Directed IRAs ............7

    D.  Thompson Coburn and Ms. Alonzo's Interactions With MGM's Counsel, Husch, Relative to Allegiant ....................................................9

    E.  The Claims Here At Issue ........................................................................10

    F.  The Subpoenas and Process Leading To This Motion........................................11

III. ARGUMENT .........................................................................................................13

    A.  Plaintiffs' Failure To Comply With Local Rules 37-3.04 and 7-4.01(A) Precludes Consideration Of Their Motion ........................................................13

        1.  Local Rule 37-3.04 Requires That Plaintiffs' Motion Be Denied ............13

        2.  Plaintiffs' Failure To Comply With Local Rule 7-4.01 Impedes The Court's Ability To Engage In Necessary Fact Finding ....................14

    B.  Plaintiffs Have Failed To Demonstrate That Allegiant's Privileges Do Not Exist Or Should Be Breached ........................................................16

        1.  Plaintiffs Have Failed To Meet Their Burden Of Showing The Crime-Fraud Exception Applies ............................................................19

        2.  Plaintiffs Have Not Met Their Burden To Show That Respondents' Communications With Allegiant Were Not For The Purpose Of Obtaining Legal Advice........................................................22

        3.  Plaintiffs Have Not Demonstrated That The Work Product Doctrine Should Not Apply To Any Document For Which It Is Claimed........................................................................25

        4.  No Waiver Has Been Shown .................................................................28

IV. CONCLUSION ......................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*188 LLC v. Trinity Industries, Inc.,* 300 F. 3d 730 (7th Cir. 2002) ................................30

*Baker v. General Motors Corp.,* 209 F.3d 1051 (8th Cir. 2000) .................................28

*Brown Sheet Iron & Steel Co. v. Maple Leaf Oil & Refining Co., Ltd.,* 68 F.2d 787
    (8th Cir. 1934)..........................................................................................................30

*Gray v. Bicknell,* 86 F.3d 1472 (8th Cir. 1996) ........................................................30

*In re BankAmerica Corp. Sec. Lit.,* 270 F. 3d 639 (8th Cir. 2001)............................16, 19, 21, 22

*In re Green Grand Jury Proceedings,* 492 F.3d 976 (8th Cir. 2007) ....................................28, 29

*In re Murphy,* 560 F.3d 326 (8th Cir. 1977) ..............................................................28

*In re von Bulow,* 828 F.2d 94 (2d Cir. 1987) ............................................................31

*Liggett v. Glenn,* 51 F. 381 (8th Cir. 1892)..............................................................24

*Painewebber Group, Inc. v. Zinsmeyer Trusts Partnership,* 187 F. 3d 988
    (8th Cir. 1999)..........................................................................................................30

*Pamida, Inc. v. E. S. Original, Inc.,* 281 F.3d 726 (8th Cir 2002).........................................30, 31

*Rabushka v. Crane Co.,* 122 F. 3d 559 (8th Cir. 1997) ...........................................17, 22, 23, 25

*Rakes v. Life Investors Ins. Co. of America,* 2008 WL 429060 (N.D. Ia. 2008) ...........................16

*United States v. Under Seal (In re Grand Jury Proceedings $ 5),* 401 F.3d 247
    (4th Cir. 2005)..........................................................................................................29

*United States v. Zolin,* 491 U.S. 554 (1989) ..............................................................16

**Rules**

Federal Rule of Civil Procedures 11 ........................................................................29

Federal Rule of Civil Procedures 8 ..........................................................................29, 31

Local Rule 7-4.01...................................................................................................13, 14, 15

Local Rule 37-3.04..................................................................................................13, 15

**Other Authorities**

Rice, <u>Attorney-Client Privilege: Continuing Confusion About Attorney
Communications, Drafts, Pre-Existing Documents, and the Source of the Facts
Communicated</u>, 48 AMULR 967 (June, 1999)........................................................................24

# I.    INTRODUCTION

Plaintiffs, Richard Aguilar et al., subpoenaed records and testimony from a law firm, Thompson Coburn LLP ("Thompson Coburn"), and one of its (now) former partners, Jan Alonzo ("Ms. Alonzo") (collectively, "Respondents"). ECF Doc. #52-1, 52-2.  The subpoenas explicitly seek records and testimony concerning legal work Respondents performed for its former client, Allegiant Bank ("Allegiant") during 2001 and 2002.  *Id.*

Defendant, PNC Bank (which Plaintiffs maintain is the legal successor to Allegiant[1]), has informed Respondents that it does not intend to waive the privileges it holds and instructed Respondents to invoke those privileges in response to the subpoenas. *See* Ex. 1, annexed hereto. Accordingly, Thompson Coburn[2] produced those non-privileged documents it was able to locate that are responsive to the subpoenas, but objected to producing other documents Thompson Coburn has located and believes to be responsive to one or more of the subpoenas but which reflect or constitute either or both (a) Respondents' communications with Allegiant for the purpose of providing legal advice to Allegiant, and (b) Respondents' work product created on behalf of Allegiant.  ECF Doc. # 52-3.

Respondents also noted their objection on those same grounds to providing at least some of the requested testimony.  *Id.*  No depositions have been taken pursuant to any of the subpoenas.  In part, this is due to scheduling issues.  Respondents perceive that there has been a tacit, though certainly not explicit, understanding with Plaintiffs' counsel that efforts to schedule these depositions would be suspended pending resolution of Respondents' claims of privilege respecting the subpoenaed documents.

---

[1] ECF Doc. #6, ¶5.

[2] Ms. Alonzo did not retain or take with her any files related to Allegiant when she resigned her Thompson Coburn partnership to assume her present position as the general counsel of another organization.

Plaintiffs now move to compel production of the withheld documents and for an order directing Thompson Coburn and Ms. Alonzo to testify concerning the legal work they performed for Allegiant without invoking any privilege. ECF Doc. # 51, 52. In essence, Plaintiffs argue that even if the withheld materials are or reflect attorney-client communications engaged in for the purpose of securing legal advice and/or attorneys' work product (neither of which Plaintiffs concede), those materials are not insulated from discovery due to the crime-fraud exception to the attorney-client and work product privileges.

Plaintiffs' motion must be denied for both procedural and substantive reasons.

Procedurally, Plaintiffs' motion is fatally flawed because Plaintiffs' counsel has failed to comply with Rules 37-3.04 and 7-4.01(A) of the Local Rules of the U.S. District Court for the Eastern District of Missouri. The failure to comply with Rule 37-3.04 precludes consideration of Plaintiffs' motion. Even were that not the situation, Plaintiffs' failure to comply with Rule 7-4.01(A) effectively deprives the Court of the ability to engage in the fact finding that would be necessary to resolve Plaintiffs' motion on its merits and in Plaintiffs' favor.

Substantively, Plaintiffs' motion falls far short of making the showing required to justify even an *in camera* inspection of the written materials Respondents object to producing on grounds of privilege. Plaintiffs have thus failed to demonstrate that this Court should grant the relief requested: entry of an order compelling disclosure of documents Respondents have identified as attorney-client privileged or attorney's work-product and giving testimony unfettered by objections based on the attorney-client privilege or work product doctrine, as requested by Plaintiffs.

For these reasons and as further explained below, Plaintiffs' motion to compel must be denied.

