**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD AGUILAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:14-cv-00985-LRR |
| | ) | |
| PNC BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs

1.      Plaintiffs are 92 individuals who claim to have suffered losses as a result of an investment scheme orchestrated by Martin Sigillito known as the British Loan Program ("BLP"). Doc. 6 at ¶¶4, 255.

2.      Nine Plaintiffs had self-directed individual retirement accounts at Allegiant Bank ("Allegiant"). They are Richard Aguilar, David Caldwell, Donald Horner, Rudolf Ouwens, William and Carol Phillips, Leonard Roman, Lewis Vollmar, and Linda Givens (collectively, the "Allegiant Customer Plaintiffs").  Excerpts from June 25, 2015 Deposition of Richard Aguilar, attached hereto as Exhibit 1 ("Ex. 1"), at 45-46; Excerpts from July 10, 2015 Deposition of David Caldwell, attached hereto as Exhibit 3 ("Ex. 3"), at 40; Excerpts from June 30, 2015 Deposition of Linda Givens, attached hereto as Exhibit 4 ("Ex. 4"), at  84; Excerpts from June 22, 2015 Deposition of Donald Horner, attached hereto as Exhibit 5 ("Ex. 5"), at . 32-33; Excerpts from July 15, 2015 Deposition of Rudolf Ouwens, attached hereto as Exhibit 6 ("Ex. 6"), at 49-50; Excerpts from July 6, 2015 Deposition of William Phillips, attached hereto as

Exhibit 7 ("Ex. 7"), at 46-47; Excerpts from July 6, 2015 Deposition of Carol Phillips, attached hereto as Exhibit 8 ("Ex. 8"), at 22-23; Excerpts from June 30, 2015 Deposition of Lewis Vollmar, attached hereto as Exhibit 11 ("Ex. 11"), at 51-52.

3.        Only eight of the Allegiant Customer Plaintiffs actually invested in the BLP via self-directed IRAs for which Allegiant served as custodian.  These eight Plaintiffs are Richard Aguilar, David Caldwell, Donald Horner, Rudolf Ouwens, William and Carol Phillips, Lewis Vollmar, and Linda Givens.  *Id.*; Responses of Allegiant Customer Plaintiffs to PNC Bank's First Request for Admissions, attached hereto as Exhibit 12 ("Ex. 12").

4.        Plaintiff Leonard Roman opened a self-directed IRA at Allegiant with the intention of holding BLP investments in these accounts but it was never funded, and no BLP investments were ever made within Roman's IRA.  Ex. 2 at 13-14; Ex. 9 at 51-54; Ex. 10 at 44-45.

5.        The remaining 82 Plaintiffs not named in paragraph 2 (collectively, the "Non-Customer Plaintiffs") do not claim to have invested in the BLP through any account affiliated with any predecessor bank of PNC Bank, N.A. or with PNC Bank, N.A.  Responses of Non-Customer Plaintiffs to PNC Bank's First Request for Admissions, attached hereto as Exhibit 13 ("Ex. 13"); Excerpts from June 25, 2015 Deposition of Melba Aguilar, attached hereto as Exhibit 2 ("Ex. 2") at 13-14.

6.        None of the Non-Customer Plaintiffs sought, obtained, or relied upon the advice of anyone from Allegiant Bank, Pioneer Bank, or National City Bank in deciding to invest in the BLP.  Ex. 13 (Responses to RFA Nos. 18, 19, 20, 23, 24, 25, 28, 29, 30).

7.        None of the Non-Customer Plaintiffs communicated in any way with anyone from Allegiant Bank, or any PNC predecessor bank regarding the BLP.  Supplemental Response and

Objection of Non-Customer Plaintiffs to PNC Bank's First Set of Interrogatories, attached hereto as Exhibit 14 ("Ex. 14").

Self-Directed Individual Retirement Accounts

8.      An IRA is a type of tax-advantaged personal account that allows an individual to save for retirement.  Declaration of Mary Mohr, attached hereto as Exhibit 15 ("Ex. 15"), at Ex. 1, p. 13 thereto.

