**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD AGUILAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:14-cv-00985-LRR |
| | ) | |
| PNC BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs began this case more than a year ago alleging that Allegiant Bank ("Allegiant")

was a central participant in the Ponzi scheme orchestrated by Martin Sigillito, for which Sigillito

is now in federal prison, known as the British Lending Program ("BLP."). The Amended

Complaint alleges that Allegiant knew of the fraud for nearly all of the 18 months during which

it served as custodian for self-directed IRAs invested in the BLP.  It alleges that Allegiant was an

insider to the scheme, having investigated it in connection with bank loans that were supposedly

secured by BLP notes and in connection with alleged personal loans to Sigillito.  After

discovery, it has become clear that this tale was nothing but fiction. Plaintiffs have been able to

garner support for <u>none</u> of these allegations.

Recognizing that they cannot prove the longstanding conspiracy alleged in the Amended

Complaint, Plaintiffs have recently focused on a much narrower, but equally unsupported, set of

claims.  Specifically, nine of the 92 Plaintiffs now assert that they had self-directed individual

retirement accounts ("IRAs") for which Allegiant served as custodian between June of 2000 and

December 2001, and that in the last two weeks of Allegiant's service as custodian, Allegiant

learned of facts that either caused it to recognize that the BLP was a Ponzi scheme, or should

have prompted such a realization.[1/] Unfortunately for Plaintiffs, these claims too are fiction. The undisputed facts show that Allegiant did not suspect Sigillito of misconduct, but rather resigned as custodian because it did not want to contend with the difficulties of administering IRAs contained illiquid and unmarketable foreign investments. Allegiant never discovered any facts that suggested to any Allegiant employee that Sigillito was engaged in fraud.

Plaintiffs have not adduced evidence to support their claims that PNC Bank, N.A. ("PNC") is liable to them for actions its predecessor Allegiant allegedly took or failed to take as custodian for any self-directed IRA invested in the BLP. Neither is PNC liable for any action taken or not taken by its predecessors Allegiant, Pioneer Bank ("Pioneer") or National City Bank ("National City") when any of these entities held Martin Sigillito's retail bank accounts. The evidence demonstrates that Plaintiffs – not Allegiant or any PNC predecessor – made the ill-fated decision to invest with Sigillito and neither Allegiant, Pioneer, nor National City did anything wrong.

PNC is entitled to summary judgment on each of its claims as described below.

- <u>Uniform Fiduciaries Law ("UFL") claims (Counts I-III)</u>: First, the UFL is transaction-specific and Plaintiffs identify no transaction in which any particular plaintiff's funds were misappropriated. Second, there is no evidence that Allegiant or any PNC predecessor bank had actual knowledge of any misappropriation and or that Allegiant or any PNC predecessor bank acted in bad faith with regard to any transaction.

- <u>Aiding and Abetting Breach of Fiduciary Duty</u> (Count V): First, there is no evidence that Allegiant or any PNC predecessor bank knew of any breach of fiduciary duty. Second, there is no evidence that Allegiant or any PNC predecessor bank provided "knowing and substantial assistance" to any breach of fiduciary duty.

- <u>Conspiracy to Violate RICO</u> (Count IX). First, the claims of all Plaintiffs who first joined this suit on July 15, 2014 (81 of the 92 current Plaintiffs) are untimely because the events

---

[1/]     The remaining 83 Plaintiffs do not claim to have invested in the BLP through Allegiant, but contend that PNC Bank, N.A. is liable to them, in any event, because of Allegiant's failure to report or publicly announce the fraud and/or because two other PNC predecessor banks supposedly held Sigillito's retail bank accounts for some period of time.

at issue took place more than a decade ago, and Plaintiffs' injuries were publicly known by not later than June 30, 2010, and those claims are subject to a four-year limitations period. Second, there is no evidence that Allegiant or any PNC predecessor bank intended to further a criminal offense.

- <u>Conspiracy to Breach Fiduciary Duties</u> (Count VII). There is no evidence that Allegiant or any PNC predecessor knew about, let alone had a meeting of the minds with, Sigillito about a criminal objective.

- <u>PNC's Counterclaim</u>. Each of the Counterclaim Defendants executed an IRA agreement that obligated him to indemnify Allegiant for "any loss [Allegiant] may incur as a result of [the account owner's] direction, actions or failures to act." Allegiant's successor PNC has suffered losses in the form of attorneys' fees and costs in this action arising out of the account owners' decisions to invest with Sigillito.

## **STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (citations and internal quotation marks omitted). In determining whether a genuine issue of material fact exists, the Court may consider only evidence that is competent and would be admissible at trial. Fed. R. Civ. P. 56(e). While the court must review the admissible evidence in the light most favorable to the nonmoving party and afford it all reasonable inferences, the burden remains on the nonmovant to

support its claims and the failure to present such proof warrants entry of judgment. *See Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 833 (8th. Cir. 1996) (affirming summary judgment because plaintiff "failed to provide evidence essential to its claims, relying instead on unreasonable inferences and mere speculation.")

Summary judgment is the time for proof of claims, and the record now shows Plaintiffs' claims to be entirely without merit.

## ARGUMENT

The undisputed record now shows that Plaintiffs' claims that were not previously dismissed by the Court are unsupported and that Allegiant had no knowledge that Sigillito was engaged in fraud or criminal activity in 2001.

### A. PNC Is Entitled to Summary Judgment on Counts I through III (UFL).

Counts I through III each purport to be brought under Missouri's version of the UFL. Count I is labeled "Violation of Missouri's Uniform Fiduciaries Law (Actual Knowledge)" and asserts that PNC is generally liable under an unspecified section of the UFL for "not informing law enforcement, regulatory agencies, successor custodians, or the many victims of Sigillito's fraud, including Plaintiffs, that Sigillito was diverting fiduciary funds" through the Interest on Lawyer Trust Accounts ("IOLTAs") Sigillito maintained at Allegiant, Pioneer, and National City. Doc. 6 at ¶262. Count II alleges that PNC is liable under Section 469.270 of the UFL because Allegiant supposedly received misappropriated fiduciary funds in payment of a debt of a fiduciary, which Plaintiffs contend triggers strict liability. *Id.* at ¶¶266-83. Count III is labeled "Violation of Missouri's Uniform Fiduciaries Law (Bad Faith)" and asserts that Allegiant Bank violated another unspecified section of the UFL by failing to investigate the source of funds

moving through Sigillito's IOLTA, which Plaintiffs contend is "commercially unjustifiable" and in bad faith. *Id.* at ¶¶285-301.

