**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD AGUILAR, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:14-cv-985-LRR |
| vs. | ) | |
| | ) | Judge: Honorable Linda R. Reade |
| PNC BANK, N.A., | ) | (Chief Judge N. Dist. Iowa) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

COME NOW Plaintiffs and in Support of their Motion for Partial Summary Judgment file this Statement of Uncontroverted Facts pursuant to Fed. R. Civ. P. 56.

## 1.    BACKGROUND FACTS

Fact 1.1    Defendant PNC Bank, N.A., succeeded to all of the liabilities of Allegiant Bank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PNC Resp. to Second Requests for Admission ("Resp. to 2nd RFA") no. 1

Fact 1.2    Allegiant Bank was a publically traded bank in 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Weiss Depo. at pg. 17

Fact 1.3    In 2001, Allegiant Bank was a financial institution that offered IOLTA accounts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo. at pg. 184

Fact 1.4    Allegiant Bank closed its merger with Southside National Bank on or about September 28, 2001.
http://www.bizjournals.com/stlouis/stories/2001/10/15/story4.html?s=print (last visited August 3, 2015)

Fact 1.5    Richard Markow ("Markow") was an employee of Allegiant Bank and president of the Bank's trust department in September and October 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo. at pg. 7

Fact 1.6    Markow received a law degree from University of Missouri in 1980 and during 2001 was licensed to practice law in the State of Missouri.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo. at pg. 7-8

Fact 1.7    Robin Fitzgibbons ("Fitzgibbons") was an employee of Allegiant Bank and a trust officer in the Bank's trust department in 2001

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fitzgibbons Depo. at pg. 10-11

Fact 1.8    Herb Morisse ("Morisse") was an employee of Allegiant Bank and a trust officer in the Bank's trust department in 2001

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo at pg 8, 20

Fact 1.9    Morisse received a law degree from Washington University in 1978 and in 2001 was licensed to practice law in the State of Missouri.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo. at pg. 9-10

Fact 1.10    Morisse practiced law in private practice in St. Louis from 1978 to 1995.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo. 9-10

Fact 1.11    Mary Schmidt ("Schmidt") was an employee of Allegiant Bank and a trust officer in the Bank's trust department in 2001.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo. at pg. 42

Fact 1.12    Schmidt worked part time and Morisse and Fitzgibbons were the only full time trust adminstrators working in the trust department at Allegiant Bank in 2001.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fitzgibbons Depo at pg. 103

Fact 1.13    Matthew Finn ("Finn") was a senior trust officer at Southside National Bank before working at Allegiant.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 8

Fact 1.14    Finn was chief investment officer at Allegiant Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 7

Fact 1.15   During the period 1994 to 1997, Finn served as president of Magna Trust Company and then as president of the trust division at Union Planters Bank
.................................... Finn Depo. at pg. 8–9, 64–65

Fact 1.16   The trust department at Allegiant Bank was a small organization and communicated well
.. ...................................... Markow Depo at pg. 129

Fact 1.17   With the trust officers in the trust department at Allegiant Bank being on the same floor, it was not hard for them to share an idea, or a thought, or a comment.
.. ...................................... Markow Depo. at pg. 129

Fact 1.18   Markow and the trust officers in the trust department at Allegiant would help with the administrative and ministerial matters just to help each other out.
....................................... Markow Depo. at pg. 129

Fact 1.19   Morisse, Fitzgibbons, and Schmidt were the only trust officers working in the trust department at Allegiant Bank in 2001.
...................................... Morisse Depo. at pg.41-42

Fact 1.20   Martin Sigillito was an attorney with the Helfrey Firm, Helfrey, Simon & Jones, P.C., 120 South Central, Suite 1500, St. Louis, Missouri 63105.
........... Markow Depo. at pg. 58, Plaintiff's Depo. Exhibit 215, 216

Fact 1.21   Allegiant Bank files in 2001 contained letters addressed to Markow from account holders of self-directed IRAs invested in the BLP stating that Sigillito was their lawyer.
.................................... Plaintiff's Depo. Exhibit 252

Fact 1.22   Markow agrees that he would not have been the only person in the trust department at Allegiant Bank who was aware of Sigillito's involvement, authority and capacity, including Sigillito's capacity as attorney for the account holders of self-directed IRAs invested in the BLP.
............................... Markow Depo., Vol 2 at pg. 43-44

Fact 1.23    Markow testified that it is fair to say that with respect to associates in the trust department, Morisse, Fitzgibbons, Weiss, and Schmidt, it was common knowledge that Sigillito represented these individuals as their attorney and was their agent.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo. at pg. 44-45

Fact 1.24    Mr. Markow at pages 44-45 of his deposition on July 17, 2015 testified as follows:

**Q** (By Mr. Andres) Fair to say it was common knowledge Martin Sigillito represented these individuals as their attorney?

MR. GIORGIO: Object to form. Lack of foundation. Calls for speculation.

MR. CAMPBELL: I will join in the objection.

MR. ANDRES: You can answer.

**A** Yes, with respect to associates in the trust department.

**Q** (By Mr. Andres) Sure. The trust officers, Mr. Mercy [Morisse], Miss Fitzgibbons, Mr. Weiss, yourself?

**A** Miss Schmidt.

**Q** Among those people that's who you're referring to that it was common knowledge?

**A** Yes.

MR. GIORGIO: Excuse me. Object to the form. Lack of foundation. Calls for speculation as to what those individuals knew 22 or did.

MR. CAMPBELL: I'll join in the objection.

**Q** (By Mr. Andres) It was your perception that it was common knowledge among the trust department and offices that we just talked about that Martin Sigillito represented them as their lawyer? The IRA account holders who held investments in the BLP is what I'm referring to.

MR. GIORGIO: Same objection.

MR. CAMPBELL: Same objection.

**A** Well, my associates did know of his authority. As far as limiting that to attorney they may have also been aware, and I'm speculating, but they were to rely on him as their agent. So you made reference to attorney and I am simply expanding that to include agent who had authority to act on their behalf.

