# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 15-3514

———————————————

Richard Aguilar; Melba Aguilar; Albert Carrell; Sharon Cobb; Clayton Givens; Linda Givens; Stanley Kuhlo; Gina Mastrantonia; Phil Rosemann; Loren Winterhof; Mary Winterhof; Lewis Vollmar; Brian Waffle; William Wantling; Brad Werner, in a representative capacity; Eric Wittenmeyer; Jill Wittenmeyer; Dorothy Zeigler; Clark Amos; Preston Amos; Thomas Barnes; Henry Barthel; Julia Barthel; Northwest Properties (1973), LTD; Tom Bertani; Donna Bertani; Kristy Bova; David Caldwell; Bonita Cobb; Casey Cook; Delores Cook; Jerry Cronkite; Mark Cunningham; Daryll Currier; Roy Currier; Sam Currier; Thomas Currier; Charles Davis; Charlotte Garrett; William Gaylor; Robert Givens; Suzanne Glisson; Carol Green; Randall Harp; Aubrey Harp; Billy Harrison; Odis Hash; Donna Hogshooter; John Holland; Audrey Holland; Donald Horner; Doris Howard; Barbara Jordan; Gifford Jordan; David Kellogg; Mary Kellogg; Stanko Matayo; Daren Mays; Sheila Mays; William McCalla; Carol McCarthy, in representative capacity; Barbara O'Hanlon, in representative capacity; William McLemore; Mark Merlotti; Cindy Merlotti; Marie Merlotti; Lorena Messenger; Ben Miller; Bob Moore; Jim Neill; Mary O'Sullivan, individually and in a representative capacity; Rudolf Ouwens; Ronald Pastor; William Phillips; Carol Phillips; Buddy Quessenberry; Elaine Reed; Darren Rogers; Debbie Rogers; Betty Rollon; Leonard Roman; David Schultz; John Shahan; Arlene Sincoski; Homer Smith; Dorothy Smith; Gary Smith; Judith Smith; Kent Sturhahn; Arlene Stevens; Winston Vines; Barbara Vollmar

*Plaintiffs - Appellants*

v.

PNC Bank, N.A.

*Defendant - Appellee*

———————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

———————

Submitted: September 21, 2016
Filed: February 7, 2017

_____

Before RILEY, Chief Judge, MURPHY and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Ninety-two plaintiffs[1] filed suit against PNC Bank, N.A. (PNC), alleging, among other things, (1) violations of Missouri's Uniform Fiduciaries Law (UFL); (2) aiding and abetting the breach of fiduciary duties; (3) conspiracy to breach fiduciary duties; and (4) conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). These claims arise from the plaintiffs' investment in the British Lending Program (BLP)—a Ponzi scheme operated by Martin Sigillito. The plaintiffs allege that PNC's predecessor, Allegiant Bank ("Allegiant"), conspired with and aided Sigillito in his scheme to defraud investors when it served as the custodian for the self-directed individual retirement accounts (IRAs) of those who chose to invest in the BLP at its inception. The district court[2] granted summary judgment to PNC, and the plaintiffs appeal. We affirm.

I. *Background*
A. *Martin Sigillito and the BLP*

In the late 1990s, Sigillito, an attorney located in St. Louis, Missouri, and J. Scott Brown, an attorney in Kansas, formed the BLP. They organized the BLP as an investment program to facilitate loans to an English law firm, Mark Gilbert Morse

_____

[1]The amended complaint is brought by 91 individuals who are citizens of various states and one company, Northwest Properties (1973) Ltd. The plaintiffs are not a certified class. One plaintiff, Mary O'Sullivan, brings her claims in her individual capacity and in her representative capacity. Plaintiffs Carol McCarthy, Barbara O'Hanlon, and Brad Werner bring their claims solely in their representative capacities.

[2]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

(MGM), to fund "black lung" claims brought on behalf of English coal miners. In approximately 2000 or 2001, the BLP began marketing loans for purported investments in real estate developments in England.

Sigillito solicited American investors for the BLP and often instructed them to hold the loan notes in self-directed IRAs. He directed them to fund the investments by depositing money into his Interest on Lawyers Trust Account (IOLTA). According to the unsworn declaration of John Morse, an MGM partner, MGM "agreed . . . for each £100 [that MGM] borrowed[,] one third (32%) would be deducted at source representing [Sigillito's and Brown's] commission." MGM agreed to "pay interest of 25% on the full £100 of the loan." Although Morse considered "the fees and interest . . . a huge amount," he found the deal agreeable because MGM "needed the money[,] and the rewards [MGM] stood to reap in the UK would outweigh the costs."

## B. *Allegiant's Role*

Beginning in July of 2000, Allegiant, a Missouri trust company with banking powers, served as the custodian for the self-directed IRAs of those who chose to invest in the BLP.[3] Allegiant was the first bank to serve as the IRA custodian for BLP loans; the majority of those loans went to fund MGM loans. "Nine of the Plaintiffs, Richard Aguilar, David Caldwell, Donald Horner, Rudolf Ouwens, William Phillips, Carol Phillips, Leonard Roman, Lewis Vollmar and Linda Givens, were customers of Allegiant Bank and held self-directed individual retirement accounts ('IRAs') at Allegiant Bank ('Customer Plaintiffs')."[4]

Although Allegiant acted as the custodian for these accounts, the Customer Plaintiffs were "solely responsible for deciding how to invest the money in these IRAs, and . . . [the Customer] Plaintiffs made all investment decisions in these IRAs

---

[3]In 2004, Allegiant was acquired by National City Bank, which, in turn, was acquired by PNC in 2008.