## II. FACTUAL BACKGROUND

### A. The British Lending Program

Plaintiffs allege that from some point during the 1990s until approximately May, 2010, Martin Sigillito, formerly a St. Louis – based lawyer and cleric, and several other individuals operated what has been referred to in this case and other proceedings before this Court as the "British Lending Program", or "BLP". *See generally,* ECF Doc. # 6. In addition to Mr. Sigillito, the principal promoters of the BLP (at least during the 2000 – 2001 period that is most significant to the pending motion) appear to have been Scott Brown, then a Kansas lawyer ("Brown"), Hal Milsap, then a provider of financial services in Arkansas ("Milsap"), and Kevin Cooper, an individual who was apparently an investment banker of sorts ("Cooper"). *See generally,* ECF Doc #6, 52. These individuals and/or persons working with them solicited individuals in the U.S. who had cash available for investment purposes to lend money to borrowers in the United Kingdom – principally a law firm called Marks, Gilbert Morse ("MGM") and a real estate developer named Derek Smith ("Smith"). Lenders participating in the BLP (among whom are the Plaintiffs in this case) were told they would be paid high rates of interest on funds committed to the BLP and that their principal would at some point be repaid. *Id.*

Plaintiffs' evidence indicates that with the knowledge and approval of at least MGM, as a borrower (but allegedly unbeknownst to the lenders), Sigillito, Brown, Milsap and Cooper took fees (apparently for arranging the loans) aggregating as much as 32% of any given lender's funds committed to the BLP before the balance of the loan principal was remitted to the borrowers. ECF Doc #52-9, 52-10, 52-11, 52-11. Plaintiffs further contend that in some instances, little, if any, of the lender's money was actually delivered to the borrowers' custody. In those instances,

the funds loaned by participants in the BLP which were not applied to the promoters' fees were used to pay interest and, in some instances, principal, due from the borrowers to pre-existing lenders in the BLP. *See generally,* ECF Doc. #6, 52.

Plaintiffs have now placed in the record evidence indicating that MGM repaid lenders the monies it borrowed via the BLP. ECF Doc. #52-10, ¶41. Presumably, in light of this evidence, Plaintiffs will contend that, by May, 2010, they were all lenders to Smith via the BLP. In May, 2010, federal law enforcement authorities executed search warrants at Sigillito's home and offices. No new loans were made through the BLP thereafter. Smith apparently defaulted on the Loan Agreements that were then outstanding, and the holders of those Loan Agreements lost the principal and interest due in respect of those Loan Agreements. *See generally,* ECF Doc #6.

### B. The BLP Participants' Use of Allegiant's Banking Services

Plaintiffs allege that, along with Sigillito, a number of them used various banking services Allegiant offered to the general public during 2000 and 2001 in connection with their involvement with the BLP. ECF Doc.#6.

Commencing in the fourth quarter of 2000, several of the Plaintiffs in this action[3] opened self-directed IRAs with Allegiant Trust Company, an unincorporated division of Allegiant.

---

[3] The Amended Complaint does not clearly allege which of the Plaintiffs opened self-directed IRA accounts with Allegiant which form some element of their claims. In the course of depositions of some former Allegiant employees, Plaintiffs utilized as deposition exhibits documents reflecting Allegiant's resignation as custodian of self-directed IRAs belonging to the following individuals named as Plaintiffs: Richard Aguilar (Dep. Exs. 127, 128), Patricia Ambrose (Dep Ex. 129), Nina Blaylock (Dep. Ex. 130), David Caldwell (Dep. Ex. 131), Sharon Carr (Dep. Ex. 132), Douglas Givens (Dep. Ex. 133), Linda Givens (Dep. Ex. 134), Robert Givens (Dep. Ex. 135), David Horner (Dep. Ex. 136), Carl Lavender (Dep. Ex. 137), Wanda Lavender (Dep. Ex. 138), Iris Pearson (Dep. Ex. 139), Carol Phillips (Dep. Ex 140), William Phillips (Dep. Ex. 141), and Margaret Price (Dep. Ex 142). In addition to these Plaintiffs, Plaintiffs have offered evidence that Betty Womack, apparently the spouse of one of Mr. Milsap's business associates who was involved with Mr. Milsap in soliciting investors in the BLP, opened a self-directed IRA with Allegiant. According to Plaintiffs, the Loan Agreement held in that account was paid prior to November 13, 2001, the date on which Allegiant notified the above Plaintiffs of its decision to resign as custodian of their IRA accounts. ECF Doc. # 52-12.

In addition to the above- named Plaintiffs, Plaintiffs introduced a resignation letter Allegiant apparently directed to Mr. Sigillito, in his capacity as the owner of a similarly invested self-directed IRA. (Dep. Ex. 143)

When opening their accounts, each of these Plaintiffs entered into standardized IRA account agreements with Allegiant[4] and through a separate document instructed Allegiant that it should handle the account in accordance with instructions Allegiant would receive from Sigillito.[5]  In this fashion, Allegiant was led to believe that the Plaintiffs were Sigillito's clients.  Once any of these self-directed IRA accounts were opened and funded, Sigillito would direct Allegiant to wire the funds in the account to a bank account controlled by Mr. Brown at Blue Valley Bank in Kansas, in exchange for a Loan Agreement payable to the IRA.[6]  *See, e.g.,*  ECF Doc. #6, ¶¶ 54-55.

On their face, it was apparent that the Loan Agreements were not the sort of assets most commonly held in IRAs – e.g., FDIC/FSLIC – insured certificates of deposit; publicly traded securities.  ECF Doc.# 52-8, pp. 8 – 15; *see also,* ECF Doc. # 52-9, ¶¶5-6, 20.  They bore interest at rates that by contemporary U.S. market standards were high.  The obligors – the borrowers – were located overseas.  There was no readily accessible market in which the Loan Agreements could be bought or sold. This made the Loan Agreements both relatively illiquid and difficult to value.  Most of the Loan Agreements prescribed interest payments only upon maturity, such that they did not produce a ready stream of cash flow from which, e.g., Allegiant's custodial fees could be paid, or any expenses associated with pursuing collection of the loans could be funded, should an event of default occur.[7]

---

[4] An exemplar agreement is attached hereto as Ex. 2.

[5] An exemplar of the form of instructions given to Allegiant by those Plaintiffs identified in note 3, *supra*, as IRA account holders of Allegiant is attached hereto as Ex. 3.

[6] Ex. 4, attached hereto, is an exemplar of the letters of instruction Allegiant received from Mr. Sigillito.

[7] All of these characteristics, once appreciated by the persons responsible for administering the IRAs, would lead to a conclusion that administration of these assets would be at least complicated, and potentially difficult.  For example, the  2001 instructions for Forms 1099-R and 5498 provided that custodians "must file Form 5498 with the IRS by May 31, 2002 to report the December 31, 2001 FMV of the account."  Reporting an accurate fair market value for an asset like the Loan Agreements would be challenging,, at a minimum.  Section 408(a)(6) of the Internal

Some of the Plaintiffs allegedly borrowed money from Allegiant, which they then loaned to others via the BLP.  ECF Doc. # 6, ¶ 100.

Sigillito is alleged to have maintained commercial bank accounts with Allegiant, including a checking account for his law practice and a trust account (an "IOLTA") for that practice. ECF Doc. #6, 35.  According to Plaintiffs, some lenders in the BLP (but not lenders who had self-directed IRAs at Allegiant through which they made loans to the BLP) delivered the funds they intended to be loaned through the BLP by depositing those funds to Sigillito's IOLTA.  ECF Doc. #6, ¶36.  Sigillito then used the IOLTA to disburse those funds, including, in some instances, to Sigillito personally and the other individuals orchestrating the BLP (in payment of the fees they were charging the borrowers to arrange the loans).  Plaintiffs contend that in some of these instances, Sigillito drew checks on his IOLTA that were deposited to his business checking account.  ECF Doc. # 6.