9.      IRAs are subject to a variety of statutory retirements and restrictions.  *Id.*

10.     One of the restrictions Congress created for IRAs to ensure proper reporting of taxes and assets within the IRAs is to require that the physical assets of all IRAs be maintained with a valid "custodian" before the IRA-holder can receive a tax deduction from the amount of the IRA contribution and the tax-deferred growth benefit of the retirement assets.  *Id.*

11.     The requirement for a custodian provides the IRS with a means of monitoring when individuals take deductions of untaxed income from traditional IRAs.  *Id.*

12.     A self-directed IRA – like those maintained by Plaintiffs in this case – is an IRA for which the account owner makes all the investment decisions himself, including selecting the investments, choosing an investment advisor (if so desired), and managing the account according to his own financial objectives for retirement savings.  *Id.*

13.     Generally, the relationship between a custodian and an account holder is defined by a written contract.  *Id.*

14.     It is the practice in the industry for the duties and responsibilities of custodians to be defined within these contracts; no industry practice or standard imposes extra-contractual duties on the custodian that must be disclaimed to be avoided.  *Id.*

15. Section 408(6) of the Internal Revenue Code of 1986 requires minimum distributions from IRAs that are similar to the rules applicable to qualified pension and profit sharing plans. IRC Section 408(6).

16. Under the minimum distribution rules, a minimum percentage of the fair market value of IRA assets must be distributed to the IRA owner each year, beginning in the year in which the owner attains age 70 ½. 26 C.F.R. §1.408-8.

17. Illiquid assets that are not transferable and have no readily-ascertainable fair market value make it difficult to comply with the required minimum distribution rules. Doc. 67-5 at ¶11.

The Defendant and Its Predecessor Banks

18. Allegiant Bank, N.A. ("Allegiant Bank") was a Missouri trust company with banking powers in 2000 and 2001.

https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?page=beSearch&ID=719719

19. In 2004, Allegiant Bank was acquired by National City Bank ("National City"). Doc. 6 at ¶15; Doc. 77 at ¶15.

20. Pioneer Bank ("Pioneer") was acquired by National City in 2006. Doc. 6 at ¶228; Doc. 77 at ¶228.

21. PNC Bank, N.A. ("PNC") closed on the acquisition of National City Bank on December 31, 2008. Doc. 77 at ¶17.

22. PNC is the successor to Allegiant Bank. Doc. 6 at ¶5; Doc. 77 at ¶5.

23. PNC is the successor to Pioneer Bank. Doc. 6 at ¶5; Doc. 77 at ¶5.

24. PNC is the successor to National City. Doc. 6 at ¶5; Doc. 77 at ¶5.

## Martin Sigillito and the British Loan Program

25.     Martin Sigillito was a St. Louis lawyer in 2000 and 2001. Doc. 6 at ¶6; Doc. 77 at ¶6.

26.     Martin Sigillito solicited investors to invest in a program that came to be known as the BLP. *Id.*

27.      The BLP started out in the late 1990s as a program facilitating loans to English law firm Mark Gilbert Morse ("MGM") for the purpose of funding  "black lung" claims brought on behalf of English coal miners. *U.S. v. Sigillito*, 2012 WL 11906810, at *2 (E.D. Mo. Dec. 20, 2012); Excerpts from July 20, 2015 Deposition of Hal Milsap, attached hereto as Exhibit 16 ("Ex. 16"), at 34-36.

28.      At some point in 2000 or 2001, the BLP began to facilitate loans to developers of English real estate (the "Real Estate Loans").  Ex. 16 at 33-37.

29.     All of the loans made to MGM (the "MGM Loans") appear ultimately to have been paid back by these borrowers. Excerpts from June 15, 2015 Deposition of Omri Praiss, attached hereto as Exhibit 17 ("Ex. 17"), at 177-178:-17; 208-209

30.     There is no evidence that MGM ultimately failed to pay back the MGM Loans.

31.     The Real Estate Loans were not paid back by the borrowers, but rather later lenders' funds were used to pay back earlier lenders, with Sigillito keeping a significant amount of the money. *United States v. Sigillito*, 759 F.3d 913 (8th Cir. 2014).

32.     In 2012, Sigillito and Brown were convicted of fraud and other charges and sentenced to prison terms. *United States v. Sigillito*, 759 F.3d 913, 922 (8th Cir. 2014).

Allegiant Bank's Role as Custodian for Self-Directed IRAs

33.     Beginning in July 2000 until mid-December 2001 Allegiant Bank acted as custodian for some self-directed IRAs whose owners chose to invest in the BLP.  Declaration of Herb Morisse, attached hereto as Exhibit 18A ("Ex. 18") at page D_Aguilar.002987-002992 thereto; Ex. 36.