PNC is entitled to judgment in its favor on all of these claims because: (1) the UFL provides only for transaction-specific liability and Plaintiffs identify no specific transaction in which any plaintiff's funds were misappropriated, (2) Section 469.270 does not impose strict liability and Plaintiffs have identified no transaction in which Allegiant had both a monetary interest and reason to suspect misappropriation, and (3) there is no evidence that Allegiant had actual knowledge of a breach of fiduciary duty or that Allegiant acted in bad faith as to any transaction.

    1.    <u>The UFL Exists to Facilitate Banking Transactions and Imposes Liability Only in Very Limited Circumstances.</u>

The UFL was enacted to protect banks, and it imposes liability only on a transaction-specific basis and in narrowly proscribed circumstances. At common law, banks were obligated to inquire into the propriety of any fiduciary transactions. *See Hendren v. Farmers State Bank, S.B.*, 272 S.W.3d 345, 348 (Mo. App. 2008). The UFL "was designed to facilitate commercial transactions … by relaxing some of the harsher [common law] rules which require … the highest degree of vigilance in the detection of a fiduciary's wrongdoing." *In re Lauer*, 371 F.3d 406, 414 (8th Cir. 2004) (quoting *Trenton Tr. Co. v. Western Sur. Co.*, 599 S.W.2d 481, 490 (Mo. banc 1980)). The statute provides that banks are "entitled to presume" that fiduciaries are managing funds for a proper purpose. *Id.* at 415. The UFL ultimately recognizes that "the burden of employing honest fiduciaries rests on the principal." *Watson Coatings, Inc. v. American Exp. Travel Related Servs., Inc.*, 436 F.3d 1036, 1041 (8th Cir. 2006). In turn, the bank's "obligation [is] to the [fiduciary], to honor his checks when drawn to form." *Hendren*, 272 S.W.3d at 349 (second alteration ours).

The UFL has specific provisions that impose liability for particular types of transactions, but every provision predicates liability on the bank either (1) actually knowing that the fiduciary duty was committing a breach of fiduciary duty or (2) knowing such facts that the act of processing the transaction amounted to bad faith. *See* R.S.Mo. §§469.240-469.350; *Hendren*, 272 S.W.3d at 349-50. "The bank has no duty to inquire whether the fiduciary properly applies funds held in trust." *Id.* at 349.

2.  The UFL Is Transaction-Specific and Plaintiffs Cite No Specific Transaction in Which Any Particular Plaintiff's Funds Were Misappropriated and That Caused the Plaintiff Injury.

As an initial matter, PNC is entitled to judgment on each of Plaintiffs' UFL claims (Counts I through III), because these counts do not identify any transaction in which any Plaintiff's funds were misappropriated and that caused any Plaintiff any injury. The UFL is not a conspiracy statute. At most, it makes a financial institution liable under certain circumstances to the principal whose fiduciary breached duties owed to that principal in the particular transaction at issue. *See* R.S.Mo. §§469.240-469.350. None of the 92 Plaintiffs identify any specific transaction with regard to which Sigillito or Brown breached a fiduciary duty owed to a particular plaintiff that caused the particular plaintiff injury.

The UFL counts of the Amended Complaint (Counts I to III) are almost entirely devoid of specific references to particular transactions. Indeed, the *only* specific transactions identified in these counts involved the repayment of loans allegedly made to Stanley Cwiakala and Doug Givens. *See* Doc. 6 at ¶¶274-77, 296. Mr. Cwiakala and Mr. Givens are not plaintiffs in this action, and Plaintiffs identify no plaintiff whose funds were misappropriated to pay back the supposed Cwiakala or Givens loans. Even if Allegiant processed transactions involving Mr. Cwiakala and Mr. Givens that would have violated the UFL (and it did not), there is no support

for the contention that such transactions would impose liability on Allegiant for claims brought by persons whose funds were not misappropriated in those transactions. *See, e.g.*, R.S.Mo. §469.270 (describing circumstances under which a payee can be liable "to the principal" of the fiduciary, if the fiduciary breaches fiduciary duties).

Plaintiffs are now focused on a transaction involving a Sigillito investor named Barbara Womack who is not even mentioned in the UFL counts. There is no evidence, however, that any plaintiff's funds were misappropriated in connection with that transaction, either. Plaintiffs claim that Betty Womack (who is not a plaintiff in this action) asked in late September 2001 to liquidate her Allegiant self-directed IRA that held a $56,715.19 loan to the Mark Gilbert Morse firm ("MGM") through the BLP. Plaintiffs contend that Womack's request caused Sigillito to send Allegiant a check drawn on his IOLTA account for purposes of satisfying Ms. Womack's request. Plaintiffs contend that the IOLTA check was funded with money that was given to Sigillito by other Sigillito clients Doug and Linda Givens in September of 2001 for purposes of investing in the BLP in the name of Givens' company, Albion Consulting. Plaintiffs have adduced no evidence, however, that funds belonging to Givens or any other plaintiff were misappropriated in connection with the Womack transaction.

There is no evidence regarding the sources and uses of funds in Sigillito's IOLTA account in September or October of 2001. Statement of Uncontroverted Material Facts ("S.O.F.") ¶¶54-55. By definition, an IOLTA account holds commingled funds that can belong to a number of different clients, as well as funds that belong to the lawyer (such as in the case of pre-paid fees). S.O.F. ¶92. The fact that the Givens gave money to Sigillito before Sigillito gave money to Womack does not prove that Sigillito gave the Givenses' money to Womack. Allegiant understood that the check it received from Martin Sigillito's IOLTA was sent for the

purpose of purchasing Womack's note, S.O.F. ¶¶51-52, and there is no evidence that the source of the funds he sent to Allegiant was neither his own funds nor the funds of another client who authorized Sigillito to purchase Womack's note on that client's behalf.

Plaintiffs also identify no plaintiff who was injured as a result of the Womack transaction. Doug Givens is deceased and no claim is brought on behalf of his estate. S.O.F. ¶66. Linda Givens is a plaintiff, but she has testified and has sworn in response to interrogatories that Albion Consulting's September 2001 BLP was repaid in its entirety and forms no part of the damages she seeks in this action. S.O.F. ¶¶65, 67.