**Q** (By Mr. Andres) So not just as their attorney but as their agent?

**A** Yes.

**Q** That was your understanding in October of 2001, correct?

**A**  Yes.

Fact 1.25   Finn knew that Sigillito was the attorney for some of the investors in the BLP who held IRA accounts at Allegiant Bank.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 99

Fact 1.26   Finn understood that Sigillito was the promoter and a broker of the BLP loans.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 99, 154

## 2.  IOLTA ACCOUNT FACTS

Fact 2.1   For a certain period of time in 2000 and 2001, Sigillito maintained Interest on Lawyers Trust Account no. xxxx7010 ("IOLTA 7010") at Allegiant Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA  no. 4

Fact 2.2   IOLTA 7010 was an Interest on Lawyers Trust Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 5

Fact 2.3   IOLTA 7010 was an Interest on Lawyers Trust Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 5

Fact 2.4   Sigillito owed fiduciary duties to persons whose money was deposited into IOLTA 7010 at Allegiant with respect to their money deposited into that account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 9

Fact 2.5   Allegiant Bank knew that IOLTA 7010 was an Interest on Lawyers Trust Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 10

Fact 2.6   PNC acknowledges as a fact that "Allegiant Bank knew in 2001 that Martin Sigillito was a fiduciary to the persons whose money was deposited into IOLTA account no. 0404007010 at Allegiant Bank" but upon diligent search, PNC has not located any documentation of this fact in the legacy records PNC inherited from Allegiant Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 12

Fact 2.7    PNC acknowledges as a fact that "Allegiant Bank knew in 2001 that Martin Sigillito owed fiduciary duties to persons whose money was deposited into IOLTA account no. 0404007010 at Allegiant Bank " but upon diligent search, PNC has not located any documentation of this fact in the legacy records PNC inherited from Allegiant Bank.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 13

Fact 2.8    PNC acknowledges as a fact that "Allegiant Bank knew in 2001 that Martin Sigillito owed fiduciary duties to persons whose money was deposited into IOLTA account no. 0404007010 at Allegiant Bank (docket no. 52-8 at p. 33 of 76) with respect to their money deposited into that account" but upon diligent search, PNC has not located any documentation of this fact in the legacy records PNC inherited from Allegiant Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 14

Fact 2.9    PNC acknowledges as a fact that "Allegiant Bank had notice in 2001 that Martin Sigillito was a fiduciary to the persons whose money was deposited into IOLTA account no. 0404007010 at Allegiant Bank" but upon diligent search, PNC has not located any documentation of this fact in the legacy records PNC inherited from Allegiant Bank.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA no. 15

Fact 2.10   The name on the account for Sigillito's IOLTA 7010 was "Missouri Lawyer Trust Account Fund Trust Account of Martin T. Sigillito.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 216

Fact 2.11   In 2001, Missouri Supreme Court Rule 4-1.15(a) provided that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded."

. . . . . . .    https://web.archive.org/web/20041121210610/http://www.c ourts.mo.gov/courts/ClerkHandbooksP2RulesOnly.nsf/c0c6f fa99df4993f86256ba50057dcb8/bd028956e041105286256c a600521261?OpenDocument (last visited July 26, 2015)

Fact 2.12    In 2001, Missouri Supreme Court Rule 4-1.15(b) provided that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

. . . . . . .    https://web.archive.org/web/20041121210610/http://www.courts.mo.gov/courts/ClerkHandbooksP2RulesOnly.nsf/c0c6ffa99df4993f86256ba50057dcb8/bd028956e041105286256ca600521261?OpenDocument (last visited July 26, 2015).

Fact 2.13    In 2001, Missouri Supreme Court Rule 4-1.15(c) provided that "[w]hen in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the lawyer shall keep the property separate until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the lawyer shall keep the portion in dispute separate until the dispute is resolved."

. . . . . . .    https://web.archive.org/web/20041121210610/http://www.courts.mo.gov/courts/ClerkHandbooksP2RulesOnly.nsf/c0c6ffa99df4993f86256ba50057dcb8/bd028956e041105286256ca600521261?OpenDocument (last visited July 26, 2015).

Fact 2.14    In 2001, Comment to Missouri Supreme Court Rule 4-1.15 stated that "[a] lawyer should hold property of others with the care required of a professional fiduciary. Securities should be kept in a safe Depo. sit box, except when some other form of safekeeping is warranted by special circumstances. All property which is the property of clients or third persons should be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts. Separate trust accounts may be warranted when administering estate monies or acting in similar fiduciary capacities."

. . . . . . .    https://web.archive.org/web/20041121210610/http://www.courts.mo.gov/courts/ClerkHandbooksP2RulesOnly.nsf/c0c6ffa99df4993f86256ba50057dcb8/bd028956e041105286256ca600521261?OpenDocument (last visited July 26, 2015).

Fact 2.15    In 2001, it was the practice of Allegiant Bank to provide account statements to most individual customers.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 132

Fact 2.16    In 2001, Allegiant Bank's understanding of the nature and function of IOLTA accounts was that an IOLTA account is an interest on lawyer's trust account and that funds in an IOLTA account can be funds for an individual client, multiple clients, and could include funds that belong to the lawyer, themselves, and that essentially, IOLTA accounts were accounts which were used to facilitate the operation of a law practice.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 135

Fact 2.17    In 2001, Allegiant understood that funds in an IOLTA account, depending on the nature of the relationship between the attorney and the client, there may be fiduciary duties associated with those funds by and between the lawyer and the client, and there may be funds in an IOLTA account for which an attorney owes duties to his or her clients.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 136

Fact 2.18    In 2001, a bank like Allegiant Bank could ask someone like Sigillito, whose funds are in the account that Sigillito was using to pay a particular check.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 137

I

Fact 2.19    PNC cannot say what deposits were made into Sigillito's IOLTA account in September 2001
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 138

Fact 2.20    PNC cannot locate and does not have any account statements for IOLTA 7010 for 2001.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Resp. To 2nd RFA no. 24–59

Fact 2.21    In 2001, Allegiant's understanding of the nature and function of IOLTA 7010 was that it was an IOLTA account.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 138

Fact 2.22    In 2001, Allegiant understood that IOLTA 7010 could receive client funds.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 139

Fact 2.23  In 2001, Allegiant Bank understood that in an IOLTA account, the underlying attorney could potentially have fiduciary duties for funds that are in that account, and there could be circumstances where there were no fiduciary duties for the funds that were in that account.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 142

Fact 2.24  Linda Givens In 2001, Allegiant Bank understood that in an IOLTA account, the underlying attorney could potentially have fiduciary duties for funds that are in that account, and there could be circumstances where there were no fiduciary duties for the funds that were in that account.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 142

## 3.  WOMACK TRANSACTION FACTS

Fact 3.1  Documents produced by PNC and Bates stamped D-Aguilar.3226 to D.Aguilar.3559 are documents PNC located in the legacy records PNC inherited from Allegiant Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-Aguilar.3226 to D.Aguilar.3559

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA nos. 12–23

Fact 3.2  On or about September 26, 2001, Sigillito called Fitzgibbons and told her that a client was needing to take early withdrawal from an account at Allegiant Bank.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 214

Fact 3.3  On or about May 2, 2001, Allegiant transferred $56,715.19 to J. Scott Brown from the Betty Womack Self-Directed IRA for purchase of a loan in the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiffs Exhibits 212, 213

Fact 3.4  On or about September 28, 2001, Allegiant Bank received a check from Sigillito.

.. . . . . . . . . . Plaintiff's Depo. Exhibit 214, 215, 216, Finn Depo. at pg. 141

Fact 3.5  PNC, at pages 24-25 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

**Q.** Showing you a document that's been marked as Exhibit 216, Exhibit 216 is a copy of the front side of a check drawn on Missouri Lawyer Trust Account Fund, Trust Account of Martin T. Sigillito at Allegiant Bank, dated September 27, 2001. Correct?