[4]The remainder of the plaintiffs "were not customers of PNC Bank or its predecessors ('Non-Customer Plaintiffs')."

maintained at Allegiant Bank's trust department." Each Customer Plaintiff signed an IRA Simplifier, which provided, in relevant part:

> 8.03 *Representations and Responsibilities*: You represent and warrant to us that any information you have given or will give us with respect to this Agreement is complete and accurate. Further, you agree that any directions you give us, or action you take will be proper under this Agreement and that we are entitled to rely upon any such information or directions. *We shall not be responsible for losses of any kind that may result from your directions to us or your actions or failures to act and you agree to reimburse us for any loss we may incur as a result of such directions, actions or failures to act.*
>
> ***
>
> 8.05 *Investment of Amounts in the IRA*:
>
> > a.   Direction of Investment—You have exclusive responsibility for and control over the investment of the assets of your IRA. You shall direct all investment transactions, including earnings and the proceeds from securities sales. Your selection of investments, however, shall be limited to publicly traded securities, mutual funds, money market instruments and other investments that are obtainable by us and that we are capable of holding in the ordinary course of our business.
> >
> > ***
> >
> > b.   Our Investment Powers and Duties—We shall have no discretion to direct any investment in your IRA. We assume no responsibility for rendering investment advice with respect to your IRA, nor will we offer any opinion or judgment to you on matters concerning the value or suitability of any investment or proposed investment for your IRA. We shall exercise the voting rights and other shareholder

-4-

rights with respect to securities in your IRA but only in accordance with the instructions you give to us.

c.      Delegation of Investment Responsibility—We may, but are not required to, permit you to delegate your investment responsibility for your IRA to another party acceptable to us by giving written notice of your delegation in a format we prescribe. We shall follow the direction of any such party who is properly appointed and we shall be under no duty to review or question, nor shall we be responsible for, any of that party's directions, actions or failures to act.

(Emphasis added in part.) (Bold omitted.)

After deciding to invest in the BLP, each Customer Plaintiff opened a self-directed IRA at Allegiant at Sigillito's direction (or at the direction of one of his associates). "Each of the Allegiant Customer Plaintiffs designated Martin Sigillito as his or her authorized representative in connection with their self-directed IRA account at Allegiant Bank" and "directed Allegiant Bank to accept direction from Sigillito on [their] behalf." Allegiant's trust department maintained the self-directed IRAs. Allegiant employees in the trust department knew that Sigillito represented the Customer Plaintiffs and had authority to act on their behalf.

During 2000 and 2001, Sigillito held an IOLTA and other retail banking accounts at Allegiant. "Sigillito's IOLTA was a demand deposit account maintained on the retail banking side of Allegiant with his other business accounts." "Sigillito owed fiduciary duties to persons whose money was deposited into [his] IOLTA . . . ." The funds held in a Missouri IOLTA account may contain a variety of funds, including individual client funds, multiple client funds, and attorney's fees.[5] In the

_____

[5]In 2001, Missouri Supreme Court Rule 4–1.15 stated, in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate

-5-

from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the lawyer shall keep the property separate until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the lawyer shall keep the portion in dispute separate until the dispute is resolved.

(d) Except as provided in paragraph (e), a lawyer or law firm shall establish and maintain one or more interest-bearing insured depository accounts into which shall be deposited all funds of clients or third persons that are nominal in amount or are expected to be held for a short period of time . . . .

In 2001, the commentary to Rule 4–1.15 explained that

[l]awyers often receive funds from third parties from which the lawyer's fee will be paid. If there is risk that the client may divert the funds without paying the fee, *the lawyer is not required to remit the portion from which the fee is to be paid*. However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention. *The disputed portion of the funds should be kept in trust* and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds shall be promptly distributed.

-6-

present case, it is undisputed that

> [i]n 2001, *Allegiant Bank's understanding* of the nature and function of IOLTA accounts was that an IOLTA account is an interest on lawyer's trust account and that funds in an IOLTA account can be funds for an individual client, multiple clients, *and could include funds that belong to the lawyer*, themselves, and that essentially, IOLTA accounts were accounts which were used to facilitate the operation of a law practice.

(Emphases added.)

Allegiant's retail and trust departments operated separately and used separate computer systems. Employees in the trust department lacked routine access to bank accounts in the retail department, including IOLTAs. Allegiant had no system to compare transactions between the two departments. But, upon proper request, employees in the trust department could review retail banking activities.

### 1. *The Womack Transaction*

On September 26, 2001, Sigillito informed Allegiant that his client, Betty Womack, wanted to liquidate her self-directed IRA. The only asset in Womack's IRA was an unmatured BLP loan note[6] with a face value of $56,715.19. Womack had previously designated Sigillito as her authorized representative to conduct transactions on her account. On September 28, 2001, Allegiant's trust department received a check from Sigillito drawn on his IOLTA and dated September 27, 2001.[7] The check was in the amount of $56,715.19. It included the notation "Womack" in the memo line. Allegiant's trust department understood from Sigillito's prior

---

(Emphases added.)

[6]Specifically, the note was an MGM loan note. MGM loans were the loans made to fund "black lung" litigation in England.

[7]The envelope that the check was delivered in had a handwritten note stating that Robin Fitzgibbons, an Allegiant trust officer, received the check on September 28, 2001.

communication that this check was for the purchase of Womack's unmatured BLP loan note. The record does not reflect the source of the IOLTA funds that Sigillito used to fund the purchase. On October 9, 2001, Allegiant's trust department credited Womack's IRA with $56,715.19. On October 19, 2001, Allegiant's trust department disbursed the same amount by wire transfer to Womack at her request.

## 2. *Allegiant's Resignation as Custodian*

In September 2001, Allegiant was in the process of acquiring Southside Bank ("Southside"). Matthew Finn, Southside's head of trust operations, began attending Allegiant trust committee meetings during this time. On September 28, 2001, Southside merged with Allegiant, and Finn became Allegiant's chief investment officer.

In Finn's unsworn declaration, much of which he has since recanted,[8] he states that he "attended a meeting in early October 2001 where Martin Sigillito explained the particulars of the investments he was promoting called the [BLP]." After hearing Sigillito's presentation, Finn concluded "[f]rom [his] prior experience running a trust department, the high interest rates, lending to a foreign law firm, and investment in foreign real estate development were red flags."