### C. Thompson Coburn and Ms. Alonzo's Disclosed Involvement In Allegiant's Resignation As Custodian of Plaintiffs' Self-Directed IRAs

On September 28, 2001, Allegiant completed the acquisition of South Side Bank.  Shortly after this transaction, Matthew Finn ("Mr. Finn"), who had been the head of South Side Bank's trust department, became involved in Allegiant's handling of the Plaintiffs' self-directed IRAs. ECF Doc. # 52-9, ¶¶3 – 5.

According to Mr. Finn's declaration, when he became an Allegiant employee, he reviewed the assets held in accounts administered by Allegiant Trust Company.  *Id.*  The high

Revenue Code of 1986 requires minimum distributions from IRAs that are similar to the rules applicable to qualified pension and profit sharing plans.  Under the required minimum distribution rules, a minimum percentage of the fair market value of IRA assets must be distributed to the IRA owner each year, beginning in the year in which the owner attains age 70½.  Illiquid assets that are not transferrable and that have no readily-ascertainable fair market value make it almost impossible to comply with the required minimum distribution rules.  These issues, and the difficulty of collecting custodial fees or any extraordinary expenses which are the obligation of the account holder, might well be regarded as "red flags" – i.e., warning signs that this might be undesirable business -- to a seasoned trust professional, such as, e.g., Mr. Finn.  *See* ECF Doc. # 52-9.

interest rates and the over-seas location of the borrowers on the BLP - Loan Agreements held in self-directed IRA accounts attracted Mr. Finn's attention and led him to believe that Allegiant "did not want to custody these loans." ECF Doc. #52-9, ¶20.

After he reviewed these assets, Mr. Finn met, sequentially, with Mr. Sigillito and then with representatives of one of the borrowers, MGM. Through these meetings, Mr. Finn acquired knowledge both about the borrowers and the BLP generally, including the fact that 32% of the loans were taken as fees by Sigillito and his associates. ECF Doc. #52-9, ¶¶ 11-12.

The record now before the Court indicates that Mr. Finn's meeting with Sigillito occurred on October 2, 2001 and involved not only Messrs. Finn and Sigillito, but also two other Allegiant officers, Arthur Weiss, Allegiant's Senior Vice President overseeing Allegiant's wealth management operations, which included Allegiant Trust Company, and Richard Markow, the individual who was President of Allegiant Trust prior to the South Side Bank transaction, as well as Ms. Alonzo. The record does not suggest that Mr. Sigillito was accompanied by counsel at this meeting. Rather, it appears he identified himself at the meeting to Ms. Alonzo as counsel for the lenders – i.e., the Plaintiffs in this action who had self-directed IRAs with Allegiant that were invested pursuant to Sigillito's instructions. ECF Doc. 3 52-7, p. 12, (entry for Oct. 2).

In other legal proceedings, Mr. Sigillito has alleged that he first engaged the law firm of Spencer, Fane Britt Brown ("Spencer Fane") to represent him in connection with the BLP in October, 2001. [8] Plaintiffs' evidence indicates that Spencer Fane was representing Mr. Sigillito in connection with the BLP not later than October 10, 2001. ECF Doc. # 52-7, p. 12, (entry for Oct. 10).

On October 26, 2001, Allegiant apparently wrote to Sigillito formally advising him that Allegiant no longer wished to serve as custodian for his clients' IRA accounts. ECF Doc. #6,

[8] See Ex. 5, annexed hereto.

¶146.   A few days later, one of Sigillito's lawyers at Spencer, Fane, Tom Jerry ("Mr. Jerry"),

faxed to Ms. Alonzo proposed revisions to the draft notice of resignation referenced as an

enclosure to the October 26 letter. ECF Doc. #52-7, pp. 40-44. From Mr. Jerry's proposed

revisions, it is evident that by the date of his fax to Ms. Alonzo (Nov. 1, 2001), Sigillito had

secured the agreement of Millenium Trust Company to act as the IRA custodian for the Loan

Agreements held in self-directed IRAs Sigillito's clients had opened with Allegiant.  There were

additional communications between Ms. Alonzo and Sigillito's lawyers. ECF Doc. # 52-7, p. 15.

On November 13, 2001, Allegiant sent letters to each of the individuals it understood to be

Sigillito's clients who held self-directed IRA accounts with Allegiant, notifying them that

Allegiant was resigning as custodian.  ECF Doc. # 52-7, p. 46; *see also* note 3, *supra.*

> **D.    Thompson Coburn and Ms. Alonzo's Interactions With
> MGM's Counsel, Husch, Relative to Allegiant.**

In addition to disclosing at least some aspects of the legal work Respondents performed

for Allegiant relating to Allegiant's resignation as custodian the record before this Court reflects

that Ms. Alonzo was involved in one communication (on October 9, 2001) with a lawyer at

Husch & Eppenberger ("Husch"), a St. Louis law firm hired by MGM to represent its interests in

connection with the loans it had taken from Sigillito's clients through the BLP.  ECF Doc. # 52-

7, p. 12.

The declarations of John Mark and John Morse, two MGM partners, show that MGM

sought advice from Husch because it was concerned that (a) it had loans that were maturing but

which it did not have the cash available to pay at that time, (b) the terms on which Sigillito was

proposing his clients would refinance the loans were more onerous than MGM thought was

acceptable, and (c) MGM was being led to believe that it may have violated some laws in the

course of borrowing from Sigillito's clients. ECF Doc. # 52-10, 52-11.   As Plaintiffs point out

(ECF Doc. 52, at p. 11) Thompson Coburn's privilege log shows that on October 9, 2001, there was a communication between Ms. Alonzo and at least one Husch lawyer. ECF Doc. # 52-4 , p. 2, (Bates pp. 55-58).   Although Plaintiffs purport to describe the substance of Ms. Alonzo's communication with the Husch attorney (ECF Doc. # 52, p. 11), there is actually no evidence in the record suggesting the contents of that communication.   Ms. Alonzo's notes of that conversation are among the documents withheld from production on the grounds that they are attorney's work product, not subject to discovery. No materials reflecting the substance of the conversation from the perspective of the Husch attorney are in the record.

### E.  The Claims Here At Issue

In this action, Plaintiffs seek to establish that PNC Bank, as successor to, among others, Allegiant, is liable for some or all of the losses Plaintiffs' sustained due to their participation as lenders in the BLP.  ECF Doc. # 6.  As described in their Amended Complaint, Plaintiffs' claims are predicated upon two basic concepts.

First, Plaintiffs allege that Allegiant received and accepted (for some of the Plaintiffs' accounts) payments that are subject to recapture on behalf of other Plaintiffs under the Uniform Fiduciaries Act.  Plaintiffs' theory seems to be that because some of the funds paid to Allegiant, as Custodian for self-directed IRAs owned by certain Plaintiffs, were delivered to Allegiant via checks drawn on Sigillito's IOLTA account (which held funds he had received from other Plaintiffs who were making loans in the BLP otherwise than through self-directed IRAs for which Allegiant was the custodian), and because some loan payments due Allegiant from certain Plaintiffs were paid via checks drawn on Mr. Brown's IOLTA account maintained at a Kansas bank (which at least during the period Allegiant served as custodian for certain Plaintiffs' self-directed IRAs was the conduit through which those Plaintiffs extended loans to BLP borrowers),

PNC Bank is liable to the Plaintiffs whose funds were (a) deposited in Sigillito's or Brown's IOLTA accounts as a means of funding loans Plaintiffs intended to make to the borrowers, and (b) then paid to Allegiant in satisfaction of the borrowers' outstanding obligations to Allegiant's customers (other Plaintiffs in this action), rather than being remitted directly to the borrowers.