34.     The nine Allegiant Customer Plaintiffs' IRAs were self-directed, these Plaintiffs were solely responsible for deciding how to invest the money in these IRAs, and these Plaintiffs made all investment decisions in these IRAs  maintained at Allegiant Bank's trust department. (Ex. 12 (Responses to RFA Nos. 33-35); Ex. 1 at 47-48; Ex. 5 at 33; Ex. 6 at 51; Ex. 7 at 47; Ex. 8 at 30-31; Ex. 11 at 55-56; Ex. 16 at 71).

35.     The Allegiant Customer Plaintiffs opened their self-directed IRA accounts with Allegiant Bank at the direction of Martin Sigillito or one of his associates, after they had already decided to invest in the BLP.  Ex. 1 at 46; Ex. 5 at 32-33, 35-37; Ex. 6 at 50-51; Ex. 7 at 47-48; Ex. 8 at 22; Ex. 9 at 51-52; Ex. 11 at 56.

36.     They had no contact with or direction from Allegiant Bank or its employees in setting up their IRAs.  Ex. 12 (Responses to RFA Nos. 36-40); Ex. 1 at 45-46; Ex. 5 at 32-33, 35-37; Ex. 6 at 50-51; Ex. 7 at 47-48; Ex. 8 at 22; Ex. 9 at 51-52; Ex. 10 at 44-45; Ex. 11 at 56.

37.     Each of the Allegiant Customer Plaintiffs designated Martin Sigillito as his or her authorized representative in connection with their self-directed IRA account at Allegiant Bank. Allegiant Customer Plaintiffs' Letters of Authorization, attached hereto as  Exhibit 19 ("Ex. 19").  Ex. 1 at 58-62; Ex. 3 at 45-48; Ex. 4 at 91; Ex. 5 at 37-39; Ex. 6 at 57-59; Ex. 11 at 60-61.

38.     Each Allegiant Customer Plaintiff directed Allegiant Bank to accept direction from Sigillito on behalf of the Allegiant Customer Plaintiff.  *Id.*

39.     No Allegiant Customer Plaintiff alleges that any Allegiant Bank employee recommended Sigillito or the BLP to them.  Doc. 6.

40.     None of the Allegiant Customer Plaintiffs sought, obtained, or relied upon the advice of anyone from Allegiant Bank in deciding to invest in the BLP.  Exs 12 and 13 (Responses to RFA Nos. 18-20; 23-25; 28-30); Ex. 1 at 43-44; Ex. 5 at 33; Ex. 6 at 48, Ex. 7 at 44-45; Ex. 8 at 19-20; Ex. 9 at 48-49; Ex. 10 at 42-44, 111; Ex. 11 at 53-54; Ex. 16 at 71.

41.     No one at Allegiant solicited or directed any Allegiant Customer Plaintiff to open a self-directed IRA at Allegiant Bank, and no one at  Allegiant Bank advised, suggested, or recommended that they invest in the BLP.  Ex. 12 (Responses to RFA Nos. 36-39); Ex. 1 at 43-46; Ex. 5 at 32-33, 35-37; Ex. 6 at 50-51; Ex. 7 at 47-48; Ex. 8 at 22; Ex. 9 at 51-52; Ex. 11 at 54-56.

42.     No Allegiant Customer Plaintiff claims to have had any communication whatsoever with Allegiant Bank, other than receiving a notice that Allegiant was resigning as custodian in November of 2001.  Supplemental Response and Objections of Allegiant Customer Plaintiffs to Interrogatory No. 6, attached hereto as Exhibit 20 ("Ex. 20"); Ex. 1 at 43-45, 132-133; Ex. 5 at 50-51, 81-83; Ex. 6 at 48-49; Ex. 7 at 44-46; Ex. 8 at 19-20; Ex. 9 at 48-51, 110-11; Ex. 10 at 42-44, 110-111; Ex. 11 at 53-55.

43.     Allegiant's duties as custodian were spelled out in contracts. Exhibit 12.

44.     Each Allegiant Customer Plaintiff signed a contract with Allegiant Bank regarding his self-directed IRA.  Ex. 1 at 50-51; Ex. 3 at 48-49; Ex. 4 at 86-87; Ex. 5 at 34-35; Ex. 6 at 52-53; Ex. 7 at 48-49; Ex. 11 at 61-63; Ex. 16 at 160-62.