PNC is entitled to judgment in its favor on each of the UFL claims based on the fact that these claims do not identify any specific transactions in which any plaintiff's funds were misappropriated and that caused any plaintiff to be injured.

### 3. No Provision of the UFL Provides for Strict Liability

PNC is also entitled to judgment in its favor on Count II for other reasons. Contrary to Plaintiffs' assertion, Section 469.270 does not make Allegiant strictly liable for any misappropriation by Sigillito or Brown and there is no evidence that Allegiant violated this section.

Even where a bank has a monetary interest in a transaction with a fiduciary, the UFL does not make a bank strictly liable for misappropriation by the fiduciary. Rather, "[w]here a bank engages in transactions with a fiduciary and has '**both reason to suspect a misappropriation by a fiduciary and a monetary interest in the continuance of such activity**,' the bank acts in bad faith" and incurs liability for that misappropriation under the UFL. *Trenton Tr. Co.*, 599 S.W.2d at 493 (emphasis added) (citation omitted).

Plaintiffs have adduced no proof of any transaction in which any plaintiff's funds were misappropriated that meets this standard. The only transactions referenced in Count II are transactions to repay a loan made by Allegiant to Stanley Cwiakala. Plaintiffs claim that J. Scott Brown made payments to Allegiant on Cwiakala's loan (nearly all of which payments were made after Sigillito was no longer banking with Allegiant and Allegiant was no longer acting as custodian for any BLP-invested IRA). This fails to support a UFL claim for multiple reasons. First, there are no authenticated records that show that Brown ever made payments on Cwiakala's loan.[2] Second, Plaintiffs do not identify any plaintiff whose funds were supposedly misappropriated by Brown to pay Cwiakala's loan. Finally, there is no evidence that Allegiant had a reason to suspect that Brown was misappropriating funds to pay an Allegiant loan, even if Brown made payments to Allegiant.[3]

---

[2] Given the significant passage of time since these claimed events, it is no surprise that PNC has no records relating to either the supposed Cwiakala loan or any payments allegedly received in connection with that loan. Plaintiffs have purported to produce some photocopies of checks that they claim to have obtained from the Sigillito criminal case, but they have failed to provide any information about the original source of the copies and they can, thus, lay no foundation for their admission. These documents must be disregarded. *See, e.g.*, *Besett v. Hegg*, 890 F. Supp. 2d 1076, 1089 (D. Minn. 2012) (where there is no evidence or testimony in the record to verify the authenticity of a document, it is not admissible evidence that can create a genuine issue of material fact).

[3] To the extent that Count II purports to rely on the Womack transaction, neither would this support a Section 469.270 claim. In addition to the fact that no plaintiff was injured as a result of the Womack transaction as described above, Allegiant did not have a monetary interest in the Womack transaction. Allegiant earned no commission for liquidating the Womack account and only acted as a conduit for a check that it cashed and disbursed to Betty Womack. S.O.F. ¶¶56-60. Further, Plaintiffs have no evidence that Allegiant had reason to suspect a misappropriation with regard to these events. S.O.F. ¶62. As explained further below, Allegiant believed that Sigillito was purchasing Womack's note, either on his own behalf or on behalf of another client. S.O.F. ¶¶51-52. There was nothing unreasonable about that belief.

### 4. Allegiant Did Not Have Actual Knowledge or Act in Bad Faith

Plaintiffs do not identify what section of the UFL forms the basis for Count I (which they label as "Violation of Missouri's Uniform Fiduciaries Law (Actual Knowledge)") or Count III (labeled "Violation of Missouri's Uniform Fiduciaries Law (Bad Faith)"), but Plaintiffs have adduced evidence of neither actual knowledge of misappropriation nor bad faith by Allegiant. As a result, PNC is entitled to summary judgment on Counts I and III. *See Hendren*, 272 S.W.3d at 349-50 (actual knowledge or bad faith are required for liability under the UFL).

#### a. *Allegiant did not have actual knowledge of misappropriation.*

Count I asserts that PNC is liable because Allegiant had "actual knowledge" that Sigillito was misappropriating fiduciary funds, but failed to alert regulators and Allegiant's clients about such misappropriation. In addition to the fact that the UFL imposes no reporting requirement and that federal law prevents any inquiry into whether Allegiant notified regulators in any event,[4] PNC is entitled to judgment on Count I because there is no evidence that Allegiant had actual knowledge of any misappropriation.

"'Actual knowledge,' as the terms are used in the [UFL], means awareness that, *at the moment*, the fiduciary was defrauding the principal." *Hendren*, 272 S.W.3d at 350 (emphasis added); *see also In re Broadview Lumber Co.*, 118 F.3d 1246, 1251 (8th Cir. 1997) ("Actual knowledge for purposes of the UFL requires a *present awareness* that a fiduciary is breaching his duty for personal gain.") (emphasis added). "A bank may not be found to possess 'actual knowledge' of a breach of trust merely because 'at some stage of the handling of the fiduciary account it could, by inspection of public records or by piecing together all the facts known by different employees of the bank, become aware of a breach of trust.'" *Hendren*, 272 S.W.3d at

---

[4] *See, e.g., Weil v. Long Island Sav. Bank*, 195 F. Supp. 2d 383 (E.D.N.Y. 2001) (discussing confidentiality of suspicious activity reports under 12 C.F.R. § 563.180(d)(12)).

350 (quoting *General Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo. App. 1974)). In other words, "'[t]he mere payment of [] money to or upon the check of [a] depositor does not constitute participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust.'" *Id.* at 349 (citation omitted).

There is no evidence that Allegiant processed any transaction with actual knowledge that that transaction was a breach of Sigillito's or any other actor's fiduciary duties. Indeed, Plaintiffs have adduced no evidence that Allegiant knew at any time that Sigillito was involved in any misconduct. Plaintiffs speculate that Allegiant elected to resign as custodian for the self-directed IRAs invested in the BLP in October of 2001 because Allegiant had learned in connection with the Womack transaction that Sigillito was operating a Ponzi scheme. But there is no evidence that supports this bald speculation, so it cannot defeat summary judgment. *See Barber*, 656 F.3d at 801 ("To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy.") (citation and internal quotation marks omitted).