**A.** Yeah, it looks like the front side of a check for $56,715.19 drawn on the account, trust account fund of Martin Sigillito Missouri Lawyer Trust Account Fund.

. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 24-25.

Fact 3.6 On the envelope from Helfrey Simon & Jones PC postmarked September 27, 2001, Fitzgibbons wrote "Rc'd 9/28 Talk to Herb" and the reference to "Herb" is a reference to Morisse.

. . . . . . . . . . Plaintiff's Depo. Exhibit 215, Fitzgibbons Depo. at pg 275-76

Fact 3.7 On or about October 4, 2001, Fitzgibbons called Matt Finn to let him know that a client, Betty Womack, was wanting to sell out of her loan agreement.

. . . . . . . . . Plaintiff's Depo. Exhibit 219, Fitzgibbons Depo. at pg. 307-309

Fact 3.8 Finn worked with Morisse at Allegiant and recalls that Morisse took note of the fact that the Check was from an IOLTA account and raised some question about it.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 182-83, 185

Fact 3.9 On Friday October 5, 2001 at 3 pm, Fitzgibbons called Mr. Womack to let him know that "we should have an answer on Tuesday" October 9, 2001, since the Bank would be closed on Monday, October 8, 2001.

. . . . . . . . . . . Fitzgibbons Depo. at pg. 313, Plaintiff's Depo. Exhibit 219

Fact 3.10 On or about October 9, 2001, proceeds of $56,715.19 from the liquidation of the Loan Agreement were received into the Betty Womack Self-Directed IRA.

. . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibits 216, 220, 224

Fact 3.11 Instead of submitting the Check for automatic processing, Allegiant held the Check from the time it was received on or about September 28, 2001 until Tuesday, October 9, 2001

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.12   PNC, at page 53 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

    **Q.**   Is it fair to say that Allegiant Bank cashed the check marked as Exhibit 216 in 2001?

    **A.**   I believe that it was applied to Ms. Womack and she received the funds.
. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 53.

Fact 3.13   PNC, at page 55-56 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

    **Q.**   So we can tell from the document marked as Exhibit 224 in the bank's records that October 9, the proceeds of the check that we had talked about in Exhibit 216 were applied to Betty Womack's account?

    **A.**   That would seem to be the case.

    **Q.**   And the amount was $56,715.19?

    **A.**   That's how it's identified on the document, yes.
. . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 55-56.

Fact 3.14   On or about October 19, 2001, Allegiant Bank sent the proceeds of $56,715.19 from the liquidation of the Loan Agreement to Betty Womack by wire transfer.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibits 220, 223

Fact 3.15   PNC, at page 54-55 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

    **Q.**   Let me show you a document that's been marked as Exhibit 220. Have you seen Exhibit 220 before?

    **A.**   I believe so, yes.

    **Q.**   PNC's records show that on October 19, 2001, the proceeds of $56,715.19 were given to Betty Womack.

    **A.**   This looks like a receipt and disbursement that indicates the sale coming in and then the funds going out to Ms. Womack.

    **Q.**   The funds going out to Ms. Womack were--went out on October 19, 2001, in the amount of fifty-six thousand dollars, seven hundred-- strike that. The amount shown going out to Ms. Womack was on October 19, 2001, in the amount of $56,715.19; correct?

    **A.**   That's what the document shows.

    **Q.**   And, that's PNC's position, as far as it knows?

**A.** I've no reason to believe that on 10/19 or thereabouts, Ms. Womack received proceeds in the amount of $56,715.19 as set forth on Exhibit 220.

. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 54-55.

Fact 3.16  PNC, at page 54-55 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

**Q.** In light of, maybe, a misunderstanding of my question earlier, let me just clarify for the record, is it correct that PNC has no reason to believe that on October 19, 2001, Betty Womack did not receive $56,715.19?

**A.** Yes. Based on the document, PNC has no reason to believe that she did not receive the $56,715.19 identified on 220.

. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 54-55.

Fact 3.17  The Check was part of a transaction in which Betty Womack sold her note to Sigillito and got paid off rather than a transaction in which her loan got paid back by Mark Gilbert Morse ("MGM"), Betty Womack simply sold her note or loan agreement to Sigillito.

. . . . . . Finn Depo. at pg. 157–58, 161–62; Plaintiff's Depo. Exhibit 216.

Fact 3.18  Finn testified at page 157 of his deposition as follows:

**Q** We have the check marked as Exhibit 1 to your deposition in the amount of $56,715.19; correct?

**A** Yes.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 157.

Fact 3.19  Finn at page 158 of his deposition testified as follows:

**Q** And the entry that converted the note to cash in Exhibit 220 was made possible, it's reasonable to conclude, by the check being cashed and the proceeds being applied that's shown in Exhibit 1?

**A** Yes, clearly. Yeah.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 158.

Fact 3.20  The transaction that Finn understood Sigillito and Womack were engaged in 2001was one where Sigillito wrote the Check and gave it to Allegiant

Trust Co. in order purchase Betty Womack's loan agreement, or investment in the BLP, from her.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. 161-62

. . . . . . . . . . . . . . . . . . . . Finn Affidavit at ¶ 10 (docket no. 67-5 at ¶ 10)

Fact 3.21    Finn at pages 161-62 of his deposition testified as follows:

**Q** What's shown here with the repayment of Betty Womack is the completion of the investment. She gave them money. Time passed. They gave her money back?

**A** No.

**Q** Why do you say no?

**A** That's not what happened. It's like buying a bond. When you buy a bond, you expect to get paid back. But in the intervening time until maturity, you may sell that bond to somebody else. That doesn't mean it got paid back. It means you sold it. So what this transaction represents is Betty Womack sold her note to Martin Sigillito and got paid off. It doesn't mean that the loan got paid back, and it doesn't have anything to do with MGM. It just means that she sold her note.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 161-62.

Fact 3.22    Finn at page 162 of his deposition testified as follows:

**Q** Okay. Why do you say he bought her note? What is it about the transaction that makes you conclude that he bought her note?

MR. GIORGIO: Object to the form of the question. It's been asked and answered repeatedly.

**A** Because he wrote a check. So he bought it.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 162.

Fact 3.23    Finn understood in 2001 that Sigillito, by purchasing Betty Womack's loan agreement, or investment in the BLP, would be able to receive the payment of principal and interest due under the loan agreement from MGM, and Finn assumed in 2001 that Sigillito as purchaser would be entitled to whatever interest was owed under the loan agreement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 166–67

Fact 3.24    Finn at pages 165-66 of his deposition testified as follows:

**Q** All right. And before I get to the next question in this series, let me just go back and ask you something about something you said. When Mr. Sigillito wrote the check marked as Exhibit 1 and gave it to the Allegiant Trust Company, are you saying that he gave it to the trust company in order to purchase Betty Womack's loan investment in the BLP?