Shortly after the meeting with Sigillito, Finn contacted MGM and set up a meeting with MGM partners John Mark and John Morse. At that meeting on approximately October 4, 2001, Mark and Morse "described how they borrowed money from the States to fund litigation having something to do with coal miners and

---

[8]In a subsequent deposition, Finn recanted large portions of his declaration. Finn also submitted a sworn affidavit that rejects the plaintiffs' interpretation of his declaration. Before the district court, PNC urged the court to disregard Finn's unsworn declaration because of the circumstances under which the plaintiffs obtained it. The court, however, "consider[ed] the declaration in determining whether a genuine issue of material fact exists with respect to PNC Bank's manifestation of an agreement to participate." We, like the district court, will consider Finn's unsworn declaration and afford the plaintiffs the benefit of it.

-8-

the British government. They stated that their claims were going well but said they were not in a position to repay the loans at that time."[9] They also told Finn "that 32% of the loans were taken as fees and that this was paid to Mr. Sigillito and his associates directly from the loan funds." Finn thought "that fees of 32% of the loan amount seemed outrageous." Having reviewed the loan agreements, Finn "knew that up-front fees were not disclosed in the loan agreements." Finn considered the information about the fees to be "another red flag in a series of red flags." Morse recalls Finn stating "that he was concerned about various aspects which had come to his attention about the loans, [the] fact that they were loans out of the jurisdiction, the high interest rates, and he also questioned [MGM's] ability to repay the loans." According to Morse, Finn "indicated that he thought the loans did not comply with regulatory requirements." At the meeting's conclusion, Mark and Morse agreed to an "urgent meeting" at Allegiant's headquarters.

The next day, October 5, 2001, the MGM partners met with Richard Markow, president of Allegiant's trust department, Finn, and Sigillito to "discuss[] the bank's concerns about these investments." During that meeting, a "gentleman from Arthur Anderson was concerned about compliance[,] and [Morse] recall[ed] a mention of regulatory authorities having to be informed." At the meeting's conclusion, Morse found it "clear . . . that Allegiant Bank would not be lending [MGM] any further money" and that Allegiant "would not support anything going further in respect of the current loans. There was concern expressed about the legality of the loans in general as they appeared to be loans of Trust monies out of the jurisdiction and breaching the mandatory limit of a one[-]year term." Morse noted that Sigillito disagreed with this assessment. According to Morse, Allegiant explained "that the Bank could not be involved in loans that could be in breach of various laws or regulations."

---

[9]Ultimately, MGM *did* repay all amounts borrowed from the Customer Plaintiffs, along with the interest and fees. But, at the time of the October 4, 2001 meeting, MGM had not yet repaid the loans.

-9-

"Following the meeting, [Allegiant] looked into Martin Sigillito's accounts at Allegiant Bank and discovered checks deposited into the accounts showing payment of up-front fees with names on the IRAs at the bank." According to Finn, "the activity in Martin Sigillito's accounts showed that he used investor money deposited into his [IOLTA] to pay interest and principal on some of the loans."

Finn found the Womack transaction "suspicious" because of the "means by which the Womack loan was repaid."[10] Finn "knew that the borrowers had not paid [Womack] back because the lawyers from England told [him] that they had not repaid any of the loans." Sigillito's use of investor money from Sigillito's account "to pay other investors confirmed [Finn's] suspicions that [Allegiant] did not want to custody these loans."

Finn recommended to Arthur Weiss, Allegiant's Executive Vice President, that Allegiant no longer act as a custodian for self-directed IRAs containing BLP investments. According to Finn, they were "inappropriate investments to be held in an IRA" because they were "highly illiquid, . . . not marketable through any of the accepted channels of investments, [and] they had high fees." The account agreements included a provision that permitted Allegiant to resign as custodian with or without cause; it stated: "Either party may terminate this Agreement at any time by giving written notice to the other. We can resign as Custodian at any time effective 30 days after we mail written notice of our resignation to you."

On October 26, 2001, Allegiant informed Sigillito that it would be resigning as the IRA custodian. Thereafter, "Sigillito and his associates requested that Allegiant not communicate the resignation decision directly to the account owners, but rather, allow Sigillito's team to do it." Sigillito and his associates asked that Allegiant

---

[10]The plaintiffs point out that despite having received Sigillito's check from the Womack loan on September 28, 2001, Allegiant Bank did not credit Womack's account until October 9, 2001, after the meeting with MGM.

"simply advise account owners that Millennium Trust would be the new custodian, rather than offer account owners an opportunity to name another custodian."

On November 13, 2001, Allegiant sent a letter to the Customer Plaintiffs, informing them of its resignation as IRA custodian, effective December 14, 2001. It said:

> It is Allegiant Bank's understanding that arrangements have been made to transfer custodianship of [the] self-directed IRA[s] to Millennium Trust Company, LLC. Please note that it is important that you act promptly to complete the transfer . . . to another financial organization of your choice. If the transfer of your IRA is not completed by December 14, 2001, it may result in the distribution of assets as permitted by your IRA Agreement, which could have adverse tax consequences to you.

Each of the Customer Plaintiffs either elected to have his or her account transferred to Millennium Trust Company, LLC, or relied upon Sigillito and his associates to transfer his or her IRA. "None of [the] . . . Customer Plaintiffs received any advice from Allegiant Bank in making the decision to transfer their IRA from Allegiant to Millennium."

### 3. *End of the BLP*

The BLP continued for more than eight years after Allegiant resigned as custodian in 2001. Between 2001 and 2010, a series of other financial institutions served as custodian for BLP loans held in self-directed IRA accounts and maintained Sigillito's business accounts and IOLTA. While no evidence exists that the BLP was fraudulent from its inception, as the district court noted, "it is undisputed that [by 2010] the BLP 'operated as a classic Ponzi scheme, in which payments on existing loans were paid with money from new loans.'"