Second, Plaintiffs allege that PNC Bank should generally be liable for the losses Plaintiffs sustained through their dealings with Sigillito et al. as lenders in the BLP because Allegiant knew (or at least was in a position to know) that (a) Sigillito, et al. were taking fees that were not being disclosed to the lenders, and (b) (contrary to the lenders' presumed expectations) the funds being loaned by some lenders were not being directly applied by the borrowers to income producing activities, but were instead being used to pay the fees collected by Sigillito et al., and interest (and sometimes principal) payable to previous lenders in the BLP. Plaintiffs contend that rather than disclosing this information to authorities or to Allegiant's customers (who now number among the Plaintiffs in this action), Allegiant simply resigned as Custodian.

### F. The Subpoenas and Process Leading To This Motion

In its answer to Plaintiffs' First Amended Complaint (ECF Doc. # 33, filed 12/03/2014), PNC Bank admitted that Allegiant had become suspicious of Sigillito's activities and had engaged counsel to investigate those activities. Subsequently, Plaintiffs deposed at least four former Allegiant officers who likely would have known if Allegiant had in fact had such suspicions and engaged counsel to investigate. None of those individuals could recall either having such suspicions or engaging counsel to investigate. PNC Bank has now moved for leave to amend its answer. ECF Doc. # 50, filed May 21, 2015. Among other things, the proposed amendment would effectively withdraw these admissions.

Before PNC Bank sought leave to amend its Answer, Plaintiffs served Thompson Coburn and Ms. Alonzo with three different subpoenas. The subpoena to Ms. Alonzo and the first of two subpoenas directed to Thompson Coburn pre-suppose that Respondents conducted an investigation of Sigillito's activities related to the BLP on behalf of Allegiant. Both subpoenas command the Respondents to produce materials pertaining to that investigation. Additionally, those subpoenas command production of materials related to work Thompson Coburn and Ms. Alonzo performed for Allegiant in connection with Allegiant's resignation as custodian. ECF Doc. # 52-1. These subpoenas' document requests[9] were calculated to avoid requesting materials that constitute or reflect attorney-client communications, while potentially capturing at least non-opinion work product and potentially opinion work product. ECF Doc. # 52-1.

Shortly after these two subpoenas were served, Plaintiffs served Thompson Coburn with another subpoena. ECF Doc. # 52-2. The second Thompson Coburn subpoena commands production of a much broader spectrum of documents pertaining to work Thompson Coburn is presumed by Plaintiffs to have performed for Allegiant and touching on Sigillito and/or the BLP, and seeks to have a Thompson Coburn representative testify (pursuant to Fed. R. Civ. P. 30(b)(6)) about that work, including Thompson Coburn's communications with Allegiant.

As Plaintiffs' motion papers indicate, there were discussions between Plaintiffs' counsel and the undersigned concerning the intended scope of the subpoenas, logistics of compliance, and similar matters. Counsel reached agreement on the search protocols for electronically stored information and logistical matters surrounding the subpoenas. Respondents timely served objections to the subpoenas (ECF Doc.# 52-3), and thereafter produced documents responsive to

---

[9] The subpoena directed to Ms. Alonzo commands her to appear and provide testimony, in addition to producing documents. By agreement among counsel, Ms. Alonzo did not appear to provide testimony on the date prescribed by the subpoena. No new date has been scheduled for this testimony. As evident from Plaintiffs' Motion to Compel, Plaintiffs remain intent on taking testimony from Ms. Alonzo. Respondents anticipate this will occur at a mutually agreeable time subsequent to the Court's resolution of Plaintiffs' Motion to Compel.

the subpoenas as well as a privilege log (ECF Doc. # 52-4) identifying responsive documents that had been located but which were not produced on the grounds of either or both attorney-client privilege or attorney's work product.

Plaintiffs now move to compel production of the documents withheld from production based on claims of privilege, and compel testimony from Thompson Coburn and Ms. Alonzo that is not limited by objections based on privilege.

### III. ARGUMENT

Plaintiffs' Motion to Compel Third Party Discovery should be denied. Procedurally, consideration of the Motion should be foreclosed because Plaintiffs have not complied with Local Rules 37-3.04 and 7-4.01(A). Substantively, Plaintiffs have failed to sufficiently demonstrate that the materials withheld on the grounds of privilege are not, in fact, privileged, and they have failed to demonstrate that no privilege applies to the intended subjects of Thompson Coburn and Ms. Alonzo's testimony.

### A. Plaintiffs' Failure To Comply With Local Rules 37-3.04 and 7-4.01(A) Precludes Consideration Of Their Motion

#### 1. Local Rule 37-3.04 Requires That Plaintiffs' Motion Be Denied.

Local Rule 37-3.04 of this Court requires that parties engage in good faith efforts to resolve discovery disputes before resorting to motions to compel discovery. The Rule provides that any discovery motion must specifically describe those efforts. The Rule specifies that the penalty for non-compliance is that "[t]he Court will not consider" a party's motion.

Plaintiffs' motion does not describe any efforts to resolve the dispute giving rise to Plaintiff's motion to compel. In fact, there were no such efforts.

There were no discussions between Plaintiffs' counsel and the undersigned in which Plaintiffs' counsel sought to persuade Respondents to withdraw or modify any of Respondents' objections. Nor were there any discussions between counsel in which Plaintiffs' counsel sought to secure further information from Respondents that Plaintiffs perceive is necessary to establish or refute the availability of the privileges invoked by Respondents.

Respondents inquired of PNC Bank's counsel whether, in light of the fact that the privileges Respondents have invoked belong, in the first instance, to Allegiant, Plaintiffs' counsel has attempted to resolve those claims of privilege with PNC Bank's counsel. We understand than Plaintiffs' counsel made no such efforts.

> **2.** **Plaintiffs' Failure To Comply With Local Rule 7-4.01 Impedes The Court's Ability To Engage In Necessary Fact Finding.**

Local Rule 7-4.01(A) requires that parties making motions predicated on facts not appearing in the record "file all documentary evidence relied on." Plaintiffs have failed in many instances to comply with this Rule.

By way of example, Plaintiffs' motion papers reference numerous documents not part of the record and not filed with their motion papers as the source of various factual assertions upon which they predicate their motion. *See, e.g.*, ECF Doc. # 52- 7, pp. 12 - 20 (referencing various documents apparently produced by Husch Blackwell ("HB"), the successor to Husch (which served as MGM's counsel concerning matters associated with the BLP during at least October, 2001), and by Spencer, Fane ("SF") (the law firm which represented Sigillito in matters connected to the BLP from October, 2001 until 2010[10]), none of which have been filed of record) and ECF Doc. # 52, p. 11, *citing* the referenced, but unfiled materials. In some instances (*e.g.*,

---

[10] The period during which the Spencer Fane firm represented Sigillito is not reflected in the record of this case. These dates are derived from allegations made by Sigillito in a Petition filed in the Circuit Court for St. Louis County, Missouri on May 15, 2015, in Case No.15SL-CC01702. A partial copy of that Petition is attached as Ex.5.

when describing the sole conversation known to have occurred between Ms. Alonzo and one of MGM's lawyers, the fact of which is documented (*see* ECF Doc. # 52-4, bates 55 – 58, # 52-7, p. 2, ¶7) but the substance of which is not) Plaintiffs purport to describe events they contend occurred without citation to any evidence within or without the record. *See,* ECF Doc. # 52 at p. 11.

The consequence of Plaintiffs' failure to comply with Local Rule 7-4.01 is that the Court is being asked to make rulings that should depend at least in part on facts asserted by Plaintiffs, which facts are unsubstantiated by the record before the Court. By failing to comply with Local Rule 7-4.01, Plaintiffs have deprived the Court and Respondents of the ability to properly assess and address whether there is a sufficient factual basis for Plaintiffs' suggestion that the written materials reflecting Respondent's communications with their client and their opinion work product should even be subjected to an *in camera* review by the Court, much less produced for examination by Plaintiffs.