45.     Each of the Allegiant Customer Plaintiffs signed copies of the IRA agreements in the form of Exhibit 18B at pp. D_Aguilar00003232-3238.  *See* Exhibit 18B at

D_Aguilar00003232-3238 (complete copy of IRA Simplifier Agreement); Exhibit 21 ("Ex. 21")

(collection of "IRA Simplifier Agreement" pages located in PNC's files for Plaintiffs Richard

Aguilar, Caldwell, Givens, Horner, Ouwens, and Vollmar); Ex. 16 at 160-62 (explaining that

clients of Millsap's signed IRA Simplifiers); Ex. 7 at 48-49 (explaining that Millsap filled out the

Phillips' IRA contract).

      46.     The Agreements provided, in relevant part:

Section 8.03, Representation and Responsibilities: You [the account owner] represent and warrant to us [Allegiant Bank] that any information you have given or will give us with respect to this Agreement is complete and accurate. Further, you agree that any directions that you give us, or action you take will be proper under this Agreement and that we are entitled to rely upon any such information or directions. **We shall not be responsible for losses of any kind that may result from your directions to us or your actions or failures to act and you agree to reimburse us for any loss we may incur as a result of such directions, actions or failures to act."**

Section 8.05, Investment of Amounts in the IRA
**Direction of Investment – You have exclusive responsibility for and control over the investment of the assets of your IRA. You shall direct all investment transactions, including the earnings and the proceeds from securities sales. Your selection of investments, however, shall be limited to publicly traded securities, mutual funds, money market instruments and other investments that are obtainable by us and that we are capable of holding in the ordinary course of our business.**

805b. Our Investment Powers and Duties.
**We shall have no discretion to direct any investment in your IRA. We assume no responsibility for rendering investment advice with respect to your IRA, nor will we offer any opinion or judgment to you on matters concerning the value or suitability of any investment or proposed investment for your IRA.**

*805c. Delegation of Investment Responsibility.*
*We may, but are not required to, permit you to delegate your investment responsibility for your IRA to another party acceptable to us by giving written notice of your delegation in a format we prescribe. We shall follow the direction of any such party who is properly appointed and we shall be under no duty to review or question, nor shall we be responsible for, any of that party's directions, actions or failures to act.*

4583502.14

Ex. 21; Ex. 1 at 50-54; Ex. 5 at 52-56; Ex. 16 at 160-62.

47.     Allegiant Bank never vetted or reviewed the BLP.  Excerpts from April 27, 2015 Deposition of Brian Davies, attached hereto as Exhibit 22 ("Ex. 22"), at 32.

48.     Allegiant Bank never took any interest in the BLP or allowed BLP notes to be used as collateral for any loan made by Allegiant Bank.  *Id.* at 32-33, 39.

The Womack Liquidation Request

49.      In late September 2001, Martin Sigillito contacted Allegiant Bank to advise that his client Betty Womack wanted to liquidate her Allegiant self-directed IRA.  Excerpts from July 21, 2015 Deposition of Corrado Salvatore, attached hereto as Exhibit 23 ("Ex. 23"), at 23-24; Salvatore Deposition Exhibit 214 - September 2001 Womack Investment Review, attached hereto as Exhibit 24 ("Ex. 24"); Excerpts from July 13, 2015 Deposition of Matthew Finn, attached hereto as Exhibit 25 ("Ex. 25"), at 32.

50.     Womack's IRA contained a single asset, a not-yet-mature MGM Loan note in favor of MGM.  Exhibit 18B at ¶ 6 and p. D-Aguilar.00003268.

51.     Allegiant understood that Sigillito was going to facilitate the purchase of Ms. Womack's MGM Loan note. Ex. 25 at 33.

52.     Allegiant understood that any payment from Sigillito for the Womack account would be to purchase Womack's unmatured note.  Ex. 23 at 26-27; Ex. 24; Ex. 25 at 33; Salvatore Deposition Exhibit 216 – $56,715.19 Check with Womack memo, attached hereto as Exhibit 26 ("Ex. 26").

53.     Sometime in late September or early October of 2001, Allegiant received a check from Sigillito dated September 27, 2001 and drawn on his IOLTA for $56,715.19 with the memo notation "Womack."  Ex. 23 at 24-25 and Ex. 26; Ex. 25 at 31-35.

4583502.14

54.     There are no existing records reflecting the balance in Sigillito's Allegiant IOLTA account or any transactions within the IOLTA account for most of 2001, including September and October 2001.