The evidence shows that Betty Womack asked to liquidate her Allegiant self-directed IRA in late September 2001, and that Allegiant understood that Sigillito would purchase the not-yet-mature MGM note for cash. S.O.F. ¶¶49-52, 56-59. Allegiant had no understanding as to whether Sigillito was purchasing the loan on his own behalf or on behalf of another customer. Moreover, the purchase itself would be no cause for suspicion.

Rather than showing any suspicion of fraud, the evidence shows that Allegiant had concerns about its ability to administer the illiquid foreign investments in the IRA accounts. In September of 2001, Allegiant was in the process of acquiring South Side Bank, which had a much larger and more established trust department than Allegiant. S.O.F. ¶¶69-70. Matt Finn, South Side's head of trust operations, had begun to attend Allegiant Trust Committee meetings and to familiarize himself with Allegiant's trust department and when he became aware of the BLP investments being held in Allegiant self-directed IRAs he recognized the administrative difficulties of holding these unmarketable, illiquid, and difficult to value notes. S.O.F. ¶¶71-73. These were reasonable concerns for an IRA custodians since these aspects of the investments made it difficult to make the value the investments and to make the required minimum distributions as required by tax law. S.O.F. ¶¶15-17, 73.

During the first Allegiant Trust Committee meeting that Finn attended on September 13, 2001 (weeks before the Womack liquidation request), the Allegiant Trust Committee decided that it would no longer accept new self-directed IRAs that account owners intended to invest in the BLP. S.O.F. ¶68. In early October 2001, Finn's concerns about administrative difficulties posed by the BLP investments prompted Mr. Finn to call one BLP borrower, MGM, regarding the loans. S.O.F. ¶74. Shortly thereafter, representatives of MGM met with Mr. Finn in person while they were in St. Louis for business. S.O.F. ¶75. They explained that they were borrowing money from the Allegiant IRA owners to fund litigation for British coal miners, and that Sigillito was brokering the loans. S.O.F. ¶76. They confirmed that the notes were illiquid, indivisible investments that were not marketable through usual channels. S.O.F. ¶77. Nothing about this conversation suggested a Ponzi scheme. To the contrary, the MGM firm confirmed that they were actually receiving the loan funds and using them for the purposes for which the loans were

made. S.O.F. ¶¶76, 79-80. This conversation confirmed, however, Mr. Finn's impression that the investments were administratively unsuitable for holding in IRAs. S.O.F. ¶78. Thereafter, he recommended to his boss, Art Weiss, that Allegiant decline to continue as custodian for IRAs holding these investments, and Weiss took that advice and notified Sigillito of Allegiant's resignation on October 26, 2001.[5] S.O.F. ¶¶81-82.

There is no evidence that Allegiant had actual knowledge that Sigillito or anyone else was misappropriating Plaintiffs' funds. As a result, PNC is entitled to judgment on its favor on Count I.

> **b.** *Allegiant Also Did Not Act in Bad Faith.*

Neither can Plaintiffs prove "bad faith" sufficient to support the UFL claim in Count III. "The UFL does not define bad faith; however, it does define 'good faith.'" *Watson Coatings*, 436 F.3d at 1041 (citing *Trenton Tr. Co.*, 599 S.W.2d at 492). "'Good faith' means that the act is 'in fact done honestly, whether it be done negligently or not.'" *Id.* (quoting *Trenton Tr. Co.*, 599 S.W.2d at 492 (quoting R.S.Mo. §469.240(2))). Therefore, in Missouri, "[m]ere negligence" will not support a finding of "bad faith" under the UFL. *Id.* (quoting *Trenton Tr. Co.*, 599 S.W.2d at 492). "The test of bad faith is 'whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where

---

[5] Plaintiffs also contend that Mr. Finn learned in early October of 2001 that Sigillito was taking "high fees" from fiduciary funds that he was allegedly not authorized to take by the loan documents (*see* Doc. 6 at ¶¶54-56), but Mr. Finn has testified that MGM advised him only that *MGM* was paying fees for these loans (which it paid in addition to the principal and interest due to the lenders under the loan agreements). S.O.F. ¶79. While these fees made the borrowing very expensive, MGM was willing to do business on these terms because the black lung claims were very profitable and MGM had little access to capital to fund the litigation. S.O.F. ¶80. The IRA account holders were not paying the fees; in fact, Plaintiffs contend they were often not disbursed from Sigillito's IOLTA, but rather were transferred to Sigillito from his associate J. Scott Brown. Doc. 6 at ¶¶68, 124-25. MGM ultimately paid back all of the amounts borrowed from IRA account owners, along with the promised interest, in addition to paying fees to Sigillito and Brown. S.O.F. ¶¶29, 30, 83.

circumstances suggestive of the fiduciary's breach become sufficiently obvious it is "bad faith" to remain passive.'" *Id.* (quoting *Trenton Tr. Co.*, 599 S.W.2d at 492). In this vein, "[m]ere suspicious circumstances" do not show bad faith. *Id.* (citation omitted); *see also Pernikoff Constr. Co. v. U.S. Bank, N.A.*, No. 4:09CV894 JCH, 2010 WL 3258399, at *4 (E.D. Mo. Aug. 16, 2010) ("Mere suspicious circumstances are insufficient to show bad faith, as there exist many legitimate reasons as to why a fiduciary and principal might engage in odd checking practices."). "'The facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction.'" *Hendren*, 272 S.W.3d at 350 (quoting *General Ins. Co.*, 505 S.W.2d at 458).

Count III asserts that it was "bad faith" for Allegiant not to investigate the source of the funds flowing through Sigillito's IOLTA. *See* Doc. 6 at ¶¶ 284-300. Specifically, Plaintiffs focus on Sigillito's purchase of the Womack note. Plaintiffs appear to suggest that the mere fact that Sigillito's check was drawn on an IOLTA, in and of itself, gave the bank reason to be suspicious. But this fact alone would not give rise to such concerns. IOLTA accounts are demand deposit accounts and can contain both funds belonging to clients or third parties and fees belonging to the attorneys. S.O.F. ¶¶92-93. Allegiant had no knowledge of whether Sigillito was acting on his own behalf or on behalf of another client. Plaintiffs offer no expert opinion regarding banking practices and, specifically, no opinion that the fact that the check was an IOLTA would have made a reasonable bank suspicious of misappropriation. Further, none of the former Allegiant employees who testified in this action testified that they viewed Plaintiffs IOLTA check with any suspicion, nor are there facts suggesting that they had knowledge that should have put them on notice. *See* S.O.F. ¶¶61-62.