MR. LUEPKE: I object. Calls for speculation. Lacks foundation.

MR. GIORGIO: I join.

**Q** Go ahead.

**A** Yes, that's my understanding.

**Q** Okay. I mean, that's the transaction that you understood was being engaged in at the time of all this going on in 2001; correct?

**A** Right.

**Q** So Mr. Sigillito was then going to be able to take that loan agreement and go to the borrower and say, Now you owe me the money?

**A** Correct.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pgs. 165-66.


Fact 3.25    The Check for $56,715.19 was meant to buy the loan agreement of Betty Womack.

.. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 48


Fact 3.26    PNC, at pages 26 and 27 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

**Q.**    Have you reviewed Mr. Finn's deposition testimony?

**A.**    I have.

**Q.**    Is Mr. Finn's testimony about the purpose of the check consistent in all respects with PNC's understanding of the purpose of the check shown in Exhibit 216?

**A.**    It is PNC's understanding that Mr. Sigillito purchased the note from Ms. Womack.

**Q.**    And when you say "note," do you--can you tell me what that means?

**A.**    The Mark-Morse-Gibson loan agreement with maturity date according to Plaintiff's Exhibit  214 of 1 5/4/02.

.. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 26-27.


Fact 3.27    PNC, at pages 47-48 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, was asked:

**Q.** Fair to say that Allegiant in 2001 didn't see any obligation on its part to determine, when it received the check shown in Exhibit 216, whether Mr. Sigillito was using funds from his IOLTA in a way that was improper, like we've been discussing?

**A.** Under the circumstances as I understand them surrounding this check, no.

**Q.** The circumstances surrounding this check meaning it was a check for %56,715.19 to buy the loan agreement of Betty Womack?

**A.** Correct.

**Q.** And we can agree that at that point in time when they cashed the check shown on Exhibit 216, Allegiant Bank did not know whether the money in the IOLTA being used to fund the check belonged to clients, belonged to Mr. Sigillito, or belonged to any--someone else; is that correct?

**A.** That's correct, yes.

.. . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 47-48.

**Fact 3.28** In 2001, Finn understood that Sigillito, by purchasing the Womack loan agreement, stood to benefit from any interest or financial gain that would be payable under the loan agreement.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 191.

**Fact 3.29** Finn at page 191 of his deposition testified as follows:

**Q** Okay. And going back to the loan agreement, the Womack loan agreement marked as Exhibit 24, do I understand correctly that by purchasing this Womack loan agreement, Mr. Sigillito stood to benefit from any interest or financial gain that would be payable under the loan agreement by purchasing it?

**A** Sure.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 191.

## 4. WOMACK LOAN AGREEMENT FACTS

**Fact 4.1** Plaintiff's Depo. Exhibit 260 is a copy of the loan agreement evidencing the loan purchased as an asset for the Betty Womack Self-Directed IRA ("Loan Agreement")

. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 162

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.2    The Loan Agreement is between Allegiant Bank – Custodian for the Self-Directed Individual Retirement Account of Betty L. Womack of 608 South Madison Street, Siloam Springs, Arkanas, 72761 U.S.A. c/o Martin T. Sigillito, Esq., of Helfrey Simon & Jones PC, 120 South Central Avenue, Suite 1500, St. Louis, Missouri 63105 USA and John Laurence Mark, John Bede Morse and John George Gibson together known as Mark Gilbert Morse of 53 Grey Street, Newcastle upon Tyne, NE1 6EE.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.3    Under the Loan Agreement, MGM agreed to repay the principal sum of $56,715.19 together with interest of $9,925.16

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 162

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.4    Sigillito was not a borrower under the Loan Agreement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.5    The terms of the Loan Agreement do not provide for payment of any fees to Sigillito, Brown, or any of their associates.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.6    Allegiant had a copy of the Loan Agreement in its files for Betty Womack.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg.  200.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 4.7    Allegiant had a copy of the loan agreements held in the accounts of Plaintiffs with Self-Directed IRA accounts at Allegiant and invested in the BLP in 2001.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg.  200

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 116

5.    **BETTY WOMACK CHECK FACTS**

Fact 5.1    Plaintiff's Depo. Exhibit 216 is a copy of the front side of check no. 561 that Fitzgibbons received from Sigillito on or about September 28, 2001 (the "Check")

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibits 215, 216

Fact 5.2   The Check is drawn on IOLTA 7010, dated September 27, 2001, and payable to Allegiant Trust Co. in the amount of $56,715.19.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 216

Fact 5.3   The word "Womack" is written on the memo line of the Check.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 216

Fact 5.4   Allegiant Bank cashed the Check in October 2001.
. . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 48, 53, 93
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 220, 224

Fact 5.5   Allegiant applied the proceeds of the check to Betty Womack's self-directed IRA account and she received the funds.. . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 53

Fact 5.6   In 2001, Allegiant Bank maintained Allegiant Trust Co. Clearing Account no. 404002138.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-Aguilar.1902

Fact 5.7   Allegiant Bank, through its trust department, received a check on or about September 28, 2001 from Martin Sigillito.
.. . . . . . D-Aguilar.3292, D-Aguilar.3295, D-Aguilar.3298, D-Aguilar.3356

Fact 5.8   Allegiant Bank, through its trust department, received check no. 561 on or about September 28, 2001 from Martin Sigillito drawn on account no. 404070010 at the Bank was the payee/drawee bank of the IOLTA check signed by Sigillito.
.. . . . . . . . . . . . . . . . D-Aguilar.3292, D-Aguilar.3298 and D-Aguilar.3356

Fact 5.9   The bank employees who made the decision to accept the check were all key employees with knowledge of all parts of the IOLTA transaction- that is, they knew the flow of funds from IRA accts to Brown, that Sigillito was a broker, promoter and advisor to IRA clients and to the BLP itself, and that Womack wanted to cash out her investment.
.. . . . . . D-Aguilar.3292, D-Aguilar.3295, D-Aguilar.3298, D-Aguilar.3356

Fact 5.10   Morisse would understand the Check to have been drawn on an IOLTA account.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo. at pg. 230-31

Fact 5.11   Allegiant Bank received the Check on or about September 28, 2001 and held it for more than ten days before cashing it.
. . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibits 215, 216, 220

Fact 5.12   Allegiant Bank did not post the Check until October 9, 2001 and did not forward the proceeds of the check to Betty Womack until October 19, 2001.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibits 220, 224

Fact 5.13   On October 9, 2001, proceeds of $56,715.19 were received into the Betty Womack self-directed IRA at Allegiant from the liquidation of the loan agreement with MGM.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 220

6.   **MEETINGS WITH MGM FACTS**

Fact 6.1   Finn met with John Mark ("Mark") and John Morse ("Morse") of MGM  in St. Louis in October 2001
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 101

Fact 6.2   During the meeting, Mark and Morse told Finn that Sigillito and his associates were receiving fees from the loan investments
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 101

Fact 6.3   Finn does not recall the specific number that Mark and Morse told him were the amount of the fees but he recalls that the amount was quite high.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 101

Fact 6.4   Finn cannot recall Mark or Morse mentioning a specific percentage for the fees.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 120

Fact 6.5   When Mark met with Finn in St. Louis, he told Finn that MGM had been asked to pay further arrangement fees of 32% on the loans.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Mark Decl. 52-10 at ¶ 24

Fact 6.6    Finn was surprised in 2001 to learn the fees were as high as they were
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 101

Fact 6.7    Finn learned from talking with Mark and Morse that MGM had not paid any
of the loans back.. . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo.at pg.122, 152

Fact 6.8    Finn at page 122 of his deposition testified as follows:
**Q**    Well, I'm not asking you to remember exactly what they said. But when
you came away from that meeting, did you have an understanding that
MGM had not paid any of the loans?
**A**    Yes.