"The BLP began to crumble when [Phil] Rosemann filed suit against [Derek] Smith for repayment of [a BLP] loan." *United States v. Sigillito*, 759 F.3d 913, 921 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1019 (2015). Smith was a real estate investor

in the United Kingdom. *Id*. at 920. Sigillito had persuaded Rosemann "to loan a significant amount to the BLP; however, Rosemann sought acceleration of the loan after the BLP made late payments to him." *Id*. at 921. To satisfy Rosemann's demands, Sigillito continued marketing the BLP and misrepresented the safety of the BLP and Smith's liabilities. *Id*. When Rosemann filed suit against Smith, Smith responded that he never received any of Rosemann's money. *Id*. Rosemann sought an explanation from Sigillito. *Id*. "During this time, Sigillito's secretary . . . contacted the Federal Bureau of Investigation (FBI) about the BLP. The FBI then initiated a criminal investigation, which led to Sigillito's arrest and indictment." *Id*. In 2012, a jury convicted Sigillito of multiple counts of wire fraud, mail fraud, conspiracy to commit wire fraud, and money laundering. *Id*. at 920. On appeal, we affirmed Sigillito's conviction and sentence. *Id*.

### 4. *Procedural History*

After Sigillito's conviction in 2012, 92 plaintiffs filed suit against PNC as successor to Allegiant. In their amended complaint, the plaintiffs alleged, among other things,[11] (1) violation of Missouri's UFL due to actual knowledge ("Count I"); (2) violation of Missouri's UFL under Missouri Revised Statute § 469.270 ("Count II"); (3) violation of Missouri's UFL due to bad faith ("Count III"); (4) aiding and abetting breach of fiduciary duty ("Count V"); (5) conspiracy to breach fiduciary duties ("Count VII"); and (6) conspiracy to violate RICO, 18 U.S.C. § 1962(d) ("Count IX"). PNC moved for summary judgment on these claims, and the plaintiffs moved for partial summary judgment on the UFL claims set forth in Counts I–III.

The district court granted summary judgment in PNC's favor on all the claims and denied the plaintiffs' motion on the UFL claims. The court noted that the plaintiffs did not put forth evidence of when the BLP became fraudulent and stated that "Sigillito's criminal activity at some point in time cannot be the basis for finding another party liable merely because it interacted with Sigillito during what may have

---

[11]The district court granted PNC's motion to dismiss the plaintiffs' claims for aiding and abetting fraud ("Count IV"); breach of fiduciary duty ("Count VI"); and negligence ("Count VIII").

-12-

been the early stages of his criminal scheme." The court concluded that the plaintiffs failed to identify evidence that

> PNC Bank agreed to participate in a RICO enterprise; PNC Bank and Sigillito had a "meeting of the minds" regarding an unlawful act; PNC Bank knowingly or substantially assisted Sigillito in breaching a fiduciary duty; or PNC Bank acted in bad faith or with actual knowledge that Sigillito misappropriated fiduciary funds out of his IOLTA.

Additionally, the court found that the plaintiffs failed to "put forth sufficient evidence for the court to determine what underlying breach of fiduciary duty Sigillito allegedly committed during the relevant period."

## II. *Discussion*

On appeal, the plaintiffs argue that the district court improperly granted PNC's motion for summary judgment on Counts V, VII, and IX because genuine issues of material fact exist. They also argue that the district court erroneously granted summary judgment on Counts I–III (the UFL claims) to PNC and denied their motion for partial summary judgment on those claims because the undisputed facts show that Sigillito was a fiduciary who breached his fiduciary duties with Allegiant's actual knowledge of the breach. They contend that the undisputed facts show that Allegiant acted in bad faith by not investigating its suspicions about Sigillito's conduct.

"We review *de novo* a district court's grant or denial of summary judgment." *Myers v. Lutsen Mountains Corp*., 587 F.3d 891, 892 (8th Cir. 2009).

### A. *Common-law Claims and RICO Claim*

The plaintiffs argue that "[t]he record is replete with evidence" supporting Count V (aiding and abetting breach of fiduciary duty); Count VII (conspiracy to breach fiduciary duty); and Count IX (RICO). According to the plaintiffs, their evidence "is at least controverted and creates an issue of fact for the jury."

The plaintiffs do not set forth the elements of their common-law claims or the RICO claim, nor do they discuss any caselaw relevant to these claims. Instead, they

-13-

dispute the district court's review of the facts, identifying 16 pieces of evidence that purportedly generate genuine issues of material fact on these claims.

Even if we overlook the plaintiffs' failure to cite any legal authorities in support of their RICO and common-law claims,[12] those claims still fail. To prove a RICO violation, a plaintiff must produce evidence

> (1) that an enterprise existed;[[13]] (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant associated with the enterprise; (4) that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts.

*United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995). Racketeering (predicate) acts include money laundering, mail fraud, and wire fraud. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2105 (2016).

---

[12]PNC argues that the plaintiffs did not properly present their RICO and common-law claims to this court because they failed to cite any legal authorities to support these claims. Federal Rule of Appellate Procedure 28(a)(8)(A) requires an appellant's brief to contain "appellant's contentions and the reasons for them, with citations to" legal authorities and the record. "[We] regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities." *United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir. 2001).

[13]To prove that a RICO enterprise existed, a plaintiff

> must offer proof of (1) a common or shared purpose that animates the individuals associated with it, (2) a formal or informal organization of the participants in which they function as a unit, including some continuity of both structure and personnel, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.

*United States v. Henley*, 766 F.3d 893, 906 (8th Cir. 2014) (citing *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir. 1987)).

-14-

"To establish the charge of conspiracy to violate the RICO statute . . . , [a party] must prove, in addition to elements one, two, and three described immediately above, that the defendant 'objectively manifested an agreement to participate . . . in the affairs of [the] enterprise.'" *Darden*, 70 F.3d at 1518 (second alteration and second ellipsis in original) (quoting *United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995)). The plaintiff need not provide "[p]roof of an express agreement." *Id*. Instead, the plaintiff "need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [each defendant's] actions." *Id.* (alteration in original) (quoting *United States v. Fregoso*, 60 F.3d 1314, 1325 (8th Cir. 1995)). But the plaintiff "does have to show more than 'mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions . . . .'" *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988) (ellipsis in original) (quoting *United States v. Percival*, 756 F.2d 600, 610 (7th Cir. 1985)). The plaintiff must prove "that the defendant was aware of the scope of the enterprise and intended to participate in it." *United States v. Stephens*, 46 F.3d 587, 592 (7th Cir. 1995).