Local Rule 7-4.01(A) serves the critical purpose of enabling both the Court and opposing parties to adequately assess whether the "facts" upon which motions are predicated are actually facts, as opposed to contentions, speculations or conjecture by the moving party. Compliance is particularly critical in a situation like the present one, in which the movant is a party, in possession of vast amounts of evidentiary material obtained via formal and informal discovery, and the respondent to the motion is a non-party that does not have equivalent access. How can Respondents, who are not parties to this action and thus have no access to the more than one million pages of documents upon which Plaintiffs' counsel's declarations in support of Plaintiffs' motion to compel are supposedly predicated (*see* Declaration of Co-Counsel In Support of Motion To Compel Third Party Discovery, ECF Doc. # 52-7 at p. 1, ¶1) be expected to

meaningfully challenge factual assertions that should be, but are not, properly supported by documents filed of record in accordance with Local Rule 7-4.01(A)?

Plaintiffs' clear failures to comply with Local Rules 37-3.04 and 7-4.01(A) provide sufficient basis for the Court to deny Plaintiffs' Motion To Compel Third-Party Discovery. Although further examination of the substantive merit of Plaintiffs' arguments concerning the privileged character of the documents Thompson Coburn has withheld on grounds of privilege is thus unnecessary, such examination shows that Plaintiffs' motion must be denied for substantive, as well as procedural reasons.

### B. Plaintiffs Have Failed To Demonstrate That Allegiant's Privileges Do Not Exist Or Should Be Breached.

When a party to litigation seeks discovery from attorneys, a fundamental problem arises: how to assess whether material in the possession of the attorneys is privileged as against the requesting party's contention that it is not without compromising the confidentiality clients rightfully expect to be associated with their communications with their lawyers and the work their lawyers perform at their behest in anticipation of litigation? The normal means of dealing with such situations is to require the person objecting to discovery to provide a privilege log that describes the basis of the claimed privilege for each document in question. *Rakes v. Life Investors Ins. Co. of America,* 2008 WL 429060, *4 (N.D. Ia. 2008), *citing Rabushka v. Crane Co.*, 122 F. 3d 559, 565 (8th Cir. 1997). Once that is done, the party resisting discovery has met its initial burden of proving a factual basis for the privileges claimed. *Id.* It then falls on the party (here, Plaintiffs) seeking to discover the materials to demonstrate that there is good reason for the Court either to conduct an *in camera* review of particular documents that the movant contends should not be protected by privilege, or to somehow demonstrate that the claimed privileges simply do not apply to the withheld documents as a more general proposition. *Id.; see*

*also, In re BankAmerica Corp. Sec. Lit.,* 270 F. 3d 639, 642 (8th Cir. 2001) (discussing *United States v. Zolin,* 491 U.S. 554 (1989) and the procedures to be followed by District Courts confronted with claims that attorney – client communications and attorneys' work product are unprotected from discovery based on the crime-fraud exception to the privileges).

Thompson Coburn has produced a privilege log that identifies bates numbers assigned to each document withheld based on a claim of privilege (thus indicating the length of each document), the author of each document, the date of the document (where one appears on the document) the recipient of the document, the subject matter of the document, the discovery request(s) to which the document is (or, in some instances in which responsiveness is uncertain, might be) responsive, and whether the privilege claimed is attorney client communications, attorneys' work product, or both. ECF Doc. 52-4, filed 5/26/2015. That is sufficient to satisfy its burden, as the proponent of the privileges claimed, that there is a factual basis for asserting the privileges claimed. *Rabushka v. Crane Co*., 122 F. 3d at 565.

Plaintiffs now bear the burden of rebutting that claim. They have not met that burden. Instead, they have engaged in an attempt to persuade the Court that they should be allowed to breach Allegiant's attorney-client privilege and obtain access to Allegiant's attorney's work product simply because bad things happened to Plaintiffs at the hands of Sigillito and the privileged material it might aid their effort to hold Allegiant's successor, PNC Bank, liable for the losses inflicted upon Plaintiffs by Sigillito.

In an effort to justify their request to breach the attorney-client and work product privileges associated with the logged documents, Plaintiffs have engaged in unsubstantiated speculation. For example, they make unsubstantiated claims about the actual contents of some of the withheld documents. *See, e.g.,* ECF Doc. # 52, at p. 14, describing a 22 page fax from

Allegiant's Richard Markow to Ms. Alonzo as "Allegiant Bank's investigative file" which "no doubt include relevant information and facts concerning [Allegiant's] investigation of Sigillito's suspicious account activity." All that is known from the record is that the fax is a 22 page long communication from Allegiant to its counsel that occurred on October 9, 2001 and contained "information re: custodial account issues". ECF 52-4, p. 2, 68 – 89. Plaintiffs assert the occurrence of meetings between Respondents, counsel for Sigillito, and counsel for MGM without any evidentiary basis to do so. *See, e.g.,* ECF Doc. 52, at p. 11, asserting "The lawyers for Allegiant (Thompson Coburn), for borrowers (Husch) and for Sigillito (Spencer Fane) had multiple meetings discussing Sigillito and the BLP and at these meeting [sic] Allegiant's counsel informed the other lawyers of the Betty Womack payment from Sigillito's trust account" and *citing* Andres' Decl. Ex. G. and Ex. G-1. Neither Mr. Andres' Declaration (referred to as Ex. G) nor Ex. G-1 references, much less documents, even a single meeting involving one or more lawyers from each of these law firms. ECF Doc. # 52-7. Based on such unsubstantiated assertions, which amount to no more than speculation about the nature the information that (a) Thompson Coburn received and communicated to others, and (b) the substance of communications between Allegiant and Respondents, Plaintiffs ask the Court to conclude that Allegiant consulted Thompson Coburn for advice on how to perpetrate a crime or a fraud.

What the record actually shows is that (a) Allegiant concluded it did not wish to continue serving as custodian for the self-directed IRAs that some Plaintiffs had opened with Allegiant (ECF Doc. # 52-9, ¶20), (b) there were communications between Allegiant and its lawyers (Respondents) concerning custodial account issues (ECF Doc. # 52-4), and (c) Respondents were actively involved in preparing documents used by Allegiant to (i) effect its resignation as custodian of the self-directed IRAs, and (ii) effect the transfer of assets of which it had custody

(Loan Agreements) to a new custodian as directed by Plaintiffs (*e.g.,* ECF Doc. # 52-7, pp. 36; 40 – 44; 55; ECF Doc. # 52-8, pp. 27 – 28).   That is not a sufficient basis for this Court to conclude that the materials withheld are not privileged because of the crime-fraud exception or that any particular document is not in fact a privileged communication or work product not subject to disclosure.

### 1. Plaintiffs Have Failed To Meet Their Burden Of Showing The Crime-Fraud Exception Applies.

In *In re BankAmerica Corp. Sec. Lit.,* 270 F.3d 639, the Eighth Circuit made clear both the process for determining when the crime-fraud exception applies to communications between lawyers and their clients that would be otherwise privileged and the substantive standard that applies to reaching that determination.   From the standpoint of process:

> a party seeking discovery of privileged communications based upon the crime-fraud exception must make a threshold showing "that the legal advice was obtained in furtherance of the fraudulent activity and was closely related to it" . . . A moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud.   There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud. . . . Because the attorney-client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown.

*Id.* at 642 [citations omitted].   If the moving party makes such a threshold showing as to particular documents, then the District Court should conduct an *in camera* review of those particular documents to determine whether they fall within the crime-fraud exception.   *Id.* at 644. For a document to fall within the crime-fraud exception, it must constitute a communication between the attorney and client wherein the client is seeking advice on how to commit a crime or perpetrate a fraud.   *Id.* at 641, *citing United States v. Zolin,* 491 U.S. 554, 563 (1989).