55.     There are no existing authenticated records reflecting the balance in Sigillito's Allegiant IOLTA account or any transactions within the IOLTA account for most of 2001, including September and October 2001.

56.     Allegiant determined that the check from Sigillito should be credited to Betty Womack's self-directed IRA and credited the check accordingly. Ex. 23 at 32, 53-54; Salvatore Deposition Exhibit 224 – "Proceeds rcvd" dated 10/09/2001, attached hereto as Exhibit 27 ("Ex. 27").

57.     Thereafter,  in mid-October 2001, Allegiant Bank disbursed $56,715.19 to Betty Womack.  Ex. 23 at 53-56; Ex. 26, Salvatore Deposition Exhibit 220 – October 2001 Receipts & Disbursements, attached hereto as Exhibit 28 ("Ex. 28"); Salvatore Deposition Exhibit 223 – 10/19/2001 Wire Instructions, attached hereto as Exhibit 29 ("Ex. 29").

58.     The disbursement referenced in paragraph 56 completely liquidated Ms. Womack's self-directed Allegiant Bank IRA.  (Ex. 23 at 54-56; Ex. 28).

59.     Allegiant Bank undertook no investigation in connection with the check referenced in paragraph 56, other than to determine to which account to credit the check.  (Ex. 23 at 60:13-20; Ex. 25 at 129, 175; Ex. 27).

60.     Allegiant Bank did not collect a commission in connection with the liquidation of the Womack account, but rather remitted the entire $56,715.19 to Ms. Womack.  Ex. 18B at p. D-Aguilar.00003266-67.

61.     There is no evidence that any Allegiant employees believed or suspected that Sigillito was misappropriating other customers' funds in connection with the Womack account. Ex. 23 at 108-109; 148-149; Ex. 25 at 61-62.

62.     There is no evidence that any Allegiant employee viewed the fact that Sigillito's check referencing "Womack" was drawn on an IOLTA as suspicious in any way. Ex. 23 at 108-109, 148-149; Ex. 25 at. 190-191.

63.     In processing the "Womack" check, there is no evidence Allegiant deviated from standard, automated check clearing practices.

Givens/Albion Consulting BLP Investment

64.     Doug and Linda Givens authorized transmission of $100,000 to Martin Sigillito in September of 2001 to fund a loan by their company Albion Consulting as part of the BLP. Ex. 4 at 138-39; 155-57.

65.     Albion Consulting's September 2001 loan was paid back in full to Albion Consulting. *Id.* at 166-67, 234-39.

66.     Doug Givens is deceased and his estate is not a plaintiff in this action. *Id.* at 15.

67.     Linda Givens does not claim this repaid $100,000 loan referenced in paragraph 64 as part of her damages in this action. *Id.* at 153-55; Givens Deposition Exhibit 5 – Declaration of Linda Givens, attached hereto as Exhibit 30 ("Ex. 30"); Supplemental Response and Objection of Plaintiff Linda Givens to PNC Bank's First Set of Interrogatories, Interrogatory No. 1, attached hereto as Exhibit 38 ("Ex. 38"); Doc. 6 at ¶ 180 (alleging that this loan was repaid).

Allegiant Bank's Resignation As Custodian

68.     Allegiant's Trust Committee's September 13, 2001 minutes reflect the Committee's decision that it no longer wished to accept accounts that would hold BLP loans. Ex. 18A at ¶ 5 and pp. D_Aguilar.003184-3189.

69.     At the time when this decision was made, Allegiant was in the midst of acquiring South Side Bank. Ex. 25 at 10-11.

70.     South Side Bank had a much larger and more experienced trust department than Allegiant. Excerpts from April 23, 2015 Deposition of Arthur Weiss, attached hereto as Exhibit 31 ("Ex. 31"), at 46-50; Ex. 25 at 11.

71.     South Side's head of trust operations, Matt Finn, began to attend Allegiant Trust Committee meetings on September 13, 2001. Ex. 18A at ¶ 5 and at pp. D_Aguilar.003184-3189.

72.     When Mr. Finn became aware that Allegiant was acting as custodian for self-directed IRAs containing BLP notes, he recognized that the notes were unmarketable, illiquid, and difficult to value and, thus, unsuitable for holding in IRAs, in his judgment. Ex. 25 at 21-24.

73.     These aspects of the investments made it difficult for a custodian to do things like making the required minimum distributions to accountholders over 70 ½ years old, and raised questions about how to reflect their value in required paperwork. Ex. 25 at 16-17; Doc. 67-5 at ¶11.