Plaintiffs' attempt to impose a duty on Allegiant to trace funds through various accounts maintained on different sides of Allegiant is even more spurious. There is no such duty as a matter of law. The Eighth Circuit has expressly held that "[w]here a bank … electronically processes checks pursuant to its normal procedures and does not employ automated procedures that unreasonably vary from general banking usage, no genuine issue of material fact exists as to whether the [bank's] automated processing of checks is commercially reasonable." *Watson Coatings*, 436 F.3d at 1041-42; *see also Pernikoff Constr. Co.*, 2010 WL 3258399, at *5 (granting summary judgment for electronic processing). Since the Eighth Circuit has held that there is not even a duty for bank employees to manually review checks, there certainly can be no duty to search the bank for connections between accounts based on memo line notations that would require a manual review to detect.

Moreover, Plaintiffs have failed to adduce any evidence that Allegiant's processing transactions without "tracing" the source funds for those transactions was "commercially unjustifiable," and, thus, in bad faith. Plaintiffs have no evidence that Allegiants "deviated from [its] own procedures in processing the Checks, or that [its] automated check processing procedures varied unreasonably from general banking usage." *Pernikoff Constr. Co.*, 2010 WL 3258399, at *5. Plaintiffs' failure to produce an expert on this question is itself dispositive on the bad faith prong. *See Pernikoff Constr. Co.*, 2010 WL 3258399, at *5 n.16 (granting summary judgment for defendant on UFL claims and holding that "'[w]hat constitutes reasonable or justifiable banking practices with respect to automated processing of checks is not a matter of common knowledge, and requires evidence of reasonable banking practices in the industry.'"). *See also Rosemann v. Sigillito*, 785 F.3d 1175, 1180 (8th Cir. 2015) (holding that allegations that turn on what a professional would do "under the same or similar circumstances" require expert

testimony because they "involve 'somewhat arcane subjects to the ordinary juror,' subjects that go beyond the 'common knowledge and experience' of most lay persons") (citations omitted); *S & A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 954 (8th Cir. 2012) (upholding summary judgment where plaintiff "presented no evidence describing a commodity-trading advisor's standard of care or how [defendant] breached that standard of care"). PNC has proffered unrebutted expert testimony by a former National Bank Examiner that Allegiant acted in a commercially justifiable manner (*see* S.O.F. ¶¶105-107), rendering Plaintiffs unable to carry their burden to show that any PNC predecessor's actions were commercially unjustifiable. Thus, PNC is entitled to judgment on Count III.

**B.    PNC Is Entitled to Judgment on the Claim of Aiding and Abetting Breach of Fiduciary Duty (Count V) Because the Undisputed Evidence Shows That PNC Neither Knew of Wrongful Activity by Sigillito or Brown Nor Provided Knowing and Substantial Assistance.**

In order to prevail on a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must show that the primary actor breached a fiduciary duty, that the aider and abettor was "generally aware of his role in the overall wrongful activity at the time assistance is provided," and that the aider and abettor knowingly and substantially assisted the wrongful act that injured the plaintiff. *See* RESTATEMENT (SECOND) OF TORTS § 867(b) (1977).[6] Plaintiffs have not come close to proving the second or third elements, each of which is separately dispositive.

1.    Plaintiffs Have Not Proven PNC Was Aware of Wrongful Activity

First, there is no evidence that Allegiant knew that Sigillito was engaged in wrongdoing. Plaintiffs speculate that Allegiant learned that Sigillito and Brown were operating a Ponzi

---

[6] As the Court acknowledged in its order on PNC's Motion to Dismiss, the Missouri Supreme Court has not ruled on whether a cause of action exists for aiding and abetting in the commission of a tort. Doc. 26 at 7. Although PNC continues to believe that such a cause of action would not be recognized and continues to provide grounds for judgment in PNC's favor (as explained in Doc. 18 at 3-4 and Doc. 24 at 8-11), PNC recognizes that the Court has held otherwise and PNC does not repeat the arguments made in Documents 18 and 24 here.

scheme, but, as stated above, there is no evidentiary support for this theory. The evidence, instead, shows that Allegiant Bank elected to resign because of the administrative difficulties posed by the fact that the BLP notes were unique, unmarketable, and illiquid, and that Allegiant Bank did not know about any breach of fiduciary duty by Sigillito or Brown. S.O.F. ¶¶72-82.

Plaintiffs argue that Allegiant could have could have compared transactions in Sigillito's bank accounts (which were maintained on the retail side of Allegiant Bank) to the transactions in the Allegiant Customer Plaintiffs' IRAs (for which the Allegiant trust department acted as custodian). But Plaintiffs' constructive knowledge theory is contrary to law. In order to aid and abet a breach of fiduciary duty, the defendant must have had <u>actual</u> knowledge of the breach. *See Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1027 (S.D.N.Y. 1984) (in order to state a claim for aiding and abetting a breach of fiduciary duty, "[a]ctual knowledge of a breach of duty is required; mere suspicion or even recklessness as to the existence of a breach is insufficient."); *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292–93 (2d Cir. 2006) (actual knowledge required to aid and abet breach of fiduciary duty); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 907-08 (W.D. Mich. 2010) (noting that, for aiding and abetting breach of fiduciary duty claims, "an actual knowledge standard is supported by the most extensive and coherent body of aiding-and-abetting authority as it specifically applies to banks— the cases decided by the Second Circuit and the New York Federal District Courts."), *aff'd,* 712 F.3d 917 (6th Cir. 2013). Application of this standard compels judgment in PNC's favor on Count V.

Plaintiffs' theory also fails on the facts. There is no evidence showing that Allegiant ever compared transactions across the various retail and trust department accounts at Allegiant Bank. To the contrary, the only evidence is that this did not occur. This is not surprising, given that this

was not the practice in the industry during the relevant time and that there were regulations that discouraged (if not prohibited) such a routine practice. S.O.F. ¶106. In 2001, banks like Allegiant were required to create "methods for ensuring that fiduciary officers and employees not use material inside information in connection with any decision or recommendation to purchase or sell any security." 12 C.F.R. § 9.5(b) (2001). One method that financial institutions used to adhere to this rule was to separate their trust operations from their banking operations and limit communications between them. *See* S.O.F. ¶106. *See also* 12 C.F.R. § 9.8(c) (2001) (mandating that records of fiduciary accounts shall be "separate and distinct" from other records of the bank); 12 C.F.R. § 9.13 (2001) (mandating that assets of fiduciary accounts be kept separate from all other accounts).