Fact 6.9    Finn at page 152 of his deposition testified as follows:
**Q**    And by the time you learned that Martin Sigillito had written a check to
repay Betty Womack, you had a general understanding from
conversations with MGM that they had not paid any of the loans back?
MR. GIORGIO: Object to form. Lack of foundation. Misstates his testimony.
**A**    I'll agree to that.

Fact 6.10    Finn recalls the meeting in Clayton does not have a recollection of specific
quotes and who said what specifically at the meeting in Clayton on or about
October 5, 2001.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 120-121
. . . . . . . . . . . . . John Morse Declaration at ¶ 19 (docket no. 52-11 at ¶ 19).

7.    **UNIFORM FIDUCIARY LAW FACTS**

Fact 7.1    The source of the funds used to pay the Check was IOLTA 7010.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Salvatore Depo. at pg. 28

Fact 7.2    Allegiant Bank made no inquiry about the Check beyond determining to
whose account the Check should be credited, given that the Womack note or
loan agreement was purchased.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 36

Fact 7.3    Allegiant Bank in 2001 saw no obligation to inquire into the source of the funds for the Check.. . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 41-43

Fact 7.4    Allegiant in 2001 was aware that the source of the funds for the Check were funds in IOLTA 7010.. . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 50

Fact 7.5    When Allegiant Bank cashed the Check in 2001, the bank was aware that IOLTA 7010 was an account that could have held funds belonging to clients of Sigillito.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 139

Fact 7.6    In 2001, Allegiant Bank employees in the trust department, including Matthew Finn, were not generally familiar with IOLTA accounts.
. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 140

Fact 7.7    In October 2001, Allegiant Bank made no effort to inquire or determine to whom the funds in IOLTA 7010 belonged that were used to pay the Check.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Salavtore Depo at pg. 139–140

Fact 7.8    Documents comprising Plaintiff's Depo. Exhibit 252 are documents PNC located in the legacy records PNC inherited from Allegiant Bank.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 252
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Resp. to 2nd RFA nos. 12-23

Fact 7.9    The legacy records PNC inherited from Allegiant Bank and produced to Plaintiffs in this case include signed letters that appear to be signed by Richard Aguilar, Nina Blaylock, David Caldwell, Sharron Carr,  Douglas Givens, Linda Givens, Robert Givens, Donald Horner, Carl Lavender, Wanda Fay Lavender, Rudolf Ouwens, Lois Pearson, William Phillips, Carol Phillips, Margaret Price, Michael Sugg, Louis Vollmar, Betty Womack, and Carol Yarberry addressed to Markow that identify Sigillito as "my attorney."
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 252

Fact 7.10    The legacy records PNC inherited from Allegiant Bank and produced to Plaintiffs in this case include 20 signed letters that identify Sigillito as "my attorney.". . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 252

Fact 7.11    Plaintiffs produced to PNC in this case a copy of a loan statement for a home equity loan received by Doug and Linda Givens on or about October 3, 2001 ("Loan Statement").

.................................... Plaintiff's Depo. Exhibit 62

Fact 7.12    The Loan Statement is for the Givens' home equity account number 309757367 at Allegiant Bank.

.................................... Plaintiff's Depo. Exhibit 62

Fact 7.13    On or about September 27, 2001, $100,000 was transferred from home equity account number 309757367 to account number 0404007010.

.................................... Plaintiff's Depo. Exhibit 62

Fact 7.14    On or about September 27, 2001, $100,000 was transferred from home equity account number 309757367 to IOLTA 7010.

.................................... Plaintiff's Depo. Exhibit 62

Fact 7.15    Plaintiff Rudolf Ouwens ("Ouwens") invested $30,000 in the BLP on or about August 28, 2001 through his IRA at Allegiant.

.............................................. D-Aguilar.4419
....... *U.S. v. Sigillito*, No. 11-CR-168-LRR (ED. Mo. 2012) Government Trial Exh. No. 101 at pg. 4

Fact 7.16    Ouwens made a cash investment of $50,000 in the BLP on or about September 28, 2001 through the Ouwens Living Trust.

....... *U.S. v. Sigillito*, No. 11-CR-168-LRR (ED. Mo. 2012) Government Trial Exh. No. 101 at pg. 4

Fact 7.17    In 2001, Spencer Fane was engaged to represent Sigillito and Brown in connection with certain legal issues related to their British Real Estate – Backed Lending Program.

............... Tom Jerry Declaration at ¶ 4 (docket no. 123-1 at ¶ 4).

Fact 7.18    Tom Jerry ("Jerry") is a partner of Spencer Fane and he wrote the notes attached as Exhibit B to his Declaration ("Notes") sometime in October 2001.. ........ Tom Jerry Decl. at ¶¶ 3, 5 (docket no. 123-1 at ¶¶ 3, 5).

Fact 7.19    The information recorded on the first page of Jerry's Notes, to the best of his recollection, was provided to Jerry by one or more of Sigillito, Brown, Omri Preiss [sic] or Richard Wolkowitz.
. . . . . . . . . . . . . .    Tom Jerry Declaration at ¶ 6 (docket no. 123-1 at ¶ 6).

Fact 7.20    Omri Praiss and Richard Wolkowitz were lawyers at Husch Eppenburger in 2001 and were engaged by MGM to provide general business and litigation advice primarily in connection with the client's U.S. financing arrangements in connection with the British coal respiratory disease litigation.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Wolkowitz Depo. at pg. 34
. . . . . . . . . . . . . . . .    Praiss Depo. at pg. 64, Plaintiff's Depo. Exhibit 64

Fact 7.21    There are two notations on the first page of the Notes. The first notation states: "MGM total indebtedness is approx. 4 mill.; fee arrangement is funky – back end custodial fees."
. . . . . . . . . . . . . .    Tom Jerry Declaration at ¶ 6 (docket no. 123-1 at ¶ 6).

Fact 7.22    The second notation on the first page of the Notes states: "Loan to Betty Womack matured -- she wanted money; Scott and Marti came up with financing; two new IRAs at Allegiant; – check from Marti's Trust Account -- loan has not been marked pd."
. . . . . . . . . . . . . .    Tom Jerry Declaration at ¶ 6 (docket no. 123-1 at ¶ 6).