Under Missouri law,[14] to prove conspiracy to breach fiduciary duties, a plaintiff must prove the elements of civil conspiracy,

> which are: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages. The essence of a civil conspiracy is an *unlawful* act agreed upon by two or more persons.

*Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996) (citation omitted). Regarding the third element, there must be evidence "that any two of the Defendants involved in the alleged civil conspiracy met, negotiated, and more importantly, achieved a meeting of the minds to carry out some unlawful purpose." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 204–05 (Mo. Ct. App. 2006). "A meeting of the minds is present if each participant acted with 'a unity of purpose

---

[14]The parties agree that Missouri law applies to the plaintiffs' common-law claims.

or a common design and understanding.'" *Glob. Control Sys., Inc. v. Luebbert*, No. 4:14-CV-657-DGK, 2016 WL 910190, at *2 (W.D. Mo. Mar. 9, 2016) (quoting *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. 1999) (en banc)); *see also John Knox Vill. v. Fortis Constr. Co., LLC*, 449 S.W.3d 68, 80 (Mo. Ct. App. 2014) ("Clear and convincing circumstantial evidence established that each of the Appellants acted with a 'unity of purpose,' a 'common design and understanding,' or 'a meeting of the minds' to unlawfully benefit themselves . . . .").

To prove that a defendant aided and abetted,[15] a plaintiff must show that the defendant "*kn[ew]* that the other's conduct constitutes a breach of duty and g[ave] *substantial assistance or encouragement* to the other so to conduct himself." *Bradley v. Ray*, 904 S.W.2d 302, 315 (Mo. Ct. App. 1995) (emphases in original) (quoting Restatement (Second) of Torts § 876(b) (Am. Law Inst. 1965)). The plaintiff must prove that the defendant "affirmatively act[ed] to aid the primary tortfeasor; neither failure to object to the tortious act nor defendant's mere presence at the commission of the tort is sufficient to charge one with responsibility." *Id*. The defendant must have "associate[d] himself in some way with the principal in bringing about the commission of the crime, and mere negative acquiescence is not sufficient." *Id*. (quoting *State v. Clark*, 596 S.W.2d 747, 751 (Mo. Ct. App. 1980)).

The plaintiffs rely primarily on Finn's unsworn declaration to prove their claims. In summary, that declaration shows that (1) MGM paid Sigillito high fees (32 percent of the loan amount), which were "paid to Mr. Sigillito and his associates directly from the loan funds"; (2) these "up-front fees were not disclosed in the loan agreements"; (3) before her loan came due, Womack was repaid from Sigillito's IOLTA; (4) at the time of the Womack transaction, MGM had not repaid any of the loans; and (5) Finn had "suspicions that [Allegiant] did not want to custody these loans" based on "[t]he fact that investor money from Martin Sigillito's account was

_____

[15]As the district court recognized, the Missouri Supreme Court has yet to decide whether Missouri recognizes a cause of action for aiding and abetting a breach of fiduciary duty. For purposes of appeal, we will assume that it does.

used to pay other investors." The plaintiffs also rely on Morse's unsworn declaration, in which he states that Finn "questioned [MGM's] ability to repay the loans" and "indicated that he thought the loans did not comply with regulatory requirements."[17] And, the plaintiffs cite PNC's original answer in which it admitted that Allegiant

_____

[17]The plaintiffs also rely on the "Minutes of Trust Committee Meeting" taken on August 14, 2001, which provide that "Markow . . . reported that the Co-Trustee and income beneficiary under the Bosse trust has again requested consideration of the purchase of first and second charges on real property in England (deeds of trust on English real property). After discussion, [Chief Financial Officer Jeff] Schatz stated that he would investigate the proposed investment further." As PNC points out, the record contains no evidence that Schatz conducted the investigation or what, if anything, he discovered. More importantly, this court is prohibited from considering the meeting minutes in light of the parties' stipulation prohibiting the plaintiffs from "refer[ring] to or introduc[ing] any evidence at trial or in dispositive motion briefing relating to (1) any member of the Bosse family . . . ."

The plaintiffs also argue that PNC admitted certain things by failing to deny them. In their amended complaint, the plaintiffs allege that "Allegiant's counsel, Jan Alonzo, after an extensive investigation, informed Hayes and Markow that Sigillito was diverting fiduciary funds in his IOLTA account in a classic Ponzi scheme where IOLTA payments to existing investors were being paid by IOLTA deposits from new investors." PNC originally responded, "PNC lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies the same." Thereafter, in its amended answer, PNC responded, "PNC can neither admit nor deny this allegation, because the substance of any communications between Allegiant Bank and its lawyers is privileged. PNC denies any remaining allegations contained in this paragraph." The plaintiffs argue that PNC admitted the allegation by failing to deny it. But in both its original and amended answer, PNC also made a general denial, stating, "PNC denies each and every allegation contained in Plaintiffs' First Amended Complaint, including all headings and sub-headings, that is not specifically admitted to be true in the preceding paragraphs of this Answer and Affirmative Defenses." Federal Rule of Civil Procedure 8(b)(3) provides that "[a] party that intends in good faith to deny all the allegations of a pleading . . . may do so by a general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted." In light of this general denial, we conclude that PNC satisfied the federal pleading rules.

"advised its counsel upon becoming suspicious of the activity in Sigillito's accounts and that counsel investigated the matter."[18]

We conclude that the plaintiffs' RICO and common-law claims fail because the aforementioned evidence does not generate genuine issues of material fact. The record is insufficient to establish a reasonable fact dispute as to whether Allegiant, PNC's predecessor, objectively manifested an agreement to participate in criminal activity with Sigillito, had a meeting of the minds with Sigillito, or substantially assisted or encouraged Sigillito's conduct.[19] First, none of the aforementioned evidence demonstrates that Allegiant "objectively manifested an agreement to participate . . . in the affairs of [the] enterprise." *Darden*, 70 F.3d at 1518 (alteration and ellipsis in original) (quoting *Bennett*, 44 F.3d at 1374). As the district court explained, "[a]t most, Finn's declaration demonstrates that [Allegiant] became suspicious of activity related to the Womack self-directed IRA and engaged in some level of review of the self-directed IRAs containing BLP loans." But Allegiant's suspicions about Sigillito's conduct are insufficient to prove that Allegiant "was aware of the scope of the enterprise and intended to participate in it." *Stephens*, 46 F.3d at 592. The district court correctly observed that "[i]f anything, the evidence establishes that [Allegiant] took steps to remove itself as custodian of accounts that

_____

[18]In its amended answer, PNC denied the allegation. PNC argues on appeal that its amended answer superseded its original answer; therefore, we should not consider the original. Our consideration of the original answer, however, does not change the result.