Here, there is no evidence that Allegiant sought legal advice from Respondents to enable it to perpetrate a fraud or to commit a crime. The record shows that Allegiant sought legal advice for an entirely conventional reason: for guidance through a process of resigning as custodian of accounts for which it no longer wished to serve as custodian due to the characteristics of the assets held in such accounts. In Plaintiffs' view, Allegiant's resignation failed to alert some of the Plaintiffs – those who had opened self-directed IRAs with Allegiant through which they loaned money to MGM or other borrowers in the BLP -- to the possibility that Sigillito and his compatriots had previously defrauded them. But even were that a plausible interpretation of the facts actually shown by the record in this case, that would not suffice as the required threshold showing by Plaintiffs. Suggesting that Allegiant's actions might have had the effect of not alerting some individuals to the possibility of Sigillito's fraud is not remotely equivalent to showing Allegiant consulted counsel to facilitate Allegiant's perpetration of a crime or fraud. The fraud now believed by Plaintiffs to have been at issue in 2001 was Sigillito's fraud, not Allegiant's. The allegedly victimized Plaintiffs[11] had already been separated from their money before Plaintiffs contend Allegiant sought any advice from Respondents.

What the record before the Court actually shows respecting Allegiant's consultation with Respondents is that Allegiant sought to cease serving as custodian for Plaintiffs' self-directed IRAs. Because it was serving as custodian pursuant to a written agreement with the account holders (Ex. 2, annexed hereto), the resignation had to be effected consistently with the terms of those agreements in order to avoid contractual liability to the account holders. Since the accounts were IRA accounts, Allegiant presumably sought to act with sensitivity to collateral tax consequences that could be triggered by its resignation. Accepting a true the evidence submitted

---

[11] Those Plaintiffs whose IRAs loaned money to MGM were, at least according to Plaintiffs' evidence submitted in connection with this motion, repaid in full. ECF Doc. # 52-10.

by Plaintiffs in support of their Motion to Compel, the situation was further complicated because (a) Allegiant's customers had given Sigillito authority to direct the activity in their accounts (Ex. 3, annexed hereto) and (b) some of the assets held in the IRA accounts were maturing at a time when there was at least some question whether the obligor on those assets – MGM – would pay the loan obligation, refinance it in some fashion, or default. ECF Doc. #s 52-9, 52-10, 52-11 Confronting such circumstances, it should come as no surprise to anyone that Allegiant consulted with its lawyers on what to do. The fact that Allegiant did so does not suggest that its purpose was to secure legal advice on how to perpetrate a fraud or a crime.

In this respect, this case is analogous to *In re BankAmerica Sec. Lit.*. There, a company whose shares were publicly traded was approaching a merger with another company. The company consulted its lawyers concerning its disclosure obligations. Plaintiffs contended that the disclosures then made by the company resulted in violations of the federal securities laws. Plaintiffs sought production of documents pertaining to the company's consultations with its lawyers concerning disclosures, and asserted that the crime-fraud exception trumped the company's claim of privilege. The Eighth Circuit disagreed. It pointed out that:

> "The attorney-client privilege is strongest where a client seeks counsel's advice to determine the legality of the conduct before taking action." . . . Therefore, the crime-fraud exception does not apply when a publicly held company seeks legal advice concerning its disclosure obligations and then commits an *unintentional* disclosure violation. To be sure, a client may seek legal advice in furtherance of intentional securities law fraud, and the crime-fraud exception will then apply. But it is not enough to show that an attorney's advice was sought before a decision was made not to disclose information that is alleged, as a matter of hindsight, to have been material. As the D.C. Circuit said in *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997):
>
> > Companies operating in today's complex legal and regulatory environments routinely seek legal advice about how to handle all sorts of matters. . . . There is nothing

> necessarily suspicious about the officers of this corporation
> getting such advice . . . . Showing temporal proximity
> between the communication and a crime is not enough.

*In re BankAmerica Sec. Lit.,* 270 F.3d at 643-44. Here, too, the record suggests that Allegiant perceived a situation that could pose legal complications, sought legal advice, and then proceeded. There is no basis to suggest that by resigning as custodian and then following the instructions of those Plaintiffs who elected to transfer the assets from an Allegiant – custodied self-directed IRA to one at Millenium Trust Company, Allegiant defrauded someone or committed a crime.

Plaintiffs have not shown that any specific document logged on Thompson Coburn's privilege log was part of a communication made in furtherance of a fraud or crime that Allegiant intended to perpetrate. Instead, they have merely offered their counsel's general theory that a fraud by Sigillito occurred and that Allegiant's communications with Respondents and its actions thereafter may have aided that fraud. Such a showing neither satisfies the requirements of the crime-fraud exception nor justifies an order to produce documents for *in camera* review. *Rabushka v. Crane Co.,* 122 F.3d at 566. To the extent that Plaintiffs' motion to compel is predicated upon the crime-fraud exception, it must be denied.

        **2.**        **Plaintiffs Have Not Met Their Burden To Show That Respondents' Communications With Allegiant Were Not For The Purpose Of Obtaining Legal Advice.**

Plaintiffs correctly point out that it is the responsibility of the party asserting attorney-client privilege to make a threshold showing that the privilege applies. What they omit from their argument is any mention of the accepted mode for that showing to be made. As explained above, the threshold showing is sufficiently made by producing a privilege log like the one

Thompson Coburn provided in this case. *Rabushka v. Crane Co.,* 122 F. 3d at 565. Now that the requisite threshold showing has been made, Plaintiffs, as the opponent of the privilege, must identify specific documents as to which the privilege is challenged, and provide sound reasons to believe that those documents are not privileged and should be reviewed by the Court *in camera. Id.*

Here, Plaintiffs have identified in their argument concerning the applicability of the attorney-client privilege a single document – a 22 page fax sent by Mr. Markow, then the President of Allegiant Trust Company, to Ms. Alonzo on October 9, 2001 – as a document for which they contest Respondents' claim of attorney – client privilege. ECF Doc. # 52, pp. 23 – 24. At one point in their Memorandum, Plaintiffs assert that this must be "Allegiant Bank's investigative file" which "no doubt include relevant information and facts concerning [Allegiant's] investigation of Sigillito's suspicious account activity." ECF Doc. # 52, at p. 14. Yet when contending that the document was not transmitted by Allegiant to Ms. Alonzo for the purpose of securing legal advice, Plaintiffs ask the Court to assume that "the record establishes that these materials without question related to ordinary business matters and that any related attorney notes claimed as attorney client communications are predominantly business advice, not protected from discovery by the attorney client privilege." ECF Doc. # 52, p. 24. Neither of these inconsistent factual assertions draws any support from the record.

There is no indication that Allegiant consulted Ms. Alonzo for routine business advice at any point in time, much less in October, 2001. Indeed, Plaintiffs allege just the opposite: that Allegiant had suspicions that one of its customers, Sigillito, was engaged in improper activity involving his IOLTA accounts maintained with Allegiant, and were consulting with Ms. Alonzo concerning that matter. ECF Doc. # 6, ¶¶130, 131. As pointed out above, the portions of the

record to which Plaintiffs point as showing that the document represents "Allegiant's investigative file" show no such thing.