74.     These concerns about the nature of the BLP investments prompted Mr. Finn to call one BLP borrower, MGM, to ask questions about the loans. Ex. 25 at 18-19.

75.     Shortly thereafter in early October of 2001, representatives of MGM had an in-person meeting with Mr. Finn when they were in St. Louis for business.. *Id.* at 19-20.

76. MGM advised that they were borrowing money from the Allegiant IRA owners to fund litigation for British coal miners, and that Sigillito was brokering the loans. *Id.* at 20, 21.

77. The conversation with MGM confirmed that the notes were illiquid, indivisible investments that were not marketable through any of the usual channels. *Id.* at 22, 23.

78. This conversation with MGM confirmed Mr. Finn's impression that the BLP investments were administratively unsuitable for holding in IRAs. *Id.* at 23-24, 26.

79. During the October 2001 meeting, MGM advised Mr. Finn that MGM was paying fees for these loans, which it paid in addition to the principal and interest due under the loan agreements. *Id.* at 21; Ex. 17 at 201-203.

80. This made the borrowing expensive, but MGM was willing to pay because the coal litigation was highly profitable and no traditional financing options were available to MGM through banks. Plaintiffs' Deposition Exhibit 194, attached hereto as Exhibit 32 ("Ex. 32"), at HB 352; Ex. 17 at 201–203, 205.

81. Thereafter, Finn recommended to his boss, Art Weiss, that Allegiant no longer act as custodian for IRAs holding BLP investments. Ex. 25 at 26-27.

82. Weiss took that advice and made the decision that Allegiant would resign as custodian. *Id.* at 27.

83. MGM ultimately paid back all of the amounts borrowed from the IRA account owners, along with the promised interest, in addition to paying fees to Sigillito and Brown. Ex. 17 at 178; 208-209.

84. On October 26, 2001, Allegiant informed the Allegiant Customer Plaintiffs' representative Sigillito that it no longer wished to serve as custodian and advised Sigillito it was

going to resign as custodian. Ex. 31 at 83; Plaintiffs' Deposition Exhibit 77, attached hereto as

Exhibit 33 ("Ex. 33").

85.    The Agreements included a provision that permitted Allegiant to resign as

custodian with our without cause that read:

> "Either party may terminate this Agreement at any time by giving written notice to the
> other.  We can resign as Custodian at any time effective 30 days after we mail written       notice
> of our resignation to you.  Upon receipt of that notice, you must make   arrangements to transfer
> your IRA to another financial organization.  If you do not complete a transfer of your IRA within
> 30 days from the date we mail the notice to you, we have the right to transfer your IRA assets to a
> successor IRA custodian or trustee that we choose in our sole discretion or we may pay your IRA
> to you in a single sum.  We shall not be liable for any actions or failures to act on the part of any
> successor custodian or trustee nor for any tax consequences you may incur that result from the
> transfer or distribution of your assets pursuant to this section."

Ex. 21.

86.    It is customary within the industry to allow account holders or their

representatives time to identify a successor custodian when an IRA custodian resigns.  Ex. 15 at

p.21.

87.    Sigillito and his associates requested that Allegiant not communicate the

resignation decision directly to the account owners, but rather, allow Sigillito's team to do it.

Exhibit 39.

88.    Sigillito's team also requested that the notice Allegiant was preparing to send to

customers advising them of its resignation as custodian simply advise account owners that

Millennium Trust would be the new custodian, rather than offer account owners an opportunity

to name another custodian.  Excerpts from July 9, 2015 Deposition of Jan Alonzo, attached

hereto as Exhibit 34 ("Ex. 34"), at 160-61; Plaintiffs' Deposition Exhibit 81, attached hereto as

Exhibit 35 ("Ex. 35").

89.     On November 13, 2001, Allegiant sent a notice to the Allegiant Customer Plaintiffs and other self-directed IRA owners whose accounts held BLP notes, notifying them that Allegiant was resigning as custodian and that included an option for Plaintiffs to elect Millennium as successor custodian or some other financial institution.  November 13, 2001 Termination Letter sent to Allegiant Customer Plaintiffs, attached hereto as Exhibit 36 ("Ex. 36")

90.     Thereafter, each of the Allegiant Customer Plaintiffs who had BLP investments in their Allegiant IRAs elected to have his or her account transferred to Millennium Trust, or relied upon Sigillito and his associates in regard to the transfer to Millennium Trust.  None of these Allegiant Customer Plaintiffs received any advice from Allegiant Bank in making the decision to transfer their IRA from Allegiant to Millenium Trust.  Ex. 1 at 74-75, 78-80; Ex. 3 at 64-65; Ex. 5 at 50-51; Ex. 6 at 75-76; Ex. 7 at  62-64; Ex. 8 at 32-34; Ex. 11 at 87, 90.