There is also no evidence that Allegiant ever drew connections between accounts based on notations made in memo lines on checks. *See* S.O.F. ¶¶62, 103-04, 107. Indeed, there is not even evidence that Allegiant *could have* done this. Banks like Allegiant clear checks through an automated process, and Plaintiffs have not shown that Allegiant deviated from the typical process. *See* S.O.F. ¶¶63, 105-06. Thus, there is no reason to believe that any Allegiant employee ever saw what was written on the memo lines. Further, because memo notations have no legal effect and are considered in the industry to be solely for the convenience of the check writer, S.O.F. ¶107, it is unsurprising that Allegiant had no system for making employees aware of memo notations. Plaintiffs' theory of an omniscient Allegiant, where all aspects of every transaction on the retail side and trust side were reviewed and scrutinized in forensic detail does not reflect reality and defies the legal limits on bank liability. Commercial transactions would come to a halt if the level of detailed investigations advocated by Plaintiffs were in fact required by law.

The nature of Sigillito's accounts raise additional problems for Plaintiffs' theory. An IOLTA, by definition, holds funds that belong to others, along with fees belonging to the attorney. *See* Mo. Sup. Ct. Rule 4-1.15. They are by their very structure a repository of commingled funds. The fact that other people's funds appear to pass through an IOLTA account is, thus, hardly an indication that the owner of the account is committing fraud.

Even if Allegiant had appreciated that Sigillito was receiving fees in connection with the BLP loans, such information would not have amounted to knowledge of fraud. Missouri Supreme Court Rules allow an attorney to use an IOLTA for a variety of purposes, including to disburse fees to himself, hold funds in escrow for real estate transactions, and more. *See* Mo. Sup. Ct. Rule 4-1.15. Allegiant had no idea what fees Sigillito was owed. The evidence shows, for instance, that the MGM firm was knowingly and routinely paying Sigillito fees in connection with these loans, which fees were paid by MGM on top of the principal and interest it paid to the IRA account owners.[7] S.O.F. ¶¶79-80, 83. Further, a bank like Allegiant would not have expected to be able to investigate the sources of funds in an attorney's IOLTA account. After all, the relationships that generate the funds in an IOLTA are often privileged and a bank would have no right to inquire into the details of privileged relationships.

2.     The Undisputed Facts Show No "Knowing and Substantial Assistance."

Plaintiffs have also failed to adduce evidence that Allegiant "knowingly and substantially assisted" Sigillito's misconduct. Plaintiffs claim that Allegiant acted to assist the breach of fiduciary duty both by action and inaction, but no activity or omission that they cite begins to satisfy this element.

---

[7] The fees that MGM paid to Sigillito are a red herring. These were the only fees known to Allegiant connected to the Allegiant Customer Plaintiffs' notes, and there is no evidence that any plaintiff ever lost money as a result of any fee known to Allegiant. MGM repaid the MGM Loans, in addition to paying fees to Sigillito. S.O.F. ¶¶29-30, 83.

The affirmative actions Plaintiffs point to in their First Amended Complaint as assisting Sigillito's misconduct were Allegiant's supposed "facilitating Sigillito's transfers of Plaintiffs' funds from Sigillito's IOLTA account to various accounts intended to obscure the flow and use of those funds for Sigillito's personal benefit" and "opening and transferring money from lines of credit to cover up Sigillito's overdrafts in his IOLTA account and conceal clear evidence of embezzlement and misappropriation." Doc. 6 at ¶312. The only things Allegiant did to "facilitate[e] Sigillito's transfers of Plaintiffs' funds," however, were to honor checks that Sigillito wrote. Since Allegiant knew of no basis to dishonor these checks, this is the kind of "routine professional service[]" that cannot amount to substantial assistance. *See Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188-89 (Minn. 1999) (rejecting claim that accounting firm aided and abetted trustee's breach of fiduciary duty by preparing financial statements, setting up draw accounts, recording conveyances, and providing tax advice and noting that "[i]n addressing aiding and abetting liability in cases involving professionals, most courts have recognized that 'substantial assistance' means something more than the provision of routine professional services.").

As for the allegation that Allegiant transferred money from lines of credit to Sigillito to "cover up" IOLTA overdrafts, there is no evidence of either: (i) any overdrafts by Sigillito or (ii) any loans made to "cover them up." Even if Allegiant had loaned money to Sigillito knowing that he had had overdrafts in his IOLTA (which there is no evidence to support), Plaintiffs identify no authority for the proposition that this would have been improper or anything other than a "routine professional service[]" for a bank engaged in the business of loaning money.[8]

---

[8] Plaintiffs elsewhere assert that Allegiant violated Missouri Supreme Court rules requiring reporting of IOLTA overdrafts to the Missouri Supreme Court Foundation (Doc. 6 at ¶314(d)), but the rule they reference was not enacted until almost a decade after the events at issue in this

Likewise, Allegiant's purported failure to act does not amount to "knowing and substantial assistance." Plaintiffs assert that Allegiant neglected to "properly investigate the alerts generated by transfers of funds between the IRA Plaintiffs' accounts and Sigillito's IOLTA account" (Doc. 6 at ¶312), but silence or inaction does not amount to "substantial assistance" unless the aider and abettor had a duty to act.[9]  *See El Camino Res.*, 722 F. Supp. 2d at 927 ("[P]roof of silence and inaction is universally deemed insufficient to establish aiding-and-abetting liability under the Restatement approach.").  *See also Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F. Supp. 1252, 1262 (S.D.N.Y. 1988) (holding that for aiding and abetting liability under securities laws, "'inaction on the part of the alleged aider and abettor ordinarily [is not] treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and direct violation of a duty to act.'") (alteration in original) (citation omitted).

As discussed above, Allegiant had no duty to do the things that Plaintiffs say it should have done.  The contracts between Allegiant and the Allegiant Customer Plaintiffs made clear that Allegiant had no duty to investigate the account owners' chosen investments or their chosen investment advisor.  S.O.F. ¶46.  There are also no industry standards or governing statutes that impose such obligations in the face of clear contract language providing more limited duties. *See, e.g., Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014); *Metz v. Serfling*, 1992 WL 23491, at *5 (N.D. Ill. Feb. 6, 1992) (self-directed IRA custodian "had no duty to

---

lawsuit.  *See* Mo. Sup. Ct. Rule 4-1.15  Advisory Committee Regulation on Overdraft Reporting (adopted January 1, 2010).  There was no obligation to report overdrafts in 2001.