Fact 7.23    There are three separate notations on the second page of the Notes. The second notation states: "32%; 30-32% placement fees; 8% accountant, Hal Millsap, etc., whoever referred; 8% Sigillito; 8% Kevin; 8% Brown."
. . . . . . . . . . . . . .    Tom Jerry Declaration at ¶ 7 (docket no. 123-1 at ¶ 7).

## 8.    SIGILLITO INDICTMENT FACTS

Fact 8.1    In 2011, Sigillito and Brown were indicted in *United States v. Martin T. Sigillito, et al.*, No. 11-CR-00168-LRR (E.D. Mo.) wherein the Indictment (docket no. 2) charged Sigillito and Brown with 22 counts of fraud and other crimes for their participation in the British Lending Program ("Indictment").
. . . . .    *U.S. v. Sigillito*, No. 11-CR-168-LRR (ED. Mo. 2012) (docket no. 1)

Fact 8.2  Count I of the Indictment charging Sigillito and Brown with wire fraud alleged that between 2000 and 2010, U.S., .and a few U.K., investors lent the following approximate amounts through the BLP during the following years: $1.6 million in 2000 and $4.2 million in 2001.
. . . . . *U.S. v. Sigillito*, No. 11-CR-168-LRR (ED. Mo. 2012) (docket no. 1)

Fact 8.3  Count I of the Indictment charging Sigillito and Brown with wire fraud alleged that as part of the scheme and artifice to defraud, false, fraudulent and deceptive material representations were made to potential lenders and actual lenders including, but not limited to, the following: Some lenders were told that Sigillito and Brown and others earned fees for facilitating the loans, but Sigillito emphasized that fees, if any, were paid by the borrower and not out of lender funds. If lenders were advised of fees and if lenders inquired as to the amount of fees, Sigillito represented that fees were not greater than 8-10%. Other lenders were simply not advised that Sigillito and Brown received any fees on BLP loans, even when lenders questioned how Derek Smith could afford to pay such high interest rates and even though the amount and frequency of fees were material to Derek Smith's ability to meet his loan obligations. In truth, as defendant Sigillito well knew, the actual amount of the fees was usually 32% or higher, fees were taken out of loan proceeds by Sigillito and Brown and fees were charged at loan initiation, rollover and redemption, if any.
. . . . . *U.S. v. Sigillito*, No. 11-CR-168-LRR (ED. Mo. 2012) (docket no. 1)

## 9. FINN AFFIDAVIT FACTS

Fact 9.1  In reviewing the self-directed custodial IRA accounts connected with Mr. Sigillito Finn identified various "red flags" that caused him concern about the appropriateness of including these investments in a self-directed IRA.
. . . . . . . . . . . . . . . . . . . . . . . . . Finn Affidavit at ¶ 8 (docket no. 67-5 ¶ 8).

Fact 9.2  In particular, Finn and Allegiant Bank identified as "red flags" the fact that:
- The investment in the "British Lending Program" appeared to be some type of foreign investment, not registered in the United States;
- The investment was not secured by any type of collateral:
- The investment had not been sold through a registered broker;

- There was no way to value the investment other than by way of its stated face value;
- The rate of interest and the fees being charged on the investment were extraordinarily high, which meant that the investment would have to perform extremely well in order to pay the high fees being charged and still generate the very high interest rates promised to the lenders *(i.e.* the individual IRA beneficiaries); and
- The investment was not easily marketable or convertible.

. . . . . . . . . . . . . . . . . . . . . . . . . Finn Affidavit at ¶ 9 (docket no. 67-5 ¶ 9).

Fact 9.3    As evidence or the lack of marketability of this investment, it appeared that, when one of the individual IRA account holders decided to have this investment removed from her portfolio, *i.e.* a woman by the name of Betty Womack, Mr. Sigillito himself had to use his own funds from another account at the Bank to purchase this investment from Ms. Womack.

. . . . . . . . . . . . . . . . . . . . . . . Finn Affidavit at ¶ 10 (docket no. 67-5 ¶ 10).

Fact 9.4    Finn at pages 141–42 of his deposition testified as follows:

**Q**    When you use the phrase "his own funds," what do you mean by that in your affidavit here?

**A**    Well, he wrote a check. So, I mean, I just want to be clear. I don't know whose funds they were. It was a check from Martin Sigillito's account to Betty Womack's account is what I know.

**Q**    In 2001 when you became aware that Martin Sigillito had written a check to repay Betty Womack, did you know whether those monies belonged to Martin Sigillito or to somebody else?

**A**    I didn't know that. I don't know who they belonged to.

**Q**    You didn't know that one way or the other in 2001, and you don't know that one way or the other as you sit here today; is that correct?

**A**    That's correct.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Deposition at pg. 141-42.

Fact 9.5    Finn is not aware of any Allegiant Bank employee conducting any investigation into the British Lending Program or into Martin Sigillito's conduct or relationship with Allegiant Bank, and any suggestion to the contrary is false.

.. . . . . . . . . . . . . . . . . . . . . . . . . . Finn Affidavit at ¶ 18 (docket no. 67-5)

10. **ALLEGIANT BANK INVESTIGATION FACTS**

Fact 10.1    PNC, at pages 74-75 of the deposition of Corrado Salvatore, its Rule 30b-6
representative, testified as follows:

**Q.**    Look at Exhibit 250, which is the affidavit, please. Turning your
attention to paragraph 18, do you see where Mr. Finn, in his affidavit,
states, quote, "I also am not aware of any Allegiant Bank employee
conducting any investigation into the British Lending Program or into
Martin Sigillito's conduct or relationship with Allegiant Bank, and any
suggestion to the contrary is false," end quote. Do you see that?

**A.**    I see that, yes.

**Q.**    Does PNC have any knowledge or awareness that any Allegiant Bank
employee conducted any investigation into the British Lending Program?

**A.**    I have not seen that, no, other than, obviously, what Mr. Finn testified to
both in these--in his affidavit and in his deposition, and I wouldn't
characterize that as an investigation, but I'm unaware of anything else at
this time.

**Q.**    Is PNC aware of any Allegiant Bank employee conducting any
investigation into Martin Sigillito's conduct or relationship with
Allegiant Bank in 2001?