[19]As the district court correctly observed, the plaintiff failed to produce evidence of "the criminal activity being undertaken by Sigillito or Brown *during the time* Allegiant Bank served as the custodian for self-directed IRAs containing BLP loans." The plaintiffs have not put forth "evidence that establishes the BLP was fraudulent from its inception." Nonetheless, we will assume, without deciding, that some form of racketeering activity occurred during this time for purposes of the RICO claim. Additionally, we agree with the district court that the plaintiff failed to "establish[] what specific breach of fiduciary duty, or other unlawful act, Sigillito allegedly committed with respect to the[] common[-]law claims during th[e] [relevant] time period." Again, we will assume, without deciding, that Sigillito did breach a fiduciary duty for purposes of the common-law claims.

-18-

contained problematic or unsuitable investments." Therefore, the plaintiffs' RICO claim fails as a matter of law.

Second, the evidence fails to establish a "meeting of the minds" between Allegiant and Sigillito. *See Mackey*, 914 S.W.2d at 50. Again, the plaintiffs' evidence shows only that Allegiant investigated Sigillito's suspicious activity. Allegiant's investigation of Sigillito's actions does not equate to conspiratorial conduct. Thus, the plaintiffs' claim of conspiracy to breach fiduciary duty fails.

Finally, the plaintiffs have produced no evidence showing how Allegiant substantially assisted or encouraged Sigillito's breach of fiduciary duty. *See Bradley*, 904 S.W.2d at 315. Instead, the plaintiffs' evidence shows the opposite—that Allegiant became suspicious of Sigillito and the loans to MGM and subsequently terminated its relationship with Sigillito. As a result, the plaintiffs' claim of aiding and abetting breach of fiduciary duty fails.

## B. *UFL Claims*

The plaintiffs argue that the district court erroneously granted summary judgment to PNC and denied summary judgment to them on Counts I–III (the UFL claims). The plaintiffs contend that a reasonable factfinder could conclude that (1) Sigillito was a fiduciary who had an attorney–client relationship with the IRA customers who invested in the BLP and owed fiduciary obligations to people whose money was in his IOLTA at Allegiant; (2) Sigillito breached his fiduciary obligations by receiving undisclosed fees not authorized by the loan agreements; (3) Allegiant had actual knowledge of Sigillito's breach of fiduciary duty when it cashed the Womack check after learning from MGM that Sigillito was breaching his fiduciary obligations; (4) Allegiant acted in bad faith because it was commercially unjustifiable for Allegiant to accept the Womack check and disregard facts readily available based on a review of Sigillito's IOLTA; (5) PNC, as Allegiant's successor, is strictly liable under the UFL based on evidence that the Womack check was drawn and delivered to Allegiant as payee in a transaction that Allegiant knew was for Sigillito's personal benefit; and (6) Sigillito breached his fiduciary duties to Linda Givens and Rudolf

-19-

Ouwens in the Womack transaction when he had Allegiant transfer monies from their accounts to Sigillito's IOLTA.

"The UFL 'is the Missouri codification of the Uniform Fiduciaries Act,' which alters 'the common law with respect to the duties of parties who deal with fiduciaries.'" *Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1040 (8th Cir. 2006) (footnote omitted) (quoting *In re Lauer*, 98 F.3d 378, 382–83 (8th Cir. 1996)). The UFL's purpose is "to facilitate banking transactions by relieving depository banks of their common law duty to inquire into the propriety of fiduciary transactions." *Hendren v. Farmers State Bank, S.B.*, 272 S.W.3d 345, 348 (Mo. Ct. App. 2008) (quoting *Bari v. Lindell Trust Co.*, 996 S.W.2d 655, 659 (Mo. Ct. App. 1999)). Under the UFL, a depository bank may "indulge in the presumption that the fiduciary in withdrawing funds from the fiduciary account is acting lawfully and in accordance with his duties." *Id.* (quoting *Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo. Ct. App. 1974)).

"The bank's obligation [is] to the trustee, to honor his check when drawn to form"; by contrast, the bank has "no duty to the trust estate save to refrain from participating in misappropriation of the funds." *Id.* at 349 (alteration in original) (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458). A bank's "mere payment of the money to or upon the check of the depositor does not constitute a participation in an actual or intended misappropriation by the fiduciary." *Id.* (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458). But the fiduciary's "conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust." *Id.* (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458). "Such circumstances do not impose upon the bank the duty or give it the right to institute any inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, but between whom and the bank there is no privity." *Id.* (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458).

A bank's agreement with the depositor is that the bank "will pay according to the checks of the [depositor], and when [the checks are] drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his

-20-

duty and to honor them accordingly." *Id*. (second alteration in original) (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458–59). The bank does not have a duty "to inquire whether the fiduciary properly applies funds held in trust. '[M]ere negligence on the part of the depository bank is not sufficient to hold it liable to the principal if the fiduciary in fact misappropriated the fund.'" *Id*. (alteration in original) (quoting *Trenton Tr. Co. v. W. Sur. Co.*, 599 S.W.2d 481, 490 (Mo. 1980) (en banc)).

The UFL provision at issue in this case provides:

> If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that this action in taking the instrument amounts to bad faith*. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the *actual knowledge* of the creditor, *or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary*, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.

Mo. Ann. Stat. § 469.270 (emphases added).