In any event, Plaintiffs' arguments concerning whether the 22 page fax from Mr. Markow to Ms. Alonzo constitutes a privileged communication is mistakenly focused on the specific content of the document rather than on the purpose for which that material was communicated by Allegiant to Respondents. As Plaintiffs correctly point out, a client's communication of particular facts to counsel, whether for the purpose of securing legal advice or some other reason, does not make those facts privileged. ECF Doc. #52 at pp. 22-23. But where the client communicates those facts (or particular documents) to the client's attorney for the purpose of securing legal advice, the fact and substance of that communication are privileged. An old, but still perfectly valid, Eighth Circuit opinion explains this point:

> It not infrequently happens that deeds, contracts, or other written instruments may be delivered by a client to an attorney under such circumstances that the attorney cannot be compelled or permitted to produce the same in evidence against his client at the demand of an adversary party. In this class of cases, the deed or other written instrument is not itself privileged. It is merely the possession of the attorney that is protected. As he received the instrument by reason of the confidential relation of client and attorney, he cannot be compelled to yield up such possession at the demand of another, nor to reveal the contents of the paper. In such cases, however, it is open to the other party to prove, by any other competent evidence, the contents of the paper because the same are not, in and of themselves, privileged. The decisions in this class of cases do not touch the principle that is involved in the matter of confidential communications, whether oral or written, passing between client and counsel. In the latter instance, the privilege attaches to the communication itself.

*Liggett v. Glenn,* 51 F. 381, 395-96 (8th Cir. 1892). *See also,* Rice, <u>Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated,</u> 48 AMULR 967, 989 - 96 (June, 1999). In other words,

in Thompson Coburn's hands, whether the fax is a narrative document prepared by Mr. Markow explaining a situation to Allegiant's counsel, a transactional document Allegiant sought to have reviewed and analyzed by its counsel in order to secure legal advice about its effects, or something else entirely does not matter. What matters is that the document was conveyed to Allegiant's counsel for the purpose of securing legal advice.

Via the privilege log, Respondents have made the requisite showing that there is a factual basis for asserting the attorney-client privilege as to Mr. Markow's fax to Ms. Alonzo . Plaintiffs have offered nothing to refute that showing. On this record, in Respondent's hands, the 22 page fax is a privileged communication. Whether other copies of some portion of the faxed material as they exist in Allegiant's or someone else's files are not privileged and hence discoverable from that alternative source is an entirely separate issue. It is, however, an issue that need not be resolved to determine that Respondents should not be compelled to produce the fax.

The motion to compel its production of Mr. Markow's fax to Ms. Alonzo, even for *in camera* inspection by the Court, must be denied.

### 3.     Plaintiffs Have Not Demonstrated That The Work Product Doctrine Should Not Apply To Any Document For Which It Is Claimed.

As with documents subject to the attorney-client privilege, a person claiming work product protection for a subpoenaed document sufficiently establishes the factual basis for that claim by properly logging the document on a privilege log. *Rabushka v. Crane Co.,* 122 F.3d at 565. Respondents have done so. It is now Plaintiffs' burden to demonstrate why Respondents' showing is insufficient. They have not done so.

Plaintiffs argue that the defect in Respondents' assertion of work – product protection is the absence of any showing that litigation was threatened. The most direct way to make that

showing would, of course, be for Respondents to breach their duty of confidentiality to Allegiant, and disclose some privileged communication Respondents received from Allegiant describing the litigation threat Allegiant perceived. Of course, Respondents are not permitted to do so. And, unfortunately, as Plaintiffs are at pains to point out, the former Allegiant employees with whom Respondents had the most significant contact concerning these matters have little to no recollection of the events, and were unable even to testify that they interacted with Thompson Coburn and Ms. Alonzo on these matters, much less why they did so. Consequently, the question becomes whether on the record before the Court, it is otherwise apparent that the materials Thompson Coburn has claimed to be its work product were prepared or obtained in anticipation of litigation or for trial.

From the record created by Plaintiffs, it takes no imagination whatsoever to conclude that Allegiant engaged Thompson Coburn's services because it anticipated litigation. First, Plaintiffs have alleged that Markow knew of the various features of the Loan Agreements that Mr. Finn has declared led him to suspect "that [Allegiant] did not want to custody these loans" (ECF Doc. #52-9, ¶20). *See* ECF Doc. # 6, ¶116. According to Plaintiffs, that knowledge prompted Markow to investigate Sigillito's IOLTA and other accounts (ECF Doc. #6, ¶117), and the facts discovered during Markow's investigation (ECF Doc. # 6, ¶¶117 – 129) led Allegiant to engage Thompson Coburn's services. ECF Doc. #6, ¶¶130 – 31. Whether all that occurred as alleged by Plaintiffs, accepting at face value the evidence proffered by Plaintiffs, it is clear that in October, 2001, Allegiant was not the only person engaging counsel for some reason connected with the BLP. Sigillito evidently perceived some new adversity directed towards him by Allegiant. ECF Doc. # 52-7, p. 33. He engaged Spencer Fane as his attorneys, and his associate in the BLP, Mr. Brown, articulated to James Dankenbring (one of the Spencer, Fane partners)

concern about great liability and cost to Sigillito and himself. ECF Doc. 52-7, pp. 37 – 38. MGM, the borrower on many of the BLP loans, hired Husch and also consulted with the Law Society in the U.K. because of its concerns about not only its contractual liabilities on borrowed sums, but for other issues apparently relating to the methods of its borrowings. ECF Doc. #s 52-10, 52-11.

When other parties to transactions that have come under scrutiny "lawyer up", it is a clear indication to all involved in the transactions that litigation may be imminent.

Plaintiffs argue that because Allegiant did not believe it had any liability, "there was no reasonable consideration or anticipation of litigation." ECF Doc. # 52, p. 25. That, of course, ignores the realities of modern life. PNC Bank has in this case denied liability to Plaintiffs and likely perceives that it should have none. Nonetheless PNC Bank finds itself locked in litigation with Plaintiffs. The fact that a person perceives that its actions are and have been proper and thus should not lead to liability in no way suggests that a party would not even in such circumstances anticipate that litigation is likely to arise from the situation they are confronting. Clearly, Allegiant had reason to anticipate litigation. Nothing in the record dispels the presumption arising from the matters set forth in Thompson Coburn's privilege log that Allegiant engaged Respondents in this instance at least in part in anticipation of litigation.

Plaintiffs' further argument that necessity overrides the claim of work product protection (ECF Doc. 52, at pp. 25 – 26) is simply wrong. While it is true that Thompson Coburn did not specify in the privilege log that the material claimed as work product is opinion work product, the record before the Court shows clearly that is the case. Each and every one of the documents withheld from production as attorney's work product is identified on the privilege log as being notes prepared by Ms. Alonzo. ECF Doc. # 52-4. Attorney's notes are classic opinion work

product, because whether they are notes taken of conversations, notes taken in the course of legal or factual research, or notes made for some other purpose, they inevitably reflect the attorney's thoughts and thought processes. *See, In re Green Grand Jury Proceedings,* 492 F.3d 976, 981-82 (8th Cir. 2007); *Baker v. General Motors Corp.,* 209 F.3d 1051, 1054 (8th Cir. 2000). Opinion work product "enjoys nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *In re Murphy,* 560 F.3d 326, 336 (8th Cir. 1977).

Plaintiffs do not suggest that the circumstances of this case would warrant an exception to the work product doctrine for anything other than ordinary work product – i.e., data or materials assembled in anticipation of litigation that are for some reason unavailable now from the original sources. They have simply failed to demonstrate from the record before this Court that the material identified in Thompson Coburn's privilege log as work product is not such or that there is some extraordinary, rare circumstance that might justify requiring Thompson Coburn to produce its opinion work product.