Allegiant's Banking Practices and Banking Relationship With Sigillito.

91.     For at least some part of 2000 and 2001, Sigillito held IOLTA and other retail accounts at Allegiant Bank.   Doc. 6 ¶ 35; Doc. 77 ¶ 35.

92.     An IOLTA is an account in which a lawyer holds property of clients or third persons separate from the lawyer's own property (along with the lawyers' fees and expenses that have been paid in advance).  Mo. Sup. Ct. Rule 4-1.15.

93.     Sigillito's IOLTA was a demand deposit account maintained on the retail banking side of Allegiant with his other business accounts.  Ex. 31 at 43-44; Ex. 23 at 114; Ex. 25 at 144-45.

94.     Allegiant's trust department served as custodian for self-directed IRAs.  Ex. 25 at 15:6-20.

95.     Allegiant observed a separation between its trust department and its retail banking operations.  Ex. 23 at 114; Ex. 25 at 13-14; Ex. 31 at 43-44.

96.     Allegiant's retail banking operations had a separate computer system from the Allegiant trust department.  Ex. 25 at 14.

97.     Allegiant trust department employees did not have responsibilities on the retail side of the bank.  *Id.* at  14.

98.     The Allegiant trust department had different employees from the retail side.  *Id.* at 14.

99.     The Allegiant trust department had different recordkeeping systems than the retail side.  *Id.* at 14.

100.    Allegiant trust department employees did not have routine access to bank accounts on the retail side.  Ex. 23 at 115 (trust department personnel would have had to make a request to the retail side); Ex. 25 at 14.

101.    Trust department employees did not have direct access to information on customer loans on the retail side.  Ex. 25 at 14-15; 189.

102.    Allegiant had no system in 2000 and 2001 for comparing transactions on the trust side of the bank against transactions on the retail side.  *Id.* at 189.

103.    Allegiant never attempted to compare memo line notations in checks drawn on retail bank accounts with any activity in self-directed IRA accounts.  *Id.* at 35-36, 188-189.

104.    There is no evidence that Allegiant had a system to review what was written on the memo lines of customers' checks and make connections between various different bank accounts.  Ex. 25 at 189.

## Banking Practices in 2000 and 2001

105. In 2000 and 2001, it was standard practice for banks to clear checks through an automated process. Declaration of William Abernathy attached hereto as Exhibit 37 ("Ex. 37"), at pp. 5-6.

106. It was customary in 2000 and 2001 within the banking industry for financial institutions to observe a separation between their retail banking operations and their trust departments. *Id.* at p. 6.

107. Within the industry, memo line notations are considered to be for the convenience of check writers, rather than to have any importance to the financial institution. *Id.* at pp. 5-6.

## Pioneer Bank and National City Bank

108. Martin Sigillito maintained an IOLTA at Pioneer Bank for some period of time. Doc. 6 at ¶ 204; Doc. 77 at ¶ 204.

109. PNC has been able to locate no records reflecting the dates on which Sigillito maintained an IOLTA at Pioneer.

110. There are no authenticated records for any IOLTA account at Pioneer Bank maintained by Sigillito.

111. There are no authenticated records for any IOLTA account at National City Bank maintained by Sigillito.

112. There is no evidence that either National City or Pioneer or Allegiant requested that Sigillito move his IOLTA or otherwise refused to do retail banking business with him.

## The End of the BLP

113. Martin Sigillito's scheme continued for more than eight years after Allegiant resigned as custodian in 2001. *U.S. v. Sigillito*, 2012 WL 11906810, at *6.

4583502.14

114.     After Allegiant resigned as custodian, a series of other financial institutions agreed to become custodians for BLP-invested self-directed IRA accounts. *U.S. v. Sigillito*, 2012 WL 11906810, at *3.

115.     On March 22, 2010, Plaintiff Phil Rosemann filed suit against Derek Smith and Distinctive Properties (UK) Limited, arising out of unpaid BLP loans.  *U.S. v. Sigillito*, 2012 WL 11906810, at *6.