[9] There is also no evidence that "alerts" were generated by the transfer of any funds.  As stated above,j there is no reason to believe that any employee of Allegiant ever appreciated that any transactions in the IOLTA (other than the Womack check) were even connected to any self-directed IRA account.  As explained above, even if Allegiant had appreciated connections, they would not have suggested misconduct.

investigate [the fraudster] or refuse to release [plaintiffs'] funds to [him]" based on the IRA agreement), *aff'd*, 994 F.2d 395 (7th Cir. 1993); *Paszamant v. Retirement Accounts, Inc.*, 776 So. 2d 1049, 1051-54 (Fla. Dist. Ct. App. 2001); *Scionti v. First Tr. Corp.*, No. H-95-5493, 1999 U.S. Dist. LEXIS 23253, at *130-31 & n.44 (S.D. Tex. June 23, 1999); *Mohr Report.* Likewise, there was never an obligation for Allegiant to compare the transactions in retail bank accounts and accounts maintained in the trust department account records to try to ferret out suspicious behavior. Abernathy Decl. And, in fact, there are reasons why Allegiant could not have routinely compared these sets of records. See above p. 19. Again, the lack of competent expert testimony setting out that Allegiant Bank was reasonably required to undertake the actions Plaintiffs now claim is fatal to their theories.[10]

### 3.   The Non-Customer Plaintiffs' Claims Fall Particularly Short.

The 82 Non-Customer Plaintiffs' aiding and abetting claims are particularly spurious. None of these customers invested via accounts at Allegiant, Pioneer, or National City, and there is no evidence that Allegiant, Pioneer or National City knew that Sigillito or Brown were breaching fiduciary duties to investors who were never their customers. Indeed, there can be no evidence that Allegiant, Pioneer, or National City would even have known that these people invested with Sigillito (many of them years after these institutions had any dealings with Sigillito). Further, Allegiant, Pioneer, and National City did nothing to assist Sigillito with any

---

[10] If anything, Allegiant declined several requests by Sigillito that might otherwise have unknowingly assisted the operation of Sigillito's scheme. After Allegiant had decided to resign as custodian, Sigillito sought to have Allegiant allow him – and not Allegiant - to communicate about the resignation with the account owners. S.O.F. ¶89. Allegiant could have simply notified Sigillito of its decision, since Sigillito was the Allegiant Customer Plaintiff's designated representative, but Allegiant chose to advise the account owners directly instead. S.O.F. ¶89. Further, Sigillito did not want Allegiant to offer the Allegiant Customer Plaintiffs a choice of successor custodian, but Allegiant asked the Allegiant Customer Plaintiffs whether they wanted to designate Millennium Trust as successor or to choose another institution. S.O.F. ¶¶87-89.

investment made by the Non-Customer Plaintiffs. S.O.F. ¶¶39-42. As the Court has already acknowledged, Allegiant had no duties whatsoever to the these plaintiffs, who were strangers to Allegiant (Doc. 26) and the same is true for Pioneer and National City.

**C.      PNC Is Entitled to Judgment on the RICO Conspiracy Claim (Count IX).**

The RICO conspiracy claim (Count IX) fares no better. As a threshold matter, the vast majority of Plaintiffs' RICO claims are untimely. In addition, Plaintiffs have failed to adduce facts that support a claim that Allegiant, Pioneer, or National City acted with intent to advance an unlawful objective.

1.      <u>The Statute of Limitations Bars RICO Claims by Any Plaintiff Filed More Than Four Years After June 30, 2010.</u>

The bulk of the RICO claims are time-barred. RICO claims must be filed within four years of the later of when (1) the plaintiffs knows or should know that he has been injured or (2) the injury occurred. *See Rotella v. Wood*, 528 U.S. 549 (2000). The events at issue in this lawsuit took place more than 12 years before this case was filed, and most of the Plaintiffs knew or should have known of their injuries more than four years prior to filing their RICO claims, making their claims untimely.

Plaintiffs Richard Aguilar, Melba Aguilar, Albert Carrell, Sharon Cobb, Clayton Givens, Linda Givens, Stanley Kuhlo, Gina Mastrantonia, Phil Rosemann, Loren Winterhof, and Mary Winterhof filed their claims against PNC on May 23, 2014. S.O.F. ¶122. The other 81 current plaintiffs did not join the action until July 15, 2014. S.O.F. ¶123. It is clear that all plaintiffs should have known of their injuries by June 30, 2010 at the latest, so the claims of the 81 Plaintiffs who filed on July 15, 2014 are untimely. *See Self v. Equilon Enters., LLC*, No. 4:00CV1903TA, 2005 WL 3763533, at *5 (E.D. Mo. Mar. 30, 2005) (when suit is amended to

add new plaintiffs, claims of new plaintiffs do not relate back to claims of original plaintiffs absent mistake of identity).

By June 30, 2010, enough was known about Sigillito's scheme that a group of BLP investors – including some of the current Plaintiffs – were able to bring a RICO lawsuit against Sigillito and 50 defendants. S.O.F. ¶118. This is the latest possible time by which Plaintiffs' injuries should have been deemed to be knowable. Plaintiffs arguably should have known of their injuries even earlier. In March of 2010, current plaintiff Phil Rosemann filed his first lawsuit arising out of the BLP (against Derek Smith and his company Distinctive Properties). S.O.F. ¶115. In May of 2010, it was publicly reported that Sigillito was under investigation in connection with the BLP and that his Clayton, Missouri offices had been raided by the FBI. S.O.F. ¶117. The RICO claims of the 81 plaintiffs who did not file until July 15, 2014 are simply untimely.