**A.**    I'm unaware of any beyond what we've been discussing.
. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 74-75

Fact 10.2    Markow has no recollection of something blowing up or requiring an
investigation related to Sigillito
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo at pg. 150

Fact 10.3    Markow denies knowledge of Allegiant Bank ever becoming suspicious of
activity in Sigillito's accounts at the bank
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo at pg. 162

Fact 10.4    Markow has no recollection of any misgivings or suspicions about Sigillito.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Markow Depo at pg. 156

Fact 10.5    Weiss has no recollection of ever seeing any activity in Sigillito's accounts
that he thought should be investigated
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Weiss Depo at pg. 232

Fact 10.6   Morisse does not recall ever making any inquiry into the activity of Sigillito's accounts at Allegiant Bank in 2001

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo at pg. 234

Fact 10.7   Morisse does not recall anyone at Allegiant ever making any inquiry into the activity of Sigillito's accounts at Allegiant in 2001.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo at pg. 234

Fact 10.8   Morisse is not aware from his time at Allegiant Bank in 2001 of any inquiry or investigation by the bank into the source of funds used to pay the Check.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo at pg. 231

Fact 10.9   Morisse did not make any inquiry or investigation into the source of the funds used to pay the Check

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo at pg. 231-32

Fact 10.10  There is nothing about the Check to indicate to Morisse that Allegiant Bank in 2001 should have made an inquiry or investigation into the source of funds for the Check.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Morisse Depo. at pg. 239-40

Fact 10.11  Finn did not trace or try to determine the source of the funds used to purchase Betty Womack's loan investment in the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 35

Fact 10.12  Finn does not recall anyone at Allegiant Trust doing any sort of forensic or other analysis to determine the source of the funds used to purchase Betty Womack's loan investment in the BLP

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 36

Fact 10.13  In 2001, Finn did not think there was any basis to investigate the source of the funds used to make the payment to Betty Womack.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 175

Fact 10.14  In 2001, Finn was not aware of any regulatory requirements that the trust company at Allegiant Bank look into the source of funds used to make the payment to Betty Womack.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 175

Fact 10.15   Information about the source of the funds used to pay the Check was on the commercial bank side of Allegiant Bank and not on the trust department side of the bank.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 189

Fact 10.16   Finn would have had to call somebody on the commercial bank side of Allegiant Bank and provide a reason why the trust company wanted to run in inquiry as to the source of funds used to make the payment to Betty Womack.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo. at pg. 186-187

Fact 10.17   In October 2001, Allegiant Bank had access to prior account activity in 2001 for IOLTA 7010.
. . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 113, 115, 117-19, 121-24

Fact 10.18   In October 2001, if the trust department at Allegiant had made proper request, it was possible for the trust department to review prior account activity in 2001 for IOLTA 7010.
. . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 115, 118, 119, 120, 125

Fact 10.19   In 2001, appropriate retail bank personnel at Allegiant Bank would generally had access to bank records of its customers, including Sigillito.
. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 133

Fact 10.20   In 2001, upon proper request, trust personnel at Allegiant Bank could have had access to account activity and copies of checks that passed through or out of Sigillito's IOLTA 7010 during that year.
. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 133

Fact 10.21   In 2001, it was customary or frequent for Allegiant Bank to provide, with account statements to customers who elected to receive check images, images or copies of checks that either passed through or went out of the account during the reported period.
. . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 133-34

Fact 10.22  Jan Alonzo has no recollection of Allegiant's inquiry into Sigillito's accounts in the Fall of 2001 and if she had received any information, it likely would have come in a privileged context
...................................... Alonzo Depo at pg. 70

Fact 10.23  Jan Alonzo has no recollection of any knowledge of facts regarding Allegiant Bank's inquiry into Sigillito's accounts in the Fall of 2001.
...................................... Alonzo Depo. at pg. 70

Fact 10.24  Jan Alonzo does not have any recollection of any facts regarding Allegiant Bank's inquiry into the Check in the Fall of 2001.
...................................... Alonzo Depo. at pg. 72

Fact 10.25  Jan Alonzo. from her work on the custodial account question in 2001, does not remember whether there was any investigation into account activity of Sigillito at Allegiant Bank.
.. ................................... Alonzo Depo. at pg. 54–55

Fact 10.26  Jan Alonzo had no knowledge or recollection of any investigation involving matters related to Sigillito and Self-Directed IRA accounts at Allegiant Bank holding loan agreements and if she would have any such information about that, it is likely that it would have been privileged.
................................... Alonzo Depo. at pg. 110-11

Fact 10.27  Jan Alonzo has no knowledge or recollection of any investigation in connection with the custodial account question and if she did, it would come from Allegiant Bank, her client at the time in 2001.
...................................... Alonzo Depo. at pg. 111

Fact 10.28  Jan Alonzo has no recollection of any investigation of a check, of the loan agreements, of the IRA accounts, or anything to do with the custodial account question issues discussed in her Deposition and any information she might have received about it is likely to have been privileged.
............................. Alonzo Depo. at pg. 112-13, 117-18

Fact 10.29  Jan Alonzo does not have any knowledge or recollection of any investigation that is non-privileged that she can share that occurred in 2001

or 2002 in connection with the custodial account question work that she was doing.

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Alonzo Depo. at pg. 121

Fact 10.30 PNC's review of documents available has not indicated that there was a policy or procedure at Allegiant in 2001 concerning any need for an inquiry when receiving a check drawn on an IOLTA account payable to the bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 32

Fact 10.31 PNC has not seen any written policies or procedures at Allegiant Bank in 2001 whereby Allegiant would make any inquiry into checks received from an IOLTA account made payable to the bank.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 33-34

Fact 10.32 PNC is unaware that there was an inquiry associated with the Check beyond the assumption that Allegiant Bank was able to determine to whom to credit the Check, given that the Womack note was bought.

. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 36

Fact 10.33 PNC is unaware of any inquiry by Allegiant Bank concerning whether the funds in IOLTA 7010 were client funds or funds that belonged to Sigillito or funds of some other type.

.. . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 40-41

Fact 10.34 PNC is unaware of Allegiant Bank making any inquiry in 2001 whether the funds in IOLTA 7010 belonged to Sigillito or Sigillito's clients after the bank received the Check.

.. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 44

Fact 10.35 In 2001, Allegiant understood that Sigillito could commingle his funds with funds belonging to multiple clients in IOLTA 7010.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 42-43

Fact 10.36 PNC has not seen any documents concerning a training program relating to trust department employees receiving training concerning IOLTA accounts and has no knowledge whether one existed in 2001.

. . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 44–45

Fact 10.37 PNC is not aware of any investigation by Allegiant Bank into Sigillito's IOLTA 7010 in October 2001 beyond making a determination of how to apply the Check.

. . . . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 61

Fact 10.38 PNC is not aware of any Allegiant Bank investigation into Sigillito's accounts at the bank in 2001 other than what Finn testified to, but PNC would not even characterize as an investigation.

. . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 61–62

Fact 10.39 PNC believes that IOLTA accounts, as a function, commingle attorney and client funds all the time.

.. . . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 139

Fact 10.40 PNC is unaware of any evidence that at the time this check was received, beyond determining how to apply these funds, that anybody at Allegiant made a determination that the $56,715.19 was, quote, "Sigillito's money," somebody else's money, or one of his clients' money.

. . . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pg. 139-40
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 216

## 11. ALLEGIANT BANK TRAINING FACTS

Fact 11.1 Fitzgibbons did not receive any type of training in the trust department at Allegiant Bank that she recalls... . . . . . . Fitzgibbons Depo at pg. 102-03

Fact 11.2 Morisse did not receive any training at Allegiant Bank in how to handle or treat IOLTA or lawyer trust accounts... . . . . . . . Morisse Depo. at pg. 233

Fact 11.3 When Finn came to Allegiant, he had never heard of the Uniform Fiduciaries Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Finn Depo at pg. 91

Fact 11.4 In 2001, while he was at Allegiant, Morisse was not familiar with the Uniform Fiduciaries Law.. . . . . . . . . . . . . . . . Morisse Depo. at pg. 232

Fact 11.5 PNC, at pages 31-32 of the deposition of Corrado Salvatore, its Rule 30b-6 representative, testified as follows:

**Q.** In 2001, what was Allegiant's policy or procedure for handling checks drawn on an IOLTA account made payable to Allegiant?

**A.** Allegiant would have had to make a determination as to where this account--or where this check would have been credited to. I don't know what policy existed to say where the check says "Pay to the order of Allegiant Trust Company," what policy existed to make that determination, but PNC's position that its employees would have made a determination as to what this check was for, and when they did, they applied it to the Womack account.

**Q.** When you say Allegiant needed to make a determination of where this check was to be credited to, you mean where the money was to be applied within Allegiant and to whose credit?

**A.** Right, in connection, as we know now, for the purchase of Ms. Womack's note.
. . . . . . . . . . . . . . . . . . . . . . PNC 30(b)(6) Salvatore Depo. at pgs. 31-32.

## 12. STANLEY CWIAKALA LOAN FACTS

Fact 12.1   Davies met Sigillito at his offices at Helfrey Simon & Jones.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Davies Depo. at pg. 27

Fact 12.2   Davies met with Sigillito after Shaun Hayes had given him Sigillito's information and said that Sigillito had clients that he wanted to find a bank to whom he could refer them. . . . . . . . . . . . . . . . . Davies Depo. at pg. 28

Fact 12.3   Davies learned from meeting with Sigillito that he and a couple of other guys, including Scott Brown, had a British loan fund that they were either setting up or running, and that they were looking for a bank to be able to refer individuals to to borrow on personal assets or whatever and invest in their fund.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Davies Depo. at pg. 29

Fact 12.4   Davies understood that Sigillito and Brown were business associates.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Davies Depo. at pg. 29–30

Fact 12.5   Davies gained an understanding that Sigillito's clients who were going to be coming to Allegiant were going to use the money, if they got a loan, to invest the money with Sigillito

.. . . . . . . . . . . . . . . . . . . . . . . . . . . . Davies Depo. at pg. 31, 33–34, 39

Fact 12.6    Brian Davies recalls that Allegiant considered lending money to Cwiakala for investment in the British loan fund... . . . . . . . . Davies Depo. at pg. 56

Fact 12.7    Allegaint extended a loan to Cwiakala... . . . . Davies Depo. at pg. 61–62

Fact 12.8    In June 2001, $107,828.20 was advanced from the loan Allegiant made to Cwiakala to IOLTA 7010.
. . . . . . . . . . . . Davies Depo. at pg. 78, Plaintiff's Depo. Exhibits 44, 173

## 13. ADDITIONAL FACTS

Fact 13.1    The following IRA account holders at Allegiant in 2001 held loans in the BLP made to Derek Smith or Princess Hotels: Lewis Vollmar, David Caldwell, Carol Phillips, William Phillips, Doug Givens, Linda Givens, Patricia Ambrose, Carol Yarberry, and Richard Aguilar,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 116

Fact 13.2    When the IRA accounts were transferred to Millennium Trust Company, Allegiant Bank assigned all of its right, title and interest in and to the loan agreements it held as IRA custodian for Iris Pearson, Lewis Vollmar, Michael Sugg, Carl Lavender, David Caldwell, Carol Phillips, William Phillips, Doug Givens, Linda Givens, Donald Horner, Patricia Ambrose, Rudolf Ouwens, Margaret Price, Wanda Lavender, Nina Blaylock, Carol Yarberry, and Richard Aguilar. . . . . . . . . . Plaintiff's Depo. Exhibit 116

Fact 13.3    The Loan Agreement that Allegiant Bank held as custodian of Betty Womack's IRA does not disclose or provide for payment of any placement or broker fees at source or from the amount being loaned under the Loan Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 13.4    The Loan Agreement Allegiant held as custodian of Betty Womack's IRA is similar to the loan agreements Allegiant Bank held as IRA custodian for Iris Pearson, Lewis Vollmar, Michael Sugg, Carl Lavender, David Caldwell, Carol Phillips, William Phillips, Doug Givens, Linda Givens, Donald Horner, Patricia Ambrose, Rudolf Ouwens, Margaret Price, Wanda

Lavender, Nina Blaylock, Carol Yarberry, and Richard Aguilar in that, like the Loan Agreement held in Betty Womack's IRA, none of those loan agreements held by Allegiant as custodian for these other IRA account holders disclose or provide for payment of any placement or broker fees at source or from the amount being loaned under the Loan Agreement

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Depo. Exhibit 260

Fact 13.5     Morse recalls that when he and Mark met with Finn in St. Louis on or about October 4, 2001, they gave Finn a full summary of all matters to date including terms relating to the fees deducted at source, of which Morse recalls Finn appeared unaware.

. . . . . . . . . . . . . . . . . . . . . . Morse Declaration (docket no. 52-11 at ¶ 18)

Fact 13.6     Mark recalls that when he and Morse met with Finn in St. Louis on or about October 4, 2001, Mark informed Finn that there were arrangement fees of 32%. Mark recalls that Finn was astonished to hear that and that it was abundantly clear to Mark that Finn had no idea that 32% had been taken in commission. . . . . . . . . . . . . Mark Declaration (docket no. 52-10 at ¶ 24)

Respectfully submitted,                     Respectfully submitted,


JONATHAN F. ANDRES P.C.                     LAW OFFICES OF SEBASTIAN RUCCI

/s/ *Jonathan Andres*                       /s/ *Sebastian Rucci*
Jonathan F. Andres (E.D. Mo. 39531MO)       Sebastian Rucci (E.D. Mo. 178114CA)
7733 Forsyth Boulevard, Suite 700           16400 Pacific Coast Hwy, Suite 212
St. Louis, MO 63105                         Huntington Beach, CA 92649
Tel: (314) 862-6800                         Tel: (330) 720-0398
Fax: (314) 862-1606                         Fax: (330) 954-0033
Email: andres@andreslawpc.com               Email: SebRucci@gmail.com
Attorneys for Plaintiffs                    Attorneys for Plaintiffs


**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2015 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's electronic filing system and parties may access this filing through the Court's Case management/Electronic Case Files (CM/ECF) found on the internet at https://ecf.moed.uscourts.gov.

/s/ *Sebastian Rucci*
Sebastian Rucci (E.D. Mo. 178114CA)