In summary, "[t]he UFL provides that banks and others who typically deal with fiduciaries may not be held liable for a fiduciary's breach of duty absent either (1) 'actual knowledge' of the breach or (2) knowledge of sufficient facts to constitute 'bad faith.'" *In re Lauer*, 98 F.3d at 383 (quoting *Trenton*, 599 S.W.2d at 491–92).[20]

---

[20]As a threshold matter, the district court found that the plaintiffs produced no evidence of a specific transaction involving the misappropriation of fiduciary funds to support their UFL claims. As to the Womack transaction, the court found that the plaintiffs only proved "that Sigillito wrote the check from his IOLTA to facilitate the

-21-

1. *Actual Knowledge (Count I)*

Count I states that PNC, through its predecessor Allegiant, "had actual knowledge of Sigillito's breach of fiduciary duty and knew Sigillito was misappropriating fiduciary funds."

> "'Actual knowledge,' as the terms are used in the Law, means awareness that, at the moment, the fiduciary was defrauding the principal." *Gen. Ins. Co. of Am.*, 505 S.W.2d at 457. "It means express factual information that the funds are being used for private purposes in violation of the fiduciary relationship." *Id*. A bank may not be found to possess "actual knowledge" of a breach of trust merely because "at some stage of the handling of the fiduciary account it could, by inspection of public records or by piecing together all the facts known by different employees of the bank, become aware of a breach of trust." *Id*.

*Hendren*, 272 S.W.3d at 350.

The plaintiffs argue that PNC's predecessor, Allegiant, had actual knowledge that Sigillito was breaching his fiduciary duty to the plaintiffs. According to the plaintiffs, when Allegiant cashed the Womack check, Allegiant had a present awareness based on the information learned from MGM that Sigillito was breaching his fiduciary obligations and defrauding his clients. The plaintiffs assert that the following purported evidence shows that Allegiant had actual knowledge of Sigillito's breach: (1) Allegiant knew in 2001 that Sigillito was a fiduciary and was the attorney and agent for its IRA customers invested in the BLP; (2) Allegiant knew

---

purchase of Womack's unmatured note." According to the court, the plaintiffs failed to show "that trust officers at Allegiant Bank knew the source of funds in Sigillito's IOLTA or contacted the retail department at Allegiant Bank to inquire about the IOLTA." And the court pointed out that "the funds from the IOLTA were paid out to Womack, not Sigillito." As a result, the court found no evidence "that Sigillito misappropriated Womack's funds" or that "the funds used to purchase the Womack note were misappropriated." For purposes of this appeal, even if we assume that the plaintiffs proved that the Womack transaction involved the misappropriation of fiduciary funds to support their UFL claims, we nonetheless conclude that these claims fail.

that Sigillito owed fiduciary duties to investors who deposited their money into his IOLTA; (3) when it cashed the Womack check, Allegiant had a present awareness based on the information learned from MGM that Sigillito was breaching his fiduciary obligations and defrauding his clients; (4) Allegiant learned in October 2001 that Sigillito was receiving high fees of 32 percent on the amounts invested in the BLP by his clients; (5) Allegiant had custody of the loan agreements evidencing the investment in the BLP and knew that the loan agreements did not disclose or provide for payment of fees; and (6) Sigillito as an attorney and fiduciary was self-dealing in breach of his fiduciary duties by receiving undisclosed, high fees on the money invested in the BLP by his clients.

We conclude that no evidence exists that Allegiant processed any transaction with actual knowledge that Sigillito was breaching his fiduciary duties. First, Sigillito's purchase of the Womack note in September 2001 with an IOLTA check does not prove that Allegiant had actual knowledge that Sigillito was breaching his fiduciary duties. The record establishes that during the time period in question, Missouri IOLTA accounts could hold client funds and, in certain circumstances, attorney's fees. Neither party disputes that "[i]n 2001, Allegiant Bank's understanding of the nature and function of IOLTA accounts was that . . . an IOLTA account can be funds for an individual client, multiple clients, and could include funds that belong to the lawyer, themselves." Furthermore, no evidence exists that Allegiant knew for whom Sigillito was purchasing the Womack note; no evidence exists that Allegiant Bank knew that Sigillito was the ultimate intended purchaser—as opposed to another principal—of the loan itself. In fact, the record does not establish what happened to the MGM note following the Womack transaction.

Second, we reject the plaintiffs' argument that Allegiant had actual knowledge that Sigillito was breaching his fiduciary duties by receiving high fees on the MGM loans. As the district court pointed out, no evidence exists that *the plaintiffs* were paying the undisclosed fees to Sigillito. Instead, it was the MGM borrowers that had an agreement with Sigillito to pay the 32-percent "finder's fee" on the loans. Specifically, Finn's deposition provides, "During part of our conversation in the hotel lobby, John Mark and John Morse [from MGM] explained that 32% of the loans were

-23-

taken as fees and that this was paid to Mr. Sigillito and his associates directly from the loan funds." Morse's declaration likewise confirms that MGM "agreed with whom for each £100 we borrowed one third (32%) would be deducted at source representing their commission and we would pay interest of 25% on the full £100 of the loan." In their statement of material facts, the plaintiffs stated that "MGM had been asked to pay further arrangement fees of 32% on [MGM] loans."

Furthermore, the plaintiffs' claims would fail even if the agreement between MGM and Sigillito required the plaintiffs to pay the undisclosed fees to Sigillito on the loans. Allegiant's purported knowledge that these fees were not disclosed in the loan agreement does not equate to actual knowledge that Sigillito was breaching his fiduciary duties. As PNC points out, "Sigillito could have told his clients in any number of ways how he was being paid"; it did not have to be in the loan agreement.

### 2. *Bad Faith (Count III)*

Count III states that PNC, through its predecessor Allegiant, violated the UFL "because it had actual knowledge that [Sigillito] breached his fiduciary obligation. Alternatively, Allegiant Bank's actions were commercially unjustifiable and amounted to bad faith by not investigating the source of the fiduciary funds."