### 4. No Waiver Has Been Shown.

Plaintiffs also argue that PNC Bank has waived its privileges by virtue of its answer. ECF Doc. 52, pp. 26 – 27. The principal basis for this contention is found in PNC Bank's Answer to the Amended Complaint. First, in paragraphs 130 and 131 of its Answer, PNC Bank admitted Plaintiffs' allegations that Allegiant (a) became suspicious of Sigillito's activities, and (b) informed its counsel of those suspicions. This, Plaintiffs contend, constitutes a subject matter waiver of the privilege. Second, Plaintiffs argue that PNC Bank waived its privilege by placing privileged matters at issue. In support of this argument, Plaintiffs point to PNC Bank's statement in its defenses that PNC Bank did not "act in bad faith or have actual or constructive knowledge of Sigillito's fraudulent scheme."

Respondents were not involved in the preparation of PNC's Answer, and do not represent PNC Bank in this action. For these reasons, Respondents believe this issue of waiver is best addressed by PNC Bank and its counsel, and generally defer to any arguments PNC Bank may be making in this regard. There are, however, several fairly obvious problems with Plaintiffs' arguments from Respondents' perspective.

Insofar as Plaintiffs contend that PNC Bank's pleading resulted in a waiver of work product protection, they overlook that the protection extended to attorneys-work product belongs both to the client and to the attorneys whose work product is at issue. *United States v. Under Seal (In re Grand Jury Proceedings § 5),* 401 F.3d 247, 250 (4th Cir. 2005). Even in cases in which the crime-fraud exception is found to apply, an attorney the client's destruction of the work product protection by using the attorney's services to commit a crime or a fraud does not necessarily affect the attorney's right to invoke the work product doctrine. *In re Green Grand Jury Proceedings,* 492 F.3d at 980. By the same principle, an attorney whose client subsequent to the termination of the attorney's engagement in which the work product was created commits some act deemed to be a waiver of the client's right to protection of the attorney's work product does not in that fashion waive the attorney's own right to protect the attorney's work product from disclosure.

Second, admissions or statements made in a responsive pleading are in effect compelled, not voluntary. Under Rule 8, Fed. R. Civ. P., PNC Bank was required to admit or deny the Plaintiffs' allegations. Under Rule 11, Fed. R. Civ. P., as well as under Rule 8, PNC Bank and its counsel were required to exercise good faith in doing so. Rule 8 makes no provision for invocation of privilege in responding to allegations of a complaint. Here, Plaintiffs' Amended Complaint specifically alleges that Allegiant consulted its attorneys. ECF Doc. # 6, ¶¶130, 131.

PNC Bank was thus obliged to admit or deny that allegation, based on the information it had at the time it was answering the Amended Complaint. An admission that a party is compelled to make by the Rules of Civil Procedure cannot constitute a waiver. A waiver must be a voluntary and intentional relinquishment of a known right. *Gray v. Bicknell,* 86 F.3d 1472, 1482 (8th Cir. 1996).

Plaintiffs' reliance on *Painewebber Group, Inc. v. Zinsmeyer Trusts Partnership,* 187 F. 3d 988 (8th Cir. 1999) is misplaced, insofar as it is intended to suggest anything to the contrary. That case does not deal with waivers of privilege through pleading. But it does point out that "the attorney/client privilege is waived by the *voluntary* disclosure of privileged communications." *Id.* at 992 (emphasis supplied).

In any event, PNC Bank has moved to amend its answer in a fashion that will result in its denial, rather than its admission, of Plaintiffs' allegations about Allegiant's suspicions being conveyed to its counsel. Assuming that amendment is permitted by the Court, the original answer will no longer bind PNC Bank. *Brown Sheet Iron & Steel Co. v. Maple Leaf Oil & Refining Co., Ltd.,* 68 F.2d 787 (8th Cir. 1934); *188 LLC v. Trinity Industries, Inc.,* 300 F. 3d 730, 736 (7th Cir. 2002).

The principle that a party waives a privilege by putting the privileged information at issue through some affirmative act generally comes into play in the context of, e.g., filing a lawsuit to recover legal fees (in which case the work product which gave rise to the legal fees is put at issue), or a personal injury case (in which case, the nature and extent of plaintiff's injuries and the medical care received for them are placed as issue, necessitating a waiver of the physician-patient privilege). *Pamida, Inc. v. E. S. Original, Inc.,* 281 F.3d 726 (8th Cir 2002) on which Plaintiffs rely was just such a case. There, the plaintiff sued for indemnity against its legal fees,

among other things, incurred in defense of litigation. The reasonableness of the legal fees was thus placed at issue by the plaintiff, and in that fashion, its work product privilege was deemed waived.

PNC Bank's statements in its answer from which Plaintiffs' ask the Court to infer a waiver are not of the same character or quality as the affirmative acts involved in cases like *Pamida*. PNC Bank's assertion that it acted in good faith and without knowledge of Sigillito's fraudulent scheme are not conventional affirmative defenses to the claims asserted by Plaintiffs. *See* Rule 8(c), Fed. R. Civ. P. Those statements are, rather, negations of elements of the claims Plaintiffs are attempting to prove. In other words, PNC Bank did not in the first instance put at issue whether it acted in good faith or with knowledge of Sigillito's fraudulent scheme. Plaintiffs themselves first placed those matters at issue through their Complaint.

Plaintiffs argue, nonetheless, that PNC Bank cannot both claim that Allegiant relied on counsel, and prevent disclosure of what went on between counsel and Allegiant, or as Plaintiffs put it, use the privileged information as both a sword and a shield. ECF Doc. # 52, p. 27. But that is not what is occurring here. Plaintiffs' complaint is that PNC Bank is using its admission at ¶¶130-131 of its Answer as a sword, while invoking the privilege as a shield. But an admission of facts alleged by Plaintiffs to support Plaintiffs' claim scarcely amounts to using an admission as a sword. In any event, PNC Bank seeks to withdraw the admission. Thus, this is not analogous to the circumstance described in *In re von Bulow,* 828 F.2d 94, 102 (2d Cir. 1987) quoted by Plaintiffs. PNC Bank has not testified to what transpired between Allegiant and Respondents. At most, it made (and now seeks to withdraw) what Plaintiffs describe as a "false" admission. ECF Doc. # 52, p. 4. This is not the stuff of which waiver is made.

# IV. CONCLUSION

Respondents have met their burden to demonstrate that there is a proper factual basis for them to have objected to disclosure of the documents appearing on Thompson Coburn's privilege log as protected by either or both the attorney-client privilege and the work product doctrine. Procedurally, Plaintiffs motion to compel production of the listed documents does not comply with applicable Local Rules. Substantively, Plaintiffs have not come forward and created a record from which this Court can determine that the claimed privilege or protections do not properly apply to any of the listed documents. For these reasons, Plaintiffs' Motion To Compel Third Party Discovery should be denied.

Respectfully submitted,

**THOMPSON COBURN LLP**


By___/s/ Kenton E. Knickmeyer_____
    John R. Musgrave, 20359MO
    Kenton E. Knickmeyer, 29158MO
    One US Bank Plaza
    St. Louis, Missouri 63101
    jmusgrave@thompsoncoburn.com
    kknickmeyer@thompsoncoburn.com
    314-552-6000
    FAX 314-552-7000

    *Attorneys for Thompson Coburn and*
    *Jan Robey Alonzo*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on June 5, 2015, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon:

Jonathan F. Andres
Jonathan F. Andres P.C.
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105
andres@andreslawpc.com

*Attorneys for Plaintiffs*


Sebastian Rucci
Law Offices of Sebastian Rucci
16400 Pacific Coast Hwy, Suite 212
Huntington Beach, CA 92649
SebRucci@gmail.com

*Attorneys for Plaintiffs*

Jeffrey J. Kalinowski
Jeffrey S. Russell
Herbert R. Giorgio, Jr.
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750

*Attorneys for PNC Bank, N.A.*



  /s/ Kenton E. Knickmeyer
Kenton E. Knickmeyer

6174405.5