116.     In May of 2010, Sigillito's secretary contacted the Federal Bureau of Investigation with her suspicion that Sigillito was defrauding investors.  *U.S. v. Sigillito*, 2012 WL 11906810, at *6.

117.     On May 29, 2010, newspapers reported that the Federal Bureau of Investigation had searched Martin Sigillito's office and that Sigillito had been accused of misconduct in connection with the BLP.  *See, e.g.,* "Clayton lawyer's office is raided by FBI agents;  British firm using Martin Sigillito's name is being sued," *St. Louis Post-Dispatch*, May 29, 2010 (www.stltoday/business/clayton-lawyer-s-office-is-raided-by-fbi-agents/article_5c83c183-114b-5747-a2e2-4b5606b6375a.html).

118.     On June 30, 2010, Phillip Rosemann, David Caldwell, William Gaylor, Stanley Kuhlo, Wanda Lavender, Ronald Pastor, William Phillips, Carol Phillips, Leonard Roman, David Schultz, and Brian Waffle, among others, filed a complaint against Martin Sigillito and 50 Doe Defendants as Case No. 4:10-cv-01165-LRR (E.D. Mo.), asserting violations of RICO, 18 U.S.C.  §1962(c) and (d).  *Rosemann v. Sigillito*, Case No. 4:10-cv-01165 LRR (E.D. Mo.).

119.     In April of 2011, Sigillito was charged with multiple counts of mail and wire fraud.  *U.S. v. Sigillito*, 899 F. Supp. 2d 850, 853 (E.D. Mo. 2012).

120.     Sigillito was ultimately convicted of multiple counts of fraud and sentenced to 40 years in prison in December of 2012. *U.S. v. Sigillito*, 2012 WL 11906810, at *23-24.

121.     Neither Allegiant nor any of the other financial institutions that acted as custodian for self-directed IRAs invested in the BLP (nor any of their employees) was ever charged with any crime in connection with the BLP scheme.

This Lawsuit

122.     On May 23, 2014, Richard Aguilar, Melba Aguilar, Albert Carrell, Sharon Cobb, Clayton Givens, Linda Givens, Stanley Kuhlo, Gina Mastrantonia, Phil Rosemann, Loren Winterhof, and Mary Winterhof, filed suit in this Court. Doc. 1.

123.     On July 15, 2014, the Plaintiffs not named in paragraph 123 filed their claims. Doc. 6.

PNC's Counterclaim

124.     When Richard Aguilar, David Caldwell, Linda Givens, Donald Horner, Rudolf Ouwents, William Phillips, Carol Phillips, and Lewis Vollmar (collectively, the "Counterclaim Defendants") opened their IRAs at Allegiant Bank, they executed agreements in which they agreed (among other things) that  "any directions you give us, or action you take will be proper under this Agreement and that [Allegiant Bank] is entitled to rely upon any such information or directions." Ex. 21 at §8.03.

125.     In the same contracts, Plaintiffs further agreed to "reimburse [Allegiant Bank] for any loss we may incur as a result of such directions, actions or failures to act." Ex. 21. At §8.03.

126.     Allegiant's successor PNC Bank has incurred losses in the form of attorney's fees and costs as a result of this lawsuit.

127.     This lawsuit results from the Counterclaim Defendants' direction to invest their

funds with a convicted fraudster, Martin Sigillito.

Dated: August 3, 2015                    Respectfully submitted,

                                         BRYAN CAVE LLP


                                         /s/ Jeffrey S. Russell
                                         Jeffrey J. Kalinowski, EDMO #29926MO
                                         Jeffrey S. Russell, EDMO #35158MO
                                         Herbert R. Giorgio, Jr., EDMO #58524MO
                                         Darci F. Madden, EDMO #51463MO
                                         One Metropolitan Square
                                         211 North Broadway, Suite 3600
                                         St. Louis, MO  63102-2750
                                         Phone:  (314) 259-2000
                                         Fax:  (314) 259-2020

                                         Attorneys for Defendant
                                         PNC Bank, N.A.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a redacted version of the foregoing was filed using the Court's CM/ECF system on August 3, 2015, which will serve notice upon all counsel of record.

An unredacted copy of the version that was filed under seal was transmitted to the counsel of record listed below via electronic mail on August 3, 2015, pursuant to the parties' agreement.

/s/ Jeffrey S. Russell

4583502.14