### 2. Allegiant Lacked the Requisite Intent.

In addition to the statute of limitations barring the RICO claims of certain Plaintiffs, PNC is entitled to judgment on all Plaintiffs' RICO claims because there is no evidence of intent by Allegiant. As the Court made clear in its ruling on PNC's Motion to Dismiss, a plaintiff alleging conspiracy to violate RICO must prove that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense" or that the conspirator "adopt[ed] the goal of furthering … the criminal endeavor." Doc. 26 at 20 (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). In other words, "[t]o be convicted of [RICO] conspiracy a person must agree with other persons that they will engage in conduct that constitutes a crime." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000). The defendant must have been "aware of the essential nature and scope of the enterprise

and intended to participate in it." *See Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993). *See also RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,* 682 F.3d 1043, 1048 (D.C. Cir. 2012) (defendant must have "adopt[ed] the goal of furthering or facilitating the criminal endeavor" to be liable for conspiracy to violate RICO) (quoting *Salinas*, 522 U.S. at 65). Plaintiffs have not come close to meeting this high bar.

Plaintiffs have utterly failed to show that Allegiant, Pioneer, or National City even knew that Sigillito was engaged in unlawful activity – much less that they agreed to further efforts they knew to be unlawful.   This is fatal to their RICO conspiracy claim. *See Pennino v. Selig*, 258 F. Supp. 2d 914, 925 (W.D. Ark. 2003) (dismissing claims under 18 U.S.C. §1962(d) where defendant bank was not alleged to have "entered into an express or tacit understanding with any other defendant to violate the statute"); *RSM Prod.*, 682 F.3d at 1050-52 (dismissing RICO conspiracy claim against law firm that represented party accused of bribing officials on the grounds that allegations did not plausibly allege that attorney knew of bribery-racketeering conspiracy and agreed to foster its goals). *See also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 731 (7th Cir. 1998) ("We have cautioned … that the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.'… Accordingly, in order to plead a viable §1962(d) claim, a plaintiff must allege that a defendant 'agreed to the objective of a violation of RICO.") (citations omitted).

The instant RICO conspiracy allegations are even farther from the mark than those rejected by the Seventh Circuit in *Frost National Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862 (7th Cir. 2001).  There, accountholders at Frost National Bank and First of America Bank who owned several automobile dealerships engaged in a check kiting scheme, writing a series of checks to each other for amounts their actual account balances would not cover.  Although there

was evidence that First of America was suspicious of the accountholder's activities prior to taking action to stop it, the court held that a defendant who has "suspicions" does not meet the standard for knowing participation required by RICO. *Id.* at 870-71. Here, of course, Plaintiffs have not even proven that any PNC predecessor Bank was suspicious of Sigillito.

Plaintiffs have not come close to adducing evidence that Allegiant Bank, Pioneer Bank, or National City were aware of the essential nature of Sigillito's fraudulent scheme, or that they agreed with him to facilitate the commission of any unlawful activity. PNC is, thus, entitled to judgment in its favor on the RICO conspiracy claim.

**D.     PNC Is Entitled to Judgment on Count VII (Conspiracy to Breach Fiduciary Duties).**

PNC is also entitled to judgment in its favor on the claim for conspiracy to breach fiduciary duties (Count VII, which is brought exclusively by the Allegiant Customer Plaintiffs). As the Court previously stated in its order on the Motion to Dismiss, "[t]o establish a claim for conspiracy, there must be '(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) [who] committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby damaged." Doc. 26 at 12 (quoting *Gettings v. Farr*, 41 S.W.3d 539, 542 (Mo. Ct. App. 2001)).

Plaintiffs fail to establish multiple of these elements. There is no evidence of any "meeting of the minds" between Allegiant and Sigillito, nor is there any evidence that Allegiant had an unlawful objective. Controlling Eighth Circuit precedent makes clear that PNC would not even be liable if its predecessors knew of Sigillito's wrongdoing. *See Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063-64 (8th Cir. 2005) ("Mere knowledge neither constitutes an act in furtherance of the conspiracy nor supports the inference" that the

defendant intended to harm the plaintiff).   And, of course, Plaintiffs have not shown that any PNC predecessor had such knowledge, in any event.

**E.      PNC Is Entitled to Summary Judgment on its Counterclaim.**

Finally, PNC is entitled to summary judgment on its counterclaim.  All of the Counterclaim Defendants, in establishing their IRAs with Allegiant Bank, expressly agreed that "any directions you give us, or action you take will be proper under this Agreement and that [Allegiant Bank] is entitled to rely upon any such information or directions."  S.O.F. ¶124. Plaintiffs further agreed to "reimburse [Allegiant Bank] for any loss we may incur as a result of such directions, actions or failures to act."  S.O.F. ¶125.

The terms of this indemnity are unambiguous.  They require indemnification out of "any loss" that Allegiant Bank incurs as a result of any directions given by the counterclaim defendant. The plain meaning of this clause is that the counterclaim defendants must indemnify PNC for the expenses, including attorneys' fees and costs, of this litigation, which was caused by the Counterclaim Defendants' direction to invest their assets with Martin Sigillito.

PNC has clearly suffered losses as a result of relying on the Counterclaim Defendants' direction to invest in the BLP and to treat Sigillito as Plaintiffs' authorized representative, namely the significant legal expenses required to defendant this action.   Courts routinely enforce such indemnification provisions.  *See, e.g., Brown v. California Pension Adm'rs & Consultants, Inc.*, 45 Cal. App. 4th 333, 349-50 (1996) (awarding attorney's fees pursuant to similar provision in agreements governing self-directed IRA accounts).  *See also Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 560-61 (10th Cir. 2001) (enforcing indemnification provision in settlement agreement).  Upon a finding of liability, PNC will submit proof regarding the amount of its

damages on this claim, as PNC's damages continue to accrue.  *See, e.g.*, *Discovery Grp. LLC v. Chapel Development, LLC*, 574 F.3d 986, 989 & fn.*.

<u>**CONCLUSION**</u>

For the reasons stated above, the Court should grant summary judgment in PNC's favor on all claims, including PNC's Counterclaim.

Dated: August 3, 2015     Respectfully submitted,

            BRYAN CAVE LLP


            /s/ Jeffrey S. Russell
            Jeffrey J. Kalinowski, EDMO #29926MO
            Jeffrey S. Russell, EDMO #35158MO
            Herbert R. Giorgio, Jr., EDMO #58524MO
            Darci F. Madden, EDMO #51463MO
            One Metropolitan Square
            211 North Broadway, Suite 3600
            St. Louis, MO  63102-2750
            Phone:  (314) 259-2000
            Fax:  (314) 259-2020

            Attorneys for Defendant
            PNC Bank, N.A.

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing was filed using the Court's CM/ECF system on August 3, 2015, which will serve notice upon all counsel of record.

/s/ Jeffrey S. Russell