"The UFL does not define bad faith; however, it does define 'good faith.'" *Watson Coatings*, 436 F.3d at 1041. Under Missouri law, an act is done in "good faith" if it is "in fact done honestly, whether it be done negligently or not." Mo. Ann. Stat. § 469.240(2). While a negligent act does not amount to bad faith, "it is not entirely accurate to equate 'bad faith' with 'dishonesty,' if the latter term is taken to denote a high degree of moral guilt, or evil motives." *Watson Coatings*, 436 F.3d at 1041 (quoting *Trenton*, 599 S.W.2d at 492). "The test of bad faith is 'whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is "bad faith" to remain passive.'" *Id*. (quoting *Trenton*, 599 S.W.2d at 492). For a bank to act in bad faith, "[t]he facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear

that inquiry would disclose a defect in the transaction." *Hendren*, 272 S.W.3d at 350 (quoting *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458).

The plaintiffs argue that PNC's predecessor, Allegiant, acted in bad faith when it processed the Womack check. In support, the plaintiffs cite the following purported evidence: (1) Allegiant, as payee, received the Womack check knowing that it was drawn by Sigillito as a fiduciary on a fiduciary account; (2) Allegiant knew that MGM was not the source of the money drawn from the IOLTA to repay Womack and purchase her loan; (3) the Womack check was drawn and delivered in a transaction that Allegiant knew was for Sigillito's personal benefit; and (4) Allegiant had actual knowledge that Sigillito was self-dealing in breach of his fiduciary duties.

We conclude that the evidence fails to show that Allegiant acted in bad faith. Sigillito's drawing of the Womack check on his IOLTA did not put Allegiant on notice that Sigillito was using fiduciary funds. As explained *supra*, this is because during the time period in question, Missouri IOLTA accounts could hold client funds and, in certain circumstances, attorney's fees. Again, the plaintiffs have not disputed that Allegiant's understanding of an IOLTA was that it could include "funds for an individual client, multiple clients, and could include funds that belong to the lawyer, themselves." Furthermore, the possibility exists that Sigillito was purchasing the Womack note for another client and not for himself.

### 3. *Strict Liability (Count II)*

Count II alleges that PNC, through its predecessor Allegiant, is strictly liable under § 469.270 of the UFL due to its receipt of proceeds from Sigillito's misappropriation of fiduciary funds.

The plaintiffs' assertion that PNC is strictly liable is based on the second sentence of § 469.270, under which

> a payee is liable to the principal for a fiduciary's breach if either: (1) the check is payable to a personal creditor of the fiduciary and delivered to the creditor to pay or secure the fiduciary's personal debt to the actual knowledge of the creditor, or (2) the check is drawn and delivered in any

-25-

transaction *known by the payee* to be for the personal benefit of the fiduciary.

*Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 55 S.W.3d 358, 360 (Mo. 2001) (en banc) (citing Mo. Ann. Stat. § 469.270). Under the second alternative of this sentence, "the Bank must know that [the fiduciary] is using the fiduciary funds for [his] personal benefit." *Id.*

While the plaintiffs argue that this sentence provides for strict liability, we agree with the district court that "by its very terms, the UFL requires actual knowledge." Section 469.270 uses the terms "actual knowledge" and "known by the payee." Mo. Ann. Stat. § 469.270. "Knows" under the UFL means "actual knowledge by the payee [taker] that the transaction is for the personal benefit of the fiduciary." *Chouteau Auto Mart, Inc.*, 55 S.W.3d at 361 (alteration in original). "Constructive knowledge under the UF[L] is insufficient to impose liability upon the payee because the UF[L] limits liability 'to relatively uncommon cases in which the person who deals with the fiduciary knows all the relevant facts.'" *Watson Coatings*, 436 F.3d at 1042–43 (quoting *Cty. of Macon v. Edgcomb*, 654 N.E.2d 598, 602 (Ill. Ct. App. 1995) (reviewing Illinois's version of the Uniform Fiduciaries Act, which is identical to Missouri's UFL)).

We have already held that the plaintiffs have failed to present evidence that Allegiant had actual knowledge that Sigillito was breaching his fiduciary duties. We also agree with the district court that the plaintiffs did not present evidence that Allegiant knew that the purchase of the Womack note was for Sigillito's personal benefit. As the district court observed, the plaintiffs produced no evidence that "any bank employee looked into the IOLTA to determine the source of funds used to purchase the Womack note or to determine for whom Sigillito was purchasing the note, either himself or someone else." Like the district court, we conclude that "the fact that Sigillito *could have* benefitted from the [Womack] transaction does not suffice under the UFL to demonstrate that PNC Bank knew that the purchase of Womack's note was for Sigillito's personal benefit." (Emphasis added.)

-26-

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

February 07, 2017

Mr. Jonathan F. Andres
JONATHAN F. ANDRES, P.C.
Suite 700
7733 Forsyth Boulevard
Saint Louis, MO  63105

RE:  15-3514  Richard Aguilar, et al v. PNC Bank, N.A.

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

CMD

Enclosure(s)

cc:     Mr. Herbert Richard Giorgio Jr.
        Mr. Jeffrey J. Kalinowski
        Mr. Gregory J. Linhares
        Mr. Darci Faulkner Madden
        Mr. Sebastian Rucci
        Mr. Jeffrey Scott Russell
        Mr. Robert G. Russell

District Court/Agency Case Number(s):   4:14-cv-00985-LRR

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

February 07, 2017

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

     RE:  15-3514  Richard Aguilar, et al v. PNC Bank, N.A.

Dear Sirs:

     A published opinion was filed today in the above case.

     Counsel who presented argument on behalf of the appellant was Jonathan F. Andres, of Saint Louis, MO. The following attorney(s) also appeared on the appellant brief;  Sebastian Rucci, of Huntington Beach, CA.

     Counsel who presented argument on behalf of the appellee was Jeffrey Scott Russell, of Saint Louis, MO. The following attorney(s) also appeared on the appellee brief; Darci Faulkner Madden, of Saint Louis, MO.,  Herbert Richard Giorgio, Jr., of Saint Louis, MO.

     The judge who heard the case in the district court was Honorable Linda R. Reade. The judgment of the district court was entered on October 21, 2015.

     If you have any questions concerning this case, please call this office.

                    Michael E. Gans
                    Clerk of Court

CMD

Enclosure(s)

cc:  MO Lawyers Weekly

       District Court/Agency Case Number(s):  4:14-cv-00985